**Agreed-Upon Redacted Copy -- May be Made Public**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FOREST CITY MILITARY COMMUNITIES LLC. | ) | BID PROTEST |
| Plaintiff, | ) | |
| v. | ) | No. 07-546C |
| THE UNITED STATES, | ) | (Judge Hewitt) |
| Defendant. | ) | |

# MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Robert H. Koehler
PATTON BOGGS LLP
8484 Westpark Dr.
McLean VA 22102
(703) 744-8005
(703) 744-8006 (Fax)
rkoehler@pattonboggs.com

Attorney of Record for
Forest City Military Communities, LLC

Of Counsel:
Michael J. Schaengold
Jennifer Zucker
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
(202) 457-6000
(202) 457-6315 (Fax)

PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

STATEMENT OF THE ISSUE ........ 1

INTRODUCTION ........ 1

BACKGROUND ........ 2

I. Overview of the Military Housing Privatization Initiative ........ 2

II. Request for Qualification No. W912DR-06-R-0006 ........ 3

A. The Evaluation Factors ........ 4

B. The Evaluation Process ........ 5

C. The West Point Evaluation ........ 6

D. Notice of Award ........ 6

E. Forest City's Debriefing ........ 9

F. Forest City's Protest to GAO ........ 9

G. Errors Revealed in the Agency Report ........ 10

1. The Army Failed to Evaluate Forest City's "Scope Guarantee" ........ 10

2. The Army Relaxed a Material RFQ Requirement by Accepting GMH/Centex's [redacted] "NO WORK" Units ........ 13

3. The Army Misrepresented GMH/Centex's True Costs When it Improperly Used a "Plug Number." ........ 14

H. GAO Decision ........ 15

ARGUMENT ........ 15

I. JURISDICTION ........ 15

II. STANDARD FOR INJUNCTIVE RELIEF ........ 16

III. FOREST CITY IS ENTITLED TO INJUNCTIVE RELIEF ........ 16

A. Forest City Has a Substantial Likelihood of Prevailing on the Merits ........ 16

1. The Army Failed to Evaluate Forest City's Scope Guarantee in Accordance with the Evaluation Criteria for Project Finance. ........ 17



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

2. The Army's Failure to Evaluate Forest City's "Scope Guarantee" in Accordance with the Evaluation Criteria for *Project Finance* Improperly Distorted the Evaluations in Favor of GMH/Centex ..... 21

3. The Army Improperly Failed to Reject GMH/Centex's Proposal as Unacceptable Because it Did Not Meet the Material Requirements of the RFQ. ..... 22

4. The Army Failed to Evaluate, Consider and Assess the Adverse Impact of GMH/Centex's "No Work" Units as Required by the Evaluation Criteria. ..... 25

5. The Army's Evaluation of GMH/Centex's Proposal Using the Army's Benchmark Improperly Distorts GMH/Centex's Evaluation and the Comparison with Forest City's Proposal. ..... 26

B. Forest City Will Suffer Irreparable Harm Absent Injunctive Relief ..... 27

C. The Harm To Forest City Outweighs Any Harm To The United States and Others ..... 30

D. Granting Injunctive Relief Is In The Public Interest ..... 31

CONCLUSION ..... 32



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

## CASES

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) ....17
Bannum, Inc. v. United States, 404 F.3d 1346, 1353 (Fed. Cir. 2005) ....17
Bishop Contractors, Inc., B-246526, Dec. 17, 1991, 1991 U.S. Comp. Gen. LEXIS 1424, 91-2 CPD ¶ 555 ....23
Chapman Law Firm Co. v. United States, 67 Fed. Cl. 188, 193 (2005) ....29, 30
Cigna, 70 Fed. Cl. at 101-02, 112-13 ....28
Data General Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ....17
FMC Corp. v. United States, 3 F.3d 424, 427 (Fed.Cir.1993) ....16
Hospital Klean v. United States, 65 Fed. Cl. 618, 624 (2005) ....27
Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) ....17
Indus. Corp. v. United States, 60 Fed. Cl. 731, 747 (2004). ....31
Informatics Corp. v. United States, 40 Fed. Cl. 508, 518 (1998) ....29
Lockheed Martin Info. Sys., B-292836 et al., Dec. 18, 2003, 2003 CPD ¶ 230 ....21, 23
Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993) ....28
Magnavox Elec. Sys. Co. v. United States, 26 Cl. Ct. 1373, 1379 ....29
ManTech Advanced Systems Int'l, Inc., B-240136, Oct. 26, 1990, 90-2 CPD ¶ 336 ....24
Multimax, Inc. et. al. B-298249.6 et. al., Oct. 24, 2006, 2006 U.S. Comp. Gen. LEXIS 179 (U.S. Comp. Gen. 2006), 2006 CPD ¶ 165 ....25
National Shower Express, Inc.; Rickaby Fire Support, B-293970, B-293970.2, July 15, 2004, 2004 CPD ¶ 140 at 4-5, 2004 U.S. Comp. Gen. LEXIS 138 ....23
PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) ....16
Planned Parenthood v. Citizens for Cmty. Action, 558 F.2d 861, 867 (8th Cir.1977)) ....30
Qwest Communications Corp. v. City of Berkeley, 146 F.Supp.2d 1081 (N.D. Cal. 2001) ....29
Semaphore Entm't Group Sports Corp. v. Gonzalez, 919 F. Supp. 543, 550 (D.P.R. 1996) ....30
Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996). ....21
U.S. Ass'n of Imps. of Textiles & Apparel v. United States, 413 F.3d 1344, 1346 (Fed. Cir. 2005);..16

## STATUTES

§ 1491(b)(2) ....16
10 U.S.C. §§ 2871-2885 ....2
31 U.S.C. § 3553(d)(3) ....9
5 U.S.C. § 706 ....17

## OTHER AUTHORITIES

Computer and Hi-Tech Management, Inc., B-283793.5, B-283793.6, Mar. 20, 2000, 2000 CPD ¶ 59 ....18
Grey Advertising, Inc., 55 Comp. Gen. 1111 (1976), 76-1 CPD ¶ 325 ....18
Mechanical Equipment Co., Inc., et al., B-292789.2, B-292789.3, B-292789.4, B-292789.5, B-292789.6, and B-292789.7, 2004 CPD ¶ 192, 2003 WL 23782511 at *5. ....27
Mechanical Equipment Co., Inc., et. al., B-292789.2, B-292789.3, B-292789.4, B-292789.5, B-292789.6, and B-292789.7, 2004 CPD ¶ 192, 2003 WL 23782511 at *5. ....22



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

Rockwell Elec. Commerce Corp., B-286201 et al., Dec. 14, 2000, 2001 CPD P 65 at 5 ............... 22, 23
Sarasota Measurements & Controls, Inc., B-252406; B-252406.2, June 25, 1993, 93-1 CPD ¶ 494...20
TRW, Inc., B-254045.2, Jan. 10, 1994, 94-1 CPD ¶ 18 ........................................ 20

**RULES**

RCFC 57 ........................................ 1

**REGULATIONS**

4 C.F.R. § 21.3(a) ........................................ 9
FAR 15.305 ........................................ 17



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

## MEMORANDUM IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION AND DECLARATORY RELIEF

Pursuant to RCFC 7 and 57, Plaintiff, Forest City Military Communities, LLC ("Forest City"), by counsel, respectfully submits its Memorandum in Support of its Motion for a Preliminary Injunction.

## STATEMENT OF THE ISSUE

Should a preliminary injunction issue here to enjoin the performance of the contract, which was awarded to GMH/Centex by the Army, that resulted from request for qualifications (RFQ) W912DR-06-R-0006, pending the resolution (on the merits) of the protest of the award of the contract by this Court?

## INTRODUCTION

In its Complaint, Plaintiff respectfully requests that this Court rule that the March 8, 2007 award of the contract at issue here to GMH/Centex Military Communities ("GMH/Centex") by the United States, acting by and through the Army Corps of Engineers (the "Army"), is arbitrary and capricious, violates law and regulation, and be set-aside. Plaintiff here seeks preliminary injunctive relief against the Army through an order enjoining the Army from continuing performance of the contract resulting from the award of Request for Qualifications No. W912DR-06-R-0006 for housing and community development at the U.S. Military Academy (USMA) in West Point, New York, until the Court rules on the merits of Forest City's Complaint.

As explained below and in Forest City's Complaint for Injunctive and Declaratory Relief (the "Complaint"), prior to this action, Forest City filed a protest with the Government Accountability Office ("GAO") on March 26, 2007, captioned "Matter of Forest City Military Communities LLC," File No. B-299577, to rectify the Army's improper award decision under RFQ W912DR-06-R-0006. Pursuant to CICA, 31 U.S.C. § 3553(d)(3), and 4 C.F.R. § 21.3(a), the Army



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

suspended the performance of the contract by the awardee, GMH. On Friday, June 29, 2007, GAO issued its decision, dismissing as untimely in part, and denying in part, Forest City's protest. (Complaint Exhibit ("CE") 16.) GAO's notice of decision was issued pursuant to a GAO Protective Order, and counsel was prohibited from sharing the basis of the decision with its client until a redacted version was issued. On the next business day, July 2, Forest City's counsel sought and was granted permission to advise its client of the following: "Earlier today we received GAO's notice of decision. GAO dismissed the protest as untimely in part, and denied the protest in part. The decision was unfortunately issued under a protective order and therefore we can not forward a copy at this time." (CE. 24.) At 4:36pm on Thursday, July 12, GAO Senior Attorney Jonathan L. Kang forwarded the final public (redacted) version of GAO's decision. (CE 17.)

## BACKGROUND

### I. Overview of the Military Housing Privatization Initiative

In 1996, Congress enacted the Military Housing Privatization Initiative with the goal of improving Department of Defense military family housing more economically and more quickly than traditional military construction approaches. This initiative allows private sector financing, ownership, and operation and maintenance of military housing. 10 U.S.C. §§ 2871-2885. The Army's program under this initiative is the Residential Communities Initiative ("RCI").

Under the RCI, the Army selects the contractor to build, renovate, manage, and maintain military housing communities at Army installations. The contractor will be responsible for owning, developing, redeveloping, managing and marketing housing units at a particular installation so that military personnel and their families will choose to become residents. The RCI uses a dual phase approach for privatizing housing. In Phase 1, *Project Planning*, the Army conducts a competition to



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

identify a qualified contractor to develop a Community Development and Management Plan (CDMP) for family housing and community facilities at an installation. (CE 1, RFQ, pp. 9-15.) In Phase 2, *Project Implementation*, the developer will implement the CDMP. (CE 1, RFQ, p. 15.)

## II. Request for Qualification No. W912DR-06-R-0006

Request for Qualification No. W912DR-06-R-0006 ("Solicitation" or "RFQ") sought proposals for military housing at three installations: (1) the United States Military Academy ("USMA" or "West Point"), West Point, New York; (2) Fort Lee, Virginia; and (3) Fort Jackson, South Carolina. See (CE, RFQ, p. 8). For each of these installations, the RFQ provided specific details concerning the existing family housing units, ancillary facilities, the current military family occupancies, and the surrounding civilian community, etc. (CE 2, Attachment B – *West Point*, Solicitation.) Offerors were allowed to compete for the work at any or all of the installations.

The acquisition divided the competition into two separate phases: (i) Project Planning, and (ii) Project Implementation. In Step One of the competition, offerors were required to establish minimum experience and qualification requirements. Offers meeting these requirements were included in the highly qualified competitive group and were eligible to compete in Step Two of the competition. In Step Two, offerors submitted written proposals and participated in oral presentations. The offeror selected for award in Step Two would be awarded a $350,000 contract to prepare the CDMP in collaboration with the Army. (CE 1, RFQ, p. 15.) The CDMP was to detail the number, type, and size of housing units that were to be renovated, rehabilitated, or newly constructed in each neighborhood with the family housing community under a privatization plan with a 50-year life cycle for Phase 2, Project Implementation. (CE 1, RFQ, p. 9.)

Under the terms of the RFQ, the CDMP was to be approved by the installation, the Department of the Army, the Office of the Secretary of Defense, OMB and the Congress. (CE 1, RFQ, pp. 7 and 15.) Upon the payment of the $350,000 to the CDMP Contractor, "the Army will



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

be granted full and unlimited rights to use the CDMP, including the right to provide the CDMP to other developers in this or other military housing privatization projects. (Id.) At this point, the contract will be complete and the developer will have no right, title, or interest in Phase 2 by virtue of its participation in Phase 1." (Id.)

Upon acceptance and approval of the CDMP, the RFQ provided that it was the stated intent of the Army to have the CDMP Contractor implement the approved plan. (Id.) The terms of the Phase 2, *Project Implementation*, was for the awardee to develop, operate and maintain the family housing units transferred to the awardee for a 50-year term. (Id.) This Protest relates only to the Army's Step Two evaluation of proposals for the RCI project at West Point.

## A. The Evaluation Factors

The evaluation factors for The Step Two portion of this procurement were, in descending order of importance: project finance, preliminary project concept statement, organizational capabilities (on-site, project specific), and small business utilization plan. (CE 1, RFQ, p. 36.) The RFQ also noted an additional factor: "the assessment of Past Performance will be used in making the 'Best Value' selection." (Id.) In this regard, the RFQ stated at Section 4.0, *Contractor Selection Process*, that "final selection will be based upon the qualifications exhibited by the offerors as outlined by the evaluation factors and upon the basis of best value to the Government." (CE 1, RFQ, p. 19) (Emphasis added.) This was further defined as the offeror who proposes the "the best value for improving military family housing for the specific project." (CE 1, RFQ, p. 30.)

Each individual factor was to be rated in accordance with the Army's evaluation scheme of Exceptional (E), Acceptable (A), Unacceptable (U), or Neutral (N), to include plus and minus modifiers to capture distinctions between each rating category. Proposals were also rated as low, moderate or high risk. (CE 1, RFQ, p. 36.)



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

### B. The Evaluation Process

A source selection evaluation board (SSEB) consisting of [redacted] members reviewed offerors' proposals and oral presentations. (CE 3, Source Selection Plan (SSP), Attachment 2.) Each SSEB member was to independently evaluate each proposal (CE 3, SSP, Attachment 3, *RFQ Rating Methodology for Step Two*) and then present its consensus evaluation report to the Source Selection Advisor Committee (SSAC). (CE 1, RFQ, p. 36.) To assist in the evaluations, the Army developed a SSEB *Step Two Individual Evaluation* Form incorporating specific factors and questions for consideration by its team. (CE 1, RFQ, pp. 43-45 and CE 4, Example of Evaluation Form.) The Form itself provided entries for an "Overall Rating," as well as ratings for each evaluation factor and their respective sub-factors. (CE 4, Example of Evaluation Form.)

The SSAC was then required to review the SSEB report and prepare its own comparative assessment of proposals against all source selection criteria. The SSAC employed an evaluation form that was an adaptation of the SSEB evaluation form, with the SSAC merely changing the title from "*SSEB Step Two Consensus Evaluation*" to "SSAC *Step Two Consensus Evaluation*." In all other aspects, the form was to be identical. To further assist the SSAC in arriving at its consensus rating, the agency contracted with Jones Lang LaSalle ("JLL"), a consultant, who prepared a "benchmark" assessment for the USMA housing project. (CE 11, Army Baseline Comparison Spreadsheet.)

The assessment of the SSAC was to be briefed to the Source Selection Authority (SSA) who was to make the final analysis resulting in a recommendation of an award. Here, the SSAC memorialized their recommendations in a memorandum for the SSA. (CE 12, SSAC Memorandum for SSA). In addition, the SSAC submitted its consensus evaluation of the offerors, along with its "Rating Matrix," and Baseline Spreadsheets. (CE 9, SSAC Consensus for Forest City, CE 10 SSAC Consensus for GMH/Centex, and CE 13, SSAC Rating Matrix.) Regardless of what was used by



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

the SSA, the final decision had to represent the SSA's independent judgment. Based on the SSA's decision, the Contracting Officer would then make the award. (CE 14, Source Selection Decision.)

### C. The West Point Evaluation

Initially the RFQ contemplated that the RCI project for West Point would include 964 family housing units, and Forest City prepared its oral presentation and submission accordingly. Forest City made its oral presentation to the SSEB on December 7, 2006. On January 4, 2007, the Army issued Amendment No. 14, which reduced the number of family housing units from 964 to 628 units:

> For purposes of this solicitation, offerors should assume that 628 end-state homes will be available to the project. . . . The remaining homes may be retained as "occupied surplus" until the end of their useful life, i.e., until the homes would require an expenditure of greater than $25K in one budget year. During the CDMP, the actual end-state number will be determined. The actual project end-state will range between 628 and 800 homes.

(CE 25, RFQ Amendment 14.) The Amendment further advised that offerors interested in continuing to participate in Step Two for West Point were to resubmit their Step Two submission, using 628 homes (and not 964 homes). (Id.) Offerors were permitted to submit revised proposals no later than January 26, 2007. (Id.) The Amendment also advised offerors that revised oral presentations would not be held. (Id.) Forest City submitted a timely revised written submission on January 26, 2007.

### D. Notice of Award

In a March 8, 2007 letter, the Army notified Forest City that it had not been selected for award because its "submission did not provide the 'best value' to the Army when evaluated against the factors contained in the RFQ," and that GMH/Centex had been selected for award. (CE 15.) Forest City was provided a post-award debriefing on March 19, 2007. (Id.)



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

Attached to the notification was: (i) the SSEB's *Consensus Evaluation Ratings* for Forest City; and (ii) the SSAC's *Consensus Ratings Matrix* for Forest City. (CE 7 and CE 9, respectively.) The contracting office also provided Forest City with the SSAC's *Overall Rating* for the awardee, GMH/Centex, but later advised that this document was inadvertently released. (CE 10.) Based on its evaluations, the SSEB rated the offerors' proposals as follows:

| Factor | Forest City | GMH/Centex |
|---|---|---|
| Finances | E- | E |
| Concept Statement | E- | E |
| Organizational | E | E |
| Small Business | E | E+ |
| Overall Rating | E- | E |
| Risk Rating | Low | Low |

(CE 8.)

Although the full SSAC Report consisted of 24 pages, all that was provided with the notification of award was the SSAC's two-page "Overall Rating" summary. For Forest City, the SSAC recounted essential elements of its proposal, and stated:

> Of the total 628 family housing units identified in the RFQ, Forest City proposed that it would demolish [redacted] units and replace them with [redacted] new units. For the remaining [redacted] housing units, Forest City proposed to renovate these units. In addition, it proposed to contribute $[redacted] in equity [redacted].

(CE 9.) For GMH/Centex, the SSAC stated:

> Of the total 628 family housing units identified in the RFQ, GMH/Centex proposed that it would construct [redacted] new units compared to Forest City [redacted] units. The summary for GMH/Centex further stated that it would renovate [redacted] units (compared to Forest City [redacted] units), and "convert [redacted] units," and "no work [redacted] units."

(CE 10.). The summary further advised that GMH/Centex would contribute $[redacted] million (compared to Forest City $[redacted] million proposed contribution) and that contribution would not be available until the [redacted] (compared to Forest City's [redacted]). (Id.)



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

### E. Forest City's Debriefing

Forest City's debriefing was held on March 19, 2007. While the Army expounded upon the written commentary in the SSAC's *Consensus Evaluation Ratings* (pages 3-24), the most significant discussion related to the substantial, and rather obvious, disparity between Forest City's *Project Finance* plan with that of GMH/Centex -- Forest City proposed to **build** [redacted] new family housing units than GMH/Centex, and **renovate** [redacted] family housing units than GMH/Centex proposed. (Nanney Decl. at ¶ 4.) Moreover, not only was there a $[redacted] disparity between Forest City's equity contribution [redacted] that of GMH/Centex, but Forest City's contribution was to be made some [redacted] than GMH/Centex. (Id.)

Forest City representatives were advised that its *Project Finance* factor only received an Exceptional minus (compared to GMH/Centex's Exceptional) because the SSAC had rejected Forest City's projected "Vertical Cost per Sq. Ft." of $[redacted] as unrealistic. (Id.) Essentially, the Army concluded that Forest City had "lied" about its costs by proposing, in the Army's view, a totally unrealistic and unattainable number, presumably, in an effort to capture the award of the West Point project. (Id.)

### F. Forest City's Protest to GAO

Forest City timely protested the award to GAO on March 26, 2007. Pursuant to Competition in Contracting Act, 31 U.S.C. § 3553(d)(3), and 4 C.F.R. § 21.3(a), the Army suspended the performance of the contract. In reviewing the source selection documentation provided in the Agency Report, Forest City discovered that, not only had the SSEB, the SSAC, and the SSA failed to properly evaluate Forest City's proposed scope, they also failed to reject GMH/Centex's proposal as failing to conform to the material requirements of the RFQ. Forest City therefore supplemented its initial protest.



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

### G. Errors Revealed in the Agency Report

#### 1. The Army Failed to Evaluate Forest City's "Scope Guarantee"

Amendment No. 0007 dated September 22, 2006, added the underscored language to the consideration of the highest-rated-evaluation-factor, Project Finance:

> Paragraph 4.6.6 Financial Plan, subparagraph 5). Does the offeror demonstrate an understanding of the opportunities for and limitations on the revenue and expenses associated with the project? ***To what degree is the offeror guaranteeing scope and price?*** Does the financial plan support the long-term maintenance of the project?

(CE 18, Amendment No. 0007; cf. CE 1, RFQ, p. 43) (Emphasis in original.) Forest City's proposal specifically addressed scope and price as follows:

> FCMC is proposing [redacted] The key components of this structure are: [redacted]

(CE 19, Excerpt of Forest City Guarantee.) (Emphasis added.) Forest City's **guaranteed** maximum price contract totals $[redacted], which covers [redacted] (Id.) By contrast, GMH/Centex's guarantee only covers Centex's [redacted]. (CE 20, Excerpt of Centex Guarantee.)



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

Based on this new evaluation factor, the SSEB's evaluation form was updated to include the following query: ***To what degree is the offeror guaranteeing scope and price?*** When [redacted] SSEB members conducted their initial evaluation of Forest City's proposal, [redacted] members ([redacted]) used the new form and one member ([redacted]) used the old form. Those who used the new form considered the guarantee. (CE 5, SSEB Individual Evaluations.) When conducting their subsequent evaluations, only one person ([redacted]) used the old form. (Id.) Where the correct form was used, all evaluators addressed and praised Forest City's guarantee. Moreover, when the correct form was used, Forest City's proposed vertical cost ($[redacted]) was a non-issue. (Id.)

As discussed, above SSEB member [redacted] used the wrong form. In addition, [redacted] cited vertical cost as a concern. In this regard, [redacted] evaluation at page 3 downgrades Forest City's Project Finance rating from Exceptional to Exceptional minus with the following rationale: "Rating was revised from an Exceptional (E) to an E- as a result of consensus discussions. Discussions included [redacted]" (Id.) In the "Major Weakness" section, it also states: "Cost of new construction ($[redacted] per square foot) seems low." (Id.) No mention was made of Forest City's guarantee.

Compounding her mistake, when the SSEB members developed their consensus rating on February 11, 2007, they also used the wrong form. Accordingly, there was absolutely no evaluation, consideration or even mention of Forest City's $[redacted] million scope guarantee, and the SSEB downgraded Forest City's overall rating from Exceptional to Exceptional minus. (CE 7, SSEB Consensus Rating.) The failures were compounded by the SSAC.

When the SSAC members took up Forest City's proposal, they too used the **old** form that did not include the subfactor for *Project Finance Element 5* added by Amendment No. 0007 (*To what degree is the offeror guaranteeing scope and price?*). And as with the SSEB's Consensus Evaluation of Forest



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

City's Proposal, the SSAC members failed to comprehensively evaluate, Forest City's $[redacted] million scope guarantee. The only reference to Forest City's guarantee is where the SSAC Consensus notes: "Value would have been added if the offeror had established some typical parameters surround the guaranteed maximum price contract, e.g., scope, time." (CE 9, SSAC Consensus of Forest City at page 8.) From this comment, it is evident that the SSAC totally failed to review Forest City's entire guarantee, as it clear covers <u>all</u> aspects of its Proposal. In fact, the SSAC gave Forest City Project Finance a rating of Exceptional minus stating:

> <u>Offeror's Vertical Cost per Square Foot appears low</u>. Value would have been added if the <u>offeror more clearly demonstrated</u> through specific examples <u>their ability to achieve this price</u> in a manner that would maintain the architectural integrity of West Point.

(<u>Id</u>.) (Emphasis added.)

The SSAC's Memorandum to the SSA stated: "Unfortunately, FC's proposal also assumes a very low cost of vertical construction of about $[redacted] per square foot in comparison to the Army benchmark and they did not sufficiently demonstrate that this cost could actually be achieved." (CE 12.) Yet there is <u>no</u> evaluation, reference or mention of Forest City's $[redacted] million scope guarantee. Since the Forest City guarantee eliminates any risk presumed to be associated with its vertical costs, an inference can be made that the Army's defective evaluation caused Forest City's proposal to be downgraded.

By contrast, even though the SSAC also used the old form to evaluate GMH/Centex guarantee, it nevertheless addressed the GMH/Centex guarantee in the Memorandum to the SSA:

> **<u>Most significantly GMH provides a Guaranteed Maximum Price Contract</u> for their projects and have never had to adjust scope on**



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

**an RCI project after assuming operations.**

(CE 12.) (Emphasis added.) Since the SSAC made no mention of Forest City's guarantee, it can be concluded that either the SSAC did not evaluate Forest City's proposal on this key element, or the SSAC intentionally omitted it from the report to the SSA.

The SSA's Source Selection Decision is flawed because he found "the analysis and conclusions within that SSAC Report to be persuasive, to be supported by the facts and to be in harmony with the selection factors in the solicitation," and then adopted them in support of his decision to award to GMH. According to the SSA, GMH was selected because it "presented a cost structure that most closely represented the Army's benchmark and offered a Guaranteed Maximum Price which provided great confidence in the viability of the proposal." (CE 14, pp. 4 and 8.) Yet the SSA's decision does not evaluate, consider or even reference Forest City's $[redacted] million guarantee. (Id.)

### 2. The Army Relaxed a Material RFQ Requirement by Accepting GMH/Centex's [redacted] "NO WORK" Units

Pursuant to the amended RFQ, the Army would convey 628 family housing units and "[i]n exchange, the partner will provide for the **new construction/renovation**, operation, management and maintenance of the existing family housing inventory. (CE 2, App. B. West Point, p. B-8.) (Emphasis added.) This conveyance will be for a fifty-year period with a twenty-five year renewal clause. (Id.) Consistent with the understanding that all 628 units would be subject to new construction or renovation, the Army's Baseline provided for all 628 to be either newly constructed or renovated. (CE 6 and 22.) Forest City's proposal also provided for all units to be either newly constructed or renovated. (Id.)


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

One of the documents relied upon by the SSA in making his selection, the SSAC's spreadsheet, fails to accurately depict GMH/Centex's proposal and leaves the false impression that GMH/Centex will also construct or renovate all 628 units. (Id.) Consequently, the SSEB's spreadsheet would lead the SSA to make an apples-to-apples comparisons between the Army's Baseline and the proposals of Forest City and GMH/Centex. Yet a careful review demonstrates that the SSAC did not record the [redacted] "no work" units GMH identified in its plan. (Id.)

In other words, the SSAC spreadsheet does not identify that hard costs identified for GMH/Centex covers only [redacted] housing units, while the Forest City costs cover [redacted] housing units, as required by the RFQ. (Id.) Only on the IDP Plan Summary sheet (page 3) does the SSAC make passing reference to the fact that GMH/Centex has [redacted] housing units "with no work funded [redacted]." (Id.)

But equally significant is the fact that throughout the SSEB, SSAC and SSA evaluation process, there was no mention of the fact that, not only would GMH/Centex not do any work on [redacted] housing units, but GMH/Centex did not plan to do any work on those [redacted] units until the beginning of the [redacted] of the development plan - that is in the year [redacted] Moreover, GMH/Centex would be receiving a stream of rental payments on those [redacted] units for [redacted] years without making any capital outlay.

### 3. The Army Misrepresented GMH/Centex's True Costs When it Improperly Used a "Plug Number."

In stating the rationale for selecting GMH/Centex, the SSA erroneously stated that GMH "presented a cost structure that most closely represented the Army's benchmark." The SSA's statement, however, is "accurate" only because the SSEB, and then the SSAC, made GMH's cost structure appear to be close to the Army's benchmark. (CE 11.)


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

The "Army benchmark" figures identified by the SSA are found at page 5 of the SSEB's spreadsheet. (CE 6.) In the "Square Footage" block, it shows the Army's baseline for the "average square footage" per unit at [redacted] SF and a "vertical cost" of $[redacted]. (Id.) In the corresponding column/block for GMH, it shows an identical "average square footage" per unit of [redacted] SF and a resulting "vertical cost" of $[redacted]. (Id.) However, the SSA was able to state GMH's cost structure most closely represented the Army's benchmark only because the Army "plugged in" the Army's [redacted] SF to calculate GMH's vertical cost. (Id.) The SSEB spreadsheet used a "plug number" for GMH/Centex because the Army official who maintained the spreadsheet stated: "**Unable to locate SF for [GMH] units - plug # .**" (Id.) Instead, he then went on to bold the [redacted] SF in the GMH column to indicate the "plug # " he used. (Id.)

The SSAC adopted the SSEB's "plug numbers" when the SSAC developed its spreadsheet. (CE 11.) Page 3 of that spreadsheet also identifies GMH's "weighted average unit GSF" as [redacted] SF. Adjacent to this item is a reference to Note 3, which is located at page 4 of the SSAC spreadsheet. It states: "**SF was not clearly identified in the proposal and was calculated by JLL.**" (Id.) (Emphasis added.) By using a "plug number" and passing it off as a calculation from JLL, its outside consultant, the SSAC misled the SSA who, in turn, adopted in full the SSAC findings and conclusions.

### H. GAO Decision

On June 29, 2007, GAO issued its protected decision, dismissing as untimely in part, and denying in part, Forest City's protest. The redacted version of the decision was issued on July 12, 2007, and posted by GAO on its web site on July 17, 2007. (CE 17.)

## ARGUMENT

### I. JURISDICTION


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

This Court has jurisdiction over post-award bid protest cases pursuant to the Tucker Act, 28 U.S.C. § 1491(b). Specifically, the Tucker Act grants the Court "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with procurement or a proposed procurement." 28 U.S.C. § 1491(b). The Tucker Act further permits the Court to "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." *Id.* § 1491(b)(2).

## II. STANDARD FOR INJUNCTIVE RELIEF

The Tucker Act, 28 U.S.C. § 1491(b)(2), grants this Court the authority to issue preliminary injunctions. In determining whether to grant a motion for a preliminary injunction, the Court must consider whether: (1) plaintiff is likely to succeed on the merits; (2) plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships favors the grant of injunctive relief; and (4) it is in the public interest to grant injunctive relief. U.S. Ass'n of Imps. of Textiles & Apparel v. United States, 413 F.3d 1344, 1346 (Fed. Cir. 2005); PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004). "As a rule, when applying the four factors for injunctive relief, no single factor is dispositive and an inadequate showing regarding one factor may be overcome by the strength of the other factors." FMC Corp. v. United States, 3 F.3d 424, 427 (Fed.Cir.1993), and *PGBA*, 57 Fed. Cl. at 656). Here, all of the factors demonstrate that a preliminary injunction should issue.

## III. FOREST CITY IS ENTITLED TO INJUNCTIVE RELIEF

### A. Forest City Has a Substantial Likelihood of Prevailing on the Merits

The Tucker Act requires the Court to review the challenged agency action under the standards set forth in the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. Under the APA standards, a contract award will be set-aside if an agency's action is "arbitrary, capricious, or an abuse of discretion; or otherwise not in accordance with law," 5 U.S.C. § 706 (2)(A), or is "without observance of procedures required by law." *Id.* § 706 (2)(D). In other words, "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

In order to overturn the agency's decision, Forest City must also show "a significant, prejudicial error in the procurement process." Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999); Data General Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). In order to show it was significantly prejudiced, Forest City does not have to demonstrate that, but for the error, it would have been awarded the contract. *Id.* But rather, "[t]o establish 'significant prejudice' [it] must show that there was a 'substantial chance' it would have received the contract award" absent the agency's action. Bannum, Inc. v. United States, 404 F.3d 1346, 1353 (Fed. Cir. 2005) (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003)). As discussed more fully below, Forest City's satisfies the first prong for injunctive relief (i.e., substantial likelihood of success on the merits) on a number of grounds, any one of which is sufficient to invalidate the award.

### 1. The Army Failed to Evaluate Forest City's Scope Guarantee in Accordance with the Evaluation Criteria for Project Finance.

By failing to consider Forest City's $[redacted] million scope guarantee, the Army's assessment of Forest City's *Project Finance* Element 5 was improper, unreasonable, and contrary to the evaluation criteria stated in the RFQ. FAR 15.305 mandates that "[a]n agency shall evaluate competitive


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

proposals and then assess their relative qualities solely on the factors and sub-factors specified in the solicitation." Therefore, an agency must follow its stated evaluation criteria in rating offerors' proposals, without omission of any stated criteria or the addition of new criteria. Future-Tec Management Systems, Inc.; Computer and Hi-Tech Management, Inc., B-283793.5, B-283793.6, Mar. 20, 2000, 2000 CPD ¶ 59. It is equally true that once an agency amends its criteria against which proposals are to be evaluated, as the Army did with respect to *Project Finance* Element 5, the agency is required to adhere to the new criteria with respect to all offerors. Grey Advertising, Inc., 55 Comp. Gen. 1111 (1976), 76-1 CPD ¶ 325.

In the instant case, Amendment No. 0007, dated September 22, 2006, added the underscored language to the consideration of the highest-rated-evaluation-factor, Project Finance:

> Paragraph 4.6.6 Financial Plan, subparagraph 5). Does the offeror demonstrate an understanding of the opportunities for and limitations on the revenue and expenses associated with the project? ***To what degree is the offeror guaranteeing scope and price?*** Does the financial plan support the long-term maintenance of the project?

(CE 18, Amendment No. 0007; cf. CE 1, RFQ, p. 43) (Emphasis in original.) Accordingly, Forest City's proposed to the amended scope as follows:

> FCMC is proposing [redacted]. The key components of this structure are:
>
> [redacted]



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

[redacted]

(CE 19, Excerpt of Forest City Guarantee.) (Emphasis added.) In addition, Forest City's **guaranteed** maximum price contract totals $[redacted], which covers not only the [redacted].

(Id.) By contrast, GMH/Centex's guarantee only covers Centex's construction cost of $[redacted]. (CE 20, Excerpt of Centex Guarantee.)

The Army committed a significant error in its evaluation and assessment of Forest City's proposed *Project Finance* by omitting any meaningful consideration of its $[redacted] million scope guarantee, while at the same time praising GMH for its lesser guarantee. The written record clearly demonstrates that following Amendment 007 and the inclusion of the guarantee criteria in *Project Finance* Element 5, where the correct evaluation form was used, the GMH guarantee was repeatedly praised, but there was only one casual reference by the SSAC to Forest City's guarantee – but even that reference clearly indicates that the SSAC failed to "comprehensively" evaluate it. Absent that reference the record is clear that when the SSEB members met to reach a consensus rating and when the SSAC members met to reach its consensus rating, both the SSEB and the SSAC used the wrong form. Not surprisingly, Forest City's guarantee was never evaluated, much less mentioned by the SSEB. And the comment in the SSAC Consensus that "value would have been added if the offeror had established some typical parameters surround the guaranteed maximum price contract, e.g., [redacted]," is clear evidence that the SSAC totally failed to review Forest City's entire guarantee, much less conduct the "comprehensive" evaluation mandated by the RFQ and the Army Source Selection Plan. (CE 7 at 8.) From this comment, it is evident that the SSAC totally failed to review Forest City's entire guarantee, much less conduct the comprehensive evaluation mandated by the RFQ and the Army Source Selection Plan. Instead, the SSAC's evaluation focused on what they



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

perceived as Forest City's "very low cost of vertical construction" and stated that Forest City "did not sufficiently demonstrate that this cost could be achieved."

Had the SSAC evaluated Forest City's $[redacted] million scope guarantee, this concern would have evaporated. As a result of the flawed evaluation, the Army improperly lowered Forest City's Project Finance Overall score from Exceptional to Exceptional Minus, when the rating should have been an Exceptional Plus. Clearly, Forest City was prejudiced by the Army's failure to evaluate Forest City's proposal in accordance with the requirements of the RFQ and the Army's Source Selection Plan.

Although source selection officials are entitled to independently judge the merits of competing proposals, these judgments must have a rational basis, TRW, Inc., B-254045.2, Jan. 10, 1994, 94-1 CPD ¶ 18, and agency officials may not disparately evaluate offerors' proposals with respect to the same requirements. Sci-Tec Gauging, Inc.; Sarasota Measurements & Controls, Inc., B-252406; B-252406.2, June 25, 1993, 93-1 CPD ¶ 494. Where the SSA decision is based on conclusions that appear to be directly contradicted by the contemporaneous record, and where the agency's evaluation record provides no explanation regarding the apparent conflict, the decision will not be viewed as reasonable and should be set aside. Caddell Construction Company, Inc., B-298949, Jan. 10, 2007, 2007 U.S. Comp. Gen. LEXIS 31 at *8. Here, the contemporaneous record proves that the SSA relied on incomplete, inaccurate, misleading and inconsistent evaluation reports, which omitted the evaluation and consideration of Forest City's $[redacted] million scope guarantee, which led to the irrational and erroneous conclusion that Forest City "assumes a very low cost of vertical construction of about $[redacted] per square foot in comparison to the Army benchmark and [therefore] did not sufficiently demonstrate that this cost could be achieved." Had the SSA been properly advised, or had he conducted a reasonable review of Forest City's proposal and accompanying $[redacted] million scope guarantee, any concern over vertical cost would have been dismissed as baseless.



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

By failing to evaluate and consider this material sub-factor when analyzing Forest City's Project Finance, the SSA mistakenly attributed the guarantee exclusively to GMH/Centex's proposal. It is clear from the record that the SSA considered that strength to fall within the most important technical evaluation area, Project Finance. (CE 14.) Had Forest City's proposal been similarly evaluated, Forest City's proposal would have been perceived as stronger by the SSA, given the SSA's praise of Forest City's "robust scope," and selected as the best value award.

The Army's failure to evaluate Forest City on all of the stated Project Finance evaluation criteria renders the agency's evaluation unreasonable, and inconsistent with the stated Solicitation criteria and applicable rules and statutes, and totally irrational. But for the flawed evaluation, Forest City would have received the award. Consequently, Forest City suffered competitive prejudice as a result of the Army's flawed and careless evaluation of its proposal. "A reasonable possibility of prejudice is a sufficient basis for sustaining a protest." Multimax, Inc. et. al. B-298249.6 et. al., Oct. 24, 2006, 2006 U.S. Comp. Gen. LEXIS 179 (U.S. Comp. Gen. 2006), 2006 CPD ¶ 165, citing, McDonald-Bradley, B-270126, Feb. 8, 1996, 96-1 CPD ¶ 54 at 3; Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996). Forest City was further prejudiced by the Army's disparate treatment of proposals with respect to the guarantee of scope and price. This is discussed further below.

**2. The Army's Failure to Evaluate Forest City's "Scope Guarantee" in Accordance with the Evaluation Criteria for *Project Finance* Improperly Distorted the Evaluations in Favor of GMH/Centex**

In stark contrast to the treatment of Forest City's proposal, the SSAC and SSA evaluated and extolled GMH/Centex's guarantee, thereby unjustly inflating GMH proposal evaluation which, in turn, improperly positioned GMH for award. It is well established that agency officials may not disparately evaluate offerors' proposals with respect to the same requirements. Sci-Tec Gauging, Inc.; Sarasota Measurements & Controls, Inc., B-252406; B-252406.2, June 25, 1993, 93-1 CPD ¶



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

494; See also, e.g., Lockheed Martin Info. Sys., B-292836 et al., Dec. 18, 2003, 2003 CPD ¶ 230 at 11-12; Rockwell Elec. Commerce Corp., B-286201 et al., Dec. 14, 2000, 2001 CPD P 65 at 5. In addition, an agency is under a general duty, when choosing which party to award a contract to, to "reasonably consider[ ] the competing proposals, in a manner that is fair and equitable, and consistent with the terms of the solicitation." Mechanical Equipment Co., Inc., et. al., B-292789.2, B-292789.3, B-292789.4, B-292789.5, B-292789.6, and B-292789.7, 2004 CPD ¶ 192, 2003 WL 23782511 at *5.

Here the record clearly demonstrates that the SSA was, at best, mistakenly enamored by GMH's guarantee. The contemporaneous record clearly demonstrates that Forest City's proposal carried with it a higher degree of confidence and a lesser degree of risk because the guarantee covers [redacted]. (CE 19.) As discussed, GMH's guarantee covers [redacted], yet excluded [redacted] (CE 20.) When compared, the outcome is truly astonishing: Forest City guarantees [redacted]. (Id.) But for the total failure of the SSEB, SSAC, and SSA to consider, evaluate and compare Forest City's guarantee to GMH's guarantee – which promised much less – the Army would have found Forest City's proposal far superior in this regard.

### 3. The Army Improperly Failed to Reject GMH/Centex's Proposal as Unacceptable Because it Did Not Meet the Material Requirements of the RFQ.


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

In reviewing protests against an agency's evaluation of proposals, the record is examined to determine whether the decision was rational, consistent with the stated evaluation criteria, consistent with applicable laws and regulations, and adequately documented. Caddell Construction Company, Inc., B-298949, May 24, 2002, 2007 U.S. Comp. Gen. LEXIS 31 at *8, Jan. 10, 2007; Johnson Controls World Services., Inc., B-289942, 2002 CPD ¶ 88 at 6. In this regard, it is a fundamental rule of competitive procurement that all offerors must compete on an equal basis by proposing to the same terms, conditions and specifications. See Lockheed Martin Info. Sys., B-292836 et al., Dec. 18, 2003, 2003 CPD ¶ 230 at 11-12; Rockwell Elec. Commerce Corp., B-286201 et al., Dec. 14, 2000, 2001 CPD ¶ 65 at 5, (all offerors must be provided a common basis for the preparation and the submission of proposals); Bishop Contractors, Inc., B-246526, Dec. 17, 1991, 1991 U.S. Comp. Gen. LEXIS 1424, 91-2 CPD ¶ 555, (bidders have a right to assume that the essential requirements in a solicitation are the same for all offerors). "Clearly stated RFP technical requirements are considered material to the needs of the government, and a proposal that fails to conform to the material terms and conditions of a solicitation is technically unacceptable and may not form the basis of award." National Shower Express, Inc.; Rickaby Fire Support, B-293970, B-293970.2, July 15, 2004, 2004 CPD ¶ 140 at 4-5, 2004 U.S. Comp. Gen. LEXIS 138.

In this case, the Army failed to enforce the material requirements of the RFQ by accepting and selecting GMH on significantly different requirements than those required of the other offeror's. The RFQ at Section 4.0, Contractor Selection Process, provides that "final selection will be based upon the qualification exhibited by the offerors as outlined by the evaluation factors and upon best value to the government." This is further defined as the offeror who proposes "the best value for improving military family housing for the specific project." (CE 1, RFQ 30). For the West Point proposal, this meant that the Army would convey 628 family housing units in exchange "for the new construction/renovation, operation, management and maintenance of existing housing



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

inventory." (CE 2, p. B-6) Consistent with the stated requirements of the RFQ, the Army's baseline required the new construction/renovation of all 628 housing units. GMH failed to comply with the material requirement for the new construction/renovation of 628 units: it offered a materially nonconforming proposal that provided for the new construction/renovation of only [redacted] units and to "no work" [redacted] units. (CE 10) There was no provision in the RFQ which permitted an offeror to propose to "no work" housing units. Accordingly, the Army should have rejected GMH's nonconforming proposal.

Assuming, *arguendo*, the Army concluded that GMH's nonconforming proposal -- "no work" [redacted] units or [redacted]% of the conveyed housing inventory -- was acceptable to the Army, it was incumbent upon the Army to amend the Solicitation and afford all offerors in the competitive range an opportunity to respond to the revised requirements. ManTech Advanced Systems Int'l, Inc., B-240136, Oct. 26, 1990, 90-2 CPD ¶ 336, at *11. The Army should have advised offerors that it was permissible to propose not to provide new construction/renovation up to [redacted] units, or to "no work" as many units as each offeror deemed appropriate. However, then the Army would have to develop appropriate evaluation sub-factors for both Project Finance and Preliminary Project Concept Statement evaluation factors to allow the SSEB, the SSAC and the SSA the opportunity to weigh, evaluate and consider the impact of "no work" units on the Project. But absent such an amendment to the RFQ, the Army's acceptance of GMH's proposal was tantamount to an amendment of Army's requirements only for GMH.

Forest City clearly suffered competitive prejudice as a result of the Army accepting a proposal which allocated no new construction/renovation to [redacted]% of the units until the [redacted]. Specifically, by permitting this material deviation from the requirement of the RFQ, it permitted GMH to construct a financial plan and new construction/renovation schedule that is significantly more beneficial to GMH. In turn, with "no work" on [redacted]% of the units until the



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

[redacted] totally distorts, and makes impossible, an apples-to-apples comparison that is essential to a fair, reasonable and proper evaluation of offerors. Had the Army eliminated or even relaxed this requirement for all offerors, Forest City surely would have revised its proposal to take advantage of the significant financial and planning benefits the "no work" units provides. "A reasonable possibility of prejudice is a sufficient basis for sustaining a protest." Multimax, Inc. et. al. B-298249.6 et. al., Oct. 24, 2006, 2006 U.S. Comp. Gen. LEXIS 179 (U.S. Comp. Gen. 2006), 2006 CPD ¶ 165, citing, McDonald-Bradley, B-270126, Feb. 8, 1996, 96-1 CPD ¶ 54 at 3; see Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996) ("GAO's standard is in harmony with the "substantial chance" standard set out" by this Court). The Army's acceptance of GMH's "no work" units clearly resulted in the disparate treatment of offerors, and therefore its award must be set aside.

**4. The Army Failed to Evaluate, Consider and Assess the Adverse Impact of GMH/Centex's "No Work" Units as Required by the Evaluation Criteria.**

Further assuming, *arguendo*, that it is determined that the RFQ permitted GMH to "no work" a portion of the housing inventory, it is irrational and illogical that the SSEB, nor the SSAC and the SSA found "no work" on [redacted]% of the units until [redacted] not to be a significant weakness in both the Project Finance or Preliminary Project Concept Statement factors. GMH's offer was clearly not deserving of an "Exceptional" rating for those two evaluation factors, much less in an overall rating. The only logical conclusion is that the SSA either was totally unaware of this aspect of GMH's proposal, or worse -- chose to ignore its financial and planning impact on the other offerors. What is clear is that this failure led to the improper award of a nonconforming offer that must be set aside.

Under GMH/Centex's plan for the [redacted] "no work" housing units, its Financial Plan had no funds allocated to those units until the beginning of the [redacted] of the development plan – that is


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

in the year [redacted]. However, during this entire [redacted] time period, GMH/Centex will be receiving the rental fees on these [redacted] housing units without any corresponding expenditure of capital. The Army Source Selection Plan provides at Paragraph 4.6.6.8, *Project Finance Element 6*, that if "the offeror [is] receiving fees during the construction and rehab period that would significantly decrease its equity position," it is a "weakness." Yet the SSEB, SSAC and the SSA failed to even mention GMH/Centex's receipt of rental fees for [redacted] without any corresponding outlay of capital, much less that it was a weakness in it proposal.

The Army failed to assess as a major weakness GMH/Centex's the financial windfall it gains by being permitted to propose "no work" units covering approximately [redacted]% of the West Point family housing for a period of [redacted]. Had the Army properly assessed GMH/Centex's proposal, it would have significantly downgraded both the *Project Finance* evaluation factor and its "Overall Evaluation" rating, thereby rendering GMH/Centex's improper.

**5. The Army's Evaluation of GMH/Centex's Proposal Using the Army's Benchmark Improperly Distorts GMH/Centex's Evaluation and the Comparison with Forest City's Proposal.**

The Army's calculation of GMH's vertical costs is more than an innocent error in calculation. Rather, it is clear and convincing evidence of the Army's failure to properly review, assess and evaluate proposals. The admitted inability of the Army to determine the total square footage of the new units proposed by GMH, calls into question whether any reasonable or meaningful analysis was ever conducted of competing proposals. Where, as here, the Army's source selection decision is based on conclusions that appear to be directly contrary to the contemporaneous record, and where the agency's evaluation record provides no explanation regarding the apparent conflict, the decision will not be viewed as reasonable and should be set aside. Caddell Construction Company, Inc., B-298949, 2007 U.S. Comp. Gen. LEXIS 31 at *8, Jan. 10, 2007.


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

As discussed above, GMH's proposal clearly sets forth the square footage for new construction. Notwithstanding the clear documentation of these figures in the record, the Headquarters, US Army Corps of Engineers, Lead Program Manager William Mysliwiec stated on the Army's Baseline Analysis, "unable to locate the SF for [GMH] units - plug # ." This erroneous approach to calculating a material term was exacerbated by the Army's consultant, Jones Lang LaSalle (JLL), who repeated the blunder on a totally separate spreadsheet, providing that "SF was not clearly identified in the proposal and was calculated" using the "plug number." The failure of the SSEB and JLL to correctly identify and calculate GMH's square footage for its new units is plain error. Moreover, the error was neither corrected by the SSAC nor questioned by the SSA. Both parties blindly adopted the "plug numbers" and it is upon those "plug numbers" that the SSA decision rests. This error demonstrates that the evaluation process and the best value award were defective.

How can the SSA's praise of GMH for "presenting a cost structure that most closely represented the Army's benchmark" stand? Once again, the Army unjustly enriched GMH/Centex and improperly positioned them for award. An agency is under a general duty, when choosing which party to award a contract to, to "reasonably consider[ ] the competing proposals, in a manner that is fair and equitable, and consistent with the terms of the solicitation." <u>Mechanical Equipment Co., Inc.</u>, <u>et al</u>., B-292789.2, B-292789.3, B-292789.4, B-292789.5, B-292789.6, and B-292789.7, 2004 CPD ¶ 192, 2003 WL 23782511 at *5. On its face, the Army's decision was neither fair nor equitable and Forest City suffered competitive prejudice as a result of the Army's flawed evaluation. "A reasonable possibility of prejudice is a sufficient basis for sustaining a protest." <u>Multimax, Inc.</u> <u>et</u>. <u>al</u>. B-298249.6 et. al., October 24, 2006, 2006 U.S. Comp. Gen. LEXIS 179 (U.S. Comp. Gen. 2006), 2006 CPD P165, citing, <u>McDonald-Bradley</u>, B-270126, Feb. 8, 1996, 96-1 CPD ¶ 54 at 3; see <u>Statistica, Inc. v. Christopher</u>, 102 F.3d 1577, 1581 (Fed. Cir. 1996).



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

### B. Forest City Will Suffer Irreparable Harm Absent Injunctive Relief

Forest City also satisfies the second prong of the test for preliminary injunctive relief in that it will suffer irreparable harm if the Agency's actions are not enjoined. When assessing irreparable harm, the relevant inquiry is whether a plaintiff has an adequate remedy at law in the absence of the injunction. Hospital Klean v. United States, 65 Fed. Cl. 618, 624 (2005) (citing Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993)). There are numerous legally-cognizable ways in which Forest City has been and will be harmed irreparably in the absence of the requested relief. These involve the denial of the opportunity to compete fairly and obtain the contract and the lost profits that Forest City would have received if it had been afforded an opportunity to compete and receive the award of the contract. These injuries constitute irreparable harm that justifies the granting of injunctive relief.

*First*, Forest City will be irreparably harmed if the new contract is implemented. Commencement of Phase 1, the *Project Planning* phase, necessitates the advancement of the CDMP, which addresses all aspects of the development effort at West Point with a "specific focus on long-term master planning and environmental stewardship." (CE 1. p. 10.) The RFQ contemplates that the renovation and construction of housing units and ancillary facilities that are developed during the CDMP will take place throughout the life of the conveyance. (Id.) This conveyance will be for a fifty-year period, with a twenty-five year renewal clause." (C2, RFQ, Appendix B, B-8.) In stark contrast to the half century that the CDMP will be in effect, the entire CDMP process is to be completed in approximately "six months of coordinated, intensive efforts between the Army and the developer." (Id). at 2.1. If this Court were subsequently to determine that the contract should have been awarded to Forest City, the CDMP process would either be complete (and have implemented GMH's approach) or so far along that it would be impossible for Forest City to implement the CDMP in accordance with its original plan.



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

Alternatively, should the contract be recompeted, in the absence of a preliminary injunction, GMH will have obtained invaluable insight into the performance of the contract (and the CDMP process) that will unfairly benefit GMH in any contract recompetition. See Cigna, 70 Fed. Cl. at 101-02, 112-13 (override decision failed to consider whether overriding the stay would serve or undermine the Congressional goal of competition; here the protestor would be harmed because its competitors would receive a competitive advantage from having performed under the contract should it be resolicited); see also Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560, 571 (2000) ("[A] lost opportunity to compete on a level playing field for a contract has been found sufficient to prove irreparable harm.").

*Second*, the loss of profits that Forest City would have received if it had been awarded the contract similarly constitutes immediate irreparable harm. Chapman Law Firm Co. v. United States, 67 Fed. Cl. 188, 193 (2005) ("this court has found that lost profits, or even the loss of an opportunity to earn profits, is sufficient to constitute irreparable harm."); Magnavox Elec. Sys. Co. v. United States, 26 Cl. Ct. 1373, 1379 (1992), overruled on other grounds by Motorola, Inc. v. United States, 988 F.2d 113 (Fed. Cir. 1993) ("Denial of the opportunity to obtain the present contract and the profits derived therefrom is precisely what plaintiff refers to when alleging its 'lost opportunity to compete.' This is an irreparable injury."). Injunctive relief is therefore necessary to prevent this otherwise unredressable injury. Informatics Corp. v. United States, 40 Fed. Cl. 508, 518 (1998) ("Plaintiff has demonstrated that absent injunctive relief it would suffer irreparable harm by the loss of anticipated profits from a contract award. Furthermore, an action at law would be unavailing, because plaintiff could recoup only its bid preparation costs in a suit for damages."); United Int'l Investigative Servs., 41 Fed. Cl. 312, 323 (1998) ("[T]he opportunity to compete for a contract and secure any resulting profits has been recognized to constitute significant harm."). If Forest City


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

does not receive an award, Forest City will lose revenues and profits on a project valued at approximately $190 million. *See* Exhibit 1, Defferding Declaration.

*Third*, the detriment to Forest City goes substantially beyond its economic loss of the contract to include damage to Forest City's marketplace reputation and future business opportunities. See, e.g., Qwest Communications Corp. v. City of Berkeley, 146 F.Supp.2d 1081 (N.D. Cal. 2001) (government contractor established irreparable harm where performance under a large public contract was essential to its reputation and to its ability to obtain future business); Semaphore Entm't Group Sports Corp. v. Gonzalez, 919 F. Supp. 543, 550 (D.P.R. 1996) ("[T]here is compliance with the irreparable harm criteria when the harm is not easily quantifiable, such as when the action that is sought to be enjoined would besmirch plaintiffs' business credibility, reputation, and good will." (citing Planned Parenthood v. Citizens for Cmty. Action, 558 F.2d 861, 867 (8th Cir.1977)).

The foregoing injuries to Forest City are substantial, immediate, irreparable, and, with the exception of lost profits, unquantifiable. Forest City fully meets the required standard.

**C. The Harm To Forest City Outweighs Any Harm To The United States and Others**

While Forest City faces irreparable harm in the loss of the opportunity to compete for the contract and to work closely with the Army team in crafting a CDMP that is acceptable and offers the best value for military family housing, there is little or no harm that would accrue to the Army or to any other party as a result of granting the preliminary injunctive relief. GMH/Centex will not be overly inconvenienced by any slight delay in awarding the contract, particularly where there is a high probability that the award will be found to lack a rational basis.

Most importantly, granting temporary injunctive relief would have no negative impact on military housing operations. The Army's needs are currently being met by its existing housing



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

inventory, which the Army admits is currently in "adequate condition." (CE 18, Para. 4.b.2). There is also no waiting list for housing, as exists at other military bases like Fort Myer. (Id. at 9.0). Granting injunctive relief would thus not require the Army to find alternative housing for those members desiring to live on base. This court has found that "no harm will inure to third parties when the government has alternative contractual vehicles available through which it can continue to obtain the needed services uninterrupted." Cf. Chapman Law Firm, 67 Fed. Cl. at 194 (citing Hospital Klean, 65 Fed. Cl. at 624). In the instant case, the Army can continue to manage the properties pending resolution of this claim and military members are free to live either on or off the installation. Moreover, granting temporary relief could well result in a greater number of newly constructed ([redacted] to be precise) and renovated homes being made available to military members and their families, as detailed in Forest City's plan.

### D. Granting Injunctive Relief Is In The Public Interest

Granting an injunction is in the public interest, as "by upholding the integrity of the procurement process, public confidence in the federal procurement process will be preserved." SAI Indus. Corp. v. United States, 60 Fed. Cl. 731, 747 (2004). The Government will likely argue that the public interest is also served by the timely completion of the government procurement process. Granted that the GAO protest delayed the award of the contract, and that an injunction would delay the award further, but such delay is insignificant compared to the fact that this housing project will touch the lives of countless military members for the next 50-75 years. Moreover, given the Army's obvious errors in evaluating Forest City's proposal and its relaxation of a material requirement, the public's interest in the integrity of this procurement and the process in general, clearly outweighs the public's interest in the timely completion of the government procurement process. Because of the


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

magnitude of the issues at stake, the public's interest would be served by the grant of a preliminary injunction.


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

## CONCLUSION

For the foregoing reasons, Forest City respectfully requests that the Court issue a preliminary injunction prohibiting the Army from allowing work to proceed under the contract until the Court has an opportunity to rule on the merits of this action.

Dated: July 19, 2007

Respectfully submitted,

Robert H. Koehler
PATTON BOGGS LLP
8484 Westpark Dr.
McLean VA 22102
(703) 744-8005
(703) 744-8006 (Fax)
rkoehler@pattonboggs.com
Attorney of Record for
Forest City Military Communities, LL

Of Counsel:
Michael J. Schaengold[1]
Jennifer Zucker
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
(202) 457-6000
(202) 457-6315 (Fax)

[1] Mr. Schaengold did not participate in the Government Accountability Office Protest and did not request admission under its Protective Order. He has not been shown and has not reviewed any documents subject to the Government Accountability Office Protective Order. He has not been orally provided with any information subject to that Protective Order. Nor has he reviewed the unredacted version of the Complaint and Motion for Preliminary Injunction in this case. He will apply for admission under the Court's Protective Order in this case and, only upon admission under the Court's Protective Order, will he review documents subject to the Court's Protective Order.


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 19th day of July, 2007, I caused to be sent via hand delivery a copy of:

1. Forest City's Complaint for Declaratory Judgment and Permanent Injunctive Relief
2. Forest City's Motion for Preliminary Injunction
3. Forest City's Memorandum In Support of Motion For Preliminary Injunction
4. Forest City's Motion For Protective Order
5. Forest City's Motion to File under Seal the Complaint and the Exhibits Thereto, and the Memorandum In Support of Motion for Preliminary Injunction.
6. Forest City's Rule 7.1 Disclosure Statement.

The above were delivered to:

Timothy P. McIlmail, Esquire
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

A courtesy copy was delivered to:

E. Sanderson Hoe, Esquire
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C. 20006
Counsel for Awardee GMH/Centex

____________________________

Robert H. Koehler



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER