**Agreed-Upon Redacted Copy -- May be Made Public**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| FOREST CITY MILITARY COMMUNITIES LLC, Plaintiff, | BID PROTEST |
| v. | No. 07-546C |
| UNITED STATES OF AMERICA, Defendant. | (Judge Hewitt) |

**PLAINTIFF'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. Plaintiff, Forest City Military Communities LLC ("Forest City"), by and through counsel, hereby protests the improper award of a contract for family housing and community development privatization at the United States Military Academy, West Point, New York ("West Point") to GMH/Centex Military Communities ("GMH/Centex") under Request for Qualification No. W912DR-06-R-0006, issued by the Department of the Army's Residential Communities Initiative ("RCI") Office, U.S. Army Corps of Engineers, Baltimore District.

2. This is a post-award bid protest seeking declaratory and injunctive relief. Forest City is seeking an injunction to suspend contract performance pending a declaration by this Court that the contract was awarded in violation of procurement laws and regulations, and an order terminating the contract and directing that the reevaluation of proposals in the competitive range occur in accordance with law and regulation.

## JURISDICTION

3. This Court has jurisdiction over this post-award protest pursuant to 28 U.S.C. § 1491(b). There is now between the parties an actual and justifiable controversy in respect of which Forest City requires declaratory and preliminary and permanent injunctive relief.

## THE PARTIES

4. Plaintiff Forest City is a limited liability company formed in the State of Ohio for the purpose of creating and revitalizing communities for U.S. services members and their families. Its principal place of business is located at 1615 L Street, N.W., Suite 400, Washington, D.C. 20036.

5. Defendant is the Department of the Army's RCI Office, U.S. Army Corps of Engineers, Baltimore District (the "Army"), located at City Crescent Building, 10 South Howard Street, Baltimore, MD 21201. The Army's Contracting Officer is James J. Rich, Ph. D., Director of Contracting, U.S. Army Corps of Engineers, ATTN: CENB-CT, 10 South Howard Street, Baltimore, MD 21201.

## STATEMENT OF FACTS

- **The Solicitation**

6. The Military Housing Privatization Initiative ("MHPI") legislation, 10 U.S.C. §§ 2871-2885), provides special authorities to the military services to privatize military family housing on military installations. The Army's MHPI program is the Residential Communities Initiative ("RCI"). As part of its continuing RCI efforts, the Army issued Request for Qualification No. W912DR-06-R-0006 ("Solicitation" or "RFQ") to solicit proposals from responsible contractors interested in the Army's RCI program to privatize military family housing communities at West Point, Fort Lee, Virginia, and Fort Jackson, South Carolina. See Exhibit 1, Solicitation. For each of these installations, the RFQ provided specific details concerning the existing family housing



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

units, ancillary facilities, the current military family occupancies, the surrounding civilian community, etc. See Exhibit 2, Appendix B – *West Point*, Solicitation. This Protest relates only to the RCI Project for West Point.

7. Under the Army RCI contracting format, the acquisition is divided into two separate phases: (i) Project Planning, and (ii) Project Implementation. In turn, the RFQ's source selection process was designed to select a developer who initially would be awarded a fixed price contract of $350,000 to develop a Community Development and Management Plan ("CDMP") for the family housing community at the installation ("CDMP Contractor"). The CDMP Development Plan was to detail the number, type, and size of housing units that were to be renovated, rehabilitated, or newly constructed in each neighborhood with the family housing community under a privatization plan with a 50-year life cycle for Phase 2, Project Implementation. See Exhibit 1, Section 2.1.1, *CDMP Development Plan*, Solicitation.

8. Under the terms of the RFQ, the CDMP was to be approved by the installation, the Department of the Army, the Office of the Secretary of Defense, OMB and the Congress. Upon the payment of the $350,000 to the CDMP Contractor, "the Army will be granted full and unlimited rights to use the CDMP, including the right to provide the CDMP to other developers in this or other military housing privatization projects. At this point, the contract will be complete and the developer will have no right, title, or interest in Phase 2 by virtue of its participation in Phase 1." See Exhibit 1, Section 2.1.4, *Completion of Phase 1 - Project Planning*, Solicitation.

9. Upon acceptance and approval of the CDMP, the RFQ provided that it was the stated intent of the Army to have the CDMP Contractor implement the approved plan. The terms of the Phase 2, *Project Implementation*, was for the awardee to develop, operate and maintain the family housing units transferred to the awardee for a 50-year term. See Exhibit 1, Section 2.2, *Phase 2 - Project Implementation*, Solicitation.



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

- **RFQ Source Selection Process - Step One**

10. In Step One of the source selection process, the Solicitation sought from interested offerors a five-page submission addressing three Minimum Experience Requirements (MERs). The MERs were established to address the skill sets of development, property management, and financial capability for this type of housing community project. See Solicitation, Section 4.0., *Contractor Selection Process*, and 4.2., *Minimum Experience Requirements (MRE)*. Offerors who satisfied the "Step 1A - MERs" were eligible to submit a "Step 1B - Statement of Qualifications (SOQ)." The SOQ sought information on the offeror's experience, financial capabilities, organizational capabilities (corporate level), past performance, and small business utilization (general history). See Exhibit 1, Section 4.3., *Statement of Qualifications (SOQ)*, Solicitation.

11. The Source Selection Evaluation Board's (SSEB) assessment of responses to the SOQ was then to be used to establish a highly qualified competitive group (HQCG). See Exhibit 1, Section 4.0., *Contractor Selection Process*, Solicitation. Offerors selected for inclusion in the HQCG or competitive ranges were then eligible to compete in Step Two. Id.

- **RFQ Source Selection Process - Step Two**

12. In Step Two of the selection process, offerors in the HQCG were eligible to compete sequentially on the following projects: *Project One* - Fort Lee, Virginia; ***Project Two* - WestPoint**; and *Project Three*- Fort Jackson, South Carolina. Offerors were not required to submit a proposal on all three projects, but could select one or more on which they wanted to compete. See Exhibit 1, Paragraph f, Section 1.1., *Overview*, Solicitation.

13. For Step Two, the eligible offerors were required to make a new submission which would be the basis upon which the SSEB would evaluate and select the awardee. Here, each offeror was required to make: (i) an oral submission, not to exceed six (6) hours, to explain and display how they satisfy the Step Two evaluation factors, and (ii) a concurrent written submission supporting the



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

offeror's oral presentation. See Exhibit 1, Section 4.5.2., *Award Based on Oral Presentation (Step Two)*, Solicitation. Following the conclusion of its oral presentation, the offeror was permitted to submit further clarifications and responses to SSEB questions.

- **The Step Two Evaluation Criteria**

14. For Step Two, the RFQ provided that the SSEB would use four (4) evaluation factors, in descending order of importance, to evaluate the oral and written submissions of the offeror:

(1) Project Finance,
(2) Preliminary Project Concept Statement,
(3) Organizational Capabilities (on-site, project specific), and
(4) Small Business Utilization Plan (on-site, project specific).

See Exhibit 1, Paragraph b, Section 4.6. *Evaluation Factors*, Solicitation. The RFQ also noted a fifth factor: "the assessment of Past Performance will be used in making the 'Best Value' selection." In this regard, the RFQ stated at Section 4.0, *Contractor Selection Process*, that "final selection will be based upon the qualifications exhibited by the offerors as outlined by the evaluation factors and upon the basis of best value to the Government." (Emphasis added.) In this regard, "best value" was identified as "the best value for improving military family housing for the specific project." See Exhibit 1, Paragraph a, Section 4.4., *Submission of Step Two*, Solicitation.

15. The RFQ also identified the rating scheme the Army would use for the individual evaluation factors. Using an adjectival rating format, the following ratings were to be used:

1) Exceptional Plus (E+): The offeror has addressed substantially all of the elements in this factor in a manner that demonstrates superior added value above a satisfactory response for substantially all of the elements.

2) Exceptional (E): The offeror has addressed many of the elements of this factor in a manner that demonstrates superior added value above a satisfactory response and has addressed substantially all of the remaining elements in this factor in a manner that demonstrates high added value above a satisfactory response.


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

3) Exceptional Minus (E-): The offeror has addressed some of the elements of this factor in a manner that demonstrates superior added value above a satisfactory response, has addressed many of the elements in this factor in a manner that demonstrates high added value above a satisfactory response and has addressed substantially all of the remaining elements in this factor in a manner that demonstrates a satisfactory response.

4) Acceptable Plus (A+): The offeror has addressed many of the elements in this factor in a manner that demonstrates some added value above a satisfactory response and has addressed substantially all of the remaining elements in this factor in a manner that demonstrates a satisfactory response.

5) Acceptable (A): The offeror has addressed substantially all of the elements in this factor in a satisfactory manner.

6) Acceptable Minus (A-): The offeror has addressed many of the elements in this factor in a satisfactory manner and has addressed substantially all of the remaining elements in this factor in a marginal manner.

7) Unacceptable (U): The offeror has failed to address substantially all of the elements of this factor in a satisfactory manner or has simply failed to address substantially all of the elements in this factor.

8) Neutral (N): This rating will only be used to evaluate an offeror in the past performance evaluation factor (4.3.6). The offeror did not have a sufficient history that could be evaluated in a level of detail that allowed the evaluation team to draw a conclusion about the offeror's past performance.

See Exhibit 1, Paragraph g, Section 4.6., *Evaluation Factors*, Solicitation.

16. In addition, the RFQ stated that the evaluators were required to provide their overall rating to the offeror's submission. While the adjectival rating was the same, the description for each rating was tailored to address the entire submission, as follows:

1) Exceptional Plus (E+): The offeror has addressed substantially all of the factors in a manner that demonstrates superior added value above a satisfactory response.

2) Exceptional (E): The offeror has addressed many of the factors in a manner that demonstrates superior added value above a satisfactory response and has addressed substantially all of the remaining factors in a manner that demonstrates high added value above a satisfactory response.

3) Exceptional Minus (E-): The offeror has addressed some of the factors in a manner that demonstrates superior added value above a satisfactory response, has addressed many of the factors in a manner that demonstrates high added value above a satisfactory response and has addressed substantially all of the remaining factors in a manner that demonstrates a satisfactory response.


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

4) Acceptable (A +): The offeror has addressed many of the factors in a manner that demonstrates some added value above a satisfactory response and has addressed substantially all of the remaining factors in a manner that demonstrates a satisfactory response.

5) Acceptable (A): The offeror has addressed substantially all of the factors in a satisfactory manner.

6) Acceptable Minus (A-): The offeror has addressed many of the factors in a satisfactory manner and has addressed substantially all of the remaining factors in a marginal manner.

7) Unacceptable (U): The offeror has failed to address substantially all of the factors in a satisfactory manner or has simply failed to address substantially all of the factors.

See Exhibit 1, Paragraph h, Section 4.6., *Evaluation Factors*, Solicitation.

17. The RFQ also advised that, in addition to the adjectival ratings, the evaluators also would assign a "risk rating" to the overall proposal. The stated purpose for this "risk rating" was for each evaluator to assess the level of risk associated with selecting the contractor to perform Phase 1, Project Planning, and Phase 2, Project Implementation. See Exhibit 1, Paragraph j, Section 4.6., *Evaluation Factors*, Solicitation. To meet this requirement, each evaluator was to assign one of the following "risk ratings" to the offeror's submittal:

1) Low Risk: Any weaknesses identified by the evaluators in the experience, approach, capabilities, and/or past performance record of the developer that have little potential to cause disruption to the planning and implementation phases. Normal contractor/government effort and monitoring will probably minimize any difficulties.

2) Moderate Risk: There are weaknesses identified by the evaluators in the experience, approach, capabilities, and/or past performance record of the offeror that can potentially cause disruption to the planning and implementation phases. Special contractor/government emphasis and close monitoring will probably minimize any difficulties.

3) High Risk: There are weaknesses identified by the evaluators in the experience, approach, capabilities, and/or past performance record of the developer that have the potential to cause significant disruption to the planning and implementation phases even with special contractor/government emphasis and close monitoring.

See Exhibit 1, Paragraph k, Section 4.6, *Evaluation Factors*, Solicitation. Each evaluator was required to "document the weaknesses and their potential impact on disruption to the planning and implementation phases of the project to justify the contractor selection rating." See Exhibit 1, Paragraph 1, Section 4.6., *Evaluation Factors*, Solicitation.



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

18. According to the Army's Source Selection Plan, there were [redacted] members of the West Point SSEB. See Exhibit 3, Attachment 2, *SSP Personnel List*, Army Source Selection Plan.

19. At the conclusion of oral presentations by the offerors, each members of the SSEB was to independently evaluate and score each proposal and then they jointly were to arrive at a consensus evaluation. See Exhibit 3, Attachment 3, *RFQ Rating Methodology for Step Two*, Army Source Selection Plan. In this regard, the elements and questions of each factor was to be "evaluated **comprehensively** to determine an overall rating for that factor," which then would be used to analyze the offeror's ability to plan and implement the project. See Solicitation, Paragraph f, Section 4.6, *Evaluation Factors*. The evaluation criteria and factor assessments that were to be used by the evaluators were specifically disclosed to the offerors in the RFQ. In turn, the Army developed a SSEB *Step Two Individual Evaluation* Form incorporating these specific factors/questions for the evaluators to use. See Solicitation, Section 4.6.6., *Financial Plan*, Section 4.6.7., *Preliminary Project Concept Statement*, Section 4.6.8, *Organizational Capabilities (On-Site, Installation Specific)*, and Section 4.6.9., *Small Business Utilization Plan (On site, Project Specific)*. The Form itself provided a detailed format for indicating an "Overall Rating," as well as ratings for each of the four evaluation factors and their respective sub-factors. See Exhibit4, Example, *SSEB Step Two Individual Evaluation* Form.

20. After the SSEB members conducted their individual evaluations, they were to determine a consensus rating of each evaluation factor ("Consensus Evaluation Factor Rating"), then a Consensus "Overall" rating, and a Consensus "Risk" Rating. See Exhibit 3, Attachment 3, *REF Rating Methodology*, at Page 29, Army Source Selection Plan; and Exhibit 5, SSEB Individual Evaluations – Forest City The SSEB also used the Army's "Baseline" for West Point to compare its Baseline to the offerors' proposals. See Exhibit 6, *SSEB Baseline vs. Offerors Comparison Spreadsheet* (as of February 8, 2007).



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

- **SSAC Evaluation Assessment**

21. At the conclusion of its evaluation, the SSEB was to present its "consensus evaluation" of each offeror to the Source Selection Advisory Committee (SSAC). See Exhibit 3, Attachment 3, *REF Rating Methodology*, Paragraph 3.1, "SSEB Evaluation Report," Army Source Selection Plan; Exhibit 7, SSEB Consensus – Forest City; Exhibit 8, SSEB Rating Matrix – *Evaluation Rating Table – SSEB Consensus – Step 2*. The SSAC, which consisted of [redacted] voting members and [redacted] non-voting advisor from [redacted], was to make a comparative assessment of proposals against the source selection criteria and arrive at a consensus. The SSAC employed an evaluation form that was an adaptation of the SSEB evaluation form - with the SSAC merely changing the title from *SSEB Step Two Consensus Evaluation* to *SSAC Step Two Consensus Evaluation*. In all other aspects, the form was to be identical. See Exhibit 9, SSAC Consensus – Forest City; Exhibit 10, SSAC Consensus – GMH/Centex.

22. In conducting its analysis, the SSAC also relied upon a comparison chart, [redacted]. See Exhibit 11, SSAC - Army Baseline vs. Offerors Comparison Spreadsheets. The assessment of the SSAC was memorialized in a memorandum submitted to the Source Selection Authority (SSA). See Exhibit 12, SSAC – *Memorandum For Source Selection Authority*, dated 1 March 2007. The SSAC also submitted its consensus evaluation of the offerors, along with its Baseline Spreadsheets and "Rating Matrix." See Exhibit 13, SSAC Rating Matrix – *Evaluation Rating Table – SSAC Consensus – Step 2*.

- **SSA Selection for Award**

23. The assessment of the SSAC was then to be briefed to the Source Selection Authority (SSA) who was to make the final analysis resulting in a recommendation of an award. See Exhibit 14, SSA - *Source Selection Decision Document*, dated 5 March 2007. While the SSA could use reports and assessments prepared by others, the final decision had to represent the SSA's



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

independent judgment. See Exhibit 14, SSA- Source Selection Decision Document, dated 5 March 2007. Based on the SSA's decision, the Contracting Officer would then make the award. See Exhibit 1, Section 4.5.3., *Source Selection Decision*, Solicitation.

- **Forest City's Proposal for the West Point RCI**

24. Based on initial Step One submissions, the Army announced on April 14, 2006, that [redacted] prospective contractors, including Forest City, were selected as being in the highly qualified competitive group and invited to participate in RFQ's Step Two process. In response, Forest City and [redacted] other companies (GMH/Centex; [redacted]) elected to submit a proposal for the West Point RCI project.

25. Initially, the RFQ contemplated that the RCI project for West Point would include 964 family housing units, and Forest City prepared its oral presentation and submission based on this assumption. On December 7, 2006, Forest City made its oral presentation to the SSEB. As contemplated in the RFQ, Forest City was provided an opportunity to provide further clarification and respond to questions raised by the SSEB during the oral presentation. Forest City made this "Further Clarification & Response to Questions" submission on December 12, 2006.

26. Approximately one month later, on January 4, 2007, the Army issued Amendment No. 14 which reduced the number of family housing units from 964 to 628 units:

> For purposes of this solicitation, offerors should assume that 628 end-state homes will be available to the project.... The remaining homes may be retained as "occupied surplus" until the end of their useful life, i.e., until the homes would require an expenditure of greater than $25K in one budget year. During the CDMP, the actual endstate number will be determined. The actual project endstate will range between 628 and 800 homes.

See Exhibit 25, Solicitation Amendment No. 0014. The Amendment further advised that offerors interested in continuing to participate in Step Two for West Point were to resubmit their Step Two submission, using 628 homes vice 964 homes. In this regard, the offerors were permitted to submit



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

an additional 75 pages of text and 150 PowerPoint slides, with submissions due on January 26, 2007. The Amendment also advised that revised oral presentations would not be held. Forest City submitted its revised written submission to the Army on January 26, 2007.

- **Notice of Award**

27. By letter, dated March 8, 2007, the Army notified Forest City that it had not been selected for award of the West Point RCI because its "submission did not provide the 'best value' to the Army when evaluated against the factors contained in the RFQ," and that GMH/Centex Military Communities had been selected for award. The letter went on to offer Forest City the opportunity for a post-award debriefing on March 19, 2007. See Exhibit 15, Army Notification Letter to Forest City, March 8, 2007.

28. The Army attached two documents to its letter: (i) a "Consensus Evaluation Ratings" which provided the SSEB's consensus rating for Forest City, and (ii) a "Consensus Ratings Matrix" which provided the SSAC's consensus ratings for Forest City on the evaluation factors. The Army also had attached the SSAC's two-sheet "Overall Rating" for the awardee, GMH/Centex. On the day of Forest City's debriefing, Forest City learned in an exchange of e-mails with the Contracting Officer that the Army had inadvertently included the GMH/Centex "Overall Rating" as part of the information it had provided to Forest City.

29. With regard to the SSEB's "Consensus Evaluation Ratings" for all of the offerors, each was rated using adjectival ratings of "Exceptional Plus (E+)," "Exceptional (E)," "Exceptional Minus (E-)," "Acceptable Plus (A+)," "Acceptable (A)," "Acceptable Minus (A-)," "Unacceptable (U)," or "Neutral (N)." Forest City, the second ranked offeror in the SSEB's rating, and GMH/Centex, received the following ratings:

| Factor | [redacted] | [redacted] |
|---|---|---|
| Finances | [redacted] | [redacted] |
| Concept Statement | [redacted] | [redacted] |
| Organizational | [redacted] | [redacted] |


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

| | | |
|---|---|---|
| Small Business | [redacted] | [redacted] |
| Overall Rating | [redacted] | [redacted] |
| Risk Rating | [redacted] | [redacted] |

30. With regard to the SSAC's "Consensus Evaluation" of the Forest City proposal, this document is 24 pages in length, consisting of a two-page "Overall Rating" summary, and then 22 pages addressing the details of the grading on the four evaluation factors, in descending order of importance, as noted earlier: (1) Project Finance, (2) Preliminary Project Concept Statement, (3) Organizational Capabilities (on-site, project specific), and (4) Small Business Utilization Plan (on-site, project specific).

- **Forest City - "Overall Rating"**

31. In the *Summary Data* section of the SSAC's two-page "Overall Rating" form, it recounted the essential elements of Forest City's proposal for the West Point RCI: Of the total 628 family housing units identified in the RFQ, Forest City proposed that it would demolish [redacted] and replace them with [redacted]. For the remaining [redacted], Forest City proposed to renovate these units. In addition, it proposed to contribute [redacted] in equity at financial closing.

- **GMH/Centex – "Overall Rating"**

32. In the *Summary Data* section of the SSAC's two-page "Overall Rating" form, it summarized certain basic facts of the GMH/Centex winning proposal: Of the total 628 family housing units identified in the RFQ, GMH/Centex proposed that it would construct [redacted] new units compared to Forest City 255 units. The summary for GMH/Centex further stated that it would renovate [redacted] (compared to Forest City's [redacted] units), and "convert [redacted] units," and "**<u>no work</u>** [redacted] units." The summary further advised that GMH/Centex would contribute [redacted] million (compared to Forest City [redacted]), but that GHM/Centex would make its contribution only at the [redacted] (compared to Forest City's [redacted]).



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

- **Forest City's Debriefing**

33. The Army held Forest City's debriefing on March 19, 2007. While the Army did expound on the written commentary in the SSAC's "Consensus Evaluation Ratings" (pages 3-24), the most significant discussion related to the substantial, and rather obvious, disparity between the basics of Forest City's [redacted] with that of GMH/Centex: Forest City was proposing to [redacted] housing units than GMH/Centex, and [redacted] housing units than GMH/Centex proposed. Moreover, not only was there a [redacted] disparity between Forest City equity contribution [redacted] that of GMH/Centex, but Forest City's contribution was to be made [redacted].

34. The Army debriefers advised the Forest City representatives that the Army had rated Forest City's *Project Finance* as only "[redacted]" (compared to GMH/Centex's "[redacted],") because the SSAC had <u>not</u> accepted Forest City's [redacted]. [redacted]. In affect, the Army had concluded Forest City had [redacted] by proposing, in the Army's view, [redacted].

35. In the SSAC evaluation of Forest City's proposal under the *Preliminary Project Concept* Factor, it identified only [redacted] - the conversion of certain apartments into townhomes. The SSAC did <u>not</u> even mention as a Major Strength the fact that of the [redacted] units identified in the RFQ, Forest City proposed that it would demolish [redacted] and replace them with [redacted] new units.

36. For "Major Weaknesses," the SSAC identified [redacted] items: (i) the SSAC did not like the fact that [redacted] new homes were not projected to be delivered [redacted] of the IDP, (ii) the SSAC identified as a "Major Weakness" a typographical error - in one write-up, the funds for the General/Flag Officer Quarters was cited as [redacted], and in the



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

Development as [redacted], (iii) the SSAC said it was a "Major Weakness" for Forest City to propose the [redacted] from the [redacted] without replacement [redacted] construction, and (iv) the SSAC identified as a "Major Weakness" the fact that the proposed size [redacted] of the Community Center, with basketball court and swimming pool, was excessive for the West Point project.

- **Protest to GAO**

37. On March 26, 2007, Forest City timely protested the award to GAO. In its GAO protest, ICF alleged that the Army: (1) misevaluated Forest City's *Financial Plan* by finding that its [redacted] and determined this was a "major weakness" to its Proposal, and (2) improperly applied the evaluation criteria by failing to acknowledge and reward [redacted] significant benefits of Forest City's *Financial Plan* compared to GMH's *Financial Plan*: (i) Forest City offered to [redacted] compared to [redacted] offered by GMH, (ii) Forest City allocated its new home construction across [redacted] (iii) Forest City offered to renovate [redacted] compared to [redacted] by GMH, and (iv) Forest City's equity contribution was [redacted] compared to [redacted] by GMH.

38. The Army suspended performance of the contract pending the outcome of the protest.

39. In reviewing the source selection documentation provided in the Agency Report filed by the Army, it was discovered that, not only had the SSEB, the SSAC and the SSA failed to properly assess Forest City's proposal, but that the Army had failed to reject GMH/Centex's proposal because it failed to meet the material requirements of the Solicitation.


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

40. Following the submission of the Agency Report, Forest City filed its Comments and asserted further protest grounds based on the Army documentation: (i) the SSEB used the wrong version of the evaluation form which omitted consideration of the question: "To what degree is the offeror guaranteeing scope and price," thereby resulting in the Army's failure to properly consider Forest City's guarantee which, in turn, led to the Army's determination that Forest City's "[redacted]" was a Major Weakness, (ii) the Army failed to reject GMH/Centex's proposal as [redacted] to GMH/Centex's proposal to do no work ("no work") on [redacted] family housing units [redacted], (iii) the SSAC used the [redacted] to calculate GMH/Centex's construction costs, and then reported to the SSA that GMH/Centex's costs were consistent with the Army benchmark, (iv) the Army improperly assessed Forest City's [redacted] for new homes as a "weakness" when compared to both the Army benchmark GMH/Centex's plan for new home [redacted], and (v) the Army's failure to consider Forest City's guarantee resulted in the Army's assessment of [redacted] a weakness.

- <u>Major Errors Revealed in the Agency Report</u>: **Failure To Evaluate Forest City's "Scope Guarantee"**

41. The RFQ's Step Two evaluation criteria for the "Project Finance" Factor - the <u>highest rated</u> of the evaluations factors - <u>initially</u> provided at Paragraph 4.6.6.a(5) the following description of this subfactor:

> Does the offeror demonstrate an understanding of the opportunities for and limitations on the revenue and expenses associated with the project? Does the financial plan support the long-term maintenance of the project?

This wording is identical to the Source Selection Plan at Paragraph 4.6.7, *Project Finance Element 5*. However, the Army modified this evaluation factor after it issued the RFQ.


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

42. By RFQ Amendment No. 0007, dated September 22, 2006, the Army added the following underscored phrase:

> Paragraph 4.6.6 Financial Plan, (subparagraph 5). Does the offeror demonstrate an understanding of the opportunities for and limitations on the revenue and expenses associated with the project? ***To what degree is the offeror guaranteeing scope and price?*** Does the financial plan support the long-term maintenance of the project?

(Emphasis in original.) See Exhibit 18, Solicitation Amendment No. 0007, dated September 22, 2006.

43. In Forest City's proposal, it specifically addressed this significant new evaluation subfactor:

> [redacted]

Emphasis added. Forest City's **guaranteed** maximum price contract [redacted], and it covers [redacted], but also [redacted] See Exhibit 19, Forest City Proposal Excerpt: Guarantee. In comparison, GMH/Centrex's guarantee covers [redacted]. It **excludes**, for example, [redacted]


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

[redacted].

See Exhibit 20, GMH/Centex Proposal Excerpt: Guarantee.

44. When the SSEB reviewed Forest City's Proposal after Forest City's oral presentation on December 7, 2006, the source selection documentation in the Agency Report establishes that four of the five SSEB members conducted their respective evaluations of Forest City's Proposal on two separate occasions - one before and one after revised proposals were submitted on January 26, 2007. One SSEB member evaluated Forest City's Proposal on only one occasion, and that one was conducted after the submission of revised proposals.

45. While the *SSEB Step Two Individual Evaluation* Form had been updated to include the new subfactor for Project Finance Element 5 added by Amendment No. 0007 ***(To what degree is the offeror guaranteeing scope and price?).*** On the first evaluations by SSEB members [redacted] used the old format and, therefore, did not evaluate or make comment on Forest City's guarantee plan. When all [redacted] members conducted their individual evaluations of Forest City's revised proposal, one person - [redacted] - used the old format that did not ask the evaluator to determine *"to what degree is the offeror guaranteeing scope and price."* Where the correct form was used, the evaluations universally extolled Forest City's guarantee. Note also the comments at page 4, where [redacted] assigned an "Exceptional" rating for Project Finance to Forest City's proposal. Moreover, when SSEB members [redacted] used the correct form, there was not a single reference to any concern with the vertical cost [redacted] projected by Forest City.

46. SSEB member [redacted] only evaluation of the Forest City proposal was conducted on February 3, 2007, and [redacted] used the **old** *SSEB Step Two Individual Evaluation* Form that did not include the subfactor for Project Finance Element 5 added by Amendment No. 0007 *(To what degree is the offeror guaranteeing scope and price?).* Accordingly, not only did [redacted] evaluation make no


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

evaluation of Forest City's guarantees, but [redacted] evaluation is the only one that mentions a concern related to "[redacted]." In this regard, at page 3 of [redacted] evaluation, a Project Finance rating of "[redacted]" was downgraded to "[redacted]" with the following reason: "Rating was revised from an [redacted] to an [redacted] as a result of consensus discussions. Discussions included [redacted], etc. in pro forma." In the "Major Weakness" section, it also states: "Cost of [redacted] seems [redacted]." See Exhibit 25, [redacted] *Two Individual Evaluation.*

47. When the SSEB members met to arrive at a consensus rating on February 11, 2007, the SSEB members used the **old** *SSEB Step Two Individual Evaluation* Form that did not include the subfactor for Project Finance Element 5 added by Amendment No. 0007 *(To what degree is the offeror guaranteeing scope and price?)*. Accordingly, there was absolutely **no** evaluation, consideration or even mention of Forest City's $[redacted] million scope guarantee. Even though the SSEB provided an overall rating of "[redacted]," it downgraded Forest City's Project Finance rating to "[redacted]". The SSEB's failures were compounded by the SSAC.

48. When the SSAC members took up Forest City's proposal, they too used the **old** form that did not include the subfactor for *Project Finance Element 5* added by Amendment No. 0007 (*To what degree is the offeror guaranteeing scope and price?*). And as with the SSEB's Consensus Evaluation of Forest City's Proposal, the SSAC members failed to comprehensively evaluate, Forest City's $[redacted] million scope guarantee. The only reference to Forest City's guarantee in where the SSAC Consensus notes: "[redacted]." See Exhibit 9, SSAC Consensus – Forest City at page 8. From this comment, it is evident that the SSAC totally failed to review Forest City's entire guarantee, as it clearly covers all aspects of its Proposal.


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

Moreover, the SSAC compounded its error by giving Forest City *Project Finance* a rating of only "[redacted] and cited the following as a major weakness:

[redacted]

Emphasis added. It is clear that Forest City's $[redacted] million scope guarantee totally eliminates this concern.

49. In the SSAC's Memorandum to the SSA, the SSAC significantly compounded the SSEB's failures by dooming Forest City's *Project Finance* proposal with the following: "Unfortunately, FC's proposal also assumes a [redacted] in comparison to the Army benchmark and they did not sufficiently demonstrate that this cost could actually be achieved." Yet there is no evaluation, reference or mention of Forest City's $[redacted] million scope guarantee. Since the Forest City guarantee eliminates any risk associated with the plan's [redacted], the SSAC's failure to address it in its evaluations caused Forest City's *Project Finance* rating, as well as its overall rating, to be downgraded.

50. The same fate did not befall GMH/Centex. See Exhibit 10, SSAC Consensus – GMH/Centex. To the contrary, the SSAC extolled GMH/Centex guarantee - but not Forest City's guarantee -- in the SSAC Memorandum to the SSA:

[redacted]

Emphasis added. See Exhibit 12, SSAC – *Memorandum for Source Selection Authority*, dated 1 March 2007. Clearly, GMH's guarantee was evaluated by the SSAC. Since the SSAC made no mention of Forest City's guarantee, it can be concluded that either the SSAC did not evaluate Forest City's proposal on the key element, or the SSAC intentionally omitted it from the report to the SSA.


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

51. The fatal flaws of the SSEB and the SSAC dooms the SSA's decision because he found "the analysis and conclusions within that [SSAC] Report to be persuasive, to be supported by the facts and to be in harmony with the selection factors in the solicitation," and then adopted them in support of his decision to award to GMH. In this regard, SSA's "Decision Document" is fatally flawed because the SSA support's his selection of GMH by finding that "GMH also presented a cost structure that [redacted] and offered a Guaranteed Maximum Price which provided [redacted]," yet does not evaluate, consider, reference or even mention Forest City's $[redacted] million scope guarantee. <u>See</u> Exhibit 14, SSA - *Source Selection Decision Document*, dated 5 March 2007.

52. The SSA's praise of GMH's guarantee is first presented in the general discussion about proposals at page 4, and then repeated at page 8 in the section on GMH's proposal - and his failure to evaluate, discuss or even mention Forest City's guarantee is omitted first in the general discussion at page 4, and then again in the section on Forest City's proposal at pages 7-8. Clearly, the SSA failed to evaluate and consider Forest City's "guarantee."

- **<u>Major Errors Revealed in the Agency Report</u>: GMH/Centex's "NO WORK" [redacted]**

53. The RFQ stated at Section 4.0, *Contractor Selection Process*, that "final selection will be based upon the qualifications exhibited by the offerors as outlined by the <u>evaluation</u> <u>factors</u> and upon the basis of <u>best</u> <u>value</u> to the Government." (Emphasis added.) In this regard, "best value" was identified as "the best value for improving military family housing for the specific project." <u>See</u> Solicitation, Section 4.4.a.

54. For the West Point Project, this meant that an offeror's proposal was to detail how it planned to provide new construction renovation to the West Point family housing units to insure that "all units will be modem homes, which fit with the historical ambiance of the installation, and


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

contain the latest amenities. Homes will have spacious floor plans which maximize space and provide adequate storage."

55. The Army's plan was to convey the 628 family housing units to the awardee. "In exchange, the partner will provide for the **new construction/renovation**, operation, management and maintenance of the existing family housing inventory. This conveyance will be for a fifty-year period with a twenty-five year renewal clause." Emphasis added. See Exhibit 2, Paragraph 5.0.b, Appendix B, *United States Military Academy (USMA), West Point, NY (West Point)*, RFQ.

56. Consistent with the understanding that all 628 units would be subject to new construction or renovation, the Army's Baseline provided that **all** 628 would be covered by new construction or renovation. See, for example the Baseline category "Categories of Construction - Hard Costs Only" at page 3 of Exhibit 21, Forest City Notations – Army Baseline – "Plug Numbers." See Exhibit 22, Forest City Notations – Army Baseline Analysis.

57. Consistent with the requirements of the RFQ and the Army's Baseline, Forest City's proposal provided for new construction or renovations to **all** 628 units, and the Army so displayed on this fact on its *Army Baseline Analysis*. However, the SSAC's spreadsheet fails to accurately and correctly depict GMH/Centex's proposal, leaving the false impression that GMH/Centex too will new construct/renovate all 628 units.

58. The SSEB's spreadsheet appears to make apples-to-apples comparisons between the Army's Baseline and the proposals of Forest City and GMH/Centex, and that the GMH/Centex's hard costs of $[redacted] "closely represented" the Army's baseline hard costs of $[redacted] particularly as compared to Forest City's $[redacted]. Yet a careful review demonstrates that the SSAC did not record the [redacted] "no work" GMH identified in its plan. This left the clear - but erroneous -- impression that both proposals accounted for all [redacted] units and their corresponding hard costs. The SSEB should have disclosed that Forest City's proposal was based on [redacted] units and



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

GMH's on only [redacted] units. See Exhibit 21, Forest City Notations – Army Baseline – "Plug Numbers"; and Exhibit 22, Forest City Notations – Army Baseline Analysis.

59. In the SSAC's adaptation of the SSEB spreadsheet, the SSAC spreadsheet does not identify for the SSA that hard costs identified for GMH/Centex covers only [redacted] housing units, while the Forest City costs cover all [redacted] housing units, as required by the RFQ. Only on the IDP Plan Summary sheet (page 3) does the SSAC make passing reference to the fact that GMH/Centex has [redacted] housing units "with no work funded during the IDP."

60. The SSAC and the SSA failed to specifically evaluate the impact on the West Point housing project if GMH/Centex was permitted to do **no work** on [redacted] housing units - [redacted] of West Point's housing units.

61. The SSAC and the SSA failed to specifically evaluate the fact that, not only would GMH/Centex not do any work on [redacted] units, but GMH/Centex did not plan to do any work on those [redacted] units until the beginning of the [redacted] of the development plan - that is in the year [redacted]

62. Given the demonstrated carelessness exhibited by the SSEB, the SSAC and the SSA related to Forest City's guarantee, it is very reasonable to conclude that the SSA was totally unaware that the disparity [redacted] permitted by the SSEB and the SSAC made it impossible for the SSEB, the SSAC or the SSA to conduct apples-to-apples comparisons and analysis of the Forest City and GMH's proposals.

- **Major Errors Revealed in the Agency Report: SSA Determines GMH/Centex's Proposal Most Closely Represented the Army's Benchmark."**

63. In stating the rationale for selecting GMH/Centrex, the SSA stated that GMH "presented [redacted] that most closely represented the Army's benchmark." However, the


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

SSA statement is "accurate" only because the SSEB, and then the SSAC, made GMH's cost structure appear to be close to the Army's benchmark.

64. The "Army benchmark" figures identified by the SSA are found at page 5 of the SSEB's spreadsheet. In the "Square Footage" block, it shows the Army's baseline for the "average square footage" per unit at [redacted] and a "vertical cost" of $[redacted]. In the corresponding column/block for GMH, it shows an identical "average square footage" per unit of [redacted] and a resulting "vertical cost" of $[redacted]. However, the SSA was able to state GMH's cost structure most closely represented the Army's benchmark only because the Army "plugged in" the Army's [redacted] to calculate GMH's vertical cost. The SSEB spreadsheet used a "plug number" for GMH/Centex because the Army official who maintained the spreadsheet noted: **"Unable to locate SF for [GMH] units - plug # ."** He then went on to bold the [redacted] in the GMH column to indicate the "plug # " he used.

65. The inability of the SSEB to identify and calculate GMH's average square footage for its new units, the SSEB's plugging in numbers to assist the analysis of GMH's proposal, and the SSEB's use of inaccurate vertical cost in its analysis is further evidence of the Army's total failure to conduct a meaningful evaluation of the offerors' proposals.

66. The SSAC did not conduct its own analysis, but blindly adopted the SSEB's "plug numbers" when the SSAC developed its spreadsheet. See Exhibit 11. SSAC – Army Baseline vs. Offerors Comparison Spreadsheets. At page 3 of the SSAC's spreadsheet "[redacted]," it too identifies GMH's "weighted average unit GSF" at [redacted]. Adjacent to this item is a reference to Note 3, which is located at page 4 of the SSAC spreadsheet. It states: **"SF was not clearly identified in the proposal and was calculated by [redacted]."** (Emphasis added.)


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

67. By using a "plug number" and passing it off as a calculation from [redacted], its outside consultant, the SSAC mislead the SSA who, in turn, adopted in full the SSAC findings and conclusions.

- **<u>Major Errors Revealed in the Agency Report</u>: SAA determines Forest City "diminishes the value of its new unit plan."**

68. In the SSA's comparison of the GMH proposal with Forest City, he adopted the SSAC's negative comments concerning Forest City's "new home" delivery schedule. In this regard, the SSAC's Memorandum for the SSA stated:

> The five year initial development period will consist of new construction of [redacted] units single family homes and renovation [redacted] homes, the most new construction of any of the bidders. **<u>Unfortunately the [redacted] of the new homes are not scheduled for delivery [redacted], with an average of [redacted] delivered the first [redacted] years of the project and [redacted] units delivered the last [redacted] months of the project. . . . The evaluators believed that the soldier would be better served if FC focused more on [redacted]</u>**

Emphasis added.

69. While both the SSAC and the SSA assert that Forest City's new home construction schedule reduces benefit to the soldiers, they both failed to evaluate and consider the following:

- The Army Baseline only envisioned [redacted] new homes - Forest City is providing [redacted] new homes to the military families at West Point.
- GMH proposed to provide [redacted] new homes, compared to Forest City's [redacted] homes.
- Under the Army Baseline, its [redacted] units are delivered by the end of the [redacted] month - Forest City will be delivering [redacted] units in the <u>same</u> timeframe.
- GMH proposes to deliver its [redacted] new units by the end of the [redacted] month - Forest City will deliver [redacted] new units by the end of the [redacted] month - only [redacted] fewer homes, with the balance delivered in months [redacted].


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

While the SSAC and the SSA find as a weakness Forest City's new construction delivery because it purportedly diminishes "the quality of life for soldiers," the facts demonstrate that under Forest City's plan, military families will have [redacted] more new homes in the same time period the Army Baseline identified for all of its new homes.

70. It is accurate to state that Forest City does not contemplate delivery of the last of its [redacted] homes until [redacted] month. But if the SSAC and the SSA maintain that this is a fair and valid criticism, then why is there **not** one single criticism or negative comment by the SSAC and/or the SSA about the fact that GMH's proposal envisions that it will do "**no work**" on [redacted] during [redacted], and it has allocated no construction/renovation funds to these [redacted] through [redacted]. Moreover, the GMH "Proposed Renovation & Replacement Schedule" clearly shows that GMH will not do any work on those [redacted] until the beginning of the [redacted]! What then of the" quality of life" for the military families living in those [redacted] as they observe other military families living in new or renovated homes? Clearly, the SSAC and the SSA have totally failed to apply the same standards in evaluating the Preliminary Concept Plan of Forest City and GMH.

- **Major Errors Revealed in the Agency Report: SSA Determines Forest City's Proposed Community Center Too Large.**

71. The SSA again adopted the criticism of the SSAC which charged that Forest City's community center [redacted]: "The size of the proposed Stony Lonesome Community center ([redacted]) and the accompanying amenities is excessive especially for a 628-unit project. Value would have been added if ancillary facilities were more appropriately sized." See Paragraph 4 at Page 10, Exhibit 9, SSAC Consensus – Forest City, and page 5, Preliminary Concept, Exhibit 12, SSAC – *Memorandum for Source Selection Authority.*

72. Notwithstanding this criticism, there is no construction standard that recommends the size of a community center relative to the number of units in the project. Moreover, how can


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

Forest City be cited for diminishing the qualify of life for military families in its [redacted] and, at the same time, be criticized for providing a community center for the military families with amenities that includes "[redacted] See Exhibit 23, Forest City Proposal Excerpt: "Community Center."

73. Third, how can Forest City's plans for the community center be listed as a weakness when compared to GMH's proposed [redacted] new community center with [redacted] and the conversion of [redacted] into a Community club?

74. And finally, how can Forest City be charged with a "weakness" in its Preliminary Project Concept when it has guaranteed the [redacted] It is clear that the SSAC and the SSA failed to evaluate Forest City's proposal on the same standards as it used for GMH's proposal.

- **GAO Decision**

75. On June 29, 2007, GAO issued its protected decision, dismissing as untimely in part, and denying in part, Forest City's protest. On the next business day, July 2, Forest City's counsel sought and was granted permission to advise its client of the following: "Earlier today we received GAO's notice of decision. GAO dismissed the protest as untimely in part, and denied the protest in part. See Exhibit 24, E-Mail exchange. The redacted version of the decision was issued on July 12, 2007, and posted by GAO on its web site on July 17, 2007. See Exhibit 16, GAO Decision (protected version - June 29, 2007); Exhibit 17, GAO Decision (redacted version - July 12, 2007).

COUNT I


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

**The Army Failed To Evaluate Forest City's "Scope Guarantee" in Accordance with the Evaluation Criteria for *Project Finance.***

76. Forest City repeats and realleges Paragraphs 1 through 75 above.

77. The RFQ provided that the Army would use four (4) Factors, in descending order of importance, to evaluate the oral and written submissions of the offeror:

(1) Project Finance;
(2) Preliminary Project Concept Statement;
(3) Organizational Capabilities (on-site, project specific); and
(4) Small Business Utilization Plan (on-site, project specific).

See Exhibit 1, Solicitation, Paragraph b, Section 4.6., *Evaluation Factors*. The RFQ further stated at Section 4.0, *Contractor Selection Process*, that "final selection will be based upon the qualifications exhibited by the offerors as outlined by the evaluation factors and upon the basis of best value to the Government." (Emphasis added.) In this regard, "best value" was identified as "the best value for improving military family housing for the specific project." See Exhibit 1, Solicitation, Paragraph a, Section 4.4., *Submission of Step Two.*

78. In addition to the four primary evaluation factors, the RFQ and the Army's Source Selection also specified a series of sub-factors that were to be evaluated under each primary evaluation factor. See Exhibit 1, *Step Two Evaluation* (Pages 43-45), Solicitation. These evaluation factors and sub-factors were to be used by the Army to prepare the evaluation forms used by the SSEB and the SSAC in their respectively evaluations of the offerors' proposals. By RFQ Amendment No. 0007, dated September 22, 2006, the Army amended one of the sub-factors for *Project Finance* (the highest valued evaluation factor), by adding a requirement for the evaluators to comprehensively determine "to what degree is the offeror guaranteeing scope and price." See Exhibit 18, Solicitation Amendment No. 0007, dated September 22, 2006.


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

79. With regard to the degree to which Forest City's proposal guaranteed scope and price, it specifically addressed this significant new evaluation sub-factor:

[redacted]

Emphasis added. Forest City then went on to detail the scope of its $[redacted] performance guarantee. In this regard, the Forest City guarantee encompassed not only the 255 new homes it proposed, but also [redacted] See Exhibit 19, Forest City Proposal Excerpt: Guarantee.

80. While the SSEB Evaluation Form had been updated to include the new sub-factor for *Project Finance* added by Amendment No. 0007 (*To what degree is the offeror guaranteeing scope and price?*), the SSEB members used the **old** *SSEB Step Two Individual Evaluation* Form that did **not** include the subfactor for *Project Finance* Element 5 added by Amendment No. 0007 (*To what degree is the offeror guaranteeing scope and price?*). Accordingly, the SSEB members failed to evaluate, consider, or even mention, Forest City's $[redacted] million scope guarantee. Even though the SSEB provided Forest City with an "Overall Rating" of [redacted], it downgraded Forest City's *Project Finance* rating to



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

"[redacted] See Exhibit 25, [redacted] *SSEB Step Two Individual Evaluation.* Unfortunately, the SSEB's failure to evaluate Forest City's guarantee was duplicated by the SSAC.

81. When the SSAC members took up Forest City's proposal, they too used the **old** form that did not include the subfactor for *Project Finance Element 5* added by Amendment No. 0007 (*To what degree is the offeror guaranteeing scope and price?*). And as with the SSEB's Consensus Evaluation of Forest City's Proposal, the SSAC members failed to comprehensively evaluate Forest City's $[redacted] million scope guarantee. The only reference to Forest City's guarantee in all of the evaluation documentation is one sentence in the SSAC Consensus notes: [redacted] See Exhibit 7, SSAC Consensus – Forest City at page 8. From this comment, it is evident that the SSAC totally failed to review Forest City's entire guarantee, much less conduct the comprehensive evaluation mandated by the RFQ and the Army Source Selection Plan.

82. The SSAC further compounded the matter by downgrading Forest City's Project *Finance* to "[redacted] and citing the following as a major weakness:

[redacted]

Emphasis added. The SSAC then gave Forest City's proposal an "Overall Rating" of only "Exceptional-." See Exhibit 13, SSAC Rating Matrix – *Evaluation Rating Table – SSAC Consensus – Step* 2. It is clear that Forest City's $[redacted] million scope guarantee totally eliminates this concern. The failure of the SSAC to comprehensively evaluate Forest City on an essential sub-factor to the *Project Finance* factor is, in and of itself, a fatal flaw to a purported fair and reasonable evaluation.

83. In the SSAC's Memorandum to the SSA, it significantly compounded the failure by dooming Forest City's "Financial Plan" with the following: "Unfortunately, FC's proposal also


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

assumes [redacted] in comparison to the Army benchmark and they did [redacted] that this cost could actually be achieved." Yet the SSAC Memorandum makes **no** evaluation, reference or even mention of Forest City's $[redacted] million scope guarantee. See Exhibit 12, SSAC – *Memorandum for Source Selection Authority*, dated 1 March 2007 at page 5. Since the Forest City guarantee eliminates any risk associated with the plan's vertical costs, the SSAC's failure to evaluate this subfactor caused Forest City's *Project Finance* rating and its "Overall Rating" to be downgraded – [redacted] GMH/Centex.

84. Interestingly, the same fate did not befall GMH/Centex. Although GMH/Centex guarantee was [redacted], the SSAC did not assign as a weakness the fact that the GMH/Centex guarantee did [redacted] See Exhibit 10, SSAC Consensus – GMH/Centex. To the contrary, the SSAC extolled GMH's guarantee – but not Forest City's guarantee -- in the SSAC Memorandum to the SSA:

[redacted]

Emphasis added. See Exhibit 12, SSAC – *Memorandum for Source Selection Authority*, dated 1 March 2007 at page 3. It is clear that the SSAC failed to fairly and equally evaluate the Forest City and GMH/Centex proposals on this matter, and that the SSAC improperly favored the GMH/Centex proposal.

85. The total failure of the SSEB and the SSAC to comprehensively evaluate this critical sub-factor for highest-valued *Project Finance* evaluation factor doomed the SSA's decision because the SSA determined that "the analysis and conclusions within that Report to be persuasive, to be supported by the facts and to be in harmony with the selection factors in the solicitation," and he adopted them in support of his decision to award to GMH. By adopting in its entirety the SSAC's



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

*Memorandum for Source Selection Authority*, the SSA's own "Decision Document" is tainted and fatally flawed. In this regard, the SSA supported his selection of GMH by finding that "GMH also presented a cost structure [redacted]," yet he makes absolutely no evaluation, reference or comment concerning Forest City's $[redacted] million scope guarantee. See Exhibit 14, SSA- *Source Selection Decision Document*.

86. With the Army receiving a full guarantee, Forest City's *Project Finance* rating should have been no less than an "[redacted]," and even possibly an "[redacted]" – but clearly **not** the [redacted] it received from the SSAC. In turn, the SSAC would not have assigned an "Overall Rating" of "[redacted] rating to Forest City's proposal.

87. It is clear that the SSEB, SSAC and SSA failed to "comprehensively" evaluate Forest City's proposal related to *Project Finance* in violation of the terms of the RFQ and the Army Source Selection Plan. By failing to make a proper evaluation of Forest City's $[redacted] million scope guarantee, the Army violated the Competition in Contracting Act, 41 U.S.C. § 253b, and the Federal Acquisition Regulation ("FAR") 15.101-1 and FAR 15.305.

88. Had the Army properly evaluated the Forest City and GMH/Centex proposals in accordance with the RFQ's *Evaluation Criteria*, Forest City would have been selected as the awardee.

## COUNT II

**The Army's Failure to Evaluate Forest City's "Scope Guarantee" in Accordance with the Evaluation Criteria for *Project Finance* Improperly Distorted the Evaluations in Favor of GMH/Centex.**

89. Forest City repeats and realleges Paragraphs 1 through 88 above.

90. From the Consensus Evaluation prepared by the SSEB, to the Consensus Evaluation prepared by the SSAC, to the SSAC's Report to the SSA, to the SSA's Source Selection Decision, the Army's own evaluation documentation demonstrates that the Army did not evaluate Forest



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

City's guarantee as required by the RFQ and the Army's own Source Selection Plan. And a pass comment by the SSAC at the bottom of a page in its Consensus Evaluation is hardly evidence that the Army met its obligation.

91. The failure to evaluate Forest City's $[redacted] million scope guarantee distorted the evaluations in favor of GMH/Centex. This is clearly evident from the Army's praise of the GMH guarantee – [redacted] costs. In comparison, Forest City guarantees [redacted]

92. Had the Army properly evaluated and compared the Forest City and GMH/Centex proposals in accordance with the RFQ's *Evaluation Criteria*, Forest City would have been selected as the awardee.

<u>COUNT III</u>

**The Army Improperly Failed to Reject the GMH/Centex Proposal as Unacceptable Because it Did Not Meet the Material Requirements of the Solicitation.**

93. Forest City repeats and realleges Paragraphs 1 through 92 above.

94. The RFQ stated at Section 4.0, *Contractor Selection Process*, that "final selection will be based upon the qualifications exhibited by the offerors as outlined by the <u>evaluation factors</u> and upon the basis of <u>best value</u> to the Government." (Emphasis added.) In this regard, "best value" was identified as "the best value for improving military family housing for the specific project." <u>See</u> Exhibit 1, Paragraph a, Section 4.4, *Step Two*, Solicitation.


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

95. For the West Point Project, this meant that an offeror's proposal was to detail how it planned to provide new construction/renovation to the West Point family housing units to insure that "all units will be modern homes, which fit with the historical ambiance of the installation, and contain the latest amenities. Homes will have spacious floor plans which maximize space and provide adequate storage." See Exhibit 2, Paragraph 4.0.b.2(b), Attachment B, *West Point*.

96. The Army's plan was to convey the 628 family housing units to the awardee. "In exchange, the partner will provide for the **new construction/renovation**, operation, management and maintenance of the existing family housing inventory. This conveyance will be for a fifty-year period with a twenty-five year renewal clause." Emphasis added. See Exhibit 2, Paragraph 5.0.b, Attachment B, *West Point*.

97. Consistent with the understanding that all 628 units would be subject to new construction or renovation, the Army's Baseline provided that **all** 628 would be covered by new construction or renovation. See, for example the Baseline category "Categories of Construction - Hard Costs Only" at page 3 of Exhibit 21, Forest City Notations – Army Baseline – "Plug Numbers." See Exhibit 22, Forest City Notations – Army Baseline Analysis.

98. GMH failed to comply with the material requirement for the new construction/renovation of 628 units: it offered a materially nonconforming proposal that provided for the new construction/renovation of only [redacted] units and to "no work" [redacted] units. There was no provision in the RFQ which permitted an offeror to propose to "no work" housing units. Accordingly, the Army should have rejected GMH's nonconforming proposal.

99. Forest City clearly suffered competitive prejudice as a result of the Army accepting a proposal which allocated **no** new construction/renovation to [redacted] of the units until the [redacted] of [redacted] Specifically, by permitting this material deviation from the requirement of the RFQ, it permitted GMH to construct a financial plan and new construction/renovation schedule



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

that is significantly more beneficial to GMH. In turn, with it undertaking "no work" on [redacted] of the West Point housing units until the [redacted], it totally distorts, and makes impossible, an apples-to-apples comparison that is essential to a fair, reasonable and unbiased evaluation of offerors. Had the Army eliminated or even relaxed this requirement for all offerors, Forest City surely would have revised its proposal to take advantage of the significant financial and planning benefits the "no work" units provides.

100. Even assuming, *arguendo*, that it is determined that the RFQ permitted GMH to "no work" a portion of the housing inventory, it is irrational and illogical that neither the SSEB, nor the SSAC, nor the SSA did not determine that find "no work" on [redacted] of the units until the [redacted] was not a **significant weakness** in both the Project Finance or Preliminary Project Concept Statement factors – and clearly not warranting an "EXCEPTIONAL" for those two evaluation factors, much less in an overall rating. The only logical conclusion is that the SSA either was totally unaware of this aspect of GMH's proposal, or worse -- chose to ignore its financial and planning impact on the other offerors. What is clear is that this failure led to the improper award of a nonconforming offer that must be set aside.

<u>COUNT IV</u>

**The Army Failed to Evaluate, Consider and Assess the Adverse Impact of GMH/Centex's "No Work" Housing Units as Required by the Evaluation Criteria.**

101. Forest City repeats and realleges Paragraphs 1 through 100 above.

102. Assuming, *arguendo*, the RFQ did not prohibit GMH/Centex from proposing "no work" housing units, the Army failed to evaluate, consider and assess the adverse impact of GMH/Centex's "no work" units as required by the Evaluation Criteria.

103. Under GMH/Centrex's plan for the [redacted] "no work" housing units, its Financial Plan had no funds allocated to those units during the [redacted], a period of



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

approximately [redacted]. Moreover, the GMH/Centrex Financial Plan does [redacted] of the development plan – that is in the [redacted]. However, during this entire eleven year time period, GNH/Centex will be receiving the rental fees on these [redacted] housing units without any corresponding expenditure of capital.

104. The Army Source Selection Plan provides at Paragraph 4.6.6.8, *Project Finance Element 6*, that if "the offeror [is] receiving fees during the construction and rehab period that would significantly decrease its equity position," it is a "weakness." Yet the SSEB, SSAC and the SSA failed to even mention GMH/Centex's receipt of rental fees for [redacted] without any corresponding outlay of capital, much less that it was a weakness in it proposal. Had they applied the requirements of the Source Selection Plan, GMH/Centex proposal would not have received an "Exceptional" for its *Financial Plan* or an "Overall Rating" of "Exceptional."

105. The Army failed to assess as a major weakness GMH/Centex's financial windfall it gains by being permitted to propose "no work" units covering approximately [redacted] of the West Point family housing for a [redacted]. Had the Army properly assessed GMH/Centex's proposal, it would have significantly downgraded both the *Project Finance* evaluation factor and its "Overall Evaluation" rating, thereby rendering GMH/Centex's improper.

## <u>COUNT V</u>

**The Army's Evaluation of GMH/Centex's "No Work" Units Improperly Distorts GMH/Centex's Evaluation and the Comparison with Forest City's Proposal.**

106. Forest City repeats and realleges Paragraphs 1 through 105 above.

107. Assuming, *arguendo*, the RFQ did not prohibit GMH/Centex from proposing "no work" units, the Army's evaluation of GMH/Centex's "no work" units improperly distorts GMH/Centex's evaluation and, in turn, distorts the comparison with Forest City's Proposal.



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

108. Consistent with the requirements of the RFQ and the Army's Baseline, Forest City's proposal provided for new construction or renovations to **all** 628 units, and it was so displayed on the spreadsheet. However, the SSAC's spreadsheet fails to accurately and correctly depict GMH's proposal, leaving the false impression that GMH too will new construct/renovate all 628 units.

109. At first blush, the SSEB's spreadsheet appears to make apples-to-apples comparisons between the Army's Baseline and the proposals of Forest City and GMH. And the casual observer (e.g., the SSAC and the SSA) would conclude that the GMH's hard costs of [redacted] But careful review demonstrates that the SSAC did not record the [redacted] "no work" GMH identified in its plan, thus leaving the clear – but erroneous -- impression that [redacted] The SSEB should have disclosed that Forest City's proposal was based on [redacted] and GMH's on [redacted] units.

110. In the SSAC's adaptation of the SSEB spreadsheet, the SSAC spreadsheet does not footnote for the SSA that hard costs identified for GMH covers [redacted] units, while the Forest City costs cover [redacted], as required by the RFQ. Only on the IDP Plan Summary sheet (page 3) does the SSAC indicate that GMH has [redacted]." And no where does the SSAC inform the SSA that GMH will not do any work on those [redacted] units until the [redacted]

111. Given the demonstrated carelessness exhibited by the SSEB, the SSAC and the SSA related to Forest City's guarantee, it is very reasonable to conclude that the SSA was totally unaware that the disparity [redacted] permitted by the SSEB and the SSAC made it impossible for the SSEB, the SSAC, or the SSA to conduct apples-to-apples comparisons and analysis of the Forest City and GMH's proposals. Accordingly, the SSA selection of GMH/Centex must be set aside.

## COUNT VI



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

**The Army's Acceptance of GMH/Centrex's "No Work" Units Required the Army to Amend the RFQ to Permit Offering "No Work" Units by all Offerors.**

112. Forest City repeats and realleges Paragraphs 1 through 111 above.

113. Assuming, *arguendo*, the RFQ did not prohibit GMH/Centex from proposing "no work" units, the Army's evaluation of GMH/Centex's Proposal using the Army's Benchmark improperly distorts GMH/Centex's evaluation and, in turn, distorts the comparison with Forest City's Proposal.

114. Assuming, *arguendo*, the Army concluded that GMH's nonconforming proposal -- "no work" [redacted] units or [redacted] of the conveyed housing inventory -- was acceptable to the Army, it was incumbent upon the Army to amend the Solicitation and afford all offerors in the competitive range an opportunity to respond to the revised requirements.

115. The Army should have advised offerors that it was permissible to propose not to provide new construction/renovation up to [redacted] housing units, or to "no work" as many housing units as each offeror deemed appropriate. However, then the Army would have to develop appropriate evaluation sub-factors for both *Project Finance* and *Preliminary Project Concept Statement* evaluation factors to allow the SSEB, the SSAC and the SSA the opportunity to weigh, evaluate and consider the impact of "no work" units on the Project. But absent such an amendment to the RFQ, the Army's acceptance of GMH's proposal was tantamount to an amendment of Army's requirements only for GMH.

116. The Government's acceptance of the "no work" housing units was prejudicial to all other offerors, and the award must be set aside.

COUNT VII


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

**The Source Selection Information Relied Upon by the SSA Made It Impossible for the SSA to Make an Informed Judgment In Selecting An Awardee.**

117. The SSA relied upon SSEB Consensus Evaluations that failed to consider the critical sub-factor concerning guarantees which, in turn, caused the SSEB to improperly rate Forest City's *Project Finance*, as well as its "Overall Rating."

118. The SSA relied upon SSAC Consensus Evaluations that failed to "comprehensively" and meaningfully consider the critical sub-factor concerning guarantees which, in turn, caused the SSAC to improperly rate Forest City's *Project Finance*, as well as its "Overall Rating."

119. The SSA relied upon the SSAC Spreadsheet that was misleading in at least two respects: (i) it improperly used a [redacted] in calculating GMH/Centex's costs causing the SSA to erroneous believe that those costs were [redacted] (ii) it improperly displayed GMH/Centex's proposed plan for the 628 housing units to [redacted]; and (iii) it improperly failed to indicated that GMH/Centex would do [redacted]

120. The SSA relied upon the Report from the SSAC which: (i) failed to disclosure the details of Forest City's $[redacted] million guarantee; (ii) failed to disclose that Forest City's $[redacted] million guarantee eliminated any concern related to its [redacted], (iii) failed to disclose that the projected size of Forest City's Community Center was covered by Forest City's $[redacted] million guarantee; (iv) failed to disclose that GMH/Centex's guarantee covered [redacted], compared to Forest City's $[redacted] million, (v) failed to disclose that GMH/Centex's guarantee [redacted] compared to Forest City's [redacted] of its plan; (vi) failed to disclose that GMH/Centex would not perform any work on [redacted] housing units -- [redacted] of


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

the housing – [redacted]; (vii) failed to disclose that GMH/Centex would be receiving rental revenue on those [redacted] "no work" housing units; and (viii) failed to disclose that the SSEB and the SSAC failed to identify the revenue produced on the [redacted] units as a "weakness," as required by the RFQ and Sources Selection Plan.

121. Given the major defects in the documentation and reports relied upon by the SSA, it is evident that the SSA was not able to make an informed and reasoned judgment on which offeror's proposal provided the best value to the Government. In making an award to GMH/Centex that does not work on [redacted], guarantees [redacted] projected costs, and provides only $[redacted] (compared to Forest City's [redacted]), it is evident that the SSA did not make a judgment that provided the best value to the Government and, therefore, was in contravention of the RFQ and should be set aside.

## PRAYER FOR RELIEF

WHEREFORE, Forest City respectfully requests this Court to enter judgment in its favor and against Defendant, and to order the following relief:

(a) A declaration that the Defendant's award of a contract under RFQ No. W912DR-06-R-0006 to GMH/Centex was contrary to applicable procurement laws and regulations;

(b) A preliminary and permanent injunction ordering Defendant to terminate its contract with GMH/Centex awarded under RFQ No. W912DR-06-R-0006;

(c) A declaration that Forest City is entitled to the award of the contract under Solicitation No. W912DR-06-R-0006; or, in the alternative, an order requiring the Army to clarify its requirements and to call for a new round of BAFOs from offerors in the competitive range and to properly score such BAFOs; and

(d) Court costs, fees, and such other relief as this Court may deem just and proper.

Respectfully submitted,

Dated: July 19, 2007



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

Robert H. Koehler
PATTON BOGGS, LLP
8484 Westpark Drive, 9th Floor
McLean, VA 22102
Phone (703) 744-8005
Facsimile (703) 744-8006
Counsel for
Forest City Military Communities LLC

*Of Counsel*
Michael J. Schaengold (*)
Jennifer S. Zucker
PATTON BOGGS, LLP

(*) Mr. Schaengold did not participate in the Government Accountability Office Protest and did not request admission under its Protective Order. He has not been shown and has not reviewed any documents subject to the Government Accountability Office Protective Order. He has not been orally provided with any information subject to that Protective Order. Nor has he reviewed the unredacted version of the Complaint and Motion for Preliminary Injunction in this case. He will apply for admission under the Court's Protective Order in this case and, only upon admission under the Court's Protective Order, will he review documents subject to the Court's Protective Order.


PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 19th day of July, 2007, I caused to be sent via hand delivery a copy of:

1. Forest City's Complaint for Declaratory Judgment and Permanent Injunctive Relief
2. Forest City's Motion for Preliminary Injunction
3. Forest City's Memorandum In Support of Motion For Preliminary Injunction
4. Forest City's Motion For Protective Order
5. Forest City's Motion to File under Seal the Complaint and the Exhibits Thereto, and the Memorandum In Support of Motion for Preliminary Injunction.
6. Forest City's Rule 7.1 Disclosure Statement.

The above were delivered to:

Timothy P. McIlmail, Esquire
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N,W.
Washington, D.C. 20530

A courtesy copy was delivered to:

E. Sanderson Hoe, Esquire
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C. 20006
Counsel for Awardee GMH/Centrex

______________________________

Robert H. Koehler



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER