**Agreed-Upon Redacted Copy -- May be Made Public**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| FOREST CITY MILITARY COMMUNITIES, LLC<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>GMH/CENTEX MILITARY COMMUNITIES,<br><br>Defendant-Intervenor. | No. 07-546C<br>(Judge Hewitt) |

**FOREST CITY'S MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD**

Robert H. Koehler
PATTON BOGGS LLP
8484 Westpark Dr.
McLean VA 22102
(703) 744-8005
(703) 744-8006 (Fax)
rkoehler@pattonboggs.com

Attorney of Record for
Forest City Military Communities, LLC

Of Counsel:
Michael J. Schaengold
Jennifer Zucker
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
(202) 457-6000
(202) 457-6315 (Fax)

[redacted]

3676909

# TABLE OF CONTENTS


I. BACKGROUND ..................................................1

A. The Evaluation Factors ..................................................1

B. The Evaluation Process ..................................................2

C. The Analysis and Conclusions Contained Within the SSEB and SSAC Reports, Upon Which the SSA Relied, Contain Major Factual Errors ..................................................3

D. The SSAC's Spreadsheet, Upon Which the SSA's Decision Rests, Fails to Accurately and Correctly Depict GMH's Proposal ..................................................7

E. The Record is Devoid of Facts to Indicate that SSA Considered Forest City's Guarantee or the Full Impact of GMH/Centex's "No Work" Units ..................................................9

II. LEGAL STANDARDS ..................................................10

III. REQUEST TO SUPPLEMENT THE RECORD ..................................................11

A. Deposition of the SSA on the Scope Guarantee Issue ..................................................11

B. Deposition of the Source Selection Authority on the "No Work" Issue ..................................................13

CONCLUSION ..................................................14




[redacted]

# TABLE OF AUTHORITIES

## Cases

Aero Corp., S.A. v. United States, 38 Fed. Cl. 408, 410 (1997). .......... 10, 13

Asia Pac. Airlines v. United States, 68 Fed. Cl. 8, 18 (2005) .......... 10

Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005) .......... 11

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) .......... 14

Emerald Coast Finest Produce Co. v. United States, 76 Fed. Cl. 445 (2007) .......... 11

Graphicdata, LLC v. United States, 37 Fed. Cl. 771, 779 (1997) .......... 10

Impresa Construzioni Geom. Domenico Garufi v. United States (Impresa), 238 F.3d 1324, 1339 (Fed. Cir. 2001) .......... 10, 11, 14

Mike Hooks, Inc. v. United States, 39 Fed. Cl. 147, 158 (1997) .......... 11

OTI Am., Inc. v. United States, 73 Fed. Cl. 758, 767 (2006) .......... 10, 11

Portfolio Disposition Mgmt. Group, LLC v. United States, 64 Fed. Cl. 1, 12 (2005) .......... 10



[redacted]

3676909

# FOREST CITY'S MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

Forest City Military Communities LLC ("Forest City") respectfully files this Motion to Supplement the Administrative Record.

## I. BACKGROUND

The factual background of this bid protest is more fully set forth in Plaintiff's Complaint for Declaratory and Injunctive Relief dated July 19, 2007. However, a brief statement of the facts pertinent to this motion is set forth below:

### A. The Evaluation Factors

The evaluation factors for the Step Two portion of this procurement were, in descending order of importance: (i) Project Finance, (ii) Preliminary Project Concept Statement, (iii) Organizational Capabilities (on-site, project specific), and (iv) Small Business Utilization Plan (on-site, project specific). (Complaint Exhibit (CE) 1, RFQ, p. 36.) In this regard, the RFQ stated at Section 4.0, *Contractor Selection Process*, that "final selection will be based upon the qualifications exhibited by the offerors as outlined by the evaluation factors and upon the basis of best value to the Government." (CE 1, RFQ, p. 19) (Emphasis added.) This was further defined as the offeror who proposes "the best value for improving military family housing for the specific project." (CE 1, RFQ, p. 30.)

Each individual factor was to be rated in accordance with the Army's evaluation scheme of Exceptional (E), Acceptable (A), Unacceptable (U), or Neutral (N), to include plus and minus modifiers to capture distinctions between each rating category. Proposals were also rated as low, moderate or high risk. (CE 1, RFQ, p. 36.)



[redacted]

**B. The Evaluation Process**

A source selection evaluation board (SSEB) consisting of [redacted] members reviewed offerors' proposals and oral presentations. (CE 3, Source Selection Plan (SSP), Attachment 2, at 1.) Each SSEB member was to independently evaluate each proposal (CE 3, SSP, at 3.6, p. 9) and then present its consensus evaluation report to a Source Selection Advisor Committee (SSAC). (CE 1, RFQ, p. 36.) To assist in the evaluations, the Army developed a *SSEB Step Two Individual Evaluation Form* incorporating specific factors and questions for consideration by the various teams (i.e., SSEB and SSAC). (CE 1, RFQ, pp. 43-45 and CE 4, Example of Evaluation Form, at 1.) The form itself provided entries for an "Overall Rating," as well as individual ratings for each evaluation factor and their respective sub-factors. (Id. at CE 4.)

Following the SSEB presentation of its consensus evaluation of each offeror to the SSAC, it was incumbent upon the SSAC to independently review the SSEB evaluations and prepare its comparative assessment of proposals against all source selection criteria. The SSAC employed an evaluation form that was an adaptation of the SSEB evaluation form, with the SSAC merely changing the title from "*SSEB Step Two Consensus Evaluation*" to "SSAC *Step Two Consensus Evaluation*." In all other respects, the form was the same. To further assist the SSAC in arriving at its comparative assessment, the agency contracted with Jones Lang LaSalle ("JLL"), a consultant, who prepared a "benchmark" assessment for the West Point housing project. (CE 11, Army Baseline Comparison Spreadsheet.)

The comparative assessment of the SSAC was to be provided to the Source Selection Authority (SSA) who, in turn, was to make the final analysis resulting in a recommendation of an award. To this end, the SSAC memorialized its recommendations in a memorandum for the SSA.



[redacted]

(CE 12, SSAC Memorandum for SSA). In addition, the SSAC submitted its consensus evaluation of the offerors, along with its "Rating Matrix," and Baseline Spreadsheets. (CE 9, SSAC Consensus for Forest City, CE 10 SSAC Consensus for GMH/Centex, and CE 13, SSAC Rating Matrix.)

According to the RFQ, "[w]hile the SSA may use reports and assessments prepared by others, the source selection decision will represent the SSA's independent judgment." (CE 1, RFQ, p. 36; <u>see also</u>, CE 3, at 9 ("The SSA will consider the [SSEB] consensus report (as well as the SSAC report) while independently exercising prudent business judgment to arrive at a Source Selection Decision based on the offeror(s) who proffers the best value to the Government.")) Based on the SSA's decision, the Contracting Officer would then make the award.

The SSA's Source Selection Decision consisted of 10 pages and provides in part:

> Because of the size and complexity of this requirement, I employ a Source Selection Advisory Council (SSAC) made up of high level agency officials and non-government advisors. **The SSAC examined the report prepared by the SSEB as well as each submission, <u>performed a trade-off analysis between offerors</u> using its expertise and prepared its findings in a report to me dated March 1, 2007. I find the analysis and conclusions within that report to be persuasive, to be supported by the facts and to be in harmony with the selection factors in the solicitation. I therefore adopt them in support of my decision.** Following examination of the materials, the representatives of the SSAC, the SSEB, and counsel convened with me on March 5, 2007 to answer any further questions and to provide additional clarifications prior to my decision.

(CE 14, Source Selection Decision, pg. 3.) (Emphasis added.)

### C. <u>The Analysis and Conclusions Contained Within the SSEB and SSAC Reports, Upon Which the SSA Relied, Contain Major Factual Errors.</u>

RFQ Amendment No. 0007, dated September 22, 2006, added the underscored language to the consideration of the highest-rated-evaluation-factor, Project Finance:

> Paragraph 4.6.6 Financial Plan, subparagraph 5). Does the offeror demonstrate an understanding of the opportunities for and limitations on the



[redacted]

> revenue and expenses associated with the project? ***To what degree is the offeror guaranteeing scope and price?*** Does the financial plan support the long-term maintenance of the project?

(CE 18, Amendment No. 0007, at 2; cf. CE 1, RFQ, p. 43) (Emphasis in original.) Based on this new evaluation factor, the SSEB's evaluation form was revised to include the following query: ***"To what degree is the offeror guaranteeing scope and price?"*** Despite the revision, during the first round of evaluations by the SSEB, only [redacted] members ([redacted]) used the revised form. Those members that used the revised form considered and praised Forest City's scope guarantee -- Forest City's "[redacted] . . . Forest City will [redacted] . . . Forest City's [redacted] . . . ." (See CE 5, [redacted] at p. 15 of 22 (Dec. 19, 2006), and [redacted] at p. 18 of 29 (Jan. 30, 2007).) Because the [redacted] member ([redacted]) used the old form, [redacted] failed to mention Forest City's extensive guarantee. (CE 5, SSEB Individual Evaluations.) The [redacted] member ([redacted]) failed to conduct an initial review. During the second round of SSEB evaluations, all members used the updated form except [redacted]. (Id.) Where the correct form was used, the evaluators addressed and praised Forest City's guarantee. Moreover, when the correct form was used, Forest City's vertical cost ($[redacted]) was a non-issue because the guarantee properly eliminated any concern. (Id.)

As discussed above, during the final round of SSEB evaluations, SSEB member [redacted] used the wrong form. Having failed to consider and mention Forest City's guarantee, [redacted] cited vertical cost as a concern. In this regard, [redacted] evaluation at page 3 downgrades Forest City's Project Finance rating from Exceptional (E) to Exceptional minus (E-) with the following rationale: "Rating was revised **downward** from an Exceptional (E) to an E- as a result of consensus discussions.



[redacted]

Discussions included [redacted]." (Emphasis added.) (Id.) In the "Major Weakness" section, it also states: "Cost of new construction ($[redacted] per square foot) seems low." (Id.)

Compounding her mistake, when the SSEB members developed their consensus rating for each offeror on February 11, 2007, they also used the wrong form. Accordingly, there was absolutely **no** evaluation, consideration or even mention of Forest City's $[redacted] million scope guarantee, and the SSEB, therefore, downgraded Forest City's overall rating from Exceptional (E) to Exceptional minus (E-). (CE 7, SSEB Consensus Rating.) These failures were to be compounded by the SSAC.

When the SSAC members evaluated Forest City's proposal, they too used the **old** form that did not include the subfactor for *Project Finance Element 5* added by Amendment No. 0007 that included the guarantee prompt: "***To what degree is the offeror guaranteeing scope and price?***" Consequently, as with the SSEB's Consensus Evaluation of Forest City's Proposal, the SSAC members failed to comprehensively evaluate Forest City's $[redacted] million scope guarantee. The only reference to Forest City's guarantee is where the SSAC Consensus notes: "Value would have been added if the offeror had established some typical parameters surrounding the guaranteed maximum price contract, e.g., [redacted]." (CE 9, SSAC Consensus of Forest City at pg. 8.) (Emphasis added.) (The guaranteed maximum price contract is [redacted] guarantee.) (CE 19, Forest City Proposal Excerpts: Scope Guarantee.) From this comment, it is evident that the SSAC totally failed to review Forest City's entire guarantee, as that guarantee clearly covers [redacted] of its Proposal. (Id.) As a result, the SSAC gave Forest City Project Finance a rating of Exceptional minus (E-), stating:



[redacted]

> Offeror's Vertical Cost per Square Foot appears low. Value would have been added if the offeror more clearly demonstrated through [redacted]

(Id.) (Emphasis added.)

The SSAC's Memorandum to the SSA followed this omission by stating: "Unfortunately, FC's proposal also assumes a very low cost of vertical construction of about $[redacted] per square foot in comparison to the Army benchmark and they did not sufficiently demonstrate that this cost could actually be achieved." (CE 12.) Significantly, there is **no** evaluation, reference, or mention of Forest City's $[redacted] million scope guarantee. Since the Forest City guarantee eliminates any risk associated with its vertical costs, it is clear that the Army's defective evaluation prejudiced Forest City by causing its proposal to be downgraded.

Ironically, this same fate did not befall GMH/Centex. For instance, when the SSAC used the old form to evaluate GMH/Centex, it nevertheless favorably addressed its guarantee in the Memorandum to the SSA, stating:

> Most significantly GMH provides a Guaranteed Maximum Price Contract for their projects and have never had to adjust scope on an RCI project after assuming operations.

(CE 12.) (Emphasis added.) Since the SSAC made no mention of Forest City's guarantee, it can only be concluded that either the SSAC did not evaluate Forest City's proposal on this key element, or the SSAC intentionally omitted it from the report to the SSA. Here, it also is significant to note that GMH's write-up on its guarantee provided **less** information, and covered significantly **fewer** costs, than Forest City's guarantee. (CE 19, Forest City Proposal Excerpts: Scope Guarantee, and CE 20, GMH/Centex Proposal Excerpt: Guarantee.) Moreover, the SSAC failed to disclose that GMH/Centex's guarantee covered only $[redacted] million in costs, compared to Forest City's $[redacted]



[redacted]

million, or that GMH/Centex's guarantee omitted [redacted]% or some $[redacted] million in GMH/Centex's costs, compared to Forest City's [redacted] of its plan. Yet GMH/Centex received praise from the SSAC and Forest City received: "Value would have been added if the offeror had established some typical parameters surrounding the guaranteed maximum price contract, e.g., [redacted]." Emphasis added. (CE 9, SSAC Consensus of Forest City at pg. 8.)

On its face, the SSA Source Selection Decision is fatally flawed because it found "the analysis and conclusions within that SSAC Report to be persuasive, to be supported by the facts and to be in harmony with the selection factors in the solicitation," and adopted the errors discussed above in support of his decision to award to GMH/Centex. According to the SSA, GMH/Centex was selected because it "[1] **presented a cost structure that most closely represented the Army's benchmark** and [2] **offered a Guaranteed Maximum Price which provided great confidence in the viability of the proposal**." (CE 14, pp. 4 and 8.) (Emphasis added.) Yet the GMH/Centex guarantee does not cover [redacted]% of the GMH/Centex proposed cost, or some $[redacted] million of GMH's costs -- and the SSA's decision does not evaluate, consider, or even reference Forest City's $[redacted] million [redacted] guarantee. Moreover, the GMH/Centex "most closely represented the Army's benchmark," because the SSAC had used the **Army "square footage" estimate** to "plug into" the calculations to determine the GMH/Centrex construction cost. (Id.)

### D. The SSAC's Spreadsheet, Upon Which the SSA's Decision Rests, Fails to Accurately and Correctly Depict GMH's Proposal.

Pursuant to the amended RFQ, the Army would convey 628 family housing units and "[i]n exchange, the partner will provide for the **new construction/renovation**, operation, management and maintenance of the existing family housing inventory." (CE 2, App. B. West Point, p. B-8.)



[redacted]

(Emphasis added.) Consistent with the understanding that all 628 units would be subject to new construction or renovation, the Army's Baseline provided for **all** 628 to be either newly constructed or renovated. (CE 6 and 22.) As a result, Forest City's proposal provided for all units to be either newly constructed or renovated. (Id.)

One of the key documents relied upon by the SSA, in selecting GMH/Centex for award, was the SSAC's spreadsheet. This spreadsheet fails to accurately depict GMH/Centex's proposal and leaves the false impression that GMH/Centex will also construct or renovate all 628 units. (Id.) Consequently, the SSEB's spreadsheet appears to make apples-to-apples comparisons between the Army's Baseline and the proposals of Forest City and GMH/Centex. A careful review, however, demonstrates that the SSAC did not record the [redacted] units identified in GMH/Centex's plan for which "no work" was to be performed. (Id.)

In other words, the SSAC spreadsheet does not identify that hard costs identified for GMH/Centex covers only [redacted] housing units, while the Forest City costs cover all **628** housing units, as required by the RFQ. (Id.) Only on the Initial Development Plan ("IDP") Summary sheet (pg. 3) does the SSAC make a passing reference to the fact that GMH/Centex has [redacted] housing units "with no work funded during [redacted]." (Id.) Equally if not more significant is the fact that throughout the SSEB, SSAC and SSA evaluation process, there was **no mention** of the fact that GMH/Centex would not touch these [redacted] units -- which constitutes [redacted] of the conveyed inventory -- until the beginning of the [redacted], or year [redacted], as compared to Forest City's plan which was to newly construct and/or renovate all 683 units within the IDP, or [redacted]. Moreover, there is **no** mention that GMH/Centex would be receiving a stream of rental payments on those [redacted] units for [redacted], without making any corresponding capital outlay. The record



[redacted]

provides no justification for the failure of the SSEB, SSAC and the SSA not identifying this as a "weakness."

Pursuant to the Source Selection Plan, Paragraph 4.6.6.8, *Project Finance Element 6*, if "the offeror [is] receiving fees during the construction and rehab period that would significantly decrease its equity position," such an occurrence constitutes a "weakness." (CE 3, pp. 23-24.) Nevertheless, the SSEB, SSAC and the SSA failed to mention -- and failed to evaluate -- GMH/Centex's receipt of rental fees for eleven years without any corresponding outlay of capital. Moreover, this fact was not deemed a weakness in GMH/Centex's proposal. Had the SSEB, SSAC or SSA properly applied the evaluation criteria in the Source Selection Plan, GMH/Centex would have received a weakness in this area and would not have received an "Exceptional" for its *Financial Plan* or an "Overall Rating" of "Exceptional."

E. **The Record is Devoid of Facts to Indicate that SSA Considered Forest City's Guarantee or the Full Impact of GMH/Centex's "No Work" Units**

The supplement Forest City requests be added to the Administrative Record is an explanation by deposition of the SSA to determine: (1) whether the SSA possessed or obtained sufficient and accurate information to make a determination that Forest City did not represent the best value to the Government, (2) whether the SSA relied on erroneous and misleading information in selecting GMH/Centex, and (3) on what basis the SSA made the source selection determination. As detailed in Section III, *Request to Supplement the Record*, below, this limited inquiry would address whether the SSA was presented sufficient and accurate information pertaining to Forest City's $[redacted] million scope guarantee, whether the SSA was presented sufficient and accurate information pertaining to GMH/Centex's plan to no work units, including the fact that it would not work on those units until [redacted], and on what basis those considerations



[redacted]

(assuming they were even considered) impacted the SSA's best value determination.

## II. LEGAL STANDARDS

Generally, the judicial review of an agency action is based on "the administrative record already in existence, not some new record made initially by the reviewing court." Aero Corp., S.A. v. United States, 38 Fed. Cl. 408, 410 (1997). Nonetheless, the Federal Circuit has recognized "that the informal administrative decision-making involved in awarding government contracts warrants allowing trial courts some latitude to supplement the administrative record." OTI Am., Inc. v. United States, 73 Fed. Cl. 758, 767 (2006) (citing Impresa Construzioni Geom. Domenico Garufi v. United States (Impresa), 238 F.3d 1324, 1339 (Fed. Cir. 2001)); see Graphicdata, LLC v. United States, 37 Fed. Cl. 771, 779 (1997) ("a judge confronted with a bid protest case should not view the administrative record as an immutable boundary that defines the scope of the case").

The "limited situations [in which] the court may consider 'extra-record' evidence," Aero Corp., 38 Fed. Cl. at 411, include:

> (1) **when the agency's action is not adequately explained in the record before the court**; (2) **when the agency failed to consider factors which are relevant to its final decision**; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) **in cases where evidence arising after the agency action shows whether the decision was correct or not**; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction state. [Emphasis added.] [Citations omitted.]

See also Impresa, 238 F.3d at 1338 (extra-record evidence may be considered where "required for meaningful judicial review"); Portfolio Disposition Mgmt. Group, LLC v. United States, 64 Fed. Cl. 1, 12 (2005) (extra-record evidence may be considered "where the record is insufficient for the Court to render a decision."); Asia Pac. Airlines v. United States, 68 Fed. Cl. 8, 18 (2005) (citing



[redacted]

Impresa, 238 F.3d at 1338-39); Mike Hooks, Inc. v. United States, 39 Fed. Cl. 147, 158 (1997) (extra-record evidence may be considered where appropriate to aid the Court in understanding "the highly technical nature of the issues which the [Government] perhaps should have considered but did not."); Emerald Coast Finest Produce Co. v. United States, 76 Fed. Cl. 445 (2007) (extra-record evidence may be considered "to fill gaps concerning the factors the contracting officer considered in reaching his decision.")(citing Impresa). This Court also has supplemented the administrative record when the supplementary evidence will enable the court to "give 'due regard' to the need for expeditious resolution of the action." OTI, 73 Fed. Cl. at 758 (quoting Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).

## III. REQUEST TO SUPPLEMENT THE RECORD

Here, Forest City questions, specifically, whether the SSA possessed sufficient and accurate information to properly evaluate Forest City's proposed scope guarantee and whether the SSA relied on erroneous and misleading information in attempting – but, Forest City believes, failing -- to make an apples-to-apples comparison between the scope of Forest City's and GMH/Centex's proposed new construction/renovation delivery. Accordingly, supplementation should be permitted in this case because: (1) the administrative record, as it stands, fails to adequately explain defendant's decision to: (i) exclude consideration of Forest City's $[redacted] million scope guarantee while favorably evaluating GMH/Centex's proposal with a lesser guarantee, and (ii) accept GMH/Centex's non-conforming proposal; (2) it appears the SSA, in making his decision, failed to consider certain factors which should have been directly relevant to his source selection; and (3) Forest City and the Court are entitled to the additional information in order to understand the SSA's decision. Moreover, Forest City's deposition request is narrowly prescribed.



[redacted]

A. <u>Deposition of the SSA on the Scope Guarantee Issue.</u>

The Administrative Record is entirely devoid of any information indicating that the SSA considered Forest City's $[redacted] scope guarantee. Instead, the record reveals that the SSEB and the SSAC both failed to comprehensively and meaningfully evaluate the critical sub-factor pertaining to Forest City's guarantee, thereby rendering the SSEB and SSAC conclusions to the SSA meaningless. According to the SSA, the "SSAC examined the report prepared by the SSEB as well as each submission, performed a trade-off analysis . . . and prepared its findings in a report to me." (CE 14, pg. 3.) The SSA appears to have adopted the flawed advice without further inquiry or independent evaluation and found: "the analysis and conclusions within that Report to be persuasive, to be supported by the facts and to be in harmony with the selection factors in the solicitation . . . and therefore [I] adopt them in support of my decision" to award to GMH. By adopting in its entirety the SSAC's *Memorandum for Source Selection Authority*, the SSA's own "Decision Document" is tainted and fatally flawed.

In this regard, the SSA relied upon the Report from the SSAC which, as noted earlier, failed to disclose: (i) the details of Forest City's $[redacted] million guarantee; (ii) that Forest City's $[redacted] million guarantee eliminated any concern related to its projected vertical costs; (iii) that GMH/Centex's guarantee covered only $[redacted] million in costs, compared to Forest City's $[redacted] million; (iv) that GMH/Centex's guarantee omitted [redacted]% or some $[redacted] million in GMH's costs, compared to Forest City's [redacted] of its plan; and (v) the SSAC used a the Army's own square footage estimate as the "plug number" to calculate the GMH/Centrex construction costs. (CE 19, Forest City Proposal Excerpts: Guarantee, and CE 20, GMH/Centex Proposal Excerpt: Guarantee.) As a result, the "(1) ... agency's action is not adequately explained in the record before the court [and/or (2)] the agency



[redacted]

failed to consider factors which are relevant to its final decision[.]" Aero Corp., 38 Fed. Cl. at 411. (Emphasis added). Consequently, in order to answer the question of whether there was a lack of rational basis for the SSA best value determination, we must know "(1) whether the [SSA] . . . possessed or obtained information sufficient to [make a] deci[sion] . . . and (2) on what basis he made the . . . determination." Impresa, 238 F.3d at 1339. The SSA is ultimately responsible for making a decision that represents his independent judgment and constitutes the best value for the Government. (CE 1, RFQ at pg. 36.) The SSA's testimony regarding the consideration given to Forest City's guarantee in relation to the overall project and Forest City's vertical cost, as well as the best value determination are directly relevant to Forest City's allegations regarding the failure of the SSEB, SSAC and SSA to properly evaluate Forest City's scope guarantee in accordance with the evaluative criteria, as well as whether GMH/Centex was unjustly enriched.

**B. Deposition of the Source Selection Authority on the "No Work" Issue.**

Once again, the Administrative Record is devoid of any meaningful independent analysis or consideration by the SSA of GMH/Centex's [redacted] "no work" units. Instead, the SSA relied upon the Report from the SSAC which failed to disclose that: (i) GMH/Centex would not perform any work on [redacted] housing units -- [redacted] of the total conveyed housing inventory – until the [redacted] of the housing program; (ii) GMH/Centex would be receiving rental revenue on those [redacted] "no work" housing units; and (iii) the SSEB and the SSAC failed to identify the revenue produced on the [redacted] units as a "weakness," as required by the Source Selection Plan. (CE 3 at pg. 23.) The major defects in the documentation and reports relied upon by the SSA, calls into question the SSA's ability to make an informed and reasoned judgment about which offeror provided the best value to the Government. In order to answer the question of whether there was a lack of rational basis for the



[redacted]

SSA's decision, we must know: "(1) whether the [SSA] . . . possessed or obtained information sufficient to [make a] deci[sion] . . . and (2) on what basis he made the . . . determination." Impresa, 238 F.3d at 1339 (applying Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) at 420). Again, this inquiry is directly relevant to Forest City's allegations regarding the Army's failure to award the Community Development and Management Plan in accordance with the material terms of the RFQ, as well the concern that the SSA was presented with an improper distortion of the GMH/Centex's evaluation as compared to Forest City's proposal and best value analyses.

## Conclusion

For the above reasons, Plaintiff respectfully requests that its Motion to Supplement the Administrative Record be granted.

Respectfully submitted,

Dated: July 25, 2007

s/Robert H. Koehler

Robert H. Koehler
PATTON BOGGS, LLP
8484 Westpark Drive, 9th Floor
McLean, VA 22102
Phone (703) 744-8005
Facsimile (703) 744-8006
Counsel for
Forest City Military Communities LLC

*Of Counsel*
Michael J. Schaengold
Jennifer S. Zucker
PATTON BOGGS, LLP



[redacted]

3676909

## CERTIFICATE OF FILING

I hereby certify that on this 25th day of July 2007, a copy of the foregoing PLAINTIFF'S MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Robert H. Koehler



[redacted]

3676909