Agreed Upon Redacted Copy -- May be Made Public

# UNITED STATES COURT OF FEDERAL CLAIMS

**BID PROTEST**
**FILED UNDER SEAL**

FOREST CITY MILITARY COMMUNITIES LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

and

GMH/Centex Military Communities,

Defendant-Intervenor.

No. 07-546C
(Judge Hewitt)

MCKENNA LONG & ALDRIDGE LLP
E. Sanderson Hoe
1900 K Street, NW
Washington, D.C. 20006
(202) 496-7562

Attorney for Record for Intervenor
GMH/Centex Military Communities

Of Counsel:
Jennifer M. Morrison
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, D.C. 20006
(202) 496-7500

Dated: August 7, 2007

[redacted]

# TABLE OF CONTENTS

Page

STATEMENT OF THE ISSUES ..... 2

STATEMENT AND COUNTERSTATEMENT OF FACTS ..... 2

SUMMARY OF THE ARGUMENT ..... 8

ARGUMENT ..... 9

I. GMH IS ENTITLED TO JUDGMENT ON THE ADMINISTRATIVE RECORD FOR COUNTS I THROUGH VII OF FOREST CITY'S COMPLAINT ..... 9

A. STANDARD OF REVIEW ..... 9

B. Forest City has Failed to Establish that the Agency's Actions Were Arbitrary, Capricious or in Violation of Law ..... 12

1. Forest City's Scope Guarantee Was Properly Evaluated ..... 14

2. The Agency Correctly Concluded that Forest City's [redacted] Vertical Cost Per Square Foot Was Not Overcome By Forest City's GMP ..... 17

3. The Agency Had A Rational Basis for Viewing GMH's GMP More Favorably than Forest City's ..... 19

4. GMH Complied with the Solicitation's Material Requirements ..... 21

5. GMH's Receipt of Revenues from "No Work" Homes during the IDP Was Not a Weakness ..... 25

6. Forest City Was Not Prejudiced by the Agency's Use of a Plug Number ..... 26



[redacted]

## TABLE OF CONTENTS
(continued)

Page

II. FOREST CITY HAS NOT ESTABLISHED PREJUDICE .......... 28

III. FOREST CITY HAS FAILED TO ESTABLISH THAT IT IS ENTITLED TO AN INJUNCTION .......... 29

A. Standard For Obtaining Injunctive Relief .......... 29

B. Success on The Merits .......... 30

C. Irreparable Harm .......... 30

D. The Harm to Forest City Does Not Outweigh Any Harm to the United States and GMH .......... 32

E. Granting Injunctive Relief is Not in the Public Interest .......... 32

IV. CONCLUSION .......... 33



[redacted]

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 12

*Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377 (2003) .......... 8

*Bannum, Inc. v. United States*, 404 F.3d 1346 (Fed. Cir. 2005) .......... 11,12

*Bean Stuyvesant, LLC v. United States*, 48 Fed.Cl. 303 (2000) .......... 29, 30

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) .......... 11

*Carlson Wagonlit Travel*, B-287016, 2001 CPD. ¶ 49 (Comp. Gen. 2001) .......... 8

*Data Gen. Corp. v. Johnson*, 78 F.3d 1556 (Fed. Cir. 1996) .......... 9, 11, 28

*DTH Mgmt. JV*, B-283239, 99-2 CPD ¶ 68 (Comp. Gen. 1999) .......... 26

*Eli Lilly & Co. v. American Cyanamid Co.*, 82 F.3d 1568 (Fed.Cir. 1996) .......... 31

*Ferranti Int'l Def. Sys., Inc.*, B-237555, Feb. 27, 1990,
90-1 CPD ¶ 239 (Comp. Gen. 1990) .......... 19

*Found. Health Fed. Servs. v. United States*, 1993 WL 738426 (D.D.C. 1993) .......... 31

*Four Points By Sheraton v. United States*, 66 Fed. Cl. 776 (2005) .......... 10

*Hawpe Constr., Inc. v. United States*, 46 Fed.Cl. 571 (2000) .......... 27, 30

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
238 F.3d 1324, (Fed. Cir. 2001) .......... 9, 10, 11

*J & D Maint. & Servs. v. United States*, 45 Fed. Cl. 532 (1999) .......... 16

*JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650 (2002) .......... 11

*Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166 (D.C.Cir. 1973) .......... 11

*ManTech Telecomms. & Info. Sys. Corp. v. United States*
49 Fed. Cl. 57 (2001)(*aff'd, 30 Fed. Appx. 995* (Fed. Cir. 2002)) .......... 25



[redacted]

*Minor Metals, Inc. v. United States*, 38 Fed.Cl. 379 (1997) ..... 31

*Portfolio Disposition Mgmt. Group LLC v. United States*, 64 Fed. Cl. 1 (2005) ..... 11

*Rig Masters, Inc. v. United States*, 70 Fed.Cl. 413 (2006) ..... 30

*Southern Foods, Inc. v. United States*, 76 Fed. Cl. 769 (2007) ..... 10, 28

*Saratoga Dev. Corp. v. United States*, 21 F.3d 445 (D.C. Cir. 1994) ..... 10

*Structural Pres. Sys., Inc., B-285085,* 2000 CPD ¶ 131 (Comp. Gen. 2000) ..... 26

*TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325 (Fed. Cir. 1996) ..... 10

*Wilson 5 Serv. Co., Inc.* B-285343.2, B-285343.3, 2000 CPD ¶ 157 (Comp. Gen. 2000) ..... 26

*Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, (D.C. Cir. 1985) ..... 31

*Zenith Radio Corp. v. United States*, 710 F.2d 806 (Fed.Cir. 1983) ..... 31

**Statutes**

5 U.S.C. § 706(2)(A) ..... 10

5 U.S.C. § 702 ..... 10

28 U.S.C. § 1491(b)(1) ..... 9

28 U.S.C. §1491(b)(4) ..... 9

**Rules**

4 CFR § 21.2(c) ..... 13

United States Court of Federal Claims Rule 52.1 ..... 1, 11

United States Court of Federal Claims Rule 56 ..... 11, 12



[redacted]

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**BID PROTEST**

**FILED UNDER SEAL**

| | | |
|---|---|---|
| FOREST CITY MILITARY COMMUNITIES LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>GMH/Centex Military Communities,<br><br>Defendant-Intervenor. | ) | No. 07-546C<br>(Judge Hewitt) |

**DEFENDANT-INTERVENOR'S OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND REQUEST FOR PERMANENT INJUNCTION AND DEFENDANT-INTERVENOR'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 52.1(b) of the Rules of the United States Court of Federal Claims, and the Court's order dated July 23, 2007, Defendant-Intervenor, GMH/Centex Military Communities ("GMH"), respectfully requests that the Court enter judgment on the administrative record in favor of the United States and Defendant/Intervenor, deny Plaintiff's motion for judgment on the administrative record and request for a permanent

[redacted]

Case 1:07-cv-00546-ECH Document 40 *SEALED* Filed 08/07/2007 Page 7 of 39

injunction. In support of our motion, we rely upon the complaint, the administrative record filed with the Court on July 27, 2007, and the following brief.

## DEFENDANT-INTERVENOR'S BRIEF

## STATEMENT OF THE ISSUES

1. Whether the Agency, the U.S. Department of the Army, acted arbitrarily or capriciously, or violated any applicable statute or regulation when it made its best value decision to award a contract to GMH under Request for Qualifications W912DR-06-R-0006 ("RFQ").

2. Whether Plaintiff was prejudiced by any arbitrary or capricious action, or by any violation of applicable statute or regulation, when the Agency selected GMH as the best value offeror under the RFQ.

3. Whether Plaintiff is entitled to a permanent injunction.

## STATEMENT AND COUNTERSTATEMENT OF FACTS

The U.S. Department of the Army ("Agency") issued Request for Qualifications No. W912DR-06-R-0006 for housing and community development at several locations including the U.S. Military Academy in West Point, NY ("RFQ"), under the Residential Communities Initiatives ("RCI"). (Tab 23). RCI is the Army's program under the Military Housing Privatization Initiative and consists of a two phase approach: i) Project



[redacted]

Planning, and ii) Project Implementation. (Tab 2 at 25). Under the Project Planning phase, the Army conducts a competition to identify a qualified contractor to develop a community development and management plan ("CDMP"). (Tab 23 at 299). Phase 2 is for the implementation of the CDMP. (*Id.* at 294).

The RFQ was divided into two steps. In step 1, offerors were required to demonstrate minimum experience and qualification requirements. (*Id.* at 307). Offerors meeting these requirements were eligible to compete in step 2 by submitting written proposals and participating in oral presentations. (*Id.* at 308). The offeror selected in step 2 would be awarded a contract for $350,000 to prepare the CDMP in collaboration with the Army. (*Id.* at 299). Only after successful completion of the CDMP is a contract executed to implement the housing plan. (*Id.*).

The evaluation factors for the step 2 portion of the competition were, in descending order of importance: i) Project Finance; ii) Preliminary Project Concept Statement; iii) Organizational Capabilities; and iv) Small Business Utilization Plan. (*Id.* at 320). The RFQ further identified subfactors within each of these factors to be evaluated. (*Id.* at 327-329). Under the Project Finance factor there were six subfactors to be evaluated. (*Id.* at 327). The RFQ stated that the Agency would make award to the offeror whose proposal represented the "best value to the government." (*Id.* at 303).

A source selection evaluation board ("SSEB") reviewed offerors' proposals and oral presentations. (Tabs 2, 29, 37-38). The SSEB provided its report on its evaluations



[redacted]

Case 1:07-cv-00546-ECH Document 40 *SEALED* Filed 08/07/2007 Page 9 of 39

to a source selection advisory council ("SSAC"). (*Id.* at 67). The SSAC then provided its assessment to the Source Selection Authority ("SSA") who was to make the final decision for award. (*Id.*).

After reviewing the evaluation material received from the SSEB and SSAC, the SSA made his decision to award the CDMP contract to GMH. (Tab 74). The SSA explained that he relied upon the evaluation of the SSAC and adopted its findings:

> Because of the size and complexity of this requirement, I use a Source Selection Advisory Council (SSAC) made up of high level agency officials and non-government advisors. The SSAC, examined the report prepared by the SSEB as well as each submission, performed a trade-off analysis between offerors using its expertise and prepared its findings in a report to me dated March 1, 2007. I find the analysis and conclusions within that report to be persuasive, to be supported by the facts and to be in harmony with the selection factors in the solicitation. I therefore adopt them in support of my decision.

(Tab 76 at 1492). The SSA concluded that GMH's proposal "presented a cost structure that most closely represented the Army's benchmark and offered a Guaranteed Maximum Price which provided great confidence in the viability of the proposal." (*Id.*). The SSA also found that "GMH's creative plan and very reasonable cost assumptions gave the proposal the highest overall credibility." (*Id.* at 1493). As a result, the SSA selected GMH for award.

After receiving notice of award, Forest City requested and received a debriefing. On March 26, 2007, based on the information it learned at the debriefing, Forest City



[redacted]

filed a protest with the Government Accountability Office ("GAO") alleging that the Army: 1) misevaluated the Project Finance portion of its proposal by finding that its vertical cost per square foot of [redacted] for new construction was a major weakness in its proposal, and 2) improperly applied the evaluation criteria by failing to credit Forest City's Project Finance plan with what it considered advantages over GMH's Project Finance plan. (Tab 80).

After receiving the Agency Report, Forest City asserted further protest grounds: 1) the SSEB used an old version of the evaluation form omitting the question, "To what degree is the offeror guaranteeing scope and price," thereby resulting in the Army's failure to evaluate Forest City's scope guarantee, also known as the Guaranteed Maximum Price ("GMP"), which would have eliminated any risk the Agency perceived with Forest City's [redacted] vertical cost per square foot; 2) the Army failed to reject GMH's proposal as noncompliant for proposing to "no work" [redacted] units until the [redacted] year of the project; 3) the SSAC improperly used a "plug number" to calculate GMH's vertical cost per square foot; and 4) the Army evaluation of Forest City's [redacted] community center as a weakness was improper in light of Forest City's GMP. ( Note: Forest City's Supplemental Protest is not a part of the Administrative Record).

In its supplemental protest and comments before GAO, and now before this Court, Forest City weaves a tale of alleged Agency error that literally puts form over substance. Forest City argues that an older evaluation form was used by the evaluators causing



[redacted]

Forest City's guarantee not to be evaluated. As discussed in more detail below, Forest City's guarantee was evaluated at every stage of the evaluation process despite which form was used. (*See* Tabs 50, 52, 53-62). In denying Forest City's protest, GAO stated

> the record shows that the SSAC expressly considered Forest City's scope guarantee, stating that "[v]alue would have been added if the offeror had established some typical parameters surrounding the guaranteed maximum price contract, e.g. [deleted]." Thus, the protester's argument that the agency overlooked its scope guarantee is not supported by the record.

(Note: GAO June 29, 2007 Decision is Not part of the Administrative Record).

Forest City also raised before GAO the Agency's "error" in not rejecting GMH's proposal for failure to meet a material solicitation requirement. Forest City bases this argument on GMH's proposed approach to "no work" [redacted] historic units [redacted] units that had recently been renovated by the Army. (Tab 23 at 376). The RFQ stated that "West Point proposes to convey an inventory of [628] family housing units…[i]n exchange, the partner will provide for new construction/renovation, operation, management and maintenance of the existing family housing inventory…[over] a fifty-year period." (*Id.* at 362).

In denying Forest City's argument on the merits, GAO held that "Forest City, however, does not identify any solicitation provision which states that all construction and renovation must be performed during the IDP." (GAO Decision). In fact, as discussed in detail below, GMH does propose to work" these units [redacted] (*See* Tab 49 at 745-52) [redacted]



[redacted]

Case 1:07-cv-00546-ECH Document 40 *SEALED* Filed 08/07/2007 Page 12 of 39

[redacted]

(*See* Tab 49 at 735).

Additionally, Forest City argued that the Agency's use of a "plug number" to calculate GMH's vertical cost per square foot was improper and skewed the result causing the SSA to determine that GMH's cost was most closely in line with the Agency's baseline. In its supplemental comments, Forest City provided schematics to demonstrate what GMH's actual cost per square foot should be. However, the result reinforced the point that GMH's costs were most in line with the Army's baseline with a difference of merely [redacted] while Forest City's costs were [redacted][1] GAO similarly found Forest City's argument to be unpersuasive and held that Forest City failed to demonstrate that it was prejudiced by the Army's use of the "plug number." (GAO Decision).

Forest City's Statement of Facts filed before this Court make gross assumptions regarding what the evaluators did or did not do during this procurement. Despite Forest

---

[1] The Agency's vertical per square foot baseline cost was calculated by the Agency's consultant, Jones Lang LaSalle Americas, Inc. ("JLL"), at $[redacted] for new construction. (Tab 90 at 1894). Forest City's proposed vertical per square foot cost was less than [redacted]. (*Id.*).



[redacted]

City's attempts to recreate the facts in a light most favorable to its position, the administrative record before this Court speaks for itself. None of the arguments advanced by Forest City are supported by the record evidence that was before the evaluators during this procurement. Thus, Forest City has stated no set of facts which show that the Agency acted arbitrarily capriciously or otherwise not in accordance with law.

## SUMMARY OF THE ARGUMENT

The Agency did not act arbitrarily or capriciously, or violate any applicable statute or regulation when it made its best value determination to award to GMH under the RFQ. Indeed, the Source Selection Authority ("SSA"), relying upon the evaluation documents of the SSEB and SSAC, had a reasonable basis to find that GMH's proposal offered the best value.

Forest City has failed to demonstrate that it is entitled to a permanent injunction as it cannot show substantial likelihood of success on the merits. Forest City's arguments are nothing more than mere disagreement with the Agency's assessment of its, and GMH's, proposals. Such disagreements are insufficient to overturn an Agency's award decision. *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 384 (2003), (claims of plaintiff, "no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence arbitrary and capricious." (*citing Carlson Wagonlit Travel*, B-287016, 2001



[redacted]

CPD. 49 at 2 (Comp. Gen. 2001)("an offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably")). Additionally, Forest City has failed to demonstrate how it would have had a substantial chance of receiving the award if not for the Agency's actions. Without this showing of prejudice, Forest City cannot be successful in its claims. *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it"). Further, Forest City has not established that it will suffer irreparable harm nor has it demonstrated that the balance of harms favors a permanent injunction.

## ARGUMENT

### I. GMH IS ENTITLED TO JUDGMENT ON THE ADMINISTRATIVE RECORD FOR COUNTS I THROUGH VII OF FOREST CITY'S COMPLAINT

#### A. STANDARD OF REVIEW

The Court possesses jurisdiction to entertain this action pursuant to the bid protest jurisdiction of the Tucker Act, 28 U.S.C. § 1491(b)(1). Section 1491(b)(4) requires the Court to "review the agency's decision pursuant to the standards set forth in section 706 of Title 5," the Administrative Procedures Act ("APA"). This Court reviews bid protest actions pursuant to the standards set forth in the APA. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). In particular, the Court must determine whether the agency's actions were "arbitrary, capricious, an



[redacted]

Case 1:07-cv-00546-ECH Document 40 *SEALED* Filed 08/07/2007 Page 15 of 39

abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Therefore, a bid award may be set aside "if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332 (citations omitted). It is well-settled that the APA does not permit the Court to undertake a *de novo* review of agency action; rather, it limits the Court to a consideration of whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," based solely upon the record before the agency. 5 U.S.C. §§ 702, 706(2)(A).

In evaluating whether an agency official's actions were rational, the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Impresa*, 238 F.3d at 1333 (*quoting Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)). In this particular case, the burden is especially high because the RFQ was a "best-value" procurement. *TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327-28 (Fed. Cir. 1996). Courts have recognized that contracting officials may properly exercise wide discretion in applying procurement regulations. *See id.* at 1332; *see also S. Foods, Inc. v. U.S.*, 76 Fed. Cl. 769, 779 (2007) ("Absent error or illegal conduct, 'this court will not second guess the agency's assessment of the comparative merits of proposals…in a best value procurement" (*citing Four Points By Sheraton v. United States*, 66 Fed. Cl. 776, 784 (2005)). The arbitrary and capricious standard, by definition, acknowledges a "zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which



[redacted]

consider[s] the relevant factors and is within the bounds of reasoned decisionmaking." *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 654 n. 8 (2002)(internal quotations omitted). In this regard, the Court cannot substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). Therefore, as long as a rational basis is articulated and relevant factors are considered, the agency's action must be sustained. *Id.*

Additionally, when a protester asserts a violation of regulation or procedure, "the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes and regulations.'" *Impresa*, 238 F.3d at 1333 (*quoting Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir. 1973)); *see also Data Gen. Corp.*, 78 F.3d at 1562. To establish prejudice, the protester must show that there was a "substantial chance" it would have been awarded the contract absent the alleged violation. *Portfolio Disposition Mgmt. Group LLC v. United States,* 64 Fed. Cl. 1 (2005).

Pursuant to United States Court of Federal Claims Rule ("RCFC") 52.1, this Court reviews the agency's procurement decision to determine whether it is supported by the already-existing administrative record. The standard of review for a Motion for Judgment on the Administrative Record, pursuant to RCFC 52.1, is similar but not identical to a motion for summary judgment under RCFC 56. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1355-56 (Fed. Cir. 2005). The inquiry on a motion for summary



[redacted]

judgment is whether the moving party has proved its case as a matter of fact and law or whether a genuine issue of material fact precludes judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also* RCFC 56. In contrast, the standard for a decision on a Motion for Judgment on the Administrative Record is narrower, *i.e.*, given all the disputed and undisputed facts, whether the plaintiff has met the burden of proof to show that the decision was not in accordance with the law. *See Bannum,* 404 F.3d at 1357 (instructing the court to make "factual findings under [former] RCFC 56.1 from the [limited] record evidence as if it were conducting a trial on the record.").

A review of the agency record in this case further supports the rational and non-prejudicial basis on which the Agency made its award decision. For this reason, and the reasons articulated below, Forest City's claims should be denied.

**B. Forest City has Failed to Establish that the Agency's Actions Were Arbitrary, Capricious or in Violation of Law**

Forest City' protest before this Court, as it was before GAO, amounts to nothing more than Forest City's disagreement with the evaluation of its and GMH's proposals and the SSA's decision to award the CDMP contract to GMH. Forest City can point to nothing in the administrative record to support its theory that the Agency's decision in this case was unreasonable, arbitrary, capricious, or in violation of law. Forest City has not met its burden to require this Court to overturn the agency's award decision. Rather than address the real issue why the Agency did not select Forest City as the best value offeror, i.e., that Forest City so underestimated its cost of new construction that the



[redacted]

Case 1:07-cv-00546-ECH Document 40 *SEALED* Filed 08/07/2007 Page 18 of 39

Agency reasonably found risk in Forest City's proposal, Forest City insufficiently argues that: 1) the Agency should have judged Forest City's scope guarantee as the "fix" for the [redacted] cost for new construction; 2) GMH's approach to "no work" [redacted] units was not properly considered; and 3) the Agency's use of a "plug number" was inappropriate.[2]

Forest City previously failed to convince the Comptroller General in Forest City's March 26, 2007 GAO protest that the Agency acted irrationally or that Forest City was prejudiced in any way. Forest City failed under GAO's rules to timely bring to GAO most of the complaints it makes here. As a result, GAO rejected most of Forest City's arguments out of hand.[3] This Court is Forest City's fallback because it does not have the same timeliness rules as GAO.[4]

---

[2] Forest City's complaint has seven counts. Counts I and II allege that the Agency erred in evaluating Forest City's "scope guarantee" and improperly favored GMH's guarantee; Counts III - VI collectively allege that the Agency misevaluated and mishandled GMH's so-called "no work" approach to [redacted] housing units during the IDP; and Count VII asserts that the SSA lacked adequate information relating to the "scope guarantee" and "no work" issues to make an informed judgment when he selected GMH.

[3] GAO's rules permit consideration of untimely filed protest challenges "for good cause shown" or where GAO determines that a protest raises issues significant to the procurement system. 4 CFR § 21.2(c). Forest City did not argue either ground for consideration of its untimely issues at GAO and GAO did not *sua sponte* accept any of the issues.

[4] A full 100 calendar days passed while the GAO considered, and then found, much of Forest City's protest to be untimely and the remainder unmeritorious. Forest City filed this current "bite at the apple" approximately four and one-half months after the award to GMH during which, for the majority of the time, contract performance was stayed.



[redacted]

As discussed below, the Agency's decision in this case was reasonable and supported by the record before the evaluators. Forest City has failed to prove otherwise, or that it was prejudiced thereby.

1. **Forest City's Scope Guarantee Was Properly Evaluated**

Forest City goes to great lengths to describe the steps the Agency followed, or did not follow, in evaluating the Project Finance portion of Forest City's proposal, particularly Forest City's GMP or scope guarantee.[5] Forest City places great reliance for its position that the Agency did not properly evaluate Forest City's GMP upon the allegation that the Agency used "old" evaluation forms which did not specifically mention an offeror's guarantee of scope and price when evaluating the Project Finance proposals. *See* Complaint Count I; Memorandum in Support of Motion for Preliminary Injunction, at 17 to 23. The record is quite clear, however, that Forest City's GMP was known and considered at all levels of the evaluation hierarchy regardless of whether the "old" or "new" form was used.

At the SSEB level, all of the evaluators recognized Forest City's guaranteed scope in their evaluations ([redacted]). (Tab 57 at 1186; Tab

[5] GMP's or scope guarantees, which both Forest City and GMH proposed, cap the cost that a builder can "charge" to the project. Any cost incurred by the builder in excess of the GMP would be absorbed by the builder and, therefore, would not be taken from the total cost committed for expenditure on the project. (*See* Tab 26 at 525-26; Tab 49 at 766). The GMP did not cap the costs the builder would incur, only the costs that the builder could charge to the project.



[redacted]

60 at 1252; Tab 59 at 1227; Tab 58 at 1210; Tab 56 at 1169). [redacted] of the [redacted] ([redacted]) were using the "new" form which highlighted offerors' scope guarantees for evaluation, but, interestingly, [redacted] was using the old form which did not. She evaluated Forest City's GMP to be a strength under Project Concept Statement Factor 2 although using the old form ([redacted]). (Tab 56 at 1169). One evaluator ([redacted]) was using the new form, not the old form, and, like [redacted] evaluated Forest City's GMP under Project Concept Statement Factor 2. (Tab 58 at 1210). It is evident from this that the particular form used did not determine whether the SSEB evaluators considered Forest City's GMP. It was evaluated regardless of the form.

At the SSAC level, the Agency also considered Forest City's GMP, although not as Forest City would have liked. The SSAC Consensus document shows the following entry under "Weaknesses" for Project Finance Factor 5:

> Value would have been added if the offeror [Forest City] had established some typical parameters surrounding the guaranteed maximum price contract, e.g., [redacted]

(Tab 50 at 1039). It is significant to note that this was the SSAC "Consensus" document. The document reflected the collective judgment of the entire SSAC. Rather than painting the picture as Forest City does, the SSAC Consensus document demonstrates



[redacted]

consideration of Forest City's scope guarantee by the entirety of the SSAC which collectively concluded that Forest City's GMP was lacking.

Finally, the Source Selection Decision document ("SSD") prepared by the SSA does not mention Forest City's GMP directly, but it does indicate that the SSA read and adopted the SSAC report which contained the consensus of the SSAC regarding Forest City's scope guarantee. The SSD provides:

> The SSAC examined the report prepared by the SSEB as well as each submission, performed a trade-off analysis between offerors using its expertise and prepared its findings in a report to me dated March 1, 2007. I find the analysis and conclusions within that report to be persuasive, to be supported by the facts and to be in harmony with the selection factors in the solicitation. I therefore adopt them in support of my decision.

(Tab 76 at 1491).

Forest City's rationale which assumes that the SSA was ignorant of Forest City's GMP is irrational and inconsistent with the record before this Court. The record shows, as noted above, that both the SSEB and SSAC considered and commented upon the GMP and then presented their findings to the SSA, who adopted these findings as his own. (Tab 76 at 1491). The lack of specific mention of Forest City's GMP in the SSD is not fatal. *See J & D Maint. & Servs. v. United States,* 45 Fed. Cl. 532, 540 (1999) (finding in connection with anomalies in the documentation of an evaluation that "the Navy's failure to have a perfect record is not a showing of arbitrary or capricious conduct, nor…an abuse of discretion or an act of bad faith").



[redacted]

Since Forest City centers Counts I and II of its Complaint around the factually erroneous premise that the Agency evaluators, the SSEB, SSAC and SSA, failed to comprehensively and meaningfully evaluate Forest City's GMP, Forest City's argument must fail. The record shows that Forest City's GMP was evaluated at all levels. Forest City simply did not receive the evaluation it hoped to receive. Forest City's quarrel is with the subjective judgment of the Agency's evaluators, an area not open for second-guessing by this Court. Forest City has not shown this Agency judgment to be arbitrary or capricious, only contrary to what Forest City would have liked.

Further, Forest City has failed to demonstrate how use of the old form prejudiced it in some way. This is particularly significant since not only did the evaluators clearly evaluate Forest City's GMP, but they used the same forms in evaluating GMH's proposal, and presumably all offerors. (*See* Tabs 65-71). The confusion surrounding the form, although intriguing, clearly did not effect the outcome of this evaluation factor.

**2. The Agency Correctly Concluded that Forest City's [redacted] Vertical Cost Per Square Foot Was Not Overcome By Forest City's GMP**

Forest City's [redacted] vertical cost per square foot for new construction concerned evaluators that Forest City would not be able to deliver what it proposed or could lose incentive to move forward if it became economically disadvantageous to do so. (*See* Tab 74 at 1481; Tab 76 at 1492). Without attempting to defend its [redacted] figure, Forest City argues that its GMP should have alleviated all such Agency concerns.



[redacted]

However, as the record shows, Forest City's [redacted] vertical cost per square foot continued to be a significant concern. As the SSA explained, he did not believe that Forest City could build what was required at its [redacted] vertical cost per square foot figure. (Tab 76 at 1492 [redacted]. Forest City's GMP did nothing to address that concern.

The likely outcomes to the project from Forest City's [redacted] per vertical square foot cost for new construction were two-fold. First, Forest City would build new housing at West Point for [redacted] per vertical square foot which the Agency reasonably concluded would risk endangering the cultural and historical character of housing at West Point, i.e., achieving the "robust proposed scope." Second, Forest City could begin work only to find that [redacted] per vertical square foot was [redacted] what was necessary to achieve what the Agency sought. Forest City then would increase its cost, exceeding its GMP by a substantial factor, putting significant, unexpected economic pressure on Forest City and its partners. Although the cost in excess of Forest City's GMP would not be "charged" to the project and Forest City might continue to perform under the strain, it also might seek relief from the Agency or decide that the economics were not there and abandon the project. The possibility of these latter events increased the risk to the Agency over a proposal from an offeror, e.g., GMH, which had demonstrated at the beginning a realistic understanding of the vertical per square foot

cost of new construction needed for West Point and had structured its overall proposal around that understanding.

Forest City has it wrong. Forest City's offer of a [redacted] GMP did nothing to instill confidence that Forest City understood what was required for new construction at West Point and would deliver what was proposed. The Agency correctly and reasonably gave Forest City a weakness for its [redacted] vertical cost per square foot, despite its GMP. *See Ferranti Int'l Def. Sys., Inc.*, B-237555, Feb. 27, 1990, 90-1 CPD ¶ 239 (Comp. Gen. 1990) (the risk of poor performance at little or no profit is, in general, a legitimate concern in the evaluation of proposals).

Interestingly, as noted earlier, rather than argue that its vertical per square foot cost can be achieved and therefore should not have earned a weakness, Forest City relies upon its GMP as a fix for the deficiency. The presence of a GMP, however, did not change Forest City's lack of understanding of what would be required. Thus, Forest City has failed to show how the Agency's actions in this regard were arbitrary, capricious or otherwise not in accordance with law.

### 3. The Agency Had A Rational Basis for Viewing GMH's GMP More Favorably than Forest City's

Forest City objects that its GMP proposal should have compared favorably to GMH's GMP, or better. However, significant differences existed between the two GMP's and the circumstances under which they were offered that justified the Agency's assessment of both.



[redacted]

The SSD explains that the Agency favored GMH's guarantee because GMH has "never had to adjust scope" in any of its previous, multiple Army housing projects. (Tab 76 at 1496). The Agency could have added two additional features of GMH's GMP that provided advantages that Forest City's GMP did not.

As noted above, the GMP provides the project with protection against the financial risk of building cost overruns. If the builder's cost exceeds the GMP, it is the builder which must absorb the extra cost, not the project. [redacted]. *See* (Tab 26 at 525-526). GMH went further, however. Instead of protecting the project only against cost overruns, [redacted] (Tab 49 at 766). This assures that the builder will expend what is necessary to fully meet the goals of the project. [redacted] Forest City's GMP offered no such advantage.

GMH' s offer also provided a [redacted] covering the [redacted] contract period. *Id.* By contrast, Forest City proposed to [redacted] (Tab 26 at 526). Forest City's likely intent, consistent with standard industry practice, was to provide [redacted] Thus, at the start of the project under Forest City's proposal, [redacted]



[redacted]

The Agency favorably evaluated GMH's GMP because it provided a high level of confidence that GMH would not have to adjust scope during performance, which was the Agency's experience with GMH in past projects. By contrast, the Agency was not confident that Forest City could perform its proposed scope due to its [redacted] vertical cost per square foot. (Tab 76 at 1492). Additionally, GMH offered [redacted] in the project from [redacted] and a [redacted] From this record, the Agency's conclusions were eminently reasonable.

### 4. GMH Complied with the Solicitation's Material Requirements

In Count III of its complaint, Forest City argues that GMH failed to meet a "material" solicitation requirement by allegedly proposing "no work" on [redacted] units [redacted] in violation of the following provision of the RFP:

> [T]he partner will provide for the new construction/renovation, operation, management and maintenance of the existing family housing inventory.

(Tab 23 at 362).

Forest City offers an unreasonable interpretation of this RFQ provision. Nothing in this provision indicates *when* work must be performed. The RFQ left each offeror to decide how best to schedule the necessary work. The RFQ clearly did not establish a mandatory requirement that all units, including those just renovated, must either be newly constructed or "re-renovated" during the IDP. Forest City has misread this RFQ provision which undermines its argument that GMH's proposal must be rejected for



[redacted]

failing to meet a material solicitation requirement. This argument, as with the others, must be denied.[6]

Despite Forest City's strained interpretation of the RFQ, GMH did propose to perform work on all 628 units identified in the RFQ [redacted] including new construction and renovation. GMH first proposed to use funding obtained [redacted] to renovate or newly construct [redacted] homes [redacted] Renovation of the remaining [redacted] homes, the so-called "no work" homes, was reserved for the [redacted] because, as noted in GMH's proposal and in the RFQ, the Army either had recently renovated those homes or they were undergoing renovation and would be transferred after completion of renovation. *See* Tab 49 at 718 (New Brick), 719 (Lusk), 720 (New Brick), and 722 (Professors Row, Old English South, Old English North); *see also* Tab 23 at 376). It made little sense to renovate homes [redacted] that the government had just renovated. GMH proposed that each of the [redacted] newly-renovated homes would be further renovated during the [redacted]. *See* Tab 49 at 735) [redacted]

GMH's plan to address the [redacted] homes also was evident from its financial proformas. GMH's Reinvestment Account proforma shows expenditures for "Historic

[6] Since Forest City has misread the RFQ as requiring new construction or renovation of all units [redacted] its allegation in Count VI of its complaint that the Agency was obligated to amend the RFQ to allow Forest City and others to offer "no work" [redacted] also must fail.



[redacted]

Renovations" from the Reinvestment Account beginning in [redacted] and running continuously in increasing amounts to the end of the [redacted] (Tab 91 at 1903). GMH's plan was clear - - the [redacted] homes would receive future renovation but they required [redacted]. *Id.* at 755 (emphasis added).

In addition, although the newly-renovated [redacted] homes would not need further renovation until the [redacted], GMH proposed to provide [redacted] *See* Tab 49 at 745-52 [redacted] The tag "no work" for these homes under the GMH proposal has been used to wrongly connote that GMH would give them no attention [redacted]. This is patently inaccurate.

Forest City's assertion that a spreadsheet prepared by JLL for the Agency containing a cost "Baseline" for the IDP and each offerors' corresponding proposed cost establishes an Agency intent to newly construct or renovate 628 homes during the IDP is misplaced. *See* Complaint at ¶ 97. As noted above, the RFQ was clear that there was no such obligation. Whatever assumptions JLL made for its analysis do not control the Agency's clear statement of its requirements in the RFQ. Additionally, Forest City alleges that the total number of units shown for GMH [redacted] on the JLL



[redacted]

Case 1:07-cv-00546-ECH Document 40 *SEALED* Filed 08/07/2007 Page 29 of 39

spreadsheet, 628, was misleading and would have led "casual observers" such as the SSAC and the SSA to conclude that GMH was proposing to newly construct or renovate all [redacted]. *See* Complaint at ¶ 109. This gives too little credit to the SSAC and the SSA. The mistake in the total for GMH [redacted] is clearly evident from the numbers of new construction, renovation and conversion shown immediately above the total. Further, since the purpose of the spreadsheet presumably was to permit comparison of offeror cost during the IDP, the spreadsheet is accurate.

Forest City fails to identify any reference in the RFQ requiring offerors to identify an exact number of homes that must be built new or renovated [redacted]. Rather, the RFQ simply requires offerors to propose their best solution for the existing housing inventory at West Point over the 50-year contract period. The fact that GMH and Forest City chose different approaches for the newly-renovated houses does not render GMH's proposal non-compliant. In fact, Forest City was free to use the same approach as GMH. Forest City took a calculated risk by proposing to newly construct or renovate [redacted], including the units renovated within just the past few years. Unfortunately for Forest City, the Agency did not find that this approach offered value. The Army exercised its judgment on what was best for the government. Forest City fails to establish this judgment was arbitrary or capricious, in violation of any statute or regulation or in conflict with the RFQ.



[redacted]

**5. GMH's Receipt of Revenues from "No Work" Homes during the IDP Was Not a Weakness**

In Count IV of its Complaint, Forest City alleges that, assuming the RFQ permitted an offer of "no work" [redacted], GMH should have received a weakness under Project Finance element 6 of the evaluation criteria because GMH proposed no equity investment for those units [redacted]. *See* Complaint at ¶ 102. There is no basis for such an allegation.

Forest City claims that paragraph 4.6.6.8 of the Army Source Selection Plan imposed a requirement that if "the offeror [is] receiving fees during the construction and rehab period that would significantly decrease its equity position," the offeror must receive a weakness. Complaint at ¶ 104. Forest City has cited no facts to support that GMH's "no work" units [redacted] in any way significantly decreased GMH's equity position. For that reason alone, this argument can be rejected. However, the argument should be rejected in any event without ever reaching this factual analysis.

Decisions of the Court of Federal Claims and the GAO make it clear beyond any doubt that the evaluation criteria in a solicitation are the standard by which a procuring agency's compliance is measured, not by what appears in a source selection plan. A source selection plan is an internal agency guideline and does not confer any rights on an offeror. *See ManTech Telecomms. & Info. Sys. Corp. v. United States,* 49 Fed. Cl. 57, 66 (2001)(*aff'd, 30 Fed. Appx. 995* (Fed. Cir. 2002) (defendant intervenor could not rely on the source selection plan, the Court noting that "GAO has repeatedly held that such plans



[redacted]

generally do not give outside parties any rights and, thus, provide no basis for departing from the requirements of a solicitation."); *Structural Pres. Sys., Inc., B-285085,* 2000 CPD 131 at 3 (Comp. Gen. 2000) ("The protestor's assertion that the agency failed to follow its source selection plan does not provide any basis to sustain the protest. Source selection plans provide internal agency guidelines and, as such, do not give outside parties any rights."); *Wilson 5 Serv. Co., Inc.* B-285343.2, B-285343.3, 2000 CPD ¶ 157 at 3 (Comp. Gen. 2000), and *DTH Mgmt. JV,* B-283239, 99-2 CPD ¶ 68 at 3 (Comp. Gen. 1999). Forest City cites to nothing in the RFQ evaluation criteria that would require the finding of a weakness in GMH's proposal on the basis Forest City suggests. Consequently, Forest City's criticism of the Agency for not finding a weakness in GMH's proposal for not "equitizing" its "no work" units [redacted] must fail.

### 6. Forest City Was Not Prejudiced by the Agency's Use of a Plug Number

Since vertical square foot cost was not a required feature in any proposal or proforma, GMH did not provide one, although Forest City did. Thus, because a vertical square foot cost was not specifically provided by GMH, JLL on behalf of the Agency adopted the Agency's benchmark of total average square footage per unit of [redacted] to calculate an assumed vertical cost per square foot for new construction for GMH.

The raw data to calculate GMH's vertical per square foot cost was in GMH's proposal, however. After collecting total square footage for new construction from GMH's written proposal, Forest City calculates an average per square foot vertical cost of



[redacted]

[redacted] for GMH. (*See* Complaint Exhibit 21). Assuming the accuracy of this calculation, this simply confirms that GMH's vertical per square foot cost "most closely represented the Army's benchmark," (*see* Tab 76 at 1492), at only [redacted] lower.[7] Meanwhile, Forest City's vertical cost per square foot remains a huge [redacted] lower than the baseline.[8] Moreover, even if JLL used the "plug" baseline of [redacted] total average per unit square feet of new construction for all offerors, Forest City's vertical cost per square foot would be [redacted] still [redacted] compared to the baseline and GMH.[9] It is difficult to imagine that the reduction of GMH's assumed vertical cost per square foot to produce a [redacted] gap between it and the Agency's benchmark would result in any change in the outcome of this procurement, particularly where Forest City's vertical cost per square foot continues to be [redacted] GMH's and the Agency's benchmark.

Forest City has not met its burden of showing that it has been prejudiced by the Agency's use of a plug number for GMH's total square footage. Absent a showing of prejudice, Forest City's protest on this point must be denied. *See Hawpe Const., Inc. v. United States*, 46 Fed. Cl. 571, 579 (2000). In *Hawpe Const., Inc.*, the Court held that even though the defendant's breach of the RFP was an "error," the plaintiff failed to

---

[7] Agency baseline of $[redacted] minus Forest City's calculated vertical cost per square foot for GMH of [redacted]

[8] Agency baseline of $[redacted] minus Forest City's vertical cost per square foot of [redacted]

[9] Agency baseline of [redacted] average square foot per unit divided into Forest City's cost per unit of [redacted] (*See* Tab 90 at 1894).



[redacted]

establish that the error resulted in prejudice. *Id.* (*citing Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). Similarly, here, Forest City has not met this burden.

## II. FOREST CITY HAS NOT ESTABLISHED PREJUDICE

Forest City's entire protest must be denied because Forest City fails to establish that, but for the Agency's actions, Forest City would have had a substantial chance of receiving the award. *See S. Foods, Inc., 76 Fed. Cl. at 777* ("Court noted that for the plaintiff to establish prejudice, it was required to "show that it had a substantial chance of being awarded the contract but for the illegality of the contracting agency's conduct.") As discussed in detail above, Forest City goes to great lengths to point out discrepancies in the evaluation forms for factor 5 of the Project Finance evaluation factor used by the evaluators. The reality, however, is that the use of the old form, if it had any effect at all (which it did not), related to only one of the six factors the Agency evaluated under Project Finance. (*See* Tab 23 at 327). The only weakness under Project Finance that Forest City challenges relates to its vertical cost per square foot and indirectly to its GMP. However, in its Project Finance evaluation of Forest City's proposal, the SSEB identified [redacted] and the SSAC [redacted] none of which Forest City challenges. (*See* Tab 52 at 1062-1067; Tab 50 at 1035-1040). Even if Forest City was successful in demonstrating that it improperly received a weakness for its vertical cost per square foot, Forest City could not show it then would have a substantial chance for award given the other Project Finance weaknesses which are not challenged.



[redacted]

Likewise, Forest City's assertion that GMH should have received weaknesses because of its alleged "no work" units or the Agency's use of a "plug" number, similarly do not establish a substantial likelihood that the evaluation would shift in Forest City's favor. As set forth in detail above, GMH proposed to address all 628 units identified in the RFQ and the Agency's use of the "plug" number was not only reasonable, but Forest City clearly suffered no prejudice. However, even if Forest City were correct, which it is not, that GMH should have received weaknesses for these areas, GMH's proposal would unlikely have been downgraded to an [redacted] in the Project Finance factor (where GMH collectively received [redacted] from both the SSEB and SSAC) or in the Preliminary Project Concept factor (where GMH received only [redacted] from the SSAC and [redacted] from the SSEB). (*See* Tabs 65-66). Thus, since Forest City fails to show a likelihood that its proposal would have received an [redacted] for both the Project Finance and Preliminary Project Concept factors, or conversely that GMH's proposal would have been downgraded to an [redacted] in both these evaluation factors, Forest City's protest must be denied for failing to show the requisite prejudice.

## III. FOREST CITY HAS FAILED TO ESTABLISH THAT IT IS ENTITLED TO AN INJUNCTION

### A. Standard For Obtaining Injunctive Relief

"If a plaintiff demonstrates that a procurement was unlawful, the issue then before the Court is whether to grant permanent injunctive relief." *Bean Stuyvesant, LLC v. United States*, 48 Fed.Cl. 303, 320 (2000). In order to obtain a permanent injunction, a



[redacted]

plaintiff must establish: (1) actual success on the merits; (2) that it will suffer irreparable injury if injunctive relief were not granted; (3) that, if the injunction were not granted, the harm to plaintiff outweighs the harm to the Government and third parties; and (4) that granting the injunction serves the public interest. *Id.* at 320-21 (*citing Hawpe Constr., Inc. v. United States*, 46 Fed.Cl. 571, 582 (2000).

**B. Success on The Merits**

As demonstrated above, Forest City has not shown that the Agency's decision to award the RFQ to GMH was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with all applicable statues and regulations. Further, Forest City has not shown any error in the evaluation process, and, even if it had, it cannot argue that this error prejudiced it in any way. Forest City has not met its heavy burden of showing that the Agency's actions had no rational basis. *See Rig Masters, Inc. v. United States*, 70 Fed.Cl. 413, 420 (2006). Accordingly, Forest City is not entitled to a permanent injunction because it failed to demonstrate success on the merits.

A finding that Forest City fails on the merits is conclusive as to Forest City's entitlement to permanent injunctive relief. However, Forest City would not succeed on the remaining three factors for such relief either.

**C. Irreparable Harm**

Forest City has failed to demonstrate that it will suffer irreparable harm due to the loss of the ability to compete for this contract. Forest City contends that it will suffer a



[redacted]

loss of profits and a loss of business opportunities as a result of the loss of this contract. However, neither of these collateral effects amount to irreparable harm.

> "Economic loss does not, in and of itself, constitute irreparable harm."...Only economic loss that threatens the survival of a movant's business constitutes irreparable harm...The plaintiff's do not claim that they will be destroyed if they do not obtain an injunction. Rather, they merely claim that they risk losing a valuable contract and some of their employees. This is insufficient.

*Found. Health Fed. Servs. v. United States*, 1993 WL 738426 (D.D.C. 1993)(*quoting Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (Citations omitted)); *see also Eli Lilly & Co. v. American Cyanamid Co.*, 82 F.3d 1568, 1578 (Fed.Cir. 1996)(observing that allowing a mere claim of lost profits to serve as the basis for a claim of irreparable harm "would convert the 'extraordinary' relief of a preliminary injunction into a standard remedy, available whenever the plaintiff has shown a likelihood of success on the merits."); *Minor Metals, Inc. v. United States*, 38 Fed.Cl. 379, 381-82 (1997) ("However, economic harm, without more, does not seem to rise to the level of irreparable injury.") (*citing Zenith Radio Corp. v. United States*, 710 F.2d 806, 810 (Fed.Cir. 1983).

Forest City has not claimed that the loss of this contract threatens the survival of Forest City's business.



[redacted]

**D. The Harm to Forest City Does Not Outweigh Any Harm to the United States and GMH**

Forest City has failed to demonstrate how the denial of injunctive relief in favor of Forest City outweighs the harm suffered by the United States and GMH. Forest City argues simply, that since the housing situation at West Point is in an "adequate condition" the Agency is not in any immediate need of the services provided for under this RFQ. Forest City completely ignores the harm suffered by GMH in this process. The granting of injunctive relief in this case would likely delay even further the proposed new construction and renovation of the units at West Point. Even though West Point's housing needs are currently being met, the need for these units is obviously present, or this RFQ would not have been issued. Thus, the housing needs at West Point and GMH's ability to timely deliver the scope it has proposed, weigh in favor of denying Forest City's request for injunctive relief.

**E. Granting Injunctive Relief is Not in the Public Interest**

The public interest will not be served by granting injunctive relief in this case. Forest City has already caused significant delay in this procurement with its filing of a protest at GAO, which was subsequently denied, and now filing the identical protest at this Court. Forest City is not seeking to advance any new arguments that were not denied or found untimely by GAO. Forest City was unsuccessful at GAO in arguing that any significant errors were made in this procurement or that it was prejudiced in any way. Forest City's attempts to delay this procurement further would not advance the public



[redacted]

interest. Thus, as the public interest favors the continuation of contract performance in this instance, Forest City's request for injunctive relief should be denied.

## IV. CONCLUSION

For the foregoing reasons, GMH requests that this Court grant its cross-motion for judgment on the administrative record and deny Forest City's complaint and request for injunctive relief.

Respectfully submitted,

s/ E. Sanderson Hoe
E. Sanderson Hoe

MCKENNA LONG & ALDRIDGE LLP
1900 K Street, NW
Washington, D.C. 20006
(202) 496-7562

Attorney of Record for Intervenor
GMH/Centex Military Communities

Of Counsel:

Jennifer M. Morrison
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, D.C. 20006
(202) 496-7500

Dated: August 7, 2007



[redacted]

**CERTIFICATE OF FILING**

I certify that on August 7, 2007, Defendant-Intervenor's Opposition to Plaintiff's Motion for Judgment on the Administrative Record and Request for Permanent Injunction and Defendant-Intervenor's Cross-Motion for Judgment on the Administrative Record, was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ E. Sanderson Hoe

E. Sanderson Hoe



[redacted]