**Agreed Upon Redacted Copy**
**May be Made Public**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **FOREST CITY MILITARY COMMUNITIES, LLC**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant,**<br><br>**and**<br><br>**GMH/CENTEX MILITARY COMMUNITIES,**<br><br>**Defendant-Intervenor.** | **No. 07-546C**<br>**(Judge Hewitt)** |

**RCFC 52.1 STATEMENT OF FACTS**

Robert H. Koehler
PATTON BOGGS LLP
8484 Westpark Dr.
McLean VA 22102
(703) 744-8005
(703) 744-8006 (Fax)
rkoehler@pattonboggs.com

Attorney of Record for
Forest City Military Communities, LLC

Of Counsel:
Michael J. Schaengold
Jennifer Zucker
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
(202) 457-6000
(202) 457-6315 (Fax)



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

## RCFC 52.1 STATEMENT OF FACTS

### Introduction

Pursuant to the Court's August 2, 2007 Order, as amended by the Court during the August 3, 2007 status conference with the parties, Plaintiff respectfully submits its Statement of Facts. See RCFC 52.1(b)

**The Request for Qualifications (RFQ)**

1. The Military Housing Privatization Initiative ("MHPI") legislation, 10 U.S.C. §§ 2871-2885, provides special authorities to the military services to privatize military family housing on military installations. (Administrative Record (AR), Tab 1 at 6.) The Army's MHPI Program is the Residential Communities Initiative ("RCI"). As part of its continuing RCI efforts, the Army issued Request for Qualification No. W912DR-06-R-0006 ("Solicitation" or "RFQ") to solicit proposals from responsible contractors interested in the Army's RCI program to privatize military family housing communities at West Point, Fort Lee, Virginia, and Fort Jackson, South Carolina. (Id.) For each of these installations, the RFQ provided specific details concerning the existing family housing units, ancillary facilities, the current military family occupancies, the surrounding civilian community, etc. (AR, Tab 2.) This Protest relates only to the RCI Project for West Point.

2. Under the Army RCI contracting format, the acquisition is divided into two separate phases: (i) Project Planning, and (ii) Project Implementation. (AR, Tab 2 at 25.) In turn, the RFQ's source selection process was designed to select a developer who initially would be awarded a fixed price contract of $350,000 to develop a Community Development and Management Plan ("CDMP") for the family housing community at the installation ("CDMP Contractor"). (AR, Tab 23 at 299.) The CDMP Development Plan was to detail the number, type, and size of housing units that were to be



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

3677590

renovated, rehabilitated, or newly constructed in each neighborhood with the family housing community under a privatization plan with a 50-year life cycle for Phase 2, Project Implementation. (Id. at 294.)

3. Under the terms of the RFQ, the CDMP was to be approved by the installation, the Department of the Army, the Office of the Secretary of Defense, OMB and Congress. (Id. at 299.) Upon the payment of the $350,000 to the CDMP Contractor, "the Army will be granted full and unlimited rights to use the CDMP, including the right to provide the CDMP to other developers in this or other military housing privatization projects. (Id.) At this point, the contract will be complete and the developer will have no right, title, or interest in Phase 2 by virtue of its participation in Phase 1." (Id.)

4. Upon acceptance and approval of the CDMP, the RFQ provided that it was the stated intent of the Army to have the CDMP Contractor implement the approved plan. (Id.) The terms of the Phase 2, *Project Implementation,* were for the awardee to develop, operate and maintain the family housing units transferred to the awardee for a 50-year term. (Id.)

**RFQ Source Selection Process - Step One**

5. In Step One of the source selection process, the Solicitation sought from interested offerors a five-page submission addressing three Minimum Experience Requirements (MERs). (Id at 307.) The MERs were established to address the skill sets of development, property management, and financial capability for this type of housing community project. (Id.) Offerors who satisfied the "Step 1A - MERs" were eligible to submit a "Step 1B - Statement of Qualifications (SOQ)." (Id. at 308.) The SOQ sought information on the offeror's experience, financial capabilities, organizational capabilities (corporate level), past performance, and small business utilization (general history). (Id.)



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

6. The Source Selection Evaluation Board's (SSEB) assessment of responses to the SOQ was then to be used to establish a highly qualified competitive group (HQCG). (Id. at 303.) Offerors selected for inclusion in the HQCG or competitive ranges were then eligible to compete in Step Two. (Id.)

**RFQ Source Selection Process - Step Two**

7. In Step Two of the selection process, offerors in the HQCG were eligible to compete sequentially on the following projects: *Project One* - Fort Lee, Virginia; ***Project Two* - WestPoint**; and *Project Three* - Fort Jackson, South Carolina. (Id. at 289.) Offerors were not required to submit a proposal on all three projects, but could select one or more on which they wanted to compete. (Id.)

8. For Step Two, the eligible offerors were required to make a new submission which would be the basis upon which the SSEB would evaluate and select the awardee. (Id. at 290.) Here, each offeror was required to make: (i) an oral submission, not to exceed six (6) hours, to explain and display how they satisfy the Step Two evaluation factors, and (ii) a concurrent written submission supporting the offeror's oral presentation. (Id. at 452.) Following the conclusion of its oral presentation, the offeror was permitted to submit further clarifications and responses to SSEB questions. (Id. at 320.)

**Step Two Evaluation - SSEB**

9. For Step Two, the RFQ provided that the SSEB would use four (4) evaluation factors, in descending order of importance, to evaluate the oral and written submissions of the offeror:

(1) Project Finance,

(2) Preliminary Project Concept Statement,

(3) Organizational Capabilities (on-site, project specific), and

(4) Small Business Utilization Plan (on-site, project specific).



**PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

(Id. at 320.) The RFQ identified a series of questions representing individual subfactors that were to be used by the evaluators in review each of these factors. (Id. at 327-329). For the *Project Finance* Factor there were six separate categories of questions, with several of the categories having multiple questions to be considered by the evaluators in their individual assessment of an offeror's proposal. (Id. at 327.) See also AR, Tab 2 at 59-61, *Project Finance Factor Evaluation*.

10. The RFQ also noted a fifth factor: "the assessment of Past Performance will be used in making the 'Best Value' selection." (Id.) In this regard, the RFQ stated at Section 4.0, *Contractor Selection Process*, that "final selection will be based upon the qualifications exhibited by the offerors as outlined by the evaluation factors and upon the basis of best value to the Government." (Emphasis added.) (Id. at 303.) In this regard, "best value" was identified as "the best value for improving military family housing for the specific project." (Id. at 314.)

11. The RFQ also identified the rating scheme the Army would use for the individual evaluation factors. (Id. at 320.) Using an adjectival rating format, the following ratings were to be used:

A) Exceptional Plus (E+): The offeror has addressed substantially all of the elements in this factor in a manner that demonstrates superior added value above a satisfactory response for substantially all of the elements.

B) Exceptional (E): The offeror has addressed many of the elements of this factor in a manner that demonstrates superior added value above a satisfactory response and has addressed substantially all of the remaining elements in this factor in a manner that demonstrates high added value above a satisfactory response.

C) Exceptional Minus (E-): The offeror has addressed some of the elements of this factor in a manner that demonstrates superior added value above a satisfactory response, has addressed many of the elements in this factor in a manner that demonstrates high added value above a satisfactory response and has addressed substantially all of the remaining elements in this factor in a manner that demonstrates a satisfactory response.

D) Acceptable Plus (A+): The offeror has addressed many of the elements in this factor in a manner that demonstrates some added value above a satisfactory response and has addressed substantially all of the remaining elements in this factor in a manner that demonstrates a satisfactory response.

E) Acceptable (A): The offeror has addressed substantially all of the elements in this factor in a



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

satisfactory manner.

F) Acceptable Minus (A-): The offeror has addressed many of the elements in this factor in a satisfactory manner and has addressed substantially all of the remaining elements in this factor in a marginal manner.

G) Uncceptable (U): The offeror has failed to address substantially all of the elements of this factor in a satisfactory manner or has simply failed to address substantially all of the elements in this factor.

H) Neutral (N): This rating will only be used to evaluate an offeror in the past performance evaluation factor (4.3.6). The offeror did not have a sufficient history that could be evaluated in a level of detail that allowed the evaluation team to draw a conclusion about the offeror's past performance.

(Id. at 321-322.)

12. In addition, the RFQ stated that the evaluators were required to provide their overall rating to the offeror's submission. (Id. at 322.) While the adjectival rating was the same, the description for each rating was tailored to address the entire submission, as follows:

A) Exceptional Plus (E+): The offeror has addressed substantially all of the factors in a manner that demonstrates superior added value above a satisfactory response.

B) Exceptional (E): The offeror has addressed many of the factors in a manner that demonstrates superior added value above a satisfactory response and has addressed substantially all of the remaining factors in a manner that demonstrates high added value above a satisfactory response.

C) Exceptional Minus (E-): The offeror has addressed some of the factors in a manner that demonstrates superior added value above a satisfactory response, has addressed many of the factors in a manner that demonstrates high added value above a satisfactory response and has addressed substantially all of the remaining factors in a manner that demonstrates a satisfactory response.

D) Acceptable Plus (A+): The offeror has addressed many of the factors in a manner that demonstrates some added value above a satisfactory response and has addressed substantially all of the remaining factors in a manner that demonstrates a satisfactory response.

E) Acceptable (A): The offeror has addressed substantially all of the factors in a satisfactory manner.

F) Acceptable Minus (A-): The offeror has addressed many of the factors in a satisfactory manner and has addressed substantially all of the remaining factors in a marginal manner.

G) Unacceptable (U): The offeror has failed to address substantially all of the factors in a satisfactory manner or has simply failed to address substantially all of the factors.



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

3677590

(Id. at 322-323).

13. The RFQ also advised that, in addition to the adjectival ratings, the evaluators would assign a "risk rating" to the overall proposal. (Id. at 323). The stated purpose for this "risk rating" was for each evaluator to assess the level of risk associated with selecting the contractor to perform Phase 1, *Project Planning*, and Phase 2, *Project Implementation*. (Id.) To meet this requirement, each evaluator was to assign one of the following "risk ratings" to the offeror's submittal:

> A) Low Risk: Any weaknesses identified by the evaluators in the experience, approach, capabilities, and/or past performance record of the developer that have little potential to cause disruption to the planning and implementation phases. Normal contractor/government effort and monitoring will probably minimize any difficulties.
>
> B) Moderate Risk: There are weaknesses identified by the evaluators in the experience, approach, capabilities, and/or past performance record of the offeror that can potentially cause disruption to the planning and implementation phases. Special contractor/government emphasis and close monitoring will probably minimize any difficulties.
>
> C) High Risk: There are weaknesses identified by the evaluators in the experience, approach, capabilities, and/or past performance record of the developer that have the potential to cause significant disruption to the planning and implementation phases even with special contractor/government emphasis and close monitoring.

(Id.) Each SSEB evaluator was required to "document the weaknesses and their potential impact on disruption to the planning and implementation phases of the project to justify the contractor selection rating." (Id.)

14. According to the Army's Source Selection Plan, there were [redacted] members of the West Point SSEB. (AR, Tab 2 at 29 [Paragraph 3.6] and 37-38.)

15. At the conclusion of oral presentations by the offerors, each member of the SSEB was to independently evaluate and score each proposal and then they jointly were to arrive at a consensus evaluation. (AR, Tab 2 at 66.) In this regard, the elements and questions of each factor were to be "evaluated **comprehensively** to determine an overall rating for that factor," which then would be used to analyze the offeror's ability to plan and implement the project. (AR, Tab 23 at 321).



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

3677590

16. To facilitate the review of the proposals, the Army developed a SSEB *Step Two Individual Evaluation* Form incorporating the identical factors/questions identified as factors and subfactors in the RFQ. (See, for example, AR, Tab 55.) The Form itself provided a detailed format for indicating an "Overall Rating" (Id. at 1138.), as well as ratings for each of the four evaluation factors and their respective sub-factors (Id. at 1139-1157.), and the "Risk" factor (Id. at 1158).

17. After the SSEB members conducted their individual evaluations of a proposal, they were to determine a consensus rating of each evaluation factor ("Consensus Evaluation Factor Rating"), then a Consensus "Overall" rating, and a Consensus "Risk" Rating for the offeror. (AR, Tab 2 at 67; Tab 53-62). (See, for example, AR, Tab 52.)

18. The SSEB also used a series of spreadsheets to record and compare elements of each offeror's proposal with the Army's internal estimate, referred to as the ("Army baseline"), for the West Point project. [**Note**: The AR at Tab 64 contains only 1 of 5 spreadsheets. **See** Complaint Exhibit ("CE") CE Nos. 21 and 22.]

**Step Two Evaluation - SSAC**

19. At the conclusion of its evaluation, the SSEB was to present its "consensus evaluation" of each offeror to the Source Selection Advisory Committee (SSAC). (AR, Tab 2 at 67.) The SSAC, which consisted of [redacted] voting members and one non-voting advisor from Jones Lang LaSalle ("JLL"), was to make a comparative assessment of proposals against all source selection criteria in the solicitation and arrive at a consensus. (Id. at 37-38 and 67; Tab 23 at 320.) Members of the SSAC did not individually evaluate the proposals as had the members of the SSEB. Rather, the SSAC considered the SSEB documentation and generated only a "consensus" evaluation for each offeror.



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

20. The SSAC employed an evaluation form that was an adaptation of the SSEB evaluation form, with the SSAC merely changing the title from *SSEB Step Two Consensus Evaluation* to SSAC *Step Two Consensus Evaluation*. (Compare, for example, AR, Tab 50 and Tab 52.) In all other aspects, the form was to be identical. (Id.)

21. In conducting its analysis, the SSAC also employed a comparison chart, *Step 2 Summary Data – Sources & Uses*, prepared by JLL. [**Note**: The AR at Tab 63 and 75 contains only 1 of 5 spreadsheets. **See** CE No. 11.] The consensus assessment of the SSAC was then memorialized in a memorandum submitted to the Source Selection Authority (SSA). (AR, Tab 74.) The SSAC also submitted its SSAC *Step Two Consensus Evaluation* form for each offeror (AR, Tab 50 and 66), along with its *Step 2 Summary Data – Sources & Uses* spreadsheets, a "Rating Matrix." [**Note**: The AR does not contain the SSAC Rating Matrix. **See** CE No. 13.]

**SSA Selection for Award**

22. The assessment of the SSAC was then to be briefed to the Source Selection Authority (SSA) who was to make the final analysis resulting in a recommendation of an award. (AR, Tab 2 at 67.) While the SSA could use reports and assessments prepared by others, the final decision had to represent the SSA's independent judgment. (Id.) In this regard, the Army Acquisition Plan provided that "while the SSA may use reports and analyses prepared by others, the source selection decision for selection of the contractor will represent the SSA's independent judgment." (AR, Tab 1 at 14.) The same directive was provided to the SSA in the Army's Source Selection Plan. (AR, Tab 2 at 29 and 67.) Based on the SSA's decision, the Contracting Officer would then make the award. (AR, Tab 23 at 320.)

**Forest City's Proposal for the West Point RCI**



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

23. Based on initial Step One submissions, the Army announced on April 14, 2006, that ten (10) prospective contractors, including Forest City, were selected as being in the highly qualified competitive group and invited to participate in RFQ's Step Two process. In response, Forest City and four other companies (GMH/Centex; Actus Lend Lease, LLC; Michaels Military Housing, LLC; and East Army Properties, LLC) elected to submit a proposal for the West Point RCI project.

24. Initially, the RFQ contemplated that the RCI project for West Point would include 964 family housing units, and Forest City prepared its oral presentation and submission based on this assumption. Prior to the oral presentations, the Army issued Amendment No. 0012 on November 12, 2006, advising the offerors that the "end-state inventory" would be 628 units, not the 964 homes in the West Point inventory. Attached to the Amendment was a spreadsheet which identified the 337 homes to which there would be "no capital improvement," leaving the 628 units for capital improvement. AR, Tab 14. [**<u>Note</u>**: The "West Point AFH Inventory USMA" Spreadsheet is not attached in the AR.] Several days later, the Army issued Amendment No. 0013 on November 15, 2006 concerning the 337 units "designated not to receive any capital improvements," and revised the Spreadsheet to clarify the 337 units that were designated <u>not</u> to receive any capital improvements. AR, Tab 15. [**<u>Note</u>**: The "West Point AFH Inventory USMA" Spreadsheet is not attached in the AR.]

25. On December 7, 2006, Forest City made its oral presentation to the SSEB. As contemplated in the RFQ, Forest City was provided an opportunity to provide further clarification and respond to questions raised by the SSEB during the oral presentation. Forest City made this "Further Clarification & Response to Questions" submission on December 12, 2006.

26. Approximately one month later, on January 4, 2007, the Army issued Amendment No. 0014



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

3677590

which eliminated reference altogether of the 337 units which were designated not to receive any capital improvements:

> Offerors interested in continuing to participate in Step Two for the USMA project should re-submit their Step Two written proposals including the following information. The **337 units** identified with a Number "1" in the first column ["**No Capital Improvements**"] of the Spreadsheet file AFH Inventory USMA 15 Nov 06.xls (attached to this amendment as well as Amendment No. 0013) shall not be included in the offeror's proposal.

A. AR, Tab 16 at 241. (Emphasis added.) [**Note**: The "West Point AFH Inventory USMA" Spreadsheet is not attached in the AR.] The Amendment further advised that offerors interested in continuing to participate in Step Two for West Point were to resubmit their Step Two submission, using 628 homes vice 964 homes. (Id.) In this regard, the offerors were permitted to submit an additional 75 pages of text and 150 PowerPoint slides, with submissions due on January 26, 2007. (Id.) The Amendment also advised that revised oral presentations would not be held. (Id.)

27. Forest City submitted its revised written submission to the Army on January 26, 2007. AR, Tab 24.

**Notice of Award**

28. By letter, dated March 8, 2007, the Army notified Forest City that it had not been selected for award of the West Point RCI because its "submission did not provide the 'best value' to the Army when evaluated against the factors contained in the RFQ," and that GMH/Centex Military Communities had been selected for award. (AR, Tab 78 at 1504.) The letter offered Forest City the opportunity for a post-award debriefing on March 19, 2007. (Id.)

29. The Army attached two documents to its letter: (i) the SSAC's "Consensus Evaluation Ratings" for Forest City, and (ii) the SSAC "Consensus Ratings Matrix" which provided the SSAC's



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

consensus ratings for Forest City on the evaluation factors compared to the other offerors. (Id. at 1505-1506 and 1529). The Army also had attached the SSAC's two-sheet "Overall Rating" for the awardee, GMH/Centex. (AR, Tab 65 at 1327-1328.) On the day of Forest City's debriefing, Forest City learned in an exchange of e-mails with the Contracting Officer that the Army had inadvertently included the GMH/Centex "Overall Rating" as part of the information it had provided to Forest City.

30. With regard to the SSAC's "Consensus Evaluation Ratings" for all of the offerors, each was rated using adjectival ratings system. (AR, Tab 23 at 321-322.) Forest City, the second ranked offeror in the SSEB's rating, and GMH/Centex, received the following ratings:

| Factor | Forest City | GMH/Centex |
|---|---|---|
| Finances | E- | E |
| Concept Statement | E- | E |
| Organizational | E | E |
| Small Business | E | E+ |
| Overall Rating | E- | E |
| Risk Rating | Low | Low |

(AR, Tab78 at 1529.) [Note: the SSAC failed to change the heading from "SSEB" to "SSAC."]

31. With regard to the SSAC's "Consensus Evaluation" of the Forest City proposal, this document is 24 pages in length, consisting of a two-page "Overall Rating" summary, and then 22 pages addressing the details of the grading on the four evaluation factors, in descending order of importance, as noted earlier: (1) Project Finance, (2) Preliminary Project Concept Statement, (3) Organizational Capabilities (on-site, project specific), and (4) Small Business Utilization Plan (on-site, project specific). (AR, Tab 50 at 1032 – 1055.)



**PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

**Forest City - "Overall Rating"**

32. In the *Summary Data* section of the SSAC's two-page "Overall Rating" form, it recounted the essential elements of Forest City's proposal for the West Point RCI: Of the total 628 family housing units identified in the RFQ, Forest City proposed that it would demolish [redacted] units and replace them with [redacted] **new** units. For the remaining [redacted] housing units, Forest City proposed to renovate these units. In addition, it proposed to contribute $[redacted]. (Id. at 1032.)

**GMH/Centex – "Overall Rating"**

33. In the *Summary Data* section of the SSAC's two-page "Overall Rating" form, it summarized certain basic facts of the GMH/Centex winning proposal: Of the total 628 family housing units identified in the RFQ, GMH/Centex proposed that it would construct only [redacted] new units compared to Forest City [redacted] units. (AR, Tab 65 t 1327.) The summary for GMH/Centex further stated that it would renovate only [redacted] units (compared to Forest City's [redacted] units), and "[redacted]," and "**no work** [redacted] units." (Id.) The summary further advised that GMH/Centex would contribute only $[redacted] (compared to Forest City $[redacted]), but that GMH/Centex would make its contribution only at the [redacted] (compared to Forest City's [redacted]). (Id.)

**Forest City's Debriefing**

34. The Army held Forest City's debriefing on March 19, 2007. While the Army did expound on the written commentary in the SSAC's "Consensus Evaluation Ratings" (AR, Tab 50 at 1034-1055.), the most significant discussion related to the substantial, and rather obvious, disparity between the basics of Forest City's *Project Finance* plan with that of GMH/Centex: Forest City was proposing to build [redacted] more new family housing units than GMH/Centex, and **renovate** [redacted] more



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

family housing units than GMH/Centex proposed. (AR, Tabs 50 and 65.) Moreover, not only was there a $[redacted] disparity between Forest City [redacted] GMH/Centex, but Forest City's contribution was to be made some [redacted] than GMH/Centex. (Id.)

35. The Army debriefers advised the Forest City representatives that the Army had rated Forest City's *Project Finance* as only "[redacted]" (compared to GMH/Centex's "[redacted],") because the SSAC had <u>not</u> accepted Forest City's projected "Vertical Cost per Sq. Ft." of $[redacted] per sq. ft., as a credible figure. In effect, the Army had concluded Forest City had engaged in misleading conduct by proposing, in the Army's view, a totally unrealistic and unattainable number, presumably in an effort to capture the award of this RCI project.

36. In the SSAC evaluation of Forest City's proposal under the *Preliminary Project Concept* Factor, it identified only one major strength - the conversion of certain [redacted]. (AR, Tab 50 at 1041.) The SSAC did <u>not</u> even mention as a Major Strength the fact that of the total 628 family housing units identified in the RFQ, Forest City proposed that it would demolish [redacted] units and replace them with [redacted] **new** units. (Id.)

37. For "Major Weaknesses," the SSAC identified several items: (i) the SSAC did not like the fact that [redacted] of Forest City's [redacted] new homes were not projected to be delivered until the [redacted], (ii) the SSAC identified as a "Major Weakness" a typographical error - in one write-up, the funds for the General/Flag Officer Quarters was cited as $[redacted], and in the Development as $[redacted], (iii) the SSAC said it was a "Major Weakness" for Forest City to propose [redacted], and (iv) the SSAC identified as a "Major Weakness" the fact that the proposed size [redacted] of the Community Center, [redacted], was excessive for



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

the West Point project. (Id.)

**Protest to GAO**

38. On March 26, 2007, Forest City timely protested the award to GAO. (AR, Tab 80). In its GAO protest, Forest City alleged that the Army: (1) misevaluated Forest City's *Financial Plan* by finding that its "vertical cost per square foot" of $[redacted] per sq. ft. was not credible and determined this was a "major weakness" to its Proposal, and (2) improperly applied the evaluation criteria by failing to acknowledge and reward four significant benefits of Forest City's *Financial Plan* compared to GMH's *Financial Plan*: (i) Forest City offered to build [redacted] new homes compared to only [redacted] homes offered by GMH, (ii) Forest City allocated its new home construction [redacted] whereas GMH limited its new home construction to only [redacted], (iii) Forest City offered to renovate [redacted] homes compared to only [redacted] by GMH, and (iv) Forest City's equity contribution was $[redacted] compared to $[redacted] by GMH. (Id.)

39. The Army suspended performance of the contract pending the outcome of the protest.

40. In reviewing the source selection documentation provided in the Agency Report filed by the Army, it was discovered that, not only had the SSEB, the SSAC and the SSA failed to properly assess Forest City's proposal, but that the Army had failed to reject GMH/Centex's proposal because it failed to meet the material requirements of the Solicitation.

41. Following the submission of the Agency Report, Forest City filed its Comments and asserted further protest grounds based on the Army documentation: (i) the SSEB used the wrong version of the evaluation form which omitted consideration of the question: "To what degree is the offeror guaranteeing scope and price," thereby resulting in the Army's failure to properly consider Forest



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

City's guarantee which, in turn, led to the Army's determination that Forest City's "vertical cost per square foot" was a "Major Weakness," (ii) the Army failed to reject GMH/Centex's proposal as unacceptable due to GMH/Centex's proposal to do no work ("no work") on [redacted] family housing units until the [redacted] of the Project, (iii) the SSAC used the Army benchmark vertical sq. ft. cost ("plug number") to calculate GMH/Centex's construction costs, and then reported to the SSA that GMH/Centex's costs were consistent with the Army benchmark, (iv) the Army improperly assessed Forest City's delivery dates for new homes as a "weakness" when compared to both the Army benchmark and GMH/Centex's plan for new home delivery dates, and (v) the Army's failure to consider Forest City's guarantee resulted in the Army's assessment of the size of the Community Center as a weakness. (**Note:** This document is not included in the AR.).

**Major Error: SSEB, SSAC and SSA Failed To Evaluate Forest City's "Scope Guarantee"**

- **Failure to Evaluate Forest City's "Scope Guarantee" By the SSEB**

42. The RFQ's Step Two evaluation criteria for the "Project Finance" Factor - the highest rated of the evaluations factors - initially provided at Paragraph 4.6.6.a(5) the following description of this subfactor:

> Does the offeror demonstrate an understanding of the opportunities for and limitations on the revenue and expenses associated with the project? Does the financial plan support the long-term maintenance of the project?

AR, Tab 23 at 327. This wording is identical to the Source Selection Plan at Paragraph 4.6.7, *Project Finance Element 5*. (Id. at 328.) However, the Army modified this evaluation factor after it issued the RFQ.

43. By RFQ Amendment No. 0007, dated September 22, 2006, the Army added the following underscored phrase to be addressed by the offerors and evaluated by the SSEB, SSAC and the SSA



**PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

when consider an offeror's Financial Plan under the Step Two Evaluation Plan (AR, Tab23 at 327.):

> Paragraph 4.6.6 Financial Plan, (subparagraph 5). Does the offeror demonstrate an understanding of the opportunities for and limitations on the revenue and expenses associated with the project? ***To what degree is the offeror guaranteeing scope and price?*** Does the financial plan support the long-term maintenance of the project?

AR, Tab 9 at 138. (Emphasis in the original.)

44. In Forest City's proposal, it specifically addressed this significant new evaluation subfactor.

First, in the *Project Finance* section of the proposal, Forest City stated the following:

> **2 – Construction Savings:** As a way to contractually transfer scope cost and schedule risk from the to-be-formed RCI Partnership, FCMC proposes [redacted]. **This is further detailed in the "Scope Guarantee" section of the *Preliminary Project Concept Statement*.**

AR, Tab 25 at 476. (Emphasis added.) Then in the "Scope Guarantee" section of the *Preliminary Project Concept Statement*, Forest City detailed its "scope guarantee:

> FCMC is proposing a [redacted]. The key components of this structure are:
>
> * [redacted];
> * [redacted];
> * [redacted];
> * [redacted]; and,
> * [redacted].

AR, Tab 26 at 525-526. (Emphasis added.) Forest City also provided a spreadsheet that established



**PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

it **guaranteed** maximum price contract value of $[redacted], which covers not only the [redacted], but also [redacted]. (Id. at 526-529). In comparison, GMH/Centex's guarantee covers only the [redacted]. It **excludes**, for example, GMH/Centex's [redacted] [**Note**: The GMH/Centex guarantee is not included in the AR. **See** CE 20.]

45. When the SSEB reviewed Forest City's Proposal after Forest City's oral presentation on December 7, 2006, the source selection documentation establishes that [redacted] of the [redacted] SSEB members conducted their respective evaluations of Forest City's Proposal on two separate occasions - one before and one after revised proposals were submitted on January 26, 2007. (AR, Tabs 53 at 1093; 57 at 1186; 59 at 1227; 60 at 1252; 54 at 1119; 58 at 1206; 61 at 1218; and 62 at 1306.) One SSEB member evaluated Forest City's Proposal on only one occasion, and that one was conducted after the submission of revised proposals. (AR, Tab 56 at 1164.)

46. The *SSEB Step Two Individual Evaluation* Form had been updated to include the new subfactor for Project Finance Element 5 added by Amendment No. 0007 ***(To what degree is the offeror guaranteeing scope and price?).*** On the first evaluations by SSEB members [redacted], only [redacted] used the old format and, therefore, did not evaluate or make comment on Forest City's guarantee plan. (AR, Tabs 53 at 1093; 57 at 1186; 59 at 1227; 60 at 1252.) When all [redacted] members conducted their individual evaluations of Forest City's revised proposal, one person - [redacted] - used the old format that did not ask the evaluator to determine "*to what degree is the offeror guaranteeing scope and price.*" (AR, Tab 56 at 1164.) Where the



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

correct form was used, the evaluations universally extolled Forest City's guarantee. Note also the comments at page 4, where [redacted] assigned an "[redacted]" rating for Project Finance to Forest City's proposal. (AR, Tab 54 at 1115). Moreover, when SSEB members [redacted] used the correct form, there was not a single reference to any concern regarding the vertical cost ($[redacted] SF) projected by Forest City.

47. SSEB member [redacted] only evaluation of the Forest City proposal was conducted on February 3, 2007, and [redacted] used the **old** *SSEB Step Two Individual Evaluation* Form that did not include the subfactor for Project Finance Element 5 added by Amendment No. 0007 *(To what degree is the offeror guaranteeing scope and price?)*. (AR, Tab 56 at 1164.) Accordingly, not only did [redacted] evaluation make **no** evaluation of Forest City's guarantees, but her evaluation is the only one that mentions a concern related to "vertical construction costs." (Id.) Yet at page 3 of her evaluation, a Project Finance rating of "[redacted]" was downgraded to "[redacted]" with the following reason: "Rating was revised from an [redacted] as a result of consensus discussions. (Id. at 1161.) Discussions included [redacted]." (Id.) In the "Major Weakness" section, it also states: "Cost of new construction ($[redacted] per square foot) seems low." (Id.)

48. When the SSEB members met to arrive at a consensus rating on February 11, 2007, the SSEB members used the **old** *SSEB Step Two Individual Evaluation* Form that did not include the subfactor for Project Finance Element 5 added by Amendment No. 0007 *(To what degree is the offeror guaranteeing scope and price?)*. (AR, Tab 52 at 1066.) Accordingly, there was absolutely **no** evaluation, consideration or even mention of Forest City's $[redacted] million scope guarantee. (Id.) Even though the SSEB provided an overall rating of "[redacted]," it downgraded Forest City's Project Finance



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

rating to "[redacted]". (Id. at 1060.) As referenced in Paragraph 47, above, the basis for the SSEB consensus downgrading from "[redacted]" to "[redacted]" was recorded in the [redacted] *SSEB Step Two Individual Evaluation* Form. (AR, Tab 56 at 1161.)

- **Failure to Evaluate Forest City's "Scope Guarantee" By the SSAC**

49. The SSEB's failure to evaluate Forest City's $[redacted] million scope guarantee was further compounded by the SSAC. When the SSAC members took up Forest City's proposal, they too used the **old** form that did not include the subfactor for *Project Finance Element 5* added by Amendment No. 0007 (*To what degree is the offeror guaranteeing scope and price?*). (AR, Tab 50 at 1039.) And as with the SSEB's Consensus Evaluation of Forest City's Proposal, the SSAC members also failed to comprehensively evaluate Forest City's $[redacted] million scope guarantee. (Id.) The only reference to Forest City's guarantee is where the SSAC Consensus notes: "Value would have been added if the offeror had established some typical parameters surrounding the guaranteed maximum price contract, e.g., [redacted]." (Id.) The SSAC apparently looked no further than Forest City's statement in the *Project Finance* section of the proposal, where it stated:

> **2 – Construction Savings:** As a way to contractually transfer scope cost and schedule risk from the to-be-formed RCI Partnership, [redacted] **This is further detailed in the "Scope Guarantee" section of the *Preliminary Project Concept Statement*.**

AR, Tab 25 at 476. (Emphasis added.) The SSAC failed to review and consider the extensive write-up and spreadsheets that evidence the full scope of Forest City's $[redacted] million coverage. See Paragraph 44, above.

50. The SSAC's negative comment concerning Forest City's guarantee (***value would have been***



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

***added if the offeror had established some typical parameters surrounding the guaranteed maximum price contract, e.g.,*** [redacted]) is in direct conflict with the SSAC's evaluation of GMH/Centex. (AR, Tab 65.) There, the SSAC made no negative comment in its Consensus Evaluation, yet the GMH/Centex guarantee consists of only three short sentences:

> **Guaranteed Maximum Price (GMP) Construction Contract**:
> **Centex** has the capacity to issue [redacted].

(AR, Tab 48 at 766.) [7th box down]. (Emphasis added.). GMH/Centex discloses the very limited scope of its guarantee in one spreadsheet. [**Note**: AR does not contain GMH/Centex guarantee. See CE 20.] The GMH/Centex guarantee covers only Centex's new construction costs of $[redacted]. It does not cover GMH's [redacted] The GMH/Centex guarantee covers only [redacted]

51. The SSAC compounded its failure to evaluate and consider Forest City's guarantee by giving Forest City *Project Finance* a rating of only "[redacted]" and citing the following as a major weakness:

> Offeror's Vertical Cost per Square Foot appears low. Value would have been added if the [redacted].

(Id.) (Emphasis added.) The very purpose of Forest City's $[redacted] million guarantee obviates this concern. (AR, Tab 26 at 525-528.)

52. In the SSAC's Memorandum to the SSA, the SSAC significantly exacerbated its failure to evaluate and consider Forest City's scope guarantee by dooming Forest City's *Project Finance* proposal



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

with the following: "Unfortunately, FC's proposal also assumes a very low cost of vertical construction of about $[redacted] per square foot in comparison to the Army benchmark and they did not sufficiently demonstrate that this cost could actually be achieved." (AR, Tab 74 at 1481.) Yet the SSAC made **no** evaluation, reference or even mention of Forest City's $[redacted] million scope guarantee. (Id.)

53. The same negative evaluation fate did not befall GMH/Centex. (AR, Tab 65.) To the contrary, the SSAC extolled GMH/Centex guarantee - but not Forest City's guarantee -- in the SSAC Memorandum to the SSA:

> **Most significantly GMH provides a Guaranteed Maximum Price contract for their projects and have never had to adjust scope on an RCI project after assuming operations.**

AR, Tab 74 at 1478. (Emphasis added). While the SSAC clearly evaluated the GMH/Centex guarantee, it failed to disclose to the SSA that: (i) the GMH/Centex guarantee was limited to only the [redacted]; (ii) this limited guarantee covered only $[redacted] of the $[redacted] or only [redacted]; and (iii) none of [redacted] of $[redacted] were guaranteed.

- **Failure to Evaluate Forest City's "Scope Guarantee" By the SSA**

54. The fatal flaws of the SSEB and the SSAC dooms the SSA's decision because the SSA found "the analysis and conclusions within that [SSAC] Report to be persuasive, to be supported by the facts and to be in harmony with the selection factors in the solicitation," and adopted them to support his decision to award to GMH/Centex. (AR, Tab 76 at 1491). The SSA adopts and relies upon information and data from the SSAC that:

(a) failed to disclose the details of Forest City's $[redacted] [redacted] [AR, Tab 26 at 525-529];



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

(b) failed to disclose that Forest City's $[redacted] guarantee eliminated any concern related to its projected vertical costs;

(c) failed to disclose that the projected size of Forest City's [redacted];

(d) failed to disclose that GMH/Centex's guarantee covered only $[redacted], compared to Forest City's $[redacted]; and

(e) failed to disclose that GMH/Centex's guarantee omitted [redacted], compared to Forest City's [redacted].

55. In this regard, SSA's "Decision Document" is fatally flawed because the SSA supports his selection of GMH/Centex by finding that "GMH also presented a cost structure that most closely represented the Army's benchmark **and offered a Guaranteed Maximum Price which provided great confidence in the viability of the proposal**." (Id. at 1492.) (Emphasis added.) The SSA repeats this finding later in his decision paper by stating "**more significantly GMH provides a Guaranteed Maximum Price contract for the projects** and have never had to adjust scope on an RCI project after assuming operations." (Id. at 1496.) Yet the SSA fails to address the fact that the GMH/Centex is very limited, covering only [redacted]% of the project cost, and that [redacted] at all.

56. In comparison, the SSA "Decision Document" makes no reference to Forest City's $[redacted] million scope guarantee, or the fact that it covers all aspects of the project costs. Rather, the SSA totally ignores the Forest City guarantee, and observes that Forest City's proposed vertical costs are significantly below the Army's benchmark without acknowledging that the guarantee obviates this concern. (Id. at 1492, 1495-1496.) Clearly, the SSA failed to evaluate and consider Forest City's "guarantee." (Id.)

**Major Error: GMH/Centex's "NO WORK" on [redacted] Units**

- **Requirements of the RFQ**



PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

57. The RFQ stated at Section 4.0, *Contractor Selection Process*, that "final selection will be based upon the qualifications exhibited by the offerors as outlined by the evaluation factors and upon the basis of best value to the Government." (AR, Tab 23 at 303.) (Emphasis added.) In this regard, "best value" was identified as "the best value for improving military family housing for the specific project." (Id. at 314.)

58. For the West Point Project, this meant that an offeror's proposal was to detail how it planned to provide new construction renovation to the West Point family housing units to insure that "all units will be modem homes, which fit with the historical ambiance of the installation, and contain the latest amenities. (AR, Tab 9 at 146.) Homes will have spacious floor plans which maximize space and provide adequate storage." (Id.)

59. The Army's plan was to convey the 628 family housing units to the awardee. "In exchange, the partner will provide for the **new construction/renovation**, operation, management and maintenance of the existing family housing inventory. (AR, Tab 9 at 147; Tab 16 at 241.) This conveyance will be for a fifty-year period with a twenty-five year renewal clause." Emphasis added. (AR, Tab 9 at 147.)

60. Through Amendment No. 0012 (AR, Tab 14), Amendment No. 0013 (AR, Tab 15), and Amendment No. 14 (AR, Tab 15), the offerors where repeatedly advised that of the 964 housing units at West Point, there were only 337 homes were there would be "no capital improvement," leaving the 628 units for capital improvement. Consistent with this understanding that all 628 units would be subject to new construction or renovation, the Army's Baseline provided that **all** 628 would be covered by new construction or renovation. See, for example the Baseline category "Categories of Construction - Hard Costs Only," [**Note**: AR, Tab 63 and 75 are incomplete. **See**



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

CE 11.]

61. Consistent with the requirements of the RFQ and the Army's Baseline, Forest City's proposal provided for new construction or renovations to **all** 628 units.

62. Contrary to the requirements of the RFQ, GMH/Centex's proposal indicated that it was not going to do any [redacted] work on [redacted] units. AR, Tab 49 at 717, 755, and after 788 at Slide 14. (Emphasis added.) Moreover, while GMH/Centex implied that it would not do any [redacted] work on those [redacted] units, not only was it not going to do any work on those [redacted] units during the [redacted] of approximately [redacted] but it was not going to begin renovation on any of those units until the [redacted] of the project. (Id.) [**Note:** GMH/Centex spreadsheets depicting work timeline for the [redacted] units are not in the AR.]

**Major Error: SSEB and SSAC "Baseline" Spreadsheets Are Misleading.**

63. To facilitate the review by the SSEB, the Army generated a spreadsheet to display the Army's baseline for the project in comparisons with those of the offerors. (AR, Tab 63 and 75 - **Note**: These are incomplete. **See** CE 21 and 22.) The SSAC, in turn, generated its own spreadsheet. (AR, Tab 64 – **Note**: These are incomplete. **See** CE 6.) However, both the SSEB spreadsheets and the SSAC's spreadsheets fails to accurately and correctly depict GMH/Centex's proposal, leaving the false impression that GMH/Centex too will new construct/renovate all 628 units. (Id.)

64. The SSEB's spreadsheet appears to make apples-to-apples comparisons between the Army's Baseline and the proposals of Forest City and GMH/Centex, and that the GMH/Centex's hard costs of $[redacted] "closely represented" the Army's baseline hard costs of $[redacted], particularly as compared to Forest City's [redacted]. (AR, Tab 64.) Yet a careful review



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

demonstrates that the SSAC did not record the [redacted] "no work" GMH identified in its plan. (AR, Tab 63 and 75; however, these documents are incomplete, see CE 11 for additional documentation). This left the clear - but erroneous -- impression that both proposals accounted for all 628 units and their corresponding hard costs. (Id.) The SSEB should have disclosed that Forest City's proposal was based on 628 units and GMH/Centex's on only [redacted] units.

65. In the SSAC's adaptation of the SSEB spreadsheet, the SSAC spreadsheet does not identify for the SSA that hard costs identified for GMH/Centex cover only [redacted] housing units, while the Forest City costs cover all **628** housing units, as required by the RFQ. (AR, Tab 63 and 75; however, these documents are incomplete, see CE 21 and 22 for additional documentation.) Only on the IDP Plan Summary sheet (page 3) does the SSAC make passing reference to the fact that GMH/Centex has [redacted] housing units "with no work funded [redacted]." (Id.) (Emphasis added.)

66. The SSAC and the SSA failed to specifically evaluate the impact on the West Point housing project if GMH/Centex was permitted to do **no work** on [redacted] housing units [redacted]% of West Point's housing units. (AR, Tabs 74 and 76.)

67. The SSAC and the SSA failed to specifically address the fact that, not only would GMH/Centex not do any work on [redacted] units, but GMH/Centex did not plan to do any work on those [redacted] units until the beginning of the [redacted] of the [redacted] - that is in the year [redacted]**!** (AR, Tab 47 at 701.)

**Major Error: The SSEB, SSAC, and the SSA Fail To Downgrade GMH/Centex**

68. In the Army's Source Selection Plan, it advised the evaluators that for *Project Finance Element 6* to evaluate and consider the following: (i) 4th bullet: "How much equity is the offeror willing to



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

commit and how much will be left in the project on a long-term basis? Return on equity is a strength and return of equity is a weakness": and (ii) 5th bullet: "Is the offeror receiving fees during the construction and rehab period that would significantly decrease its equity position? If so, this is a weakness." (Tab 2 at AR 113.) (Emphasis added.)

69. The SSEB, SSAC, and the SSA failed to identify as a weakness in GMH/Centex's proposal that it was receiving rental revenue for the [redacted] units for a period of [redacted] without any corresponding outlay of capital. Using GMH/Centex spreadsheet, entitled "West Point Units to [redacted]," the annual rental income for the [redacted] units for the [redacted] averages approximately $[redacted] per year, and totals $[redacted] for the entire [redacted] period – all income without any capital outlay. (AR, Tab 49 – spreadsheets are missing from AR.)

**Major Error: The "Army's Benchmark" and the GMH/Centex Proposal**

70. In stating the rationale for selecting GMH/Centex, the SSA stated that GMH "presented a cost structure that most closely represented the Army's benchmark." (AR, Tab 76 at 1492.) However, the SSA statement is "accurate" only because the SSEB, and then the SSAC, made GMH's cost structure appear to be close to the Army's benchmark. (AR, Tab 64.)

71. The "Army benchmark" figures identified by the SSA are found at page 5 of the SSEB's spreadsheet. (AR, Tabs 63 and 64 incomplete; however, these documents are incomplete, see CE 11 for additional documentation.) In the "Square Footage" block, it shows the Army's baseline for the "average square footage" per unit at [redacted] SF and a "vertical cost" of $[redacted]. In the corresponding column/block for GMH, it shows an identical "average square footage" per unit of [redacted] SF and a resulting "vertical cost" of $[redacted]. (AR, Tab 64.) However, the SSA was able to state GMH's cost structure most closely represented the Army's benchmark only because the Army "plugged in" the



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

Army's [redacted] SF to calculate GMH's vertical cost. (Id.) The SSEB spreadsheet used a "plug number" for GMH/Centex because the Army official who maintained the spreadsheet noted: "**Unable to locate SF for [GMH] units - plug #.**" He then went on to bold the [redacted] **SF** in the GMH column to indicate the "plug #" he used. (Id.)

72. The inability of the SSEB to identify and calculate GMH's average square footage for its new units, the SSEB's plugging in numbers to assist the analysis of GMH's proposal, and the SSEB's use of inaccurate vertical cost in its analysis is further evidence of the Army's total failure to conduct a meaningful evaluation of the offerors' proposals.

73. The SSAC did not conduct its own analysis, but blindly adopted the SSEB's "plug numbers" when the SSAC developed its spreadsheet. (AR, Tab 63 and 75 – incomplete. See CE 11 for additional documentation.) At page 3 of the SSAC's spreadsheet "calculated by JLL," it too identifies GMH's "weighted average unit GSF" at [redacted] **SF**. Adjacent to this item is a reference to Note 3, which is located at page 4 of the SSAC spreadsheet. It states: **"SF was not clearly identified in the proposal and was calculated by JLL."** (Id.) (Emphasis added.)

74. By using a "plug number" and passing it off as a calculation from JLL, its outside consultant, the SSAC mislead the SSA who, in turn, adopted in full the SSAC findings and conclusions. (AR, Tab 76 at 1490.)

**Major Error: SAA determines Forest City "diminishes the value of its new unit plan."**

75. In the SSA's comparison of the GMH proposal with Forest City, he adopted the SSAC's negative comments concerning Forest City's "new home" delivery schedule. In this regard, the SSAC's Memorandum for the SSA stated:

> The [redacted]



**PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

[redacted]

AR, Tab 74 at 1481. (Emphasis added.)

76. While both the SSAC and the SSA assert that Forest City's new home construction schedule reduces benefit to the soldiers, they both failed to evaluate and consider the following:

* The Army Baseline only envisioned [redacted] new homes - Forest City is providing [redacted] new homes to the military families at West Point.
* GMH proposed to provide [redacted] new homes, compared to Forest City's [redacted] homes.
* Under the Army Baseline, its [redacted] units are delivered by the [redacted] Forest City will be delivering [redacted] units in the <u>same</u> timeframe.
* GMH proposes to deliver its [redacted] new units by the [redacted] - Forest City will deliver [redacted] new units by the [redacted] - only [redacted] fewer homes, with the balance delivered in [redacted].

(AR, Tabs 74 and 76.) While the SSAC and the SSA find as a weakness Forest City's new construction delivery because it purportedly diminishes "the quality of life for soldiers," the facts demonstrate that under Forest City's plan, military families will have [redacted] <u>more</u> new homes in the same time period the Army Baseline identified for [redacted] of its new homes. (AR, Tab 64.)

77. It is accurate to state that Forest City does not contemplate delivery of the last of its [redacted] homes until the [redacted]. But if the SSAC and the SSA maintain that this is a fair and valid criticism, then why is there **<u>not</u>** one single criticism or negative comment by the SSAC and/or the SSA about the fact that GMH's proposal envisions that it will do "**<u>no work</u>**" on [redacted] **homes** during its [redacted], and it has allocated <u>no</u> construction/renovation funds to these [redacted] homes through



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

3677590

[redacted]. (AR, Tabs 74 and 76.) Moreover, the GMH "Proposed Renovation & Replacement Schedule" clearly shows that GMH will not do any work on those [redacted] homes until the beginning of the [redacted]! (AR, Tab 47 at 701.)

**Major Error: SSA Determines Forest City's Proposed Community Center Too Large.**

78. The SSA again adopted the criticism of the SSAC which charged that Forest City's community center with an [redacted] was too large: "The size of the proposed [redacted] Community center ([redacted]) and the accompanying amenities is excessive especially for a 628-unit project. Value would have been added if ancillary facilities were more appropriately sized." (AR, Tab 50 at 1041.)

79. Forest City's is criticized for providing a community center for the military families with amenities that includes "[redacted])." (AR, Tab 26 at 503.)

80. GMH proposed a [redacted] SF new community center with only [redacted]"), and the [redacted] Community club. (AR, Tab49 at 728 and 732.)

Respectfully submitted,

Dated: August 3, 2007

s/Robert H. Koehler



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

Robert H. Koehler
PATTON BOGGS, LLP
8484 Westpark Drive, 9th Floor
McLean, VA 22102
Phone (703) 744-8005
Facsimile (703) 744-8006
Counsel for
Forest City Military Communities LLC

*Of Counsel*
Michael J. Schaengold
Jennifer S. Zucker
PATTON BOGGS, LLP



**PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

**CERTIFICATE OF FILING**

I hereby certify that on this 3rd day of August 2007, a copy of the foregoing PLAINTIFF'S MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Robert H. Koehler



**PROTECTED MATERIAL**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U. S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**