**Agreed Upon Redacted Copy**
**May be Made Public**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **FOREST CITY MILITARY COMMUNITIES, LLC** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 07-546C** |
| | ) | **(Judge Hewitt)** |
| **THE UNITED STATES,** | ) | |
| **Defendant,** | ) | |
| **and** | ) | |
| **GMH/CENTEX MILITARY COMMUNITIES,** | ) | |
| **Defendant-Intervenor.** | ) | |

# FOREST CITY'S REPLY IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

**AND**

# OPPOSTION TO DEFENDANT'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

**AND**

# OPPOSITION TO DEFENDANT-INTERVENOR'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Robert H. Koehler
PATTON BOGGS LLP
8484 Westpark Dr.
McLean VA 22102
(703) 744-8005
(703) 744-8006 (Fax)
rkoehler@pattonboggs.com
Attorney of Record for
Forest City Military Communities, LLC

Of Counsel:
Michael J. Schaengold
Jennifer S. Zucker

**PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... IV

INTRODUCTION .......... 1

STATEMENT OF THE QUESTIONS INVOLVED .......... 1

STATEMENT OF THE CASE .......... 1

I. RELEVANT FACTS .......... 1

A. Procurement Background .......... 1

B. West Point Project .......... 3

C. Overview of Proposals .......... 4

1. Forest City's Proposal .......... 4

2. GMH/Centex's Proposal .......... 4

D. Proposal Evaluation Factors .......... 5

E. Source Selection Plan .......... 6

1. The Army Did Not Evaluate the Forest City Financial Guarantee In Accordance With the Requirements of the RFQ. .......... 7

2. The Army Failed to Evaluate the GMH/Centex Financial Guarantee In Accordance With the Requirements of the RFQ .......... 13

3. The Army Failed to Reject the GMH/Centex Proposal as Unacceptable for not Meeting the Material Requirements of the Solicitation. .......... 15

4. Assuming, Arguendo, the RFQ Permitted No Immediate Work on Units, the Army Failed to Downgrade GMH/Centex's Proposal. 17

5. The Army Failed to Downgrade GMH/Centex's Proposal as Required by RFQ Project Finance Element 6. .......... 18

6. The SSAC's Report Misled the SSA Into Concluding that GMH/Centex's Construction Costs are Close to the Benchmark Developed by the Army. .......... 19




PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

7. The SSAC's Report Misled the SSA into Concluding Forest City's New Home Construction Schedule was Unacceptable. ............... 21

8. The SSAC's Report Misled the SSA Into Concluding that the Proposed Community Center Would be Too Large.................... 22

II. STANDARDS OF REVIEW ........................................................................ 23

A. Judgment on the Administrative Record - RCFC 52.1 ........................... 23

B. Bid Protest Review ........................................................................ 24

III. THE ARMY IMPROPERLY FAILED TO REJECT THE GMH/CENTEX PROPOSAL BECAUSE GMH/CENTEX FAILED TO PROVIDE CAPITAL IMPROVEMENTS FOR [redacted] HOUSING UNITS [redacted] – AND FOR [redacted] THEREAFTER – THUS FAILING TO FULFILL A MATERIAL REQUIREMENT OF THE SOLICITATION AND RENDERING GMH/CENTEX INELIGIBLE FOR CONTRACT AWARD............................ 25

IV. THE ARMY'S FAILURE TO PROPERLY EVALUATE AND CONSIDER THE IMPACT OF GMH/CENTEX'S "NO WORK" HOUSING UNITS IN ACCORDANCE WITH THE EVALUATION CRITERIA WAS IMPROPER, ARBITRARY, CAPRICIOUS AND VIOLATED THE TERMS OF THE RFQ. 30

V. THE ARMY'S FAILURE TO PROPERLY EVALUATE AND CONSIDER FOREST CITY'S FINANCIAL GUARANTEE IN ACCORDANCE WITH THE EVALUATION CRITERIA WAS IMPROPER, ARBITRARY, CAPRICIOUS AND VIOLATED THE TERMS OF THE RFQ. ............................................ 33

VI. THE ARMY'S FAILURE TO PROPERLY EVALUATE AND CONSIDER GMH/CENTEX'S "SCOPE GUARANTEE" IN ACCORDANCE WITH THE EVALUATION CRITERIA WAS IMPROPER, ARBITRARY AND CAPRICIOUS AND VIOLATED THE TERMS OF THE RFQ. ...................... 38

VII. THE SSA RELIED UPON THE SSAC'S INACCURATE AND MISLEADING COMPARATIVE ANALYSIS, THEREBY PREVENTING THE SSA FROM MAKING AN INFORMED JUDGEMENT IN SELECTING THE BEST VALUE FOR THE GOVERNMENT, AND RENDERING THE SSA'S SELECTION OF GMH/CENTEX IMPROPER, ARBITRARY AND CAPRICIOUS AND IN VIOLATION OF THE TERMS OF THE RFQ........... 40

VIII. STANDARD FOR INJUNCTIVE RELIEF .................................................... 42

IX. FOREST CITY IS ENTITLED TO INJUNCTIVE RELIEF ............................. 42

A. Forest City Has Prevailed on the Merits. ............................................... 42



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

B. Forest City Will Suffer Irreparable Harm Absent Injunctive Relief. ....... 43

C. The Harm To Forest City Outweighs Any Harm To The United States and Others. .......... 46

D. Granting Injunctive Relief Is In The Public Interest. .......... 47

X. THE PUBLIC INTEREST FAVORS THE ISSUANCE OF INJUNCTIVE RELIEF. .......... 47

XI. THE BALANCE OF HARDSHIPS TIPS IN FOREST CITY'S FAVOR. ......... 48

CONCLUSION .......... 48

CERTIFICATE OF FILING .......... 50



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

# TABLE OF AUTHORITIES

## Cases

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365 (Fed. Cir. 1999) ................ 25, 26, 43
Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 381 (Ct. Cl. 2003) .................... 25
Bannum, Inc. v. United States, 404 F.3d 1346 (Fed. Cir. 2005). .......................................... 24, 43
Chapman Law Firm Co. v. United States, 67 Fed. Cl. 188 (2005) ...................................... 45, 46
Data General Corp. v. Johnson, 78 F.3d 1556 (Fed. Cir. 1996) ................................................ 43
Dyncorp International LLC v. United States, 76 Fed. Cl. 528 (2007) ........................................ 24
Ellsworth Associates, Inc. v. United States, 45 Fed Cl. 388 (1999) ................................... 42, 48
FMC Corp. v. United States, 3 F.3d 424 (Fed. Cir. 1993) ......................................................... 42
Heritage of Am., LLC v. United States, 77 Fed. Cl. 66 (2007); 2007 U.S. Claims LEXIS 166... 44
Hospital Klean of Texas, Inc. v. United States, 65 Fed. Cl. 618 (2005) ..................................... 46
Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324 (Fed. Cir. 2001) .................................................................................................................................... 24
Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312 (Fed. Cir. 2003) .................. 43
Informatics Corp. v. United States, 40 Fed. Cl. 508 (1998) ....................................................... 45
Latecore Int'l Inc. v. Dept. of Navy, 19 F.3d 1342 (11th Cir. 1994) ................................... 38, 42
Magnavox Elec. Sys. Co. v. United States, 26 Cl. Ct. 1373 (1992) ........................................... 45
Mangi Envtl. Group, Inc. v. United States, 47 Fed. Cl. 10 (2000) ................................ 26, 37, 42
Mantech Telcoms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57 (Ct. Cl. 2001) ............... 26
Marsh v. Oregon Nat. Res., 490 U.S. 360 (1989) ..................................................................... 25
Motor Vehicle Manuf. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ........... 24
Motorola, Inc. v. United States, 988 F.2d 113 (Fed. Cir. 1993) ................................................. 45
Overstreet Electric Co. v. United States, 47 Fed. Cl. 728 (2000) ........................... 24, 25, 42, 48
Planned Parenthood v. Citizens for Cmty. Action, 558 F.2d 861 (8th Cir.1977) ......................... 46
Qwest Communications Corp. v. City of Berkeley, 146 F.Supp.2d 1081 (N.D. Cal. 2001) ........ 45
SAI Indus. Corp. v. United States, 60 Fed. Cl. 731, 747 (2004) ................................................ 47
Seattle Sec. Servs. v. United States, 45 Fed. Cl. 560 (1999) ........................................... 37, 44, 48
Semaphore Entm't Group Sports Corp. v. Gonzalez, 919 F. Supp. 543 (D.P.R. 1996) ............... 46
United Int'l Investigative Servs., 41 Fed. Cl. 312, 323 (1998) .................................................. 45

## Statutes

10 U.S.C. § 2305(b)(1) ............................................................................................................ 33
28 U.S.C. § 1491(b)(2) ............................................................................................................ 42
41 U.S.C. 253b (d)(3) .............................................................................................................. 33
5 U.S.C. § 706 ......................................................................................................................... 24

## Other Authorities

Barents Group, B-276082, 276082.2, May 9, 1997, 97-1 CPD ¶164, at 10 ............................... 26
Bishop Contractors, Inc., B-246526, Dec. 17, 1991, 1991 U.S. Comp. Gen. LEXIS 1424, 91-2 CPD ¶ 555 ........................................................................................................................ 26
Future-Tec Management Systems, Inc.; Computer and Hi-Tech Management, Inc., B-283793.5,



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

B-283793.6, Mar. 20, 2000, 2000 CPD ¶ 59 .......... 33
Infrared Technologies Corp., 99-2 C.P.D. ¶ 41 (1999) .......... 25
Lockheed Martin Info. Sys., B-292836 et al., Dec. 18, 2003, 2003 CPD ¶ 230 .......... 25
MCR Fed., Inc., B-280969, 99-1 CPD ¶8, at 5 .......... 38
PharmChem Labs., Inc., B-244385, 91-2 CPD ¶ 317 .......... 38
Rockwell Elec. Commerce Corp., B-286201 et al., Dec. 14, 2000, 2001 CPD ¶ 65 .......... 26

## Rules

RCFC 52.1 .......... 1, 24

## Regulations

48 C.F.R. § 15.206(d) .......... 29
48 C.F.R. § 15.303 .......... 43
48 C.F.R. § 15.305 .......... 33



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

## INTRODUCTION

Pursuant to RCFC 52.1, Forest City Military Communities, LLC ("Forest City") respectfully files this Reply in Support of its Motion for Judgment on the Administrative Record, and its Opposition to Defendant's and Defendant-Intervenor's Cross-Motions for Judgment on the Administrative Record. As demonstrated below, Forest City's Motion should be granted and an appropriate permanent injunction should be entered.

## STATEMENT OF THE QUESTIONS INVOLVED

Whether the Court should permanently enjoin performance of a contract where the Army committed significant errors in: (i) its evaluation of Forest City's proposal to the detriment and prejudice of Forest City, and (ii) its evaluation of GMH/Centex's proposal to the advantage of GMH/Centex (and prejudice of Forest City), thus resulting in Forest City's proposal being improperly downgraded, GMH/Centex's proposal being improperly upgraded, and the Army's award to GMH/Centex being arbitrary and capricious, in violation of procurement laws, and not in accordance with the stated evaluation factors or the "best value" to the Government.

## STATEMENT OF THE CASE

## I. RELEVANT FACTS

### A. Procurement Background

The Army issued Request for Qualification No. W912DR-06-R-0006 ("Solicitation" or "RFQ") to solicit proposals from responsible contractors interested in the Army's plan to privatize military family housing communities at the United States Military Academy at West



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

Point, New York ("West Point"), Fort Lee, Virginia, and Fort Jackson, South Carolina. (Tab 23, AR 289.[1]) This Protest relates only to the Army Project for West Point.

This acquisition is divided into two separate phases: (i) Project Planning, and (ii) Project Implementation. (Tab 23, AR 291.) In turn, the RFQ's source selection process was designed to select a developer who initially would be awarded a fixed price contract of $350,000 to develop a Community Development and Management Plan ("CDMP") for the family housing community at West Point ("CDMP Contractor"). (Tab 23, AR 299.) The CDMP Development Plan was to detail the number, type, and size of housing units that were to be "renovated, rehabilitated, or newly constructed" in each neighborhood, with the family housing community under a privatization plan with a **50-year** life cycle for Project Implementation. (Id. at AR 294.)

Once the CDMP was accepted by the Government, the CDMP Contractor and the Army would move into the Project Implementation phase, with the transfer of the housing and their maintenance and operation over to the contractor. Here, there were two periods: (i) the Initial Development Period ("IDP"), the length of which was to be proposed by each offeror,[2] during which the transferred homes would undergo renovation, rehabilitation or new construction; and, (ii) the Secondary Development Period ("SDP"), which ran from the end of the offeror's IDP through year 50, during which the transferred housing would be maintained at pre-established standards. (Tab 23, AR 294, 314-317.) The RFQ also advises that an offeror's preliminary project concept statement was to detail how it planned bring the housing inventory to an

---

[1] "Tab __, AR __" refers to the Tab number and page number of the Administrative Record. "GCM" refers to the Government Cross-Motion, and "DICM" refers to Defendant-Intervenor Cross-Motion.

[2] Forest City proposed a [redacted] month IDP, GMH/Centex proposed a [redacted] month IDP, and the Army project "baseline" included a [redacted] month IDP. (Tab 90, AR 1864.)



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

adequate condition within 10 years of the transfer of operations, and protect the project scope during the IDP. (Id. at 317.)

B. **West Point Project**

The housing requirements for West Point were detailed at Appendix B of the RFQ. (Tab 23, AR 356-383.) As initially envisioned, the RFQ advised offerors that:

> West Point proposes to convey an inventory of **964** family housing units and lease the land on which the existing units are located and possibly include additional lands for deficit elimination and/or replacement construction to a non-Department of Defense entity. In exchange, the partner will provide for **the new construction/ renovation**, operation, management and maintenance of the existing family housing inventory. This conveyance will be for a fifty-year period with a twenty-five year renewal clause.

(Tab 25, AR 362.) (Emphasis added.) However, by RFQ Amendment No. 0011, the Army advised offerors that, for proposal purposes, the number of units ("end-state") would be **628** family housing units rather than 964, that the remaining 336 homes would be retained as "occupied surplus," and that the actual end-state to be transferred to the contractor would range between 628 and 800 homes. (Tab 13, AR 175.)

Shortly thereafter, RFQ Amendment Nos. 0012 (Tab 14, AR 102) and 0013 (Tab 15, AR 237) advised offerors the Army had revised its housing unit spreadsheet (*West Point AFH Inventory USMA*) to indicate the 336 units that had been designated "**not to receive any capital improvements**." (Emphasis added.) (See Tab 15, AR 237; Tab 103 at Column 1: "**No Cap Improvements=1**";Tab 16, AR 241 (RFQ Amendment No. 0014); and Tab 17, AR 245 (Amendment No. 15, which repeats the units designated in Column 1: "**No Cap Improvements=1,**" of the *West Point AFH Inventory USMA* Spreadsheets were not to be included in the offeror's proposal.)) These Amendments made clear that offerors were only to



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

address the **628** housing units and that the 336 "No Capital Improvement" units were not to be included in the offeror's proposal. (Id. at AR 245.)

C. **Overview of Proposals**

1. Forest City's Proposal

For the purposes of this Protest, the essential RFQ evaluation elements of Forest City's proposal are: (i) of the total 628 family housing units identified in the RFQ, Forest City planned to demolish [redacted] units and replace them with [redacted] **new** units (Tab 26, AR 500); (ii) for the remaining [redacted] housing units, Forest City proposed to renovate these units (Id.); (iii) it provided a financial guarantee for the [redacted] (i.e., [redacted] etc.) (Tab 25, AR 476; Tab 26, AR 525-526); (iv) it would contribute $[redacted] (Tab 25, AR 495); and (v) it would not [redacted] (Id. at AR 475).

2. GMH/Centex's Proposal

For the purposes of the protest, the essential RFQ evaluation elements of GMH/Centex's proposal are: (i) of the total 628 family housing units identified in the RFQ, GMH/Centex proposed that it would construct only [redacted] units (Tab 49, AR 717); (ii) it would renovate only [redacted] units (Id.) ; (iii) it would "convert" [redacted] units (Id.); (iv) it would perform no capital improvements ("**no work**") on [redacted] units until the beginning of the [redacted][3] of the project (Tab 91, AR 1904-1905); (v) it would receive rent income on those [redacted] units without a corresponding capital outlay for [redacted] (Id. at AR 1908); (vi) it would limit its [redacted]

[3] In its Proposal, GMH/Centex often identified these [redacted] units as units that "no immediate work was required." (Emphasis added.) (Tab 49, AR 755; and Slide 14 [following AR 788].)


PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

[redacted] (Tab 49, AR 766; Tab 91, AR 1900); and (vii) it would contribute [redacted] (Tab 49, AR 758).

D. **Proposal Evaluation Factors**[4]

In the selection of the CDMP contractor, the RFQ provided that the Army would use four Evaluation Factors, in descending order of importance, to evaluate the oral and written submissions of each offeror:

(1) Project Finance;
(2) Preliminary Project Concept Statement;
(3) Organizational Capabilities (on-site, project specific); and
(4) Small Business Utilization Plan (on-site, project specific).

(Tab 24, AR 320.) The RFQ also identified a series of questions representing individual subfactors that were to be used by the evaluators in reviewing each of the factors. (Id. at AR 327-329.) "These elements and questions for each factor will be evaluated comprehensively to determine an overall rating for that factor, which will be used to analyze the offeror's ability to plan and implement the project." (Emphasis added.) (Id. at AR 321.) For the *Project Finance* factor, the RFQ identified six separate categories, with several of the categories having multiple questions to be considered by the evaluators in assessing an offeror's proposal. (Id. at AR 327.) See also Tab 2, AR 59-61. (Tab 23, AR 327-330.) With regard to the "Project Finance" Factor -

[4] The RFQ established a two-step selection process. In Step One, offerors were to submit information on their experience as a developer of major real estate development projects, financial capabilities, organizational capabilities (corporate level), past performance over the last 10 years, and small business utilization (general history). (Tab 23, AR 308-313, 324-326.) Based on this information, the SSEB selected offerors who were qualified to participate in Step Two, the selection process for a CDMP Contractor. (Id. at AR 314.) The Step Two process had


PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

- the highest rated of the Evaluation Factors -- the RFQ initially provided the following description for the *Project Finance Element 5* subfactor:

> Does the offeror demonstrate an understanding of the opportunities for and limitations on the revenue and expenses associated with the project? Does the financial plan support the long-term maintenance of the project?

(Tab 23, AR 327.) While this RFQ wording is identical to the initial draft of the Source Selection Plan ("SSP") at Paragraph 4.6.7, *Project Finance Element 5* (Tab 2, AR 60.), the Army's final version of its SSP was modified to add the follow evaluation question: ***To what degree is the offeror guaranteeing scope and price?*** (Tab 2, AR 113.)

Apparently finding this discrepancy (and another discrepancy for *Project Finance Element 6*) between the SSP and the RFQ, the Army issued RFQ Amendment No. 0007, dated September 22, 2006. It advised offerors that the question, ***To what degree is the offeror guaranteeing scope and price?***, was being added to the evaluation for *Project Finance Element 5*, and would be evaluated by the Army when considering an offeror's Financial Plan.[5] (Tab 9, AR 138.)

E. **Source Selection Plan**

The Army's interrelated evaluation process included: (i) a Source Selection Evaluation Board ("SSEB") – where each of the [redacted] member Board was to use the elements and questions for each Evaluation Factor to evaluate the proposals, provide his/her independent and separate

---

an entirely different set of evaluation criteria. (Id. at AR 327-329.) The protest issues here are related only to the Army's actions in the Step Two phase.

[5] Amendment No. 0007 also added to the RFQ *Project Finance Element 6* subfactor the following underscored words: "Does the offeror identify appropriate amounts of equity, detail sources, ***and outline a plan for limiting its return on equity?***" (Id.) This addition made the RFQ consistent with the final version of the Army's SSP for the *Project Finance Element 6* subfactor. (Tab 2, AR 113.)



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

evaluation of each offerors' proposal, and then collectively arrive at a "SSEB Consensus Evaluation" for each offeror that is "based on the details of the individual reports and the agreement" reached by the SSEB members (Tab 2, AR 120.); (ii) a Source Selection Advisory Council ("SSAC") – where a [redacted] member panel would review and evaluate the SSEB's consensus evaluation of the offerors and make a comparative assessment of proposals against all source selection criteria in the RFQ (Tab 2, AR 37-38; Tab 23, AR 320.); and (iii) a Source Selection Authority ("SSA") -- where this individual would consider the reports and analyses prepared by the SSEB and the SSAC and, based on the RFQ evaluation criteria, use his independent judgment to select the offer providing the best value to the Government. (Tab 1, AR 14; Tab 2, AR 29 and 67; Tab 23, AR 320.)

1. The Army Did Not Evaluate the Forest City Financial Guarantee In Accordance With the Requirements of the RFQ.

a. SSEB's Evaluation of Forest City's "Scope Guarantee".

According to the Army's SSP and the RFQ, each of the [redacted] members of the SSEB was required to **comprehensively** review and evaluate each proposal based on the elements and questions of each evaluation factor cited in the RFQ. (Tab 23, AR 321.) To facilitate the review of the proposals, the Army developed a *SSEB Step Two Individual Evaluation* Form incorporating the identical evaluation factors and subfactors questions identified in the RFQ. (See, for example, Tab 55.) The Form itself provided a detailed format for indicating an "Overall Rating" (Id. at AR 1138.), as well as ratings for each of the four evaluation factors and their respective subfactors (Id. at AR 1139-1157.), and the "Risk" Factor (Id. at AR 1158). The SSEB also used a series of spreadsheets to record and compare elements of each offerors' proposal with the Army's internal estimate, referred to as the "Army Baseline," for the project.


PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

(Tab 64, 90.) However, during the evaluations, one SSEB member ([redacted]) used the old form -- as did both the entire SSEB and the entire SSAC when they developed their respective Consensus Evaluations, and these old forms did not contain the subfactor questions added to the evaluation criteria by RFQ Amendment No. 0007 (i.e., Project Finance Element-5 (***To what degree is the offeror guaranteeing scope and price?***) and Project Finance Element-6 ("Does the offeror identify appropriate amounts of equity, detail sources, ***and outline a plan for limiting its return on equity?***")).

One of the critical considerations for the Army was the feasibility of the offeror's proposed Financial Plan, particularly for the very important IDP when the 628 family housing units transferred to the contractor would undergo initial renovation, rehabilitation or new construction. (Tab 23, AR 294, 314-317.) To this end, the Army was to comprehensively review and evaluate ***to what degree is the offeror guaranteeing scope and price***.

In its proposal, Forest City specifically addressed this new evaluation subfactor. First, in the *Project Finance* section of the proposal, Forest City stated the following:

> **2 – Construction Savings:** As a way to contractually transfer scope cost and schedule risk from the to-be-formed RCI Partnership, [redacted].

(Tab 25, AR 476.) (Emphasis added.)

Then in the "Scope Guarantee" section of its *Preliminary Project Concept Statement*, Forest City detailed the breadth of its financial guarantee:

> FCMC is proposing a **multifaceted approach to ensure pricing and scope completion for the RCI Project**. The key components of this structure are:
>
> * [redacted]



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

[redacted];

* [redacted];

* [redacted];

* [redacted],

* [redacted].

(Tab 26, AR 525-526.) (Emphasis added.) Forest City also provided a spreadsheet that established that its financial guarantee covered all [redacted]. (Id. at AR 526-529.)

When the SSEB members conducted their individual evaluations of Forest City's proposal, these evaluations of "[redacted]" were made concerning Forest City's financial guarantee:

(i) [redacted]]." (Tab 62, AR 1306.)

(ii) [redacted]



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

[redacted]" (Tab 61, AR 1278.)

(iii) [redacted]." (Tab 54, AR 1112, 1115, 1120.)

(iv) [redacted]." (Tab 58, AR 1210.)

(v) [redacted]." (Tab 56, AR 1161.)

As noted, when the SSEB members developed their consensus evaluation, they used the old form that did not have the added requirements for *Project Finance Element-5* (***To what degree is the offeror guaranteeing scope and price?***) and *Project Finance Element-6*. Yet notwithstanding the fact that the members had identified and detailed Forest City's financial guarantee as a "[redacted]" in their individual evaluations, and notwithstanding the fact that the consensus evaluation was to be derived "based on the details of the individual reports and the agreement" reached by the SSEB members (Tab 2, AR 120), there was not one single reference to Forest City's financial guarantee in the SSEB Consensus Evaluation for Forest City. (Tab 52.)

b. SSAC Consideration of Forest City's Financial Guarantee.

The SSAC was to review the SSEB consensus analysis and make a comparative assessment of proposals against one another and all source selection criteria in the Solicitation, and provide its analysis to the SSA. (Tab 1, AR 14; Tab 2, AR 26, 28.) The Administrative


PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

Record makes clear that the only documentation the SSAC received from the SSEB was: (i) a copy of the SSEB Consensus Evaluations for each of the [redacted] offerors that the SSAC was, in turn, going to use in its own briefing to the SSA (Tab 98.), (ii) the SSEB Spreadsheets comparing the Army Baseline to each proposal (Tab 90, 95, 96, 100, 101.), and (iii) the SSEB's Consensus Matrix. (Tab 51, AR 1056). The SSAC did **not**, however, receive or review the individual evaluations by the SSEB members.[6] Accordingly, the SSAC was totally unaware that individual evaluations by SSEB members had, in fact, considered and identified Forest City's financial guarantee as a "[redacted]" in its proposal. And since the SSAC also used the wrong form, the SSAC was totally unaware that the SSEB assessment of an "[redacted]" on the Forest City Consensus Evaluation form for "Finances" was caused by the SSEB's failure to properly evaluate the Forest City's financial guarantee under *Project Finance Element-5* because the SSEB had used the wrong form.[7] (Tab 52, AR 1060, Tab 51.)

When the SSAC conducted its comparative analysis of the offers, it too used the old form for its Consensus Evaluations. (Tab 50.) On the Consensus Evaluation form for Forest City, the only mention of Forest City's **$[redacted] million** financial guarantee by the SSAC was the following comment in the "[redacted]" section for Project Finance Element-5: "**Value would have been added if the offeror had established some typical parameters surrounding the guaranteed**

[6] The SSAC stated that the following materials were considered: (i) the Source Selection Plan, (ii) the RFQ, (iii) the Offeror submissions, (iv) the **SSEB Consensus Evaluations**, (v) **SSEB Consensus Evaluation Matrix**, and (vi) reports of non-Government advisors. (Tab 74, AR 1476.) However, the AR does **not** contain any "reports of non-Government advisors."

[7] The failure of the SSEB to evaluate Forest City's financial guarantee in its Consensus Evaluation was fatal to Forest City's proposal in the SSAC's "comparative analysis" because the SSAC used the SSEB Consensus Evaluations for each proposal as the baseline for its own evaluation, in "confirming," "concurring," "agreeing," or "changing" the SSEB's determinations. (See Tab 74, AR 1481, 1482, 1483, 1485.)



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

**maximum price contract, e.g., [redacted].**" (Tab 50, AR 1039.) The Government argues that this one sentence is evidence that at least the SSAC met its responsibility to comprehensively evaluate Forest City's "financial guarantee." (See GCM at 11.) To the contrary: it only is evidence that the SSAC: (i) looked no further than the brief statement Forest City made in the "Finance" section of the proposal (Tab 25, AR 476.), and (ii) totally ignored the detailed discussion Forest City provided for its financial guarantee in the *Preliminary Project* section of its proposal. (Tab 26, AR 525-529.)

In the SSAC's Memorandum to the SSA, the SSAC significantly exacerbated its failure to evaluate and consider Forest City's financial guarantee by dooming Forest City's *Project Finance* proposal with the following: "Unfortunately, FC's proposal also assumes a very low cost of vertical construction of about $[redacted] per square foot in comparison to the Army benchmark and they did not sufficiently demonstrate that this cost could actually be achieved."[8] (Tab 74, AR 1481.) Yet the SSAC made **no** evaluation, reference or even mention of Forest City's $[redacted] million financial guarantee which, by its very terms, [redacted] and obviates any concerns that its vertical cost estimate might be low.[9] (Id.)

c. The SSA Did Not Evaluate Forest City's Financial Guarantee.

The fatal flaws of the SSEB and the SSAC, discussed above, doomed the SSA's decision when the SSA found "the analysis and conclusions within that [SSAC] Report to be persuasive, to be supported by the facts and to be in harmony with the selection factors in the solicitation,"

---

[8] Moreover, the SSAC fails to reconcile this dire observation with its rating Forest City's proposal as "**Low**" in the "Overall Risk" assessment, where "normal contractor/government effort and monitoring will probably minimize any difficulties." (Tab 50, AR 1054.)



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

and "adopted them" in support of his decision. (Tab 76, AR 1491.) In this regard, the SSA's statement in his "Source Selection Decision Document" makes clear that the SSA reviewed, and relied upon, only the 11-page SSAC "Memorandum for Source Selection Authority" (Tab 74), which itself included only one attachment (Id. at AR 1487), the SSAC Rating Matrix.[10] (See Tab 93, AR 1927.) While the SSA met with the SSAC, representatives of the SSEB, and agency counsel (Tab 76, AR 1491), there is no evidence in the AR to support a finding that the SSA saw or reviewed the individual evaluations by the SSEB members, nor is there evidence in the AR to suggest he reviewed any aspect of Forest City's proposal. Accordingly, the SSA made no mention of Forest City's financial guarantee because he was totally unaware of its existence, much less its scope and parameters, and whether it eliminated any concerns associated with Forest City's proposed "vertical construction cost." (Tab 76, AR 1495-1496.)

2. The Army Failed to Evaluate the GMH/Centex Financial Guarantee In Accordance With the Requirements of the RFQ.

While the SSAC commented, with respect to its evaluation of Forest City's financial guarantee, that "**value would have been added if the offeror had established some typical parameters surrounding the guaranteed maximum price contract, e.g., [redacted],**" the same negative evaluation did not befall GMH/Centex. Yet GMH/Centex's entire written description of its financial guarantee consists of only three short sentences in a table summary:

[redacted]

---

[9] Forest City made clear in its Proposal that its vertical cost estimated was based on [redacted] from its national homebuilder, K. Hovnanian Homes, the 7th largest publicly-traded homebuilder in the U.S. (Tab 25, AR 497; Tab 26, AR 525.)

[10] Forest City is not aware of any evidence in the Administrative Record that indicates that the SSA was provided any other documentation for making his selection.



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

[redacted]

(Tab 48, AR 766, 7th row.) (Emphasis added.) The "details" of the coverage were then presented in one portion of one column of a two-column spreadsheet. (Tab 91, AR 1900.) If the SSAC had performed a fair and reasonable "comparative analysis" of guarantees, then the SSAC should have made the identical comment and found the identical "weakness" in the "Project Finance" Evaluation Factor for GMH/Centex.

Not only did the SSAC fail to make the "weakness" assessment against the GMH/Centex financial guarantee but, more significantly, the SSAC failed to identify as a "weakness" in the "Project Finance" Evaluation Factor that: (i) the GMH/Centex guarantee was limited to only the [redacted]; (ii) this limited guarantee covered [redacted]; and (iii) [redacted]. (AR, Tab 65.)

The failure of the SSAC to consider these serious shortcomings was compounded by the fact that the SSAC did <u>not</u> disclose these facts to the SSA. To the contrary, the SSAC extolled the GMH/Centex financial guarantee in the SSAC's "Memorandum for Source Selection Authority":

> Most significantly **<u>GMH</u>** provides a Guaranteed Maximum Price contract for **<u>their projects</u>** and **<u>have never had to adjust scope on an RCI project after assuming operations</u>**. [redacted].

(Tab 74, AR 1478.) (Emphasis added.) While the SSAC clearly addressed the guarantee, the above praise is misleading because it failed to disclose to the SSA that: (i) the proposed guarantee was limited to [redacted]


PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

[redacted]; (ii) the Centex Guaranteed Maximum Price guarantee covered [redacted]; (iii) none of [redacted]; and (iv) none of the [redacted]

3. The Army Failed to Reject the GMH/Centex Proposal as Unacceptable for not Meeting the Material Requirements of the Solicitation.

The RFQ stated at Section 4.0, *Contractor Selection Process*, that "final selection will be based upon the qualifications exhibited by the offerors as outlined by the evaluation factors and upon the basis of best value to the Government." (Tab 23, AR 303.) (Emphasis added.) In this regard, "best value" was identified as "the best value for improving military family housing for the specific project." (Id. at AR 314.) For the West Point Project, the Army's plan was to convey 628 family housing units to the awardee. "In exchange, the partner will provide for the **new construction/renovation**, operation, management and maintenance of the existing family housing inventory." (Tab 9, AR 147; Tab 16, AR 241.) (Emphasis added.)

Through Amendment Nos. 0012 (Tab 14), 0013 (Tab 15), and 0014 (Tab 16), the offerors were repeatedly advised that of the 964 housing units at West Point, there were only 337 homes that the Army had designated not to receive capital improvements, leaving the 628 units for construction/renovation capital improvements. To further make the point, the West Point family housing inventory provided to the offerors, *West Point AFH Inventory USMA*, specifically identified homes that were not to receive any capital improvements by being marked in the first column of the spreadsheet, entitled: **"No Cap Improvements=1."** **(**See the *West Point AFH*



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

*Inventory USMA* Inventory List at Tabs 102, 105, 106.) Accordingly, all of the 628 housing units were to receive capital improvements on the 628 housing units during the IDP.[11]

To facilitate its review of proposals, the Army developed a "baseline" spreadsheet against which it would compare the proposals of the offerors. (See generally Tab 90.) Consistent with the understanding that all 628 units would be subject to new construction or renovation, the Army identified that **all** 628 would be covered by new construction or renovation during the IDP, as follows:

[redacted]

(See the "Baseline" Column in the category titled: "**Categories of Construction - Hard Costs Only**" at Tab 90, AR 1892.) (Emphasis added.) The Army's "baseline" is consistent with the RFQ requirement that all 628 housing units would receive capital improvements during the IDP, regardless of duration of the IDP proposed by an offeror.

Contrary to the requirements to provide capital improvements to all 628 housing units during the IDP, GMH/Centex's proposed that it would "accept [redacted] existing homes requiring no

[11] Consistent with this requirement, Forest City stated that "in accordance with Amendment 0014, our proposal ignores the 336 units that have been designated as "No Capital Expenditure" units. The FCMC plan calls for the construction of [redacted] new homes to replace [redacted] units that are [redacted]. The resulting end-state will be 628 AFH homes at West Point." (Tab 25, AR 500.)



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

renovation." (Tab 49, AR 717.) At various places, it also indicated that it was not going to do any "**immediate**" work on [redacted] units (Tab 49, AR 717, 755, and after 788 at Slide 14.) (Emphasis added.), and also identified them as "no work required" (Id. at AR 718, 719, 721), "no work" units (Id. at AR 722.), or "Historic (As/Is)." (Id. at AR 735.) While the GMH/Centex proposal text states that it would not do any **immediate** work on those [redacted] units, it fails to disclose in any of its proposal text that not only was it not going to do any work on the [redacted] units during [redacted], but it planned not to make any capital improvements on those [redacted] units until the [redacted] of the project. This information was only presented in the GMH/Centex Spreadsheets entitled, "Renovation Budget." (Tab 91, AR 1904-1907.)

4. Assuming, Arguendo, the RFQ Permitted No Immediate Work on Units, the Army Failed to Downgrade GMH/Centex's Proposal.

The SSEB, the SSAC, and the SSA failed to determine that conducting "no work" on [redacted]: (i) improperly distorted the comparative evaluation of the Forest City and GMH/Centex proposals for both the "Project Finance" and "Preliminary Project Concept Statement" Evaluation Factors, (ii) was a **significant weakness** in GMH/Centex's proposal for both the "Project Finance" and "Preliminary Project Concept Statement" Evaluation Factors; (iii) did not warrant an "[redacted]" for the "Project Finance" and "Preliminary Project Concept Statement" Evaluation Factors, and (iv) conducting "no work" on [redacted] of the units until the [redacted] did not warrant an Overall Rating of "[redacted]" for GMH/Centex's proposal. Moreover, the RFQ advised that an offeror's preliminary project concept statement was to detail how it planned bring the housing inventory to an adequate condition within 10 years of the transfer of operations – [redacted]. (Id. at 317.)



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

5. The Army Failed to Downgrade GMH/Centex's Proposal as Required by RFQ Project Finance Element 6.

As discussed at pages 6-7 above, when the Army discovered that the RFQ description for the "Project Finance" Evaluation Factor omitted several subfactors[12] that were in the Army's SSP, the Army issued Amendment No. 0007 to add those subfactors. One of the additions was to the RFQ *Project Finance Element 6* subfactor, with the following underscored words: "Does the offeror identify **appropriate amounts of equity**, detail sources, ***and outline a plan for limiting its return on equity?***" (Tab 9, AR 138.) This addition made the RFQ consistent with the final version of the Army's SSP for the *Project Finance Element 6* subfactor. (Tab 2, AR 113.)

In the Army's SSP, it advised evaluators that for *Project Finance Element 6* they were to evaluate and consider the following:

4th bullet: [redacted].

5th bullet: [redacted]

(Tab 2, AR 113.) (Emphasis added.)

In the GMH/Centex proposal, it made an equity contribution of $[redacted]. However, GMH/Centex also would generate $[redacted] on the [redacted] "no work" units during the first [redacted] of the project, or $[redacted], but before [redacted]

[12] This Amendment also added the question, ***To what degree is the offeror guaranteeing scope and price?***, to the evaluation for *Project Finance Element 5*.



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

[redacted]. Thereafter, the remaining $[redacted] would be generated [redacted]. The $[redacted] is derived by multiplying GMH/Centex's projected [redacted] at Tab 91, AR 1908:

| | | | | | |
|---|---|---|---|---|---|
| [redacted] | [redacted] | x | "[redacted] | = | [redacted] |
| [redacted] | [redacted] | X | [redacted] | = | [redacted] |
| [redacted] | [redacted] | X | [redacted] | = | [redacted] |
| [redacted] | [redacted] | X | [redacted] | = | [redacted] |
| [redacted] | [redacted] | X | [redacted] | = | [redacted] |
| [redacted] | [redacted] | X | [redacted] | = | [redacted] |
| [redacted] | [redacted] | X | [redacted] | = | [redacted] |
| [redacted] | [redacted] | X | [redacted] | = | [redacted] |
| [redacted] | [redacted] | X | [redacted] | = | [redacted] |
| [redacted] | [redacted] | X | [redacted] | = | [redacted] |
| [redacted] | [redacted] | X | [redacted] | = | [redacted] |
| | | | TOTAL | | [redacted] |

While GMH/Centex does not receive this revenue on a dollar-for-dollar basis, it does receive both a [redacted] (Tab 49, AR 758.) Then beginning at the [redacted]." (Id. at AR 756.) Notwithstanding the fees that will be generated for GMH/Centex, the SSEB, SSAC, and the SSA failed to identify as a "weakness" in the "Project Finance" Evaluation Factor the fact that GMH/Centex was generating rental revenue for the [redacted] units for a period of [redacted].

6. The SSAC's Report Misled the SSA Into Concluding that GMH/Centex's Construction Costs are Close to the Benchmark Developed by the Army.

In the Army "Benchmark" Spreadsheet, it identifies its projection of $[redacted] in "Construction Costs" which consists of four cost elements: (i) hard costs; (ii) contingency; (iii) fees; and (iv) soft costs. (Tab 90, AR 1892; Tab 92, AR 1918.) The Army's projected


PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

Construction Costs were, in turn, based on the renovation and new construction it projected for all 628 housing units during the IDP. See the "Baseline" Column in the category titled: "**Categories of Construction - Hard Costs Only**" at Tab 90, AR 1892.

As represented on the SSAC's "Step 2 Summary Data – Sources & Uses," Forest City's construction costs were approximately $[redacted] million for the renovation and new construction of **628** units, while GMH/Centex's construction costs of $[redacted] million were for the renovation and new construction of only [redacted] units. (Tab 92, AR 1918.) Notwithstanding this gross disparity in the number of units to be renovated/newly constructed, the SSAC favorably reports in its "Memorandum for Source Selection Authority" that "GMH's construction costs appear high in relation to the other bidders, but are very close to the benchmark developed by the Army during due diligence preparation." (Tab74, AR 1478.) (Emphasis added.) The SSAC did not affirmatively disclose that the Army's projection was based on renovation/new construction of 628 homes, while GMH/Centex costs were based on only [redacted] units. The SSAC's failure to disclose this information led to the SSA making the statement that "GMH also presented a cost structure that most closely represented the Army's benchmark." (Tab 76, AR 1492.)

In their analysis of other construction costs, the SSEB and the SSAC provided favorable treatment to GMH/Centex. For example, in the SSEB's spreadsheet, it shows in the "Square Footage" block, the Army's baseline for "average square footage" per unit at [redacted] SF and a "vertical cost" of $[redacted]. (Tab 80, AR 1894.) In the corresponding column/block for GMH, it shows an identical "average square footage" per unit of [redacted] SF and a resulting "vertical cost" of $[redacted]. (Id.) But the closeness of the numbers is only because the Army "plugged in" the Army's [redacted] SF to calculate GMH's vertical cost. (Id.) The SSEB spreadsheet used a "plug number" for GMH/Centex because the Army official who maintained the spreadsheet noted:



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER