**"Unable to locate SF for [GMH] units - plug #."** (Id.) He then went on to bold the [redacted] **SF** in the GMH column to indicate the "plug #" he used. (Id.)

The SSAC did not conduct its own analysis, but adopted the SSEB's "plug numbers" when the SSAC developed its spreadsheet, which was "calculated by JLL." (Tab 94, AR 1928.) The SSAC also used the Army's [redacted] **SF** number as a "plug number" for GMH's "weighted average unit GSF" at [redacted] **SF**." (Id. at AR 1930 [Adjacent to this item is a reference to Note 3, which is located at page 4 of the SSAC spreadsheet. It states: "SF was not clearly identified in the proposal and was calculated by JLL."**]**.) By using a "plug number" and passing it off as a calculation from Jones Lang LaSalle ("JLL"), its outside consultant, the SSAC mislead the SSA who, in turn, adopted in full the SSAC findings and conclusions.

7. The SSAC's Report Misled the SSA into Concluding Forest City's New Home Construction Schedule was Unacceptable.

In the SSA's comparison of the GMH and Forest City proposals, he adopted the SSAC's negative comments concerning Forest City's "new home" delivery schedule. In this regard, the SSAC's Memorandum for the SSA stated:

[redacted]

(Tab 74, AR 1481.) (Emphasis added.) While both the SSAC and the SSA assert that Forest City's new home construction schedule reduces benefit to the soldiers, they both failed to evaluate and consider the following:



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

> The Army Baseline only envisioned [redacted] new homes - Forest City is providing [redacted] new homes to the military families at West Point.
>
> GMH proposed to provide [redacted] new homes, compared to Forest City's [redacted] homes.
>
> Under the Army Baseline, its [redacted] units are delivered by the end of the [redacted] - Forest City will be delivering [redacted] units in the same timeframe.
>
> GMH proposes to deliver its [redacted] new units by the end of the [redacted] - Forest City will deliver [redacted] new units by the end of the [redacted] - only [redacted] fewer homes, with the balance delivered in months [redacted].
>
> Forest City would deliver the last of its [redacted] homes at the end of its [redacted] months – GMH/Centex will not begin to make capital improvements on its [redacted] "no work" units for another [redacted].
>
> Forest City's demolition, construction and delivery of new homes at the end of its [redacted] month IDP consist of [redacted] units in the "[redacted]" housing area.[13] (Tab 39, AR 687-688.) Yet GMH/Centex identifies these [redacted] units as part of its [redacted] "no work" units that do not receive capital improvements for the [redacted] of the project. (Tab 49, AR 718-719.) Forest City was criticized; GMH/Centex was not.

(See Tab 74, 76.) Under Forest City's new construction delivery plan, military families will have [redacted] more new homes in the same time period the Army Baseline identified for all of its new homes. (Tab 64.)

8. The SSAC's Report Misled the SSA Into Concluding that the Proposed Community Center Would be Too Large.

The SSA again adopted the criticism of the SSAC which charged that Forest City's community center, with [redacted], was too large: "The size of the proposed [redacted] and the accompanying amenities is excessive

[13] Forest City describes these [redacted] homes as not being located within the [redacted], and that the replacement of these homes would be one of the last projects in its [redacted] to take advantage of relatively recent MILCON [Military Construction] renovations. (Tab 26, AR 512-513.) This reasoning was not addressed by the SSEB, the SSAC, or the SSA.



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

especially for a 628-unit project. Value would have been added if ancillary facilities were more appropriately sized." (Tab 50, AR 1041.)

The RFQ did not identify a "maximum" size for a community center, and there is no evidence in the AR which establishes an "industry standard," or even a "Government standard" for the relative size of a community center. Yet Forest City's proposal is criticized by the SSAC,[14] and in turn by the SSA, for providing a community center for the military families with amenities that include "[redacted]" (Tab 26, AR 503.) In comparison, GMH proposed a [redacted] SF new community center with only [redacted] (e.g., "[redacted]. (Tab 49, AR 728, 732.)

## ARGUMENT

## II. STANDARDS OF REVIEW

### A. Judgment on the Administrative Record - RCFC 52.1

Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment on the administrative record. "To review a motion, or cross-motions, under RCFC

[14] Interesting, the SSEB Consensus Evaluation, and all of the individual evaluations, viewed Forest City's proposed community centers as one of the "major strengths" of its "Preliminary Project Concept Statement." (See Tab 52, AR 1068, 1070; Tab 54, AR 1122, 1126; Tab 56, AR 1166, 1170; Tab 57, AR 1192; Tab 58, AR 1211; Tab 61, AR 1286; Tab 62, AR 1309, 1312, 1314.)



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

52.1, the [C]ourt asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." Dyncorp International LLC v. United States, 76 Fed. Cl. 528, 536 (2007) citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The court shall make findings of fact where necessary. (Id.)

B. **Bid Protest Review**

The Tucker Act requires the Court to review the challenged agency action under the standards set forth in the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. Under the APA standards, a contract award will be set-aside if an agency's action is "arbitrary, capricious, or an abuse of discretion; or otherwise not in accordance with law," 5 U.S.C. § 706 (2)(A), or is "without observance of procedures required by law." (Id. § 706 (2)(D).) In other words, "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

While deferential, the arbitrary and capricious standard "is not a rubber stamp." Overstreet Electric Co. v. United States, 47 Fed. Cl. 728, 742 (2000). Moreover, it does not require the Court "to accept ... bald assertions on a critical point that are not otherwise tied to the administrative record and that are at least in tension with, if not contradicted by, various aspects of that record." Id. To the contrary, the Supreme Court has stated that, under the arbitrary and capricious standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Motor Vehicle Manuf. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Thus, only by "carefully reviewing the record and satisfying [itself] that the agency has made a



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

reasoned decision" can a court "ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." Marsh v. Oregon Nat. Res., 490 U.S. 360, 378 (1989); Overstreet Electric Co, 47 Fed. Cl. at 742. As demonstrated below, the Army's actions here were arbitrary, capricious and lack a rational basis.

We also demonstrate below that Forest City was prejudiced by the Army's errors because "there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (citation omitted). If Forest City prevails on any of its various challenges to the procurement and evaluation process, then it will receive a contract award or, alternatively, all proposals will have to be re-evaluated. Under any of these alternatives, Forest City will have a "substantial chance" of securing a contract.

## III. THE ARMY IMPROPERLY FAILED TO REJECT THE GMH/CENTEX PROPOSAL BECAUSE GMH/CENTEX FAILED TO PROVIDE CAPITAL IMPROVEMENTS FOR [redacted] HOUSING UNITS [redacted] – AND FOR [redacted] THEREAFTER – THUS FAILING TO FULFILL A MATERIAL REQUIREMENT OF THE SOLICITATION AND RENDERING GMH/CENTEX INELIGIBLE FOR CONTRACT AWARD.

In reviewing protests against an agency's evaluation of proposals, the record is examined to determine whether the decision was rational, consistent with the stated evaluation criteria, consistent with applicable laws and regulations, and adequately documented. Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 381 (Ct. Cl. 2003), citing Infrared Technologies Corp., 99-2 C.P.D. ¶ 41 at 3 (1999). In this regard, it is a fundamental rule of competitive procurement that all offerors must compete on an equal basis by proposing to the same terms, conditions and specifications. See Lockheed Martin Info. Sys., B-292836 et al., Dec. 18, 2003, 2003 CPD ¶ 230 at 11-12; Rockwell Elec. Commerce Corp., B-286201 et al., Dec. 14, 2000,


PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

2001 CPD ¶ 65 at 5, (all offerors must be provided a common basis for the preparation and the submission of proposals); Bishop Contractors, Inc., B-246526, Dec. 17, 1991, 1991 U.S. Comp. Gen. LEXIS 1424, 91-2 CPD ¶ 555, (bidders have a right to assume that the essential requirements in a solicitation are the same for all offerors). Moreover, clearly stated RFP technical requirements are considered material to the needs of the Government, and a proposal that fails to conform to the material terms and conditions of a solicitation is technically unacceptable and may not form the basis of award. Mantech Telcoms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. Ct. 57, 71 (2001); Mangi Envtl. Group, Inc. v. United States, 47 Fed. Cl. 10, at 17-18 (2000) ("where a proposal is not compliant with the mandatory technical requirements of the solicitation, the proposal is unacceptable for award"); Barents Group, B-276082, 276082.2, May 9, 1997, 97-1 CPD ¶164, at 10 ("in negotiated procurements, any proposal that fails to conform to material terms and conditions of a solicitation should be considered unacceptable and may not form the basis for an award"); see Alfa Laval, 175 F.3d at 1368 (where a procuring official failed to abide by a mandatory solicitation provision, the protestor will prevail, provided it can demonstrate that, but for the violation, it had a substantial chance to receive the award).

In this case, the Army failed to enforce the material requirements of the RFQ by accepting and selecting GMH on significantly different requirements than those required of the other offeror's. The RFQ made clear that the Army would convey 628 family housing units and "in exchange, the partner will provide for the **new construction/renovation**, operation, management and maintenance of the existing family housing inventory. (Tab 9, AR 147; Tab 16, AR 241.) (Emphasis added.) Through Amendment No. 0012 (Tab 14), 0013 (Tab 15), and 0014 (Tab 16), the offerors were repeatedly advised that of the 964 housing units at West Point,


PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

there were only 337 homes that the Army had designated not to receive capital improvements, leaving 628 units for construction/ renovation capital improvement during the IDP.

To further make the point, the West Point family housing inventory provided to the offerors, *West Point AFH Inventory USMA*, specifically identified the homes that were not to receive any capital improvements by being marked in the first column of the spreadsheet, entitled: "**No Cap Improvements=1.**" (See the *West Point AFH Inventory USMA* Inventory List at Tab 102, 105, 106.) Stated differently, there was no provision in the RFQ that permitted an offeror to propose not making any capital improvements on the 628 housing units during the offeror's proposed IDP.

The requirement to perform renovations or construct new homes during the IDP was not only made clear in the RFQ, but the development plan the Army projected for West Point was based on this requirement. This is clearly evidenced by the Army "baseline" it developed to compare its projections with the proposals of the offerors. Consistent with the understanding that all 628 units would be subject to new construction or renovation, the Army identified that **all** 628 would be covered by new construction or renovation during its IDP – it made no provisions for "no work" units. (See the "Baseline" Column in the category titled: "**Categories of Construction - Hard Costs Only,**" Tab 90, AR 1892.)

Ignoring the statements in the RFQ, in Amendment Nos. 0012, 0013, and 0014, and even its own West Point project "baseline," the Army (and GMH/Centex) argues that the RFQ did not prohibit GMH/Centex from proposing the [redacted] "no work" units [redacted], or for that matter, not performing any capital improvements until the [redacted] of the project. See GCM at 144; DICM at 21.) Of course, this is an unreasonable and illogical interpretation of the RFQ because it would mean that GMH/Centex could have proposed 400 "no



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

work" units, or 500 "no work" units, or even all 628 "no work" units. The Army's interpretation also would mean that GMH/Centex could have elected not to perform any capital improvements on those units for 20 years, or 30 years, rather than the [redacted] years it proposed. These are absurd possibilities, but generated from an equally absurd interpretation of the RFQ.

While the Army and GMH/Centex might respond that the SSEB, the SSAC and the SSA would have evaluated and downgraded such a plan, the evidence in the AR totally disproves this position. The SSEB, the SSAC and the SSA did not even evaluate or discuss[15] the [redacted] "no work" units, much less identify it as a "weakness." Yet these "no work" units represented [redacted] of the homes to be transferred to the developer, not to mention that they were not to receive capital improvements until the [redacted] of the project. Clearly, if the Army intended for offerors to propose "no work" units, it would have addressed the issue in the Evaluation criteria for *PROJECT FINANCE* and *PRELIMINARY PROJECT CONCEPT STATEMENT*.

Under the terms of the RFQ, the offeror was to propose an IDP during which it was to renovate or provide new construction for 628 housing units. Forest City proposed an IDP of [redacted] months to renovate/newly construct the 628 units. (Tab 90, AR 1864.) The Army's "baseline" projected all 628 housing units to be renovated/newly constructed in its IDP of [redacted] months. (Id.) And GMH/Centex proposed a [redacted] month IDP to renovate/build, but with no corresponding renovation/new construction on [redacted] units until [redacted]. (Id.)

---

[15] The SSEB Consensus Evaluation (Tab 66, AR 1342.), and the SSAC Consensus Evaluation (Tab 65, AR 1327.), do not list the [redacted] "no work" units in the "Summary Data" section, much less provide a comprehensive evaluation of units and their potential impact on the project. The only reference by the SSAC in its "Memorandum to Source Selection Authority" is in 6 words ("...and perform no work on [redacted] units") in its 11-page submission to the SSA. (Tab 74, AR 1478.) These same words, in turn, were copied verbatim in the SSA "Source Selection Decision Document." (Tab 76, AR 1496.)



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

Notwithstanding the requirements of the RFQ and the Army's own understanding of the requirement to provide capital improvements to all 628 housing units during the IDP, the Army failed to reject GMH/Centex's proposal as "unacceptable." It should have been unacceptable because GMH/Centex proposed that it would do "no work" on [redacted] housing units until the beginning of the [redacted]. If such a proposal was of interest to the Army, it should have amended the RFQ to provide all offerors the opportunity to propose on those terms. See 48 C.F.R. § 15.206(d).

Forest City clearly suffered competitive prejudice as a result of the Army accepting a proposal which allocated **no** new construction/renovation to [redacted]% of the units until the [redacted]th year of the development plan.[16] A reasonable possibility of prejudice is a sufficient basis for sustaining a protest. Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996). Here, by permitting this material deviation from the requirement of the RFQ, it permitted GMH to construct a financial plan and new construction/renovation schedule that is significantly more beneficial to GMH, and totally distorts, and makes impossible, any comparative analysis that is essential to fair, reasonable, and unbiased "best value" award. The Army's acceptance of GMH's "no work" units clearly resulted in the disparate treatment of offerors, significantly prejudiced Forest City, and therefore its award must be set aside.

[16] The RFQ advised that housing inventory to an adequate condition [redacted] of the transfer of operations – not the beginning of the [redacted] year. (Id. at 317.)



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

## IV. THE ARMY'S FAILURE TO PROPERLY EVALUATE AND CONSIDER THE IMPACT OF GMH/CENTEX'S "NO WORK" HOUSING UNITS IN ACCORDANCE WITH THE EVALUATION CRITERIA WAS IMPROPER, ARBITRARY, CAPRICIOUS AND VIOLATED THE TERMS OF THE RFQ.

Assuming, *arguendo*, the RFQ did not prohibit GMH/Centex from proposing "no work" units [redacted], the Army failed to properly evaluate and consider as a "weakness" the adverse impact of not performing capital improvements on [redacted]% of the family housing for the first [redacted] years of the project. Moreover, the Army failed to properly evaluate and consider the impact of these "no work" units when it conducted the "comparative analysis" of the Forest City and GMH/Centex proposal.

The *Preliminary Project Concept Statement* Evaluation Factor (Tab 23, AR 328) requires the Army to evaluate whether offeror understands the goals and needs of the Army for family housing, including such factors as: "Ensuring that soldiers and their families have access to high quality, safe, attractive, and affordable housing <u>by upgrading or replacing existing family housing and, if necessary, by building new housing</u> to meet the on-post family housing requirements at each installation." (Tab 23, AR 290 at Paragraph 1.1.g.1.) (Emphasis added.) Yet not a single evaluation, by individual or consensus, even commented on, much less cited as a "weakness," the fact that GMH/Centex's proposed no capital improvements on [redacted]% of the family housing for the first [redacted] years of the project. The total failure of the Army's evaluation team -- SSEB, SSAC and SSA -- to make any mention of these facts is clear evidence of a significant error in their evaluation of the GMH/Centex's proposal.

This failure by the Army evaluation team to properly evaluate and consider the GMH/Centex's proposal is exacerbated by the fact that GMH/Centex received a significant unfair competitive advantage when the SSAC conducts its "comparative analysis" to generate its



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

recommendation to the SSA. In this instance, by permitting GMH/Centex to perform **no** new construction/renovation on [redacted]% of units until the [redacted]th year of the project, it permits GMH/Centex to propose a financial plan ("Project Finance") and new construction/renovation schedule ("Preliminary Project Concept Statement") that is necessarily based on less costs, fewer new homes, and rental income without offsetting capital expenditures. Yet there was no mention of these facts in the SSAC's comparative analysis and recommendation to the SSA.

By accepting GMH/Centex's plan to make no capital expenditures on [redacted]% of the housing units until the [redacted]th year of project, the Government provided GMH/Centex with an unfair competitive advantage because it was impossible for the Army to make an apples-to-apples comparison between the Financial Plans proposed by GMH/Centex and Forest City, thus totally distorting the "Project Finance" Evaluation Criteria in favor of GMH/Centex. This improper competitive advantage was further exacerbated by the fact that GMH/Centex will receive [redacted] years of rental income totaling $[redacted] **million** without any corresponding outlay of capital.

While GMH/Centex does not receive this revenue on a dollar-for-dollar basis, it does receive both a [redacted] (Tab 49, AR 758.) Then beginning at [redacted]" (Id. at AR 756.) Notwithstanding the fees that will be generated for GMH/Centex, the SSEB, SSAC, and the SSA failed to identify as a "weakness" in the "Project Finance" Evaluation Factor the fact that GMH/Centex was generating rental revenue for the [redacted] units for a period of [redacted] years without any corresponding outlay of capital.

It also is important to note that in the SSAC's "comparative assessment" of the offerors,



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

the SSAC makes no mention of the fact that: (i) GMH/Centex's financial plan provides for capital expenditures on only [redacted]% of the West Point homes compared to Forest City's plan for all 628 homes; (ii) Forest City's financials cover capital expenditures for all 628 units during the IDP, while GMH/ Centex's financials cover only capital expenditures for [redacted] units; and (iii) GMH/Centex's financial plan is greatly benefited by a $[redacted] million windfall in rental payments without a corresponding outlay of capital.[17] (Tab 74, AR1478.)

More importantly, it was impossible for the SSAC to make a fair and reasonable comparison between the proposals of Forest City and GMH/Centex, where Forest City is planning capital improvements to all 628 units during the IDP ([redacted]), while GMH/Centex only has to plan for [redacted] units, or [redacted]% fewer homes. The impact of this competitive advantage was clear: the SSAC complained that Forest City's new home delivery schedule was too late in the IDP for its liking. (Tab 73, AR 1481.) Yet the SSAC makes no mention of the fact that Forest City is constructing [redacted] new homes compared to GMH/Centex's [redacted] units, or that Forest City's plan covers capital improvements to 628 units compared to only [redacted] units in GMH/Centex's plan. Moreover, it is clear that Forest City was prejudiced by this failure in that it led to the improper award of a nonconforming offer that must be set aside. Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996).

---

[17] At Page 14-15 of its brief, the Government argues that GMH/Centex does provide for maintaining the units. While this is true, it is irrelevant to the fact that the RFQ requires the contractor to make capital improvements to the units during the IDP.



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

## V. THE ARMY'S FAILURE TO PROPERLY EVALUATE AND CONSIDER FOREST CITY'S FINANCIAL GUARANTEE IN ACCORDANCE WITH THE EVALUATION CRITERIA WAS IMPROPER, ARBITRARY, CAPRICIOUS AND VIOLATED THE TERMS OF THE RFQ.

By failing to consider Forest City's $[redacted] million financial guarantee, the Army's assessment of Forest City's *Project Finance* Element 5 was improper, unreasonable, and contrary to the evaluation criteria stated in the RFQ. 48 C.F.R. § 15.305 mandates that "[a]n agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and sub-factors specified in the solicitation." Therefore, an agency must follow its stated evaluation criteria in rating offerors' proposals, without omission of any stated criteria or the addition of new criteria. 10 U.S.C. § 2305(b)(1) and 41 U.S.C. 253b (d)(3); see also Future-Tec Management Systems, Inc.; Computer and Hi-Tech Management, Inc., B-283793.5, B-283793.6, Mar. 20, 2000, 2000 CPD ¶ 59. It is equally true that once an agency amends its criteria against which proposals are to be evaluated, as the Army did with respect to *Project Finance* Element 5, the agency is required to adhere to the new criteria with respect to all offerors.

The Government acknowledges that the SSEB and the SSAC used the wrong form when they prepared their respective Consensus Evaluations. (See GCM at 4, 11.) However, the Government argues that the individual evaluations by the SSEB members prove that Forest City's "Scope Guarantee" was evaluated. It is more accurate to state that, not only did the members of the SSEB evaluate the Forest City financial guarantee, but they universally found it a "Strength" of Forest City's proposal. However, these individual evaluations were of absolutely no benefit to Forest City for two significant reasons.

First, by using the old form for its Consensus Evaluations, the SSEB as a Board failed to even mention Forest City's financial guarantee, much less conduct the required comprehensive


PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

evaluation and consideration of *Project Finance Factor-5*, in arriving at its consensus rating for Forest City. This failure by the Board resulted in Forest City receiving only an "[redacted]" rating for the highest valued "Project Finance" Factor.[18] (Tab 52, AR 1060.) In this regard, since Forest City received an "[redacted]" rating from the SSEB for the other three evaluation factors (Id. at AR 1068, 1076, 1082), it is reasonable to conclude that Forest City's "Project Finance" rating also would have been at least an "[redacted]" rating. (Tab 51.) It is important to note that the only difference in the Board's ratings between Forest City and GMH/Centex was on the "Project Finance" factor where Forest City received the "[redacted]" and GMH/Centex an "[redacted]." On all other factors, including the "Overall Rating," both received an [redacted] rating. (Id.)

Second, the very favorable evaluations and assessments recounted by the SSEB members on their individual consensus forms were totally void of meaning or import because these individual forms were not provided to the SSAC. The only evaluation provided to the SSAC was the SSEB Consensus Evaluation form – which had no reference to Forest City's "Scope Guarantee" and its import to *Project Finance Factor-5* question: ***To what degree is the offeror guaranteeing scope and price?*** (Tab 2, AR 113.)

The Government also argues that the SSAC did evaluate Forest City's financial guarantee because it referenced the guarantee with the observation: "**Value would have been added if the offeror had established some typical parameters surrounding the guaranteed maximum price contract, e.g., [redacted]**." (Tab 50, AR 1039.) To the contrary: this is only evidence

---

[18] Using the old form, SSEB Member [redacted] recorded on her *SSEB Step Two Individual Evaluation* form that Forest City's "Project Finance" rating "was revised from an [redacted] as a result of consensus discussions. Discussions included pro forma analysis, vertical construction costs, [redacted] etc. in pro forma." (Tab 56, AR 1161.) (Emphasis added.)



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

that: (i) the SSAC looked no further than the brief statement Forest City made in the "Finance" section of the proposal (Tab 25, AR 476.), and (ii) the SSAC totally ignored the detailed discussion Forest City provided for its "Scope Guarantee" in the *Preliminary Project* section of its proposal. (Tab 26, AR 525-529.)

It is impossible to reconcile the detailed comments of the SSEB members with the SSAC's off-handed comment that "**value would have been added if the offeror had established some typical parameters surrounding the guaranteed maximum price contract, e.g., [redacted]**." If the SSAC had reviewed the individual evaluations of the SSEB members, the SSAC would have seen that these individuals viewed Forest City's financial guarantee as a "**Strength**" – not a "weakness" – and that several SSEB members (including Co-Chair [redacted]) described Forest City's financial guarantee as a "multifaceted approach to ensure pricing and scope completion for the RCI project." (See Tab 62, AR 1306; Tab 54, AR 1112, 1115, 1120.) Yet the SSAC made **no** evaluation, reference or even mention of Forest City's $[redacted] million scope guarantee. (Id.) It can only be concluded that the SSAC totally failed to comprehensively consider Forest City's financial guarantee in assessing the "Project Finance" Evaluation Factor.

Rather than recognizing the strength and scope of Forest City's financial guarantee – particularly when compared to GMH/Centex's financial guarantee – the SSAC raises a concern that Forest City's proposed "vertical construction costs", in its judgment, is too low. (Tab 74, AR 1481.) On this point, the Government argues that Forest City's financial guarantee does not alleviate the "vertical cost" concern expressed by the SSAC. However, the Government does not state a reason or, more importantly here, identify a specific finding in the AR to support its argument. (See GCM at 12.)


PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

In fact, there is no evidence in the AR that the SSEB, SSAC or the SSA determined that Forest City's financial guarantee did not cover all of the vertical costs, regardless of what those costs might result in being.[19] To the contrary, the very wording of Forest City's "Scope Guarantee" makes clear that [redacted] are covered. (Tab 25, AR 525-528.) But more importantly, the AR does contain a determination that Forest City's financial guarantee covers all project costs. For example, SSEB Member [redacted] determined:

[redacted]

Tab 54, AR 1120. (Emphasis added.) Note also the statements of SSEB Co-Chair [redacted] who found that "FCMC proposed a multifaceted approach to ensure price and scope completion for the RCI project. [redacted]

[19] In the GMH/Centex brief at 18, it opines that a low vertical cost may have ultimately resulted in abandonment of the project by Forest City. Aside from the fact that nowhere in the Administrative Record was such a concern raised by the Government, Forest City's guarantee specifically details the [redacted] scope of its financial guarantee, including the fact that [redacted]. (Tab 26, AR 525-528.)



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

[redacted]." (Tab 60, AR 1252.)

These individual SSEB evaluations are the only evidence in the AR where the Army evaluated and considered the full scope and coverage of Forest City's financial guarantee. Conversely, there is no evidence in the AR that the SSAC properly evaluated and considered Forest City's financial guarantee in the manner done by SSEB members, much less evidence that the SSAC determined that the Forest City's financial guarantee would not fully cover any shortfall resulting from the alleged "very low cost of vertical construction."[20]

Since the SSA only relied upon the SSAC's "Memorandum to Source Selection Authority," (AR 74) and he fully adopted it in support of his decision (Tab 76, AR 1491), there is no evidence in the AR that the SSA was even aware of Forest City's financial guarantee, much less its scope and coverage. Accordingly, it can only be concluded that the concern expressed in the SSA's "Source Selection Decision Document" concerning Forest City's "very low new construction costs" (Tab 76, AR 1492, 1495) would have been totally alleviated had he and/or the SSAC evaluated the financial guarantee as required by *Project Finance Element-5* (Tab 9, AR 138), or he and/or the SSAC had reviewed and considered the individual evaluations by the SSEB members.

As this Court has observed, the "source selection decision must be documented and the documentation must include the rationale for any business judgment or tradeoffs made or relied on by the contracting officer[.]" Mangi Envtl. Group Inc., 47 Fed.Cl. 10 at 19; see Seattle Sec. Servs. v. United States, 45 Fed. Cl. 560, 569 (1999); Latecore Int'l Inc. v. Dept. of Navy, 19 F.3d

[20] There also is no evidence in the AR to support to interpretation proffered by the Government in its brief. (See GCM at 12,)


PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

1342, 1356 (11th Cir. 1994) (to permit review, a contracting agency must provide "a coherent and reasonable explanation of its exercise of discretion"); MCR Fed., Inc., B-280969, 99-1 CPD ¶8, at 5 ("[w]here there is inadequate supporting rationale in the record for a decision to make award to a lower-priced offeror with a lower technical ranking notwithstanding a solicitation's emphasis on technical factors, we cannot conclude that the agency had a reasonable basis for its decision") (emphasis added); PharmChem Labs., Inc., B-244385, 91-2 CPD ¶ 317, at 5 ("we are obligated to object to a cost/technical tradeoff where a reasonable basis is not evident from the record"). Here, the source selection decision documentation lacks a rational basis and, therefore, the protests should be sustained on this basis alone.

## VI. THE ARMY'S FAILURE TO PROPERLY EVALUATE AND CONSIDER GMH/CENTEX'S "SCOPE GUARANTEE" IN ACCORDANCE WITH THE EVALUATION CRITERIA WAS IMPROPER, ARBITRARY AND CAPRICIOUS AND VIOLATED THE TERMS OF THE RFQ.

As noted earlier, the SSAC extolled GMH/Centex guarantee in the SSAC's "Memorandum for Source Selection Authority":

> Most significantly **GMH** provides a Guaranteed Maximum Price contract for **their projects** and **have never had to adjust scope on an RCI project after assuming operations** [redacted].

(Tab 74, AR 1478.) (Emphasis added). While the SSAC clearly addressed the guarantee, the above praise is misleading because it failed to disclose to the SSA that: (i) the proposed guarantee [redacted]k; (ii) the [redacted]; (iii) none of [redacted], and (iv) none of the other $[redacted]


PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

[redacted]

Based on the above statement, it is evident SSAC relied not upon the guarantee proposed in the GMH/Centex proposal, but rather on facts outside the four corners of GMH/Centex's proposal in making its assessment to the SSA. It relied upon GMH's past performance on other projects. Yet "Past Performance" is **not** a Step Two evaluation criterion. (Tab 23, AR 320, 327-329.) "**Past Performance**" considerations were to be used only for the initial Step One selection. (Id. at AR 312-313.) Consequently, the SSA failed in his obligation: (i) to ensure consistency among evaluations; and (ii) to ensure that proposals are evaluated based on solely on the factors contained in the RFQ. (See 48 C.F.R. 15.303.)

Because the SSAC failed to disclose to the SSA the very limited scope of the GMH/Centex "guarantee," the SSA was misled into finding that GMH/Centex "**offered a Guaranteed Maximum Price which provided great confidence in the viability of the proposal**." (Tab 76, AR 1492.) (Emphasis added.) If the SSA had been properly and completely advised about GMH/Centex's financial guarantee, the SSA would have recognized that the Guaranteed Maximum Price was limited to only [redacted] of the projected project costs does not demonstrate much confidence in GMH/Centex's own proposal; much less generate great confidence for the Army in the viability of GMH/ Centex's proposal. Consequently, Forest City suffered competitive prejudice as a result of the Army's flawed and careless evaluation of its proposal, thus its protest should be sustained. Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996).


PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

## VII. THE SSA RELIED UPON THE SSAC'S INACCURATE AND MISLEADING COMPARATIVE ANALYSIS, THEREBY PREVENTING THE SSA FROM MAKING AN INFORMED JUDGEMENT IN SELECTING THE BEST VALUE FOR THE GOVERNMENT, AND RENDERING THE SSA'S SELECTION OF GMH/CENTEX IMPROPER, ARBITRARY AND CAPRICIOUS AND IN VIOLATION OF THE TERMS OF THE RFQ.

The SSA relied upon the SSAC's "comparative analysis" of the Forest City and GMH/Centex proposals which: (i) failed to mention, much less disclose the details of, Forest City's financial guarantee of $[redacted] million; (ii) failed to disclose that the scope of this $[redacted] million guarantee eliminated any concern related to its projected vertical costs, (iii) failed to disclose that the projected size of Forest City's Community Center was [redacted], (iv) failed to disclose that GMH/Centex's financial guarantee was limited to only $[redacted] million, compared to Forest City's $[redacted] million, (v) failed to disclose that the GMH/Centex financial guarantee did [redacted], (vi) failed to disclose that the GMH/Centex financial guarantee covered [redacted], compared to Forest City's [redacted] of its plan; (vii) failed to disclose that GMH/Centex would not perform any work on [redacted] housing units -- [redacted] of the housing – not only during the entire proposed [redacted] months, but not until the [redacted]th year of the project; (viii) failed to disclose that GMH/Centex would be receiving rental revenue on those [redacted] "no work" housing units over the [redacted] without a corresponding outlay of capital for those units; and (ix) failed to disclose that both the SSEB and the SSAC had failed to identify the revenue produced on the [redacted] units as a "weakness," as required by the RFQ.

With regard to the SSA's concern that "the majority of the new homes are not scheduled for delivery until the [redacted] year of the project, with an average of only [redacted] units per year delivered



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

the first [redacted] years of the project and [redacted] units delivered the [redacted] of the project" (Tab 76, AR 1496), the SSA relied upon the SSAC's erroneous "comparative analysis" of the Forest City and GMH/Centex proposals which failed to disclose that:

> The Army Baseline only envisioned [redacted] new homes - Forest City is providing [redacted] new homes to the military families at West Point.
>
> GMH proposed to provide [redacted] new homes, compared to Forest City's [redacted] homes.
>
> Under the Army Baseline, its [redacted] units are delivered by the end of the [redacted] month - Forest City will be delivering [redacted] units in the <u>same</u> timeframe.
>
> GMH proposes to deliver its [redacted] new units by the end of the [redacted] month - Forest City will deliver [redacted] new units by the end of the [redacted] month - only [redacted] fewer homes, with the balance delivered in months [redacted].
>
> Forest City would deliver the last of its [redacted] homes at the [redacted] of its project IDP of [redacted] months – GMH/Centex will not begin to make capital improvements on its [redacted] "no work" units for another [redacted] years.
>
> Forest City's demolition, construction and delivery of new homes at the end of its [redacted] month IDP consist of [redacted] units in the "[redacted]" housing area. (Tab 39, AR 687-688.) Yet GMH/Centex identifies these [redacted] units as part of its [redacted] "no work" units that do not receive capital improvements for the first [redacted] of the project. (Tab 49, AR 718-719.)

(Tabs 74, 76.) While Forest City's delivery schedule was identified as a [redacted] because it purportedly diminishes "[redacted]," the facts demonstrate that under Forest City's plan, military families will have [redacted] <u>more</u> new homes in the same time period the Army Baseline identified for [redacted]. (AR, Tab 64.)

Given the numerous and major defects in the documentation relied upon by the SSA, it is evident that the SSA was not able to make an informed and reasoned judgment on which offeror's proposal provided the best value to the Government. In making an award to GMH/Centex, a proposal that calls for no work on [redacted] units for [redacted] years, provides a financial guarantee for only [redacted] in rental revenue on the



**PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

[redacted] "no work" units without a corresponding capital outlay, and makes only $[redacted], it is evident that the SSA did not make a judgment that provided the best value to the Government. Where, as here, the source selection decision documentation lacks a rational basis, the protests must be sustained. Mangi Envtl. Group, 47 Fed.Cl. 10 at 19; Latecore Int'l Inc. v. Dept. of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)(to permit review, a contracting agency must provide "a coherent and reasonable explanation of its exercise of discretion"); PharmChem Labs., Inc., B-244385, 91-2 CPD ¶ 317, at 5 ("we are obligated to object to a cost/technical tradeoff where a reasonable basis is not evident from the record").

## VIII. STANDARD FOR INJUNCTIVE RELIEF

The Tucker Act, 28 U.S.C. § 1491(b)(2), grants this Court the authority to issue permanent injunctions. In determining whether to grant a motion for a permanent injunction, Forest City must establish: (1) that it is likely to succeed on the merits; (2) that it will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships favors the grant of injunctive relief; and (4) it is in the public interest to grant injunctive relief. Mangi Envtl. Group, Inc., 47 Fed. Cl. at 19; (citing FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993) and Ellsworth Associates, Inc. v. United States, 45 Fed Cl. 388, 398 (1999); Overstreet Electric Co, 47 Fed. Cl. at 743. "As a rule, when applying the four factors for injunctive relief, no single factor is dispositive and an inadequate showing regarding one factor may be overcome by the strength of the other factors." FMC Corp., 3 F.3d at 427. Here, all of the factors demonstrate that a permanent injunction should issue.

## IX. FOREST CITY IS ENTITLED TO INJUNCTIVE RELIEF

### A. Forest City Has Prevailed on the Merits.


PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

The Agency's decision to award the CDMP to GMH was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with applicable statutes and regulations. In that regard, Forest City has demonstrated that had the Army properly rejected GMH/Centex's proposal for failing to conform to the material requirements of the RFQ, Forest City, as the next in line for award, would have received the award. In addition, had the SSA ensured that Forest City's proposal was evaluated in accordance with the factors and subfactors contained in the RFQ, and as required by 48 C.F.R. § 15.303, Forest City would have also had a substantial chance of receiving the award. Consequently, Forest City has shown that "a significant, prejudicial error [occurred] in the procurement process." Alfa Laval Separation, 175 F.3d at 1367; Data General Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); Bannum, Inc, 404 F.3d at 1353 (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003)) (To show that it was significantly prejudiced, protestor does not have to demonstrate that, but for the error, it would have been awarded the contract, but rather, "[t]o establish 'significant prejudice' [it] must show that there was a 'substantial chance' it would have received the contract award" absent the agency's action.)

Accordingly, as demonstrated above, Forest City satisfies the first prong for injunctive relief (i.e., substantial likelihood of success on the merits) on a number of grounds, any one of which is sufficient to invalidate the award.

### B. Forest City Will Suffer Irreparable Harm Absent Injunctive Relief.

Forest City also satisfies the second prong of the test for permanent injunctive relief in that it will suffer irreparable harm if the Agency's actions are not enjoined. When assessing irreparable harm, the relevant inquiry is whether a plaintiff has an adequate remedy at law in the



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

absence of the injunction. Heritage of Am., LLC v. United States, 77 Fed. Cl. 66 (2007); 2007 U.S. Claims LEXIS 166, * 38 – 39. There are numerous legally-cognizable ways in which Forest City has been and will be harmed irreparably in the absence of the requested relief. These involve the denial of the opportunity to compete fairly and obtain the contract and the lost profits that Forest City would have received if it had been afforded an opportunity to compete and receive the award of the contract. These injuries constitute irreparable harm that justifies the granting of injunctive relief.

First, Forest City will be irreparably harmed if performance is not enjoined. Commencement of Phase 1, the *Project Planning* phase, necessitates the advancement of the CDMP, which addresses all aspects of the development effort at West Point with a "specific focus on long-term master planning and environmental stewardship." (Tab 23, AR 294.) The RFQ contemplates that the renovation and construction of housing units and ancillary facilities planned during the CDMP will take place throughout the life of the conveyance. (Id.) "This conveyance will be for a fifty-year period, with a twenty-five year renewal clause." (Id. at 362.) In stark contrast to the half century that the CDMP will be in effect, the entire CDMP process is to be completed in approximately "six months of coordinated, intensive efforts between the Army and the developer." (Id. at 294.) Accordingly, if performance is not enjoined, the CDMP process may be complete or so far along that it would be impossible for Forest City to implement the CDMP in accordance with its original plan.

Alternatively, should the contract be re-competed, in the absence of a permanent injunction, GMH will have obtained invaluable insight into the performance of the contract (and the CDMP process) that will unfairly benefit GMH in any contract re-competition. See Seattle Sec. Servs., Inc., 45 Fed. Cl. at 571 ("[A] lost opportunity to compete on a level playing field for



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

a contract has been found sufficient to prove irreparable harm.").

Second, the loss of profits that Forest City would have received if it had been awarded the contract similarly constitutes immediate irreparable harm. Chapman Law Firm Co. v. United States, 67 Fed. Cl. 188, 193 (2005) ("this court has found that lost profits, or even the loss of an opportunity to earn profits, is sufficient to constitute irreparable harm."); Magnavox Elec. Sys. Co. v. United States, 26 Cl. Ct. 1373, 1379 (1992), overruled on other grounds by Motorola, Inc. v. United States, 988 F.2d 113 (Fed. Cir. 1993) ("Denial of the opportunity to obtain the present contract and the profits derived therefrom is precisely what plaintiff refers to when alleging its 'lost opportunity to compete.' This is an irreparable injury."). Injunctive relief is therefore necessary to prevent this otherwise unredressable injury. Informatics Corp. v. United States, 40 Fed. Cl. 508, 518 (1998) ("Plaintiff has demonstrated that absent injunctive relief it would suffer irreparable harm by the loss of anticipated profits from a contract award. Furthermore, an action at law would be unavailing because plaintiff could recoup only its bid preparation costs in a suit for damages."); United Int'l Investigative Servs., 41 Fed. Cl. 312, 323 (1998) ("[T]he opportunity to compete for a contract and secure any resulting profits has been recognized to constitute significant harm."). If Forest City does not receive an award, Forest City will lose revenues and profits on a project valued at approximately $[redacted] million. (See Defferding Declaration, Exhibit 1, previously filed with Forest City's Memorandum in Support of its Motion for Preliminary Injunction.)

Third, the detriment to Forest City goes substantially beyond its economic loss of the contract to include damage to Forest City's marketplace reputation and future business opportunities. See, e.g., Qwest Communications Corp. v. City of Berkeley, 146 F.Supp.2d 1081 (N.D. Cal. 2001) (Government contractor established irreparable harm where performance under



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

a large public contract was essential to its reputation and to its ability to obtain future business); Semaphore Entm't Group Sports Corp. v. Gonzalez, 919 F. Supp. 543, 550 (D.P.R. 1996) ("[T]here is compliance with the irreparable harm criteria when the harm is not easily quantifiable, such as when the action that is sought to be enjoined would besmirch plaintiffs' business credibility, reputation, and good will." (citing Planned Parenthood v. Citizens for Cmty. Action, 558 F.2d 861, 867 (8th Cir.1977)).

The foregoing injuries to Forest City are substantial, immediate, irreparable, and, with the exception of lost profits, unquantifiable. Forest City fully meets the required standard.

### C. The Harm To Forest City Outweighs Any Harm To The United States and Others.

While Forest City faces irreparable harm in the loss of the opportunity to compete for the contract and to work closely with the Army team in crafting a CDMP that is acceptable and offers the best value for military family housing, there is little or no harm that would accrue to the Army or to any other party as a result of granting the permanent injunctive relief.

Most importantly, granting permanent injunctive relief would have no negative impact on military housing operations. The Army's needs are currently being met by its existing housing inventory, which the Army admits is currently in "adequate condition." (Tab 9, AR 145.) There is also no waiting list for housing, as exists at other military bases like Fort Myer. (Id. at 153.) Granting injunctive relief would thus not require the Army to find alternative housing for those members desiring to live on base. This court has found that "no harm will inure to third parties when the government has alternative contractual vehicles available through which it can continue to obtain the needed services uninterrupted." Chapman Law Firm Co., 67 Fed. Cl. at 194 (citing Hospital Klean of Texas, Inc. v. United States, 65 Fed. Cl. 618, 624 (2005). In the instant case,


PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

the Army can continue to manage the properties pending resolution of this claim and military members are free to live either on or off the installation. Moreover, granting relief could well result in a greater number of newly constructed ([redacted] to be precise) and renovated homes being made available to military members and their families, as detailed in Forest City's plan.

D. **Granting Injunctive Relief Is In The Public Interest.**

Granting an injunction is in the public interest, as "by upholding the integrity of the procurement process, public confidence in the federal procurement process will be preserved." SAI Indus. Corp. v. United States, 60 Fed. Cl. 731, 747 (2004). GMH/Centex argues that the public interest is also served by the timely completion of the government procurement process and the Government is silent on Forest City's request for injunctive relief. (DCM 32) Granted that the GAO protest delayed the award and performance of the CDMP, and that an injunction would delay the award further, but such delay is insignificant compared to the fact that this housing project will touch the lives of countless military members for the next 50-75 years. Moreover, given the Army's obvious errors in evaluating Forest City's proposal and its relaxation of a material requirement, the public's interest in the integrity of this procurement and the process in general, clearly outweighs the public's interest in the completion of the government procurement process. It certainly outweighs Defendant-Intervenor argument that Forest City "has already caused significant delay," especially where adequate military housing currently exists. (DCM 32). Because of the magnitude of the issues at stake, the public's interest would be served by the grant of a permanent injunction.

## X. THE PUBLIC INTEREST FAVORS THE ISSUANCE OF INJUNCTIVE RELIEF.

"It is beyond peradventure that the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

a contractor's bid." Overstreet Electric Co, 47 Fed. Cl. at 744; Seattle Sec. Servs,, 45 Fed. Cl. at 572. Furthermore, "a public interest is manifest in ensuring that the Government closely adheres to the requirements of the procurement regulations." Overstreet Electric Co, 47 Fed. Cl. at 744. Forest City has demonstrated that the Army has engaged in improper procurement activities which, unless corrected by this Court: (a) threaten the integrity of the Army's procurement system, and (b) will prevent the Army from receiving the best value in this procurement. As a result, the public interest lies in the issuance of an appropriate injunction.

## XI. THE BALANCE OF HARDSHIPS TIPS IN FOREST CITY'S FAVOR.

"Under this factor, the court must consider whether the balance of hardships leans in the plaintiff's favor. This requires a consideration of the harm to the government." Overstreet Electric Co, 47 Fed. Cl. at 744. It will also lose the opportunity to receive profits on the contract. The harm to the Army, if an injunction is issued, is that it would be required to receive the best value for West Point housing. To the extent the Army claims that the entry of an injunction would delay an important procurement, it is well established that "only in an exceptional case would such delay alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in protests." Ellsworth Assoc., Inc., 45 Fed. Cl. at 399, quoted in Overstreet Electric Co, 47 Fed. Cl. at 744. Here, GMH/Centex is only in the CDMP stage which is estimated to be approximately six months in duration. (Tab 23, AR 293.)

## CONCLUSION

For the above reasons, Forest City respectfully requests that this Court grant Forest City's Motion and issue an appropriate injunction:

a. Sustaining Forest City's protest;
b. Disqualifying GMH/Centex from receiving an award because of its failure to fulfill


PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

material requirements of the solicitation and directing an award to Forest City;

c. Alternatively, ordering the Army to amend the RFQ to reflect permit offerors to propose not to provide capital improvements on any or all of the 628 housing units for any length of time in the IDP and SDP, and then obtain revised proposals based thereon, evaluate the revised proposals in accordance with the new RFQ's requirements and make a new source selection based on such new evaluation;

d. Alternatively, ordering the Army to re-evaluate the Forest City and GMH/Centex proposals by conducting a proper evaluation of both the "Project Finance" and "Preliminary Project Concept Statement" Evaluation Factors and their respective Subfactors, giving due weight and consideration to: (i) the number of housing units the offerors propose to renovate/new construct during the IDP, (ii) the scope and nature of the offerors guarantees, and (iii) the scope and nature of any rental revenue without offsetting capital planned by the offerors;

e. Alternatively, ordering the Army to re-evaluate all of the Step 2 proposals by conducting a proper evaluation of both the "Project Finance" and "Preliminary Project Concept Statement" Evaluation Factors and their respective Subfactors, giving due weight and consideration to: (i) the number of housing units the offerors propose to renovate/new construct during the IDP, (ii) the scope and nature of the offerors guarantees, and (iii) the scope and nature of any rental revenue without offsetting capital planned by the offerors;

f. Declaring that the evaluation of proposals and source selection decisions were improper, arbitrary and capricious, and contrary to applicable law and regulation;

g. Granting Forest City its attorneys fees, expenses and costs associated with this action; and

h. Granting Forest City such further relief as the Court may deem just and proper.

Respectfully submitted,

/s/

Robert H. Koehler
PATTON BOGGS LLP
8484 Westpark Dr.
McLean VA 22102
(703) 744-8005
(703) 744-8006 (Fax)
rkoehler@pattonboggs.com
Attorney of Record for
Forest City Military Communities, LLC

Of Counsel:
Michael J. Schaengold
Jennifer S. Zucker

Date: August 14, 2007



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

**CERTIFICATE OF FILING**

I hereby certify that on August 14, 2007, a copy of the foregoing Reply in Support of Forest City's Motion for Judgment on the Administrative Record, and its Opposition to Defendant's and Defendant-Intervenor's Cross-Motion for Judgment on the Administrative Record was filed electronically. The Court will notify the Parties of the electronic filing, and they may access this filing through the Court's system.

/s/
Robert H. Koehler



PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER