# In the United States Court of Federal Claims

No. 07-546 C
(E-Filed under seal: October 31, 2007)[1]
(E-filed for publication: November 19, 2007)

| | |
|---|---|
| FOREST CITY MILITARY COMMUNITIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>GMH/CENTEX MILITARY COMMUNITIES,<br><br>Defendant-Intervenor. | Post-Award Bid Protest; Cross-Motions for Judgment on the Administrative Record; RCFC 52.1; Best Value Selection of Phase 1 Community Development and Management Awardee for Privatization of Military Family Housing at West Point; Military Housing Privatization Initiative, 10 U.S.C. §§ 2871-2885 |

Robert H. Koehler, McLean, VA, for plaintiff. Michael J. Schaengold and Jennifer S. Zucker, McLean, VA, of counsel.

Timothy McIlmail, with whom were Peter D. Keisler, Assistant Attorney General, Jeanne E. Davidson, Director, Harold D. Lester, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. Matthew R. Keiser, Assistant Counsel for Procurement, U.S. Army Corps of Engineers, Washington, DC, of counsel.

[1]When this Opinion was e-filed under seal on October 31, 2007, the court afforded the opportunity to "any party [who] believes that this Opinion contains protected material that should be redacted before publication," to request, by motion, that such protected material be redacted. Both plaintiff and defendant-intervenor requested redactions, to which the court, after considering the reasons for the requests, agrees. This opinion is therefore published with the requested redactions (indicated by [xxx]) and with minor revisions to correct scrivener's errors.

E. Sanderson Hoe, Washington, DC, for defendant-intervenor. Jennifer M. Morrison, Washington, DC, of counsel.

OPINION

HEWITT, Judge

This is a bid protest brought by Forest City Military Communities, LLC (Forest City or FCMC), an unsuccessful offeror in a procurement by the United States, acting through the Department of the Army (government or defendant or the Army), of military housing and related amenities at the United States Military Academy, West Point, New York (West Point). Plaintiff's Complaint for Declaratory and Injunctive Relief (Pl.'s Compl.) ¶ 1. GMH/Centex Military Communities, the successful offeror, joined the case as defendant-intervenor. Consent Motion for Leave to Intervene, filed July 23, 2007; Order of July 23, 2007 (granting the Consent Motion for Leave to Intervene). Briefing (described in note 2 below) followed.[2]

---

[2]During a telephonic status conference (TSC) with the parties on July 20, 2007, the parties agreed that plaintiff's Motion for a Preliminary Injunction (plaintiff's Motion or Pl.'s Mot.) would serve as its motion for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC). TSC July 20, 2007 Transcript (TSC July 20, 2007 Tr.) 9:22 - 10:2. During the August 3, 2007 status conference, plaintiff again confirmed that its Motion will serve as its motion for judgment on the administrative record. TSC Aug. 3, 2007 Tr. 15:10-18. Defendant stated that it would respond to both plaintiff's Complaint and plaintiff's Motion, but it would regard plaintiff's Motion, as a motion for judgment on the administrative record. TSC Aug. 3, 2007 Tr. 17:6-15.

Defendant filed the Administrative Record (AR) on July 27, 2007. Plaintiff, anticipating that it would find lacunae in the AR, filed Forest City's Motion to Supplement the Administrative Record (Motion to Supplement) on July 25, 2007. Defendant filed its Opposition to Forest City's Motion to Supplement the Administrative Record on July 30, 2007, and defendant-intervenor filed its Opposition to Plaintiff's Motion to Supplement the Administrative Record on August 1, 2007. The court held a TSC on August 3, 2007 to hear argument on the Motion to Supplement. During the TSC, plaintiff withdrew its Motion to Supplement. TSC Aug. 3, 2007 Tr. 4:13-15. The court issued an order finding that plaintiff's Motion to Supplement was moot. Order of Aug. 3, 2007.

Pursuant to the court's Order of August 2, 2007, plaintiff filed its RCFC 52.1 Statement of Facts (Pl.'s Facts) on August 3, 2007. On August 7, 2007, pursuant to the court's order, Order of Aug. 3, 2007, defendant filed additional materials necessary to complete the administrative record. Defendant filed its Cross-Motion for Judgment Upon the Administrative Record, and Opposition to Plaintiff's Motion for Judgment Upon the Administrative Record (defendant's

(continued...)

For the following reasons, plaintiff's Motion is DENIED and defendant's and defendant-intervenor's Motions are GRANTED.

I. Background

The Military Housing Privatization Initiative (MHPI) statute provides the military services with the ability to privatize military family housing on military installations. 10 U.S.C. §§ 2871-2885 (2000); AR 289; Pl.'s Facts ¶ 1. The Army's MHPI program is the Residential Communities Initiative (RCI) program. Pl.'s Facts ¶ 1. The Army solicited proposals from contractors interested in the Army's RCI program to privatize military family housing communities in several locations, including West Point, through Request for Qualification No. W912DR-06-R-0006 (Solicitation or RFQ) [undated]. AR 288-89. The Solicitation was apparently issued on or about December 16, 2005. AR 1638 (Letter from Contracting Officer for Department of the Army to Senior Attorney in the Procurement Law Control Group).

The RFQ provides for two phases: Phase 1 – the phase at issue in this bid protest – is project planning, which includes a $350,000 contract to develop a Community Development and Management Plan (CDMP); Phase 2 is project implementation, which would be a contract awarded to a developer to implement the CDMP. AR 299; Pl.'s Facts ¶ 2. The awardee of a Phase 1 contract does not necessarily receive a Phase 2 contract to implement the CDMP. AR 299. Phase 1 consists of two solicitation steps: Step 1 solicits from interested offerors a five-page submission addressing three Minimum Experience Requirements (MERs), id. at 304, 307; those offerors who meet the MERs then submit a Statement of Qualifications, id. at 305, 308. In Step 2, out of which this

[2](...continued)
Motion or Def.'s Mot.) and defendant-intervenor filed its Opposition to Plaintiff's Motion for Judgment on the Administrative Record and Request for Permanent Injunction and Defendant-Intervenor's Cross-Motion for Judgment on the Administrative Record (defendant-intervenor's Motion or Def.-Int.'s Mot.) on August 7, 2007. On August 14, 2007, plaintiff filed Forest City's Reply in Support of Its Motion for Judgment on the Administrative Record and Opposition to Defendant's Cross-Motion for Judgment on the Administrative Record and Opposition to Defendant-Intervenor's Cross-Motion for Judgment on the Administrative Record, (plaintiff's Reply or Pl.'s Reply). On August 24, 2007, defendant filed its Reply to Plaintiff's Opposition to Defendant's Cross-Motion for Judgment Upon the Administrative Record (defendant's Reply or Def.'s Reply) and defendant-intervenor filed its Reply in Support of Its Cross Motion for Judgment on the Administrative Record (defendant-intervenor's Reply or Def.-Int.'s Reply).

dispute arises, eligible offerors submit a project proposal.[3] Id. at 314. The Step 2 proposals are evaluated by the individual members of a Source Selection Evaluation Board (SSEB). Id. at 318. The SSEB that evaluated the West Point proposals was comprised of five members, including a Chairperson and Deputy Chairperson. Id. at 89. The Step 2 evaluation criteria comprise the following four factors: 1) Project Finance[4]; 2) Preliminary Project Concept Statement; 3) Organizational Capabilities, and 4) Small Business Utilization Plan. Id. at 314, 320, 327-29. Each of these factors includes a series of subfactor questions used by the evaluators to rate the four factors for each proposal. Id. at 327-29.

This dispute centers on the Project Finance factor, Pl.'s Mot. 17-28, in particular, an amendment to Project Finance subfactor five to add the underlined text:

> Does the offeror demonstrate an understanding of the opportunities for and limitations on the revenue and expense associated with the project? To what degree is the offeror guaranteeing scope and price? Does the financial plan support the long-term maintenance of the project?

AR 138 (RFQ Amendment No. 7, Sept. 22, 2006) (emphasis added). Plaintiff argues that its so-called scope guarantee offered in response to Amendment No. 7 was not properly evaluated because, among other reasons, defendant failed to appreciate the value of the

---

[3]On April 14, 2006, based on the Step 1 submissions, the Army announced that ten contractors, including Forest City, were invited to participate in the Step 2 process. Pl.'s Facts ¶ 23. Forest City submitted its proposal to the SSEB on December 7, 2006. Id. at ¶ 25. Four other offerors also submitted proposals for the West Point Residential Communities Initiative (RCI) project. Id. at ¶ 23. Initially, the Request for Qualifications (RFQ) for the West Point RCI project included 964 family housing units. AR 147 (Amendment No. 7 to RFQ) ("West Point proposes to convey an inventory of 964 family housing units and lease the land on which the existing units are located and possibly include additional lands for replacement construction to a non-Department of Defense entity."). On January 4, 2007, the Army amended the RFQ and reduced the number to 628 family housing units. Id. at 241 (Amendment No. 14) ("The project will consist of 628 units . . . ."). Offerors were then allowed an opportunity to resubmit their Step 2 proposals. Id. at 241. Forest City submitted its revised proposal to the Army on January 26, 2007. Pl.'s Facts ¶ 27.

[4]The West Point RFQ alternately refers to the finance evaluation factor of the Phase 1 Step 2 process as "Project Finance" and "Financial Plan." AR 314, 320, 327. The court uses the term "Project Finance" when referring to this evaluation factor.

guarantee in its evaluation of plaintiff's proposed vertical cost of construction.[5] Pl.'s Mot. 17-23. Plaintiff's complaint also focuses on the Preliminary Project Concept Statement evaluation factor. Plaintiff argues that GMH's overall rating for the Preliminary Project Concept Statement factor should have been downgraded because GMH proposed to perform no work on [xxx] units (the "no work" units) until the [xxx] year of the project. Id. at 25-26.

In addition to the four evaluation factors, the RFQ also provides that "[t]he assessment of Past Performance will be used in making the 'Best Value' selection." AR 320. The RFQ states that, for Step 2, Past Performance may be considered under the Organization Capabilities factor. Id. at 317-18 (instructing offerors that "for the gathering of past performance information (Appendix K), provide the names and contact information . . . for, at minimum, the Government project manager for all MHPI type projects for all military services that offeror is currently involved in even if offeror is not the lead on that project"). The RFQ states that the evaluation team will use a "Past Performance Questionnaire (Appendix K) . . . to obtain customer input on other MHPI projects and this information will be consolidated into an overall Past Performance rating. The Evaluation Team may consider information about other projects performed by offerors and identified through any and all means, including but not limited to customer surveys and comments from Government agencies." Id. at 321.

The RFQ sets out an adjectival rating system, which includes the following ratings: exceptional plus, exceptional, exceptional minus, acceptable plus, acceptable, acceptable minus, unacceptable, and neutral. Id. at 321-22. The RFQ requires the evaluators to use this rating system for the four individual evaluation factors and, excluding the option for a "neutral" rating, for an overall evaluation of the offeror's submission. Id. The evaluators also assess the risk level of selecting each offerors' overall proposal, rating the risk low, moderate, or high. Id. at 323.

After the five SSEB members conclude their individual evaluations of each proposal, the chair of the SSEB prepares a consensus report based on the details of the individual evaluations. Id. The SSEB, through the Contracting Officer, then presents its consensus evaluation of each proposal to the Source Selection Advisory Committee (SSAC). Id. at 320. The SSAC, composed of three voting members and one non-voting advisor, a consultant from Jones Lang LaSalle, Pl.'s Facts ¶ 19, then makes "a

[5]The court was advised by counsel at oral argument that the "cost of vertical construction" refers to construction costs incurred "from the slab, [or] the vertical cost upward[,]" and does not include the cost of landscaping and site preparation. Oral Argument Transcript Aug. 27, 2007 (Oral Arg. Tr.) 25:3-7.

comparative assessment of the proposals against all source selection criteria in the solicitation," AR 323. The SSAC then "brief[s] . . . the [Source Selection Authority (SSA)] who will make the final analysis resulting in a recommendation to award." Id.

The SSAC consensus evaluation rated Forest City's proposal overall as "exceptional minus." AR 1032. Forest City received a rating of "exceptional" for the evaluations factors of Organizational Capability and Small Business Utilization Plan. AR 1047, 1052. For the Project Finance and Preliminary Project Concept Statement evaluation factors, Forest City received a rating of "exceptional minus." AR 1034, 1041. GMH received an overall rating of "exceptional" on its SSAC consensus evaluation, with "exceptional" ratings on the Project Finance, Preliminary Project Concept Statement, and Organizational Capabilities factors and "exceptional plus" on the Small Business Utilization Plan factor. AR 1327, 1329, 1336, 1477.

In its consensus evaluation of Forest City's proposal as to the Project Finance evaluation factor, the SSAC Report to the Source Selection Authority (SSAC report) noted, "Unfortunately, [Forest City]'s proposal . . . assumes a very low cost of vertical construction of about [xxx] per square foot in comparison to the Army benchmark and they did not sufficiently demonstrate that this cost could actually be achieved." AR 1481. The SSAC report also noted, "While some major points of [Forest City]'s financial proposal were attractive, there were several minor weaknesses." Id. On March 8, 2007, by letter, the Army informed Forest City that it was not selected for the Phase 1 contract award "because [Forest City's] submission did not provide the 'best value' to the Army when evaluated against the factors contained in the RFQ." Id. at 1504. GMH was selected for award of the Phase 1 contract. Id. at 1489. On March 19, 2007, the Army held a debriefing for Forest City of its proposal and evaluation ratings. Id. at 1503.

Forest City protested the award to GAO on March 26, 2007. Id. at 1531. On June 29, 2007, GAO dismissed Forest City's protest as untimely in part, and denied it in part. Id. at 2190.

Plaintiff filed its Complaint, its Request for a Protective Order, and its Motion for a Preliminary Injunction on July 19, 2007 and briefing followed. See supra note 2. The court held oral argument on the parties' motions on August 27, 2007. See Oral Argument Transcript, Aug. 27, 2007 (Oral Arg. Tr.). For the following reasons, plaintiff's Motion for Preliminary Injunction is DENIED, defendant's Motion is GRANTED, and defendant-intervenor's Motion is GRANTED.

## II. Discussion

A. Bid Protest Standard of Review

The Tucker Act, as amended by the Administrative Disputes Resolution Act (ADRA), 28 U.S.C. § 1491(b) (2000), confers jurisdiction on this court

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1).

The court reviews a bid protest action under the standards set forth in the Administrative Procedure Act (APA), 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4); NVT Techs., Inc. v. United States (NVT Techs.), 370 F.3d 1153, 1159 (Fed. Cir. 2004). The APA provides that an agency's decision is to be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir. 2004); Impresa Construzioni Geom. Domenico Garufi v. United States (Impresa), 238 F.3d 1324, 1332 (Fed. Cir. 2001); Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057 (Fed. Cir. 2000). "[T]he court implements this APA standard by applying the standard as previously interpreted by the district court[] in [Scanwell Labs., Inc. v. Shaffer (Scanwell), 424 F.2d 859 (D.C. Cir. 1970)]."[6] Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004).

The Federal Circuit has stated that, under the APA standard applied in Scanwell, and now under the ADRA, "'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" Id. (quoting Impresa, 238 F.3d at 1332). When challenging a procurement on the ground of a regulatory violation, the protester "'must show a clear and prejudicial violation of [the] applicable statutes or regulations.'" Id. (quoting Impresa, 238 F.3d at 1333). The protester must also "show that there was a 'substantial chance' [that] it would have received the contract award absent the alleged error." Id. (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001)).

---

[6]In Scanwell, the circuit court upheld the district court's review of government procurement decisions under the APA. See Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859, 874-75 (D.C. Cir. 1970).

As a general rule, when considering motions for judgment on the administrative record within the context of a bid protest proceeding, the court focuses its review on "'the administrative record already in existence.'" Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States, 56 Fed. Cl. 502, 508 (2003) (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973) (per curiam)). The force of the general rule that the court focuses its review on the administrative record already in existence has been strengthened both by changes in the Rules of the Court of Federal Claims (RCFC) and related Federal Circuit precedent. Effective June 20, 2006, the court adopted RCFC 52.1 to govern the filing and other aspects of proceedings to review the administrative record. See RCFC 52.1. The Rules Committee explained the rationale for RCFC 52.1 as follows:

> The rule replaces an earlier rule, RCFC 56.1, that applied certain standards borrowed from the procedure for summary judgment to review of an agency decision on the basis of an administrative record. That incorporation proved to be confusing in practice because only a portion of the summary judgment standards were borrowed. Summary judgment standards are not pertinent to judicial review upon an administrative record. See Bannum, Inc. v. United States [(Bannum)], 404 F.3d 1346, 1355-57 (Fed. Cir. 2005). Specifically, the now repealed Rule 56.1 did not adopt the overall standard that summary judgment might be appropriate where there were no genuine issues of material fact. See RCFC 56(c). Nonetheless, despite this omission, parties, in moving for judgment on the administrative record under the prior rule, frequently would contest whether the administrative record showed the existence of a genuine dispute of material fact. To avoid this confusion, the new rule omits any reference to summary judgment or to the standards applicable to summary judgment.
>
> . . . .
>
> The standards and criteria governing the court's review of agency decisions vary depending upon the specific law to be applied in particular cases. The rule does not address those standards or criteria.

RCFC 52.1 (Rules Committee Note).

As the Rules Committee Note states, RCFC 52.1 responded in part to the Federal Circuit's 2005 Bannum decision, where that court explained that RCFC 56.1, the predecessor rule, had in fact contemplated "trial on a paper record allowing fact-finding by the trial court." Bannum, 404 F.3d at 1356. The Federal Circuit found that, in the context of a bid protest action, "judgment on an administrative record is properly

understood as intending to provide for an expedited trial on the record." Id. The Bannum court found support for its conclusion in the text of the Administrative Disputes Resolution Act (ADRA), 28 U.S.C. § 1491(b):

> The statute conferring the Court of Federal Claims's jurisdiction over bid protests expressly requires the trial court to give 'due regard' to 'the need for expeditious resolution of the action.' 28 U.S.C. § 1491(b)(3). Proceeding under RCFC 56.1 merely restricts the evidence to the agency record, as may be supplemented consistent with RCFC 56(a) or (b).[7]

Id. (footnote added).

If the protester fails to demonstrate that a procurement statute, regulation, or procedure has been violated in a manner prejudicial to the protester, the court's review of the award decision focuses on whether the decision was arbitrary, capricious, or an abuse of discretion. United Enter. & Assocs. v. United States, 70 Fed. Cl. 1, 16 (2006); see also 5 U.S.C. § 706(2)(A). Under the arbitrary or capricious standard of review, the court must sustain an agency's award if it has a rational basis. Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto Ins. Co. (Motor Vehicle Mfrs.), 463 U.S. 29, 43 (1983). "The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, 216 F.3d at 1058. In particular, the reviewing court may not substitute its judgment for that of the agency. Citizens to Preserve Overton Park, Inc. v. Volpe (Overton Park), 401 U.S. 402, 416-20 (1971), abrogated in part by Califano v. Sanders, 430 U.S. 99, 105 (1977) (abrogating Overton Park by recognizing that the Administrative Procedure Act is an independent grant of subject matter jurisdiction). Moreover, the court affords particular deference to the agency in its source selection process of a best value procurement. Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); Tidewater Mgmt. Servs., Inc. v. United States, 573 F.2d 65, 73 (Ct. Cl. 1978).

B. Standing

Standing to bring a protest as an "interested party" under the ADRA is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Am. Fed'n of Gov't Employees v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001). The Federal

---

[7]The text of superseded RCFC 56.1 permitted supplementation only "by stipulation or by court order." RCFC 56.1(a) (abrogated June 20, 2006).

Circuit has further defined "interested party" as a party having "greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest." Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003). "The term 'interested parties' excludes those who did not submit proposals, bidders who withdrew from a solicitation, and offerors who were not competitively ranked for award." Microdyne Outsourcing, Inc. v. United States, 72 Fed. Cl. 230, 232 (2006) (citing Impresa, 238 F.3d at 1334).

Forest City's proposal was ranked second to the GMH proposal that the Army selected for award. AR 1529. The court therefore determines that Forest City is a protester whose direct economic interest was affected by the contract award to GMH. Accordingly, Forest City has standing to bring this action as an interested party.

C. Motions for Judgment on the Administrative Record

Plaintiff's protest focuses on the evaluation of its scope guarantee, the impact of its proposed vertical cost of construction on its evaluation rating, the evaluation of GMH's "no work" units, and the weight of past performance in GMH's evaluation. In addition, in its Reply, plaintiff argues that defendant unfairly rated its proposed home delivery schedule and proposed community center. Pl.'s Reply 21-23.

1. Evaluation of Forest City's Scope Guarantee

Plaintiff's arguments regarding the evaluation of its scope guarantee arise from defendant's amendment of the evaluation criteria for Project Finance. On September 22, 2006, by Amendment No. 7, defendant amended the "Project Finance" evaluation subfactor five to include the question: "To what degree is the offeror guaranteeing scope and price?" AR 138. Plaintiff argues that it responded to this amendment by proposing "a multifaceted approach to ensure pricing and scope completion for the RCI Project," Pl.'s Mot. 18, and by offering a "guaranteed maximum price" of [xxx] million that would cover the construction of [xxx] new homes as well as renovations and other relevant costs, id. at 19. Plaintiff makes two arguments regarding the alleged failure of defendant properly to evaluate plaintiff's "scope guarantee": 1) defendant failed to evaluate and meaningfully consider plaintiff's scope guarantee in accordance with Project Finance evaluation criteria, and 2) defendant's failure to evaluate plaintiff's scope guarantee distorted evaluations in favor of GMH. Id. at 17, 21.

Plaintiff argues that "the Army's assessment of Forest City's Project Finance Element 5 was improper, unreasonable, and contrary to the evaluation criteria stated in the RFQ." Id. at 17 (emphasis omitted); see also Pl.'s Reply 33. Plaintiff argues that one

of the reasons the Army's evaluation is "improper, unreasonable, and contrary to the evaluation criteria stated in the RFQ" is that the use of an incorrect form distorted the consensus evaluations of plaintiff's proposal. Pl.'s Mot. 19; Pl.'s Reply 33.

The incorrect form does not include the language, "To what degree is the offeror guaranteeing scope and price?" added by Amendment No. 7 to the RFQ. See AR 138. Plaintiff does not argue that its guarantee was not evaluated at all because of the use of an incorrect form; rather, plaintiff argues that use of an incorrect form resulted in an improper recommendation by the SSEB to the SSAC and, through the SSAC, to the SSA. Pl.'s Reply 34-37. Plaintiff argues that "not only did the members of the SSEB evaluate the Forest City financial guarantee, but they universally found it a '[s]trength' of Forest City's proposal." Id. at 33. Plaintiff contends that "the SSEB as a Board failed to even mention Forest City's financial guarantee, much less conduct the required comprehensive evaluation and consideration of Project Finance Factor-5, in arriving at its consensus rating for Forest City." Id. at 33-34 (second emphasis omitted). Plaintiff further argues that the SSAC's comments are "evidence that: (i) the SSAC looked no further than the brief statement Forest City made in the 'Finance' section of the proposal, and (ii) the SSAC totally ignored the detailed discussion Forest City provided for its 'Scope Guarantee' in the Preliminary Project [Concept Statement] section of its proposal." Id. at 34-35 (emphasis and citations omitted). Plaintiff contends that the SSAC's "off-handed comment" regarding Forest City's guarantee "is impossible to reconcile [with] the detailed comments of the SSEB members," id. at 35, and that "the SSAC totally failed to comprehensively consider Forest City's financial guarantee in assessing the 'Project Finance' [e]valuation [f]actor," id.

Defendant argues that the Army did in fact "assess[] the value of [Forest City's] guarantee." Def. Mot. 10. Defendant argues that "(1) the Army's [SSA] adopted the reasoning of [the SSAC] [AR 1491]; (2) the SSAC expressly assessed Forest City's guarantee [AR 1039]; and (3) each of the [SSEB] evaluators expressly assessed that guarantee [AR 1169, 1186, 1210, 1278, 1306]." Def.'s Reply 2-3 (footnotes omitted). Defendant argues that the SSA's and the SSAC's assessment of Forest City's guarantee "demonstrates that the SSAC did not assign to the guarantee the value that Forest City might have preferred, and did not view the guarantee as the cure for Forest City's low vertical cost." Id. at 4. Defendant also argues that the SSAC's comments "establish[] that the Army considered Forest City's guarantee, even though the consensus of the SSEB and the consensus of the SSAC were recorded on forms that did not include the questions regarding scope and price guarantee." Def.'s Mot. 11. Defendant argues that "[w]hat the SSA made of [Forest City's] guarantee . . . is the type of discretionary rating determination that should not be second guessed." Id. at 12 (citing T&S Prods., Inc. v. United States, 48 Fed. Cl. 100, 104 (2000)).

The Project Finance subfactor questions (with the question about the guarantee of scope and price added by Amendment No. 7 underlined) are as follows:

> 1) Does the offeror's proposed approach to generating a financial return provide incentives to reward good service and high-quality maintenance over the life of the project?
> 2) Does the offeror demonstrate an understanding of the MHPI authorities? . . .
> 3) Does the offeror outline a plan for securing the most efficient debt [lowest cost debt at the most flexible terms], through a competitive process? . . .
> 4) Does the offeror's pro forma financial model accurately reflect the project concept and financial plan outlined in the proposal? . . .
> 5) Does the offeror demonstrate an understanding of the opportunities for and limitations on the revenue and expense associated with the project? To what degree is the offeror guaranteeing scope and price? Does the financial plan support the long-term maintenance of the project?
> 6) Does the offeror identify appropriate amounts of equity, detail sources, and outline a plan for limiting its return on equity?

AR 327 (West Point RFQ); see also id. at 138 (RFQ Amendment No. 7, Sept. 22, 2006) (emphasis added).

Forest City's proposal is separated into four sections that correspond with the four evaluation factors: Project Finance, Preliminary Project Concept Statement, Organizational Capabilities, and Small Business Utilization Plan. AR Tabs 25, 26, 27, 28. Within the Project Finance section of Forest City's proposal, Forest City organizes its proposal according to the six Project Finance evaluation subfactors. AR Tab 25. Forest City submitted its revised proposal on January 26, 2007. Pl.'s Facts ¶ 27. Under Project Finance subfactor five, Forest City's proposal opens with three paragraphs which include the word "guarantee" only in connection with the purchase of insurance. AR 491. Forest City's proposal states that it is [xxx]. Id. Forest City continues in its subfactor five discussion to describe: 1) how it will satisfy the Army's Portfolio and Asset Management program reporting requirements, id. at 492; 2) its out-year development plan, id. at 492-93; 3) how its proposal will provide both successful financial returns and quality service and management, id., at 493-94; and 4) its reserves for Capital Repair and Replacement and its proposed expenditures for repair and maintenance, id. at 494.

Notably, however, nowhere under the Project Finance subfactor five section of its proposal does Forest City mention its financial guarantee of price and scope. See id. at 491-94.

Forest City's scope guarantee makes a brief appearance under Project Finance subfactor one (which seeks information on incentives for high performance): "As a way to contractually transfer scope cost and schedule risk from the to-be-formed RCI Partnership, FCMC proposes executing the construction scope through a Guaranteed Maximum Price (GMP) Design-Build contract. This is further detailed in the 'Scope Guarantee' section of the Preliminary Project Concept Statement."[8] Id. at 476 (emphasis omitted).

Inexplicably, given that Amendment No. 7 to the RFQ located the scope guarantee issue in subfactor five of the Project Finance factor, Forest City offers a description of its scope guarantee in the Preliminary Project Concept Statement section of its proposal:

> FCMC is proposing a multifaceted approach to ensure pricing and scope completion for the RCI Project. The key components of this structure are:

---

[8]The paragraph titled "construction savings" in which this reference to the "scope guarantee" appears continues as follows:

> The Design-Build entity will be placed under contract with the RCI LLC at closing at an amount based on the Design-Builder's subcontractors' construction cost estimates at that time. To the extent actual costs (including general conditions) are less than this amount, Forest City proposes to split these savings [xxx] to the Army's reinvestment account and [xxx] to the Design-Builder.
>
> FCMC has had considerable success in estimating and budgeting on its two previous MHPI projects and does not believe that significant deviation from the budget would be likely post closing. We intend to buy out those key subcontracts simultaneously with the execution of the Design-Build contract which will assign the risk associated with the volatility of cost fluctuations to those subcontractors. To the extent that the actual cost is greater than the budgeted amount for reasons within FCMC's control, Forest City Enterprises (FCMC's corporate parent) will make up the difference without recourse to the project with the caveat that the Design-Builder will not take responsibility for issues outside of its control including latent and undisclosed environmental issues, failure of the owner to provide sufficient sources and force majeure events.

AR 476.

- Scope pricing will be guaranteed by contracting for phases of work using Guaranteed Maximum Price (GMP) contracts. Costs above the GMP will be borne solely by the Design-Builder subject to standard force majeure terms;
- The Design-Builder will carry payment and performance bonds sufficient to fully assure each phase;
- Forest City Enterprises, [Forest City's] parent company, will put its balance sheet behind the Design-Builder with a corporate guarantee for the performance of the Design-Builder;
- All subcontractors will be required to obtain full payment and performance bonding for their contracted amounts; and
- Forest City Enterprises commits to making up to a [xxx] [m]illion loan to the project to cover sourcing shortfalls, subject to the unanimous consent of both owners of the RCI partnership.

> This last point is important and is one of the defining features of the FCMC proposal for West Point. In any situation where an owner or developer does not have sufficient funds to pay a general contractor, the general contractor is under no obligation to complete the work. Although pricing and completion guarantees are critical, they only protect the partnership against a portion of the completion risk. To mitigate all the completion risk, Forest City will put its balance sheet on the line by making a loan to the project. This in turn will give protection to the owner against sourcing shortfalls which would leave the RCI project with insufficient funds to cover the Design-Builder's draw requirements. The most likely cause of a sourcing shortfall is less cash flow than projected, caused by lower occupancy, higher expenses, or a lower [Basic Allowance for Housing (BAH)] than modeled in the pro forma. The aforementioned loan would be repaid by a preferred return senior to the Army's preferred return and the cash flow splits at the bottom of the waterfall.

Id. at 526. Plaintiff also includes a chart that indicates that its GMP is [xxx]. Id. at 528 (chart providing a breakdown of expenses in the categories of Residential Construction ([xxx] of GMP), Facilities/Amenities ([xxx] of GMP), D/B Miscellaneous ([xxx] of GMP), and General ([xxx] of GMP)).

Even though plaintiff's proposal provides the most detail regarding its price and scope guarantee in the Preliminary Project Concept Statement section of its proposal and only a brief mention of its guarantee in the Project Finance section, id. at 476, 526, plaintiff insists that its scope and price guarantee was not properly evaluated because the

Army used the incorrect Project Finance subfactor five form in its evaluation, Compl. ¶ 81. A review of the government's evaluations of Forest City's proposal demonstrates that Forest City's guarantee was evaluated, despite the government having used the incorrect Project Finance form and despite plaintiff having placed its fullest description of its scope guarantee in the Project Concept section of its proposal.

Five individual SSEB evaluators considered Forest City's proposal (Arbogast, Barr, Williams, Bobby, and Zedalis). AR 1086-1324. The administrative record contains two sets of SSEB individual evaluation forms from each of the five evaluators, one set of forms dated in late 2006 and the other set dated early 2007. Id. As contemplated by Amendment No. 14 to the RFQ (reducing the number of units in the project), id. at 241, Forest City amended its proposal and resubmitted it on January 26, 2007 to adjust for the change in total units of the project, Pl.'s Facts ¶27. The court assumes that Amendment No. 14 is the reason that the SSEB conducted a second evaluation. However, the court cannot discern from the administrative record whether both sets of individual evaluations were used to create the SSEB consensus report. Therefore, the court reviewed both sets of the individual SSEB evaluations.[9]

SSEB Member Arbogast's evaluation noted Forest City's guaranteed maximum price contract as a strength under the Preliminary Project Concept factor, rather than under the Project Finance Factor. AR 1093, 1097. Arbogast's SSEB individual evaluation, dated December 19, 2006, used the correct form, id. at 1093, and rated Forest City on the factors of Preliminary Project Concept Statement, Organizational Capabilities, and Small Business Utilization, id. at 1096-1110. Under the Preliminary Project Concept Statement factor, subfactor question two, Arbogast noted, as a strength, that "[Forest City] provides guaranteed maximum price (GMP) contracts for scope of project and commits to paying costs above that GMP." Id. at 1097 (emphasis added). Arbogast does not indicate an overall rating or a rating for the Preliminary Project Concept Statement factor for Forest City's proposal. Id. at 1086, 1095. Arbogast's December 2006 evaluation contains no

---

[9]The evaluation forms used by the SSEB individual members and used for the SSEB consensus and SSAC consensus reports include a summary page which provides space for the evaluators to list overall major strengths and weaknesses in each of the evaluation factors. AR 1032-55, 1057-1324. The evaluation forms also include separate forms for each evaluation factor and subfactor. Id. Each evaluation factor has a form with space for the evaluators to summarize the "major strengths" and "major weaknesses" for the evaluation factor overall. Id. Additionally, each evaluation subfactor has its own form that includes space for the evaluators to list "major strengths" and "major weaknesses." Id. Neither the SSEB nor the SSAC consensus evaluation form contained Project Finance subfactor five revised to conform to RFQ Amendment No. 7 adding the scope guarantee language. Id. at 1032-55, 1057-85.

ratings under the Project Finance factor or subfactor questions, id. at 1086-94. Arbogast's February 5, 2007 SSEB individual evaluation used the correct form, id. at 1206, and includes an overall summary, but no ratings under any of the Project Finance subfactor questions, id. at 1202-07. Arbogast's February 2007 evaluation includes, in its Preliminary Project Concept Statement evaluation, the same sentence regarding Forest City's guarantee that appeared on the December 2006 evaluation. Id. at 1210. Arbogast rated Forest City's proposal overall as "exceptional." Id. at 1202.

Both of SSEB Member Barr's evaluations, dated December 19, 2006 and January 27, 2007, are on the correct forms. Id. at 1119-20, 1186. Barr evaluated Forest City's guarantee under Project Finance subfactor five but noted that the details of the guarantee were located in the Preliminary Project Concept section of Forest City's proposal. Id. at 1120, 1186. Barr's December 2006 evaluation noted both strengths and weaknesses regarding Forest City's guarantee. Id. at 1186. In particular, Barr's December 2006 evaluation noted the following as Forest City's strengths in Project Finance (all of the points being imported from the Preliminary Project Concept section of Forest City's proposal):

- FCMC proposes a multifaceted approach to ensure pricing and scope completion for the RCI Project. [Forest City] documents that scope pricing will be guaranteed by contracting phases of work using [GMP] contracts. Costs above the GMP will be borne solely by the Design Builder subject to standard force majeure terms (Project Concept; p.28).
- FCMC documents that the Design/Builder will carry payment and performance bonds sufficient to fully assure each phase (Project Concept; p.28). FCMC includes bonding letter in their appendix.
- Forest City Enterprises, [Forest City's] parent company, will put its balance sheet behind the Design/Builder with a corporate guarantee for the performance of the Design Builder (Project Concept; p.28).
- FCMC documents that all subcontractors will be required to obtain full payment and performance bonding for their contracted amounts (Project Concept; p.28).

AR 1186. Again drawing on the Preliminary Project Concept section for the Project Finance evaluation, Barr noted the following weaknesses for Project Finance subfactor five:

- Forest [C]ity Enterprises commits to making up to a [xxx] million loan to the project to cover sourcing shortfalls, subject to a unanimous

consent of both owners of the RCI partnerships (Project Concept, p.28). [Forest City] states [xxx] (Project Concept; p.29).
- Escalation Costs pro forma development budget?
- What are their general condition expenses, both for construction and developer?
- DSR surety [xxx]?

AR 1186. Barr rated Forest City's proposal as "exceptional" for the Project Finance factor. Id. at 1182. Barr's December 2006 evaluation does not indicate an overall rating for Forest City's proposal. Id. at 1180. Barr's January 2007 proposal evaluation also imported information from the Project Concept section of Forest City's proposal in identifying strengths relating to the scope guarantee under Project Finance subfactor five:

- FCMC documents that they will be able to deliver lower than market pricing for renter's insurance and builder's risk, due to the fact that they own their insurer. FCMC is also able to guarantee the availability of insurance every year as opposed to purchasing it in the open market annually (Financial; 20).

. . . .

- FCMC's financial plan provides for a corporate guarantee, backed by an $8 billion balance sheet, to ensure completion of the project (Financial; 26).
- FCMC proposes a multifaceted approach to ensure pricing and scope completion for the RCI Project. FCMC documents that scope pricing will be guaranteed by contracting phases of work using [GMP] contracts. Costs above the GMP will be borne solely by the Design Builder subject to standard force majeure terms (Project Concept; p.29).
- FCMC documents that the Design/Builder will carry payment and performance bonds sufficient to fully assure each phase (Project Concept; p.29). FCMC includes bonding letter in their appendix.
- Forest City Enterprises, FCMC's parent company, will put its balance sheet behind the Design/Builder with a corporate guarantee for the performance of the Design Builder (Project Concept; p.29).
- FCMC documents that all subcontractors will be required to obtain full payment and performance bonding for their contracted amounts (Project Concept; p.29).

AR 1119-20. Barr listed no weaknesses on the January 2007 Project Finance subfactor five form. Id. Barr rated Forest City's proposal as "exceptional" for the Project Finance factor, id. at 1115, and as "exceptional" overall, id. at 1112.

SSEB Member Williams completed three SSEB individual evaluation forms on August 17, 2006,[10] id. at 1138-58, on December 21, 2006, id. at 1220-44, and on January 30, 2007, id. at 1270-98. The December 2006 and January 2007 evaluations were on the correct form. Id. at 1227, 1278. In the December 2006 evaluation, Williams noted the scope guarantee as among the strengths of Forest City's proposal:

> FCMC proposes executing the construction scope through a [GMP] Design-Build contract. FCMC guarantees that if the cost of the project identified in the GMP exceeds expectations, the corporate offices will make up the difference in cost if the event was caused by instances under the control of FCMC (p. 5 of 27 FP).
>
> . . . .
>
> FCMC states that it will provide scope protection through the use of payment and performance bonds, a corporate completion guarantee, and the ability to obtain up to [xxx] million in loans in the event of shortfalls in the financial status of the project during the IDP (orals).

AR 1227. Williams noted no weaknesses for subfactor five of Project Finance on the December 2006 form and rated Forest City's proposal as "exceptional" for the Project Finance factor. Id. at 1222, 1227. Williams' December 2006 form for Forest City's proposal does not include an overall rating. Id. at 1220. In the January 2007 evaluation form Williams evaluated both the Project Finance and Preliminary Project Concept sections in Forest City's proposal that discuss the guarantee. Williams noted strengths related to the scope guarantee on the January 2007 evaluation:

> FCMC proposes executing the construction scope through a [GMP] Design-Build contract. FCMC guarantees that if the cost of the project identified in the GMP exceeds expectations, the corporate offices will make up the difference in cost if the event was caused by instances under the control of FCMC (p. 5 of 26 FP).

---

[10]Because plaintiff's arguments regarding the evaluation of its guarantee stem from the amendment of the Project Finance subfactor five form on September 22, 2006, the court does not address the comments in William's evaluation dated August 17, 2006.

> . . . .
>
> FCMC states that it will provide scope protection through the use of payment and performance bonds, a corporate completion guarantee, and the ability to obtain up to [xxx] million in loans in the event of shortfalls in the financial status of the project during the IDP (p. 29 of 39 PPC).

AR 1278. Williams noted the following weaknesses on the January 2007 form:

> Offeror indicates in the proposal that new units will be on line in month [xxx] of the project. The majority of the new homes will not be delivered until the [xxx] year of the project. Value would be added by aggressively providing new homes for the families as soon as possible. The offeror's statement of delivery of these homes is optimistic and overly aggressive when documenting that those new homes will be available within [xxx] of project start. (pro forma) The offeror does not clearly designate in the phasing plan when the renovated homes will be ready for occupancy. The first home is scheduled for turnover in [xxx] but the completion process is multi-year and deliberate based on the phasing schedule provided by the offeror (project schedule).

Id. at 1278-79. Williams rated Forest City's proposal as "exceptional minus" for the Project Finance factor. Id. at 1272. Williams' January 2007 form does not provide an overall rating for Forest City's proposal. Id. at 1270.

SSEB Member Bobby's evaluations are both on the correct forms. Id. at 1252, 1306-07. Both of Bobby's evaluations evaluated Forest City's guarantee as a strength under Project Finance subfactor five and referenced both the Project Finance and Preliminary Project Concept sections of Forest City's proposal as sources. Id. Bobby completed the first SSEB individual evaluation on December 13, 2006, noting strengths for Project Finance subfactor five based on scope guarantee information provided in the Preliminary Project Concept section:

> FCMC propose[s] a multifaceted approach to ensure price and scope completing for the RCI project. Scope pricing will be guarantee[d] by contracting for phases of work using [GMP] contracts. Costs above the GMP will be borne solely by the Design-Builder subject to standard force majeure terms. 4.6.7 Project Concept [p.] 28, Orals

> Design-Builder will carry payment and performance bonds sufficient to fully assure each phase of the project. 4.6.7 Project Concept [p.] 28, Orals
>
> FCMC's proposal provides for a corporate guarantee to ensure completion of project. 4.6.6 Financial Plan [p.] 27, Orals

AR 1252. Bobby did not note any weaknesses for Project Finance subfactor five. Id. Bobby did not provide a proposal rating for the Project Finance factor generally, id. at 1247, nor an overall rating of Forest City's proposal, id. at 1245. In the February 6, 2007, SSEB individual evaluation, Bobby also noted the scope guarantee as a strength:

> FCMC proposes a multifaceted approach to ensure pricing and scope completion for the RCI project.
>
> - Guaranteed Maximum Price Contract (GMP) – costs above the GMP will be borne solely by the Design-Builder subject to standard force majeure terms
> - Design-Builder will carry payment and performance bonds sufficient to fully assure each phase
> - FCE will put its balance sheet behind the Design-Builder with a corporate guarantee for the performance of all Design-Builder
> - All subcontractors will be required to obtain full payment and performance bonding for their contracted amounts
> - FCE commits to making up to a [xxx]M loan to the project to cover sourcing shortfalls, subject to the unanimous consent of both owners of the RCI partnership. 4.6.7 Preliminary Project Concept Statement [p.] 29

AR 1306-07. Bobby did not indicate a rating for the Project Finance factor generally, id. at 1301, nor an overall rating for Forest City's proposal, id. at 1299.

The administrative record contains only one SSEB individual evaluation by SSEB Member Zedalis, dated February 3, 2007. Id. at 1164. Zedalis's evaluation form did not include the correct Project Finance subfactor five form. Id. Zedalis did not evaluate Forest City's guarantee under the Project Finance factor. Id. Rather, Zedalis noted Forest City's guarantee as a strength under the Preliminary Project Concept Statement factor:

> - Offeror notes that work will be guaranteed using GMP . . . contracts and all subcontractors will be required to obtain full payment and performance bonding (page 29).

- Forest City Enterprises commits to making up to a [xxx] million loan to the project to cover sourcing shortfalls (loan would be repaid with a preferred return) (page 29).

AR 1169. Zedalis rated Forest City's proposal as "exceptional" for the Preliminary Project Concept Statement factor generally. Id. at 1166. Zedalis rated Forest City's proposal overall as "exceptional minus." Id. at 1159.

Notwithstanding the fact that Forest City's scope guarantee was most particularly described in the Preliminary Project Concept section of its proposal and not in Project Finance, each of the five SSEB members noted Forest City's scope guarantee. Four of the five SSEB individual evaluators used the correct version of the Project Finance subfactor five evaluation form containing the proposal question, "To what degree is the offeror guaranteeing scope and price?" Id. at 1093, 1119, 1206, 1227, 1252, 1186, 1210, 1278, 1306. All five SSEB individual evaluators found aspects of Forest City's guarantee to be a strength. Id. at 1097, 1119-20, 1169, 1186, 1227, 1252, 1278, 1306-07. In addition, one evaluator, SSEB Member Barr, noted a weakness in Forest City's guarantee regarding the $12.5 million loan from Forest City's parent company. Id. at 1186. The SSEB chairperson, SSEB Member Bobby, id. at 89, prepared the SSEB consensus evaluation based on the individual SSEB evaluations and the agreement on a consensus evaluation among the board members, id. at 323.

The SSEB consensus evaluation was on the incorrect version of the Project Finance subfactor five form. Id. at 1066. The SSEB consensus evaluation did not mention Forest City's guarantee as a strength or a weakness under either the Project Finance factor, id. at 1060-61, 1066, or under the Preliminary Project Concept Statement factor, id. at 1068-75. The SSEB consensus evaluation, dated February 11, 2007, rated Forest City's proposal overall as "exceptional." Id. at 1057. On the Overall Rating form, the SSEB consensus evaluation noted a single overall major strength for the Project Finance factor unrelated to the scope guarantee:

> Offeror adds value by documenting that the calculations for its Return On Equity (ROE) will be based on the distributable proceeds at the end of the cash waterfall, only after the Army first receives a [xxx] preferred return on the distributable cash from the project (p. 4 of 26 FP)."

AR 1057. The SSEB consensus evaluation also noted an overall major strength for Preliminary Project Concept that did not include any aspect of the scope guarantee:

> Offeror has placed a strong focus on community planning and development by allocating sufficient funds to meet the desired/proposed outcome. Offeror plans to remove unnecessary alleyways, construct screen walls and/or fences that establish private backyards and centralize trash/recycle containment. In addition, the offeror proposes the design of streetscapes to maintain cohesive tree-lined communities. Offeror's proposal adds storage facilities through the conversion of existing structures. (Drawing Package)."

Id.

The SSEB consensus evaluation rated Forest City's proposal as "exceptional minus" for the Project Finance factor generally. Id. at 1060. For Project Finance subfactor five, the SSEB consensus evaluation noted several strengths, none of which involved Forest City's scope guarantee.[11] Id. at 1066. The SSEB consensus evaluation noted as a weakness for Project Finance subfactor five that "[v]alue would be added if offeror accounted for police and fire expenses. Although there is a monthly calculation, the figure was not included in the annual cash flow assumptions. Furthermore, if calculated annually, the required amount would be below the $328 per unit stated in the RFQ (pro forma)." Id. The SSEB consensus evaluation also noted as a weakness that "[v]alue would be added if the renters' insurance and liability coverage were clear and consistent (Financial p.20, Operations, Maintenance & Property Management Plan p.12)". AR 1066. The SSEB consensus evaluation did not designate the scope guarantee as a weakness. Id.

---

[11]The Project Finance subfactor five strengths noted were:

1. Offeror adds value by documenting that the calculations for its Return On Equity (ROE) will be based on the distributable proceeds at the end of the cash waterfall, only after the Army first receives a [xxx] preferred return on the distributable cash from the project (p. 4 of 26 FP).
2. Offeror documents the funding of the Capital Repair and Replacement (CRR) account to be [xxx] per non-historical units per year, [xxx] per historical unit per year, and [xxx] for GFOQ quarters per year. Offeror also identifies the annual repair and maintenance budget per unit will be [xxx] per year. (p. 23 of 26 FP)
3. Offeror documents that they will be able to deliver lower than market pricing for renter's insurance and builder's risk, due to the fact that they own their insurer. Offeror is also able to guarantee the availability of [xxx] (Financial; 20).

AR 1066.

The SSEB consensus evaluation rated Forest City's proposal as "exceptional" for the Preliminary Project Concept Statement factor. Id. at 1068. The SSEB consensus evaluation noted seven major strengths for the Preliminary Project Concept Statement factor, none of which related to the scope guarantee. Id. The SSEB consensus evaluation noted two major weaknesses for the Preliminary Project Concept Statement factor, neither of which related to the scope guarantee. Id. at 1068-69.

The RFQ evaluation plan calls for the SSEB to present its consensus report to the SSAC through the Contracting Officer. Id. at 323. The SSAC then reviews the SSEB report and makes "a comparative assessment of proposals against all source selection criteria in the solicitation." Id. The SSEB consensus report was not the only source of information that the SSAC used to make its determination. The Chief and the Deputy Chief of the SSEB[12] briefed the SSAC on the SSEB's findings and on the SSEB's consensus strengths and weaknesses of the offerors. Id. at 1476. Along with the SSEB consensus summary, the SSAC also reviewed the Source Selection Plan, the RFQ, offeror submissions, a summary table of the SSEB findings, and reports of non-governmental advisors. Id. Unlike the SSEB, the SSAC did not conduct individual evaluations, but rather produced a consensus evaluation on a form similar to that used by the SSEB, id. at 1032, and created a memorandum for the SSA that further explained its consensus evaluation of the proposals, id. at 1476. The form did not contain the correct text of Project Finance subfactor five. See supra note 9.

Although the SSEB consensus report did not include any comments regarding Forest City's guarantee, it is clear from the administrative record that Forest City's scope guarantee came to the attention of the SSAC. The SSAC noted Forest City's guarantee as a weakness under Project Finance subfactor five, "[v]alue would have been added if the offeror had established some typical parameters surrounding the guarantee maximum price contract, e.g. scope, time." AR 1039. The SSAC rated Forest City's proposal as "exceptional minus." Id. at 1032. The SSAC does not list any overall major weaknesses of Forest City's proposal in the area of Project Finance. Id. at 1033. The SSAC rated Forest City's proposal as "exceptional minus" for the area of Project Finance. Id. at 1034. The SSAC summarized the strengths of Forest City's proposal in the area of Project Finance as follows:

---

[12]The court understands the Chief and Deputy Chief of the SSEB to be the SSEB Chairperson, Sue Bobby, and Deputy Chairperson, Albert Williams, as listed in the administrative record under the source selection plan personnel list. AR 89.

1. Offeror adds value by documenting that the calculations for its Return On Equity (ROE) will be based on the distributable proceeds at the end of the cash waterfall, only after the Army first receives a [xxx] preferred return on the distributable cash from the project (p. 4 of 26 FP).
2. Offeror contributes equity at closing and accrues no return until the end of [xxx] year IDP.
3. Offeror documents the funding of the Capital Repair and Replacement (CRR) account to be [xxx] per non-historic units per year, [xxx] per historical unit per year, and [xxx] for GFOQ quarters per year. Offeror also identifies the annual repair and maintenance budget per unit will be [xxx] per year (p. 23 of 26 FP).

AR 1034. The SSAC summarized Forest City's major weaknesses in the area of Project Finance as follows:

> Offeror's Vertical Cost per Square Foot appears low. Value would have been added if the offeror more clearly demonstrated through specific example their ability to achieve this price in a manner that would maintain the architectural integrity of West Point.

Id.

Notwithstanding that the SSAC consensus evaluation form for Project Finance subfactor five does not include the question, "To what degree is the offeror guaranteeing scope and price?" id. at 1039, the SSAC noted as a weakness that Forest City could have provided more information regarding the parameters of its guarantee, id. The SSAC did not note any aspects of Forest City's guarantee as a strength.[13] Id. The SSAC identified

---

[13]The SSAC noted the following strengths of Forest City's proposal regarding Project Finance subfactor five:

1. Offeror adds value by documenting that the calculations for its Return On Equity (ROE) will be based on the distributable proceeds at the end of the cash waterfall, only after the Army first receives a [xxx] preferred return on the distributable cash from the project (p. 4 of 26 FP).
2. Offeror documents the funding of the Capital Repair and Replacement (CRR) account to be [xxx] per non-historic units per year, [xxx] per historical unit per year, and [xxx] for GFOQ quarters per year. Offeror

(continued...)

seven weaknesses in Forest City's proposal for subfactor five of Project Finance. Id. Weaknesses six and seven make it clear that the SSAC had focused specifically on plaintiff's scope guarantee, because these paragraphs deal directly with major features of the scope guarantee, in particular, the proposed loan of [xxx] million by Forest City Enterprises and the proposed GMP contracts with the Design-Builder. Id. The SSAC listed the following seven weaknesses:

1. Value would be added if offeror accounted for police and fire expenses. Although there is a monthly calculation, the figure was not included in the annual cash flow assumptions. Furthermore, if calculated annually, the required amount would be below the $328 per unit stated in the RFQ (pro forma).
2. Value would have been added if the offeror more clearly demonstrated how self-insurance is more beneficial to the project than insurance acquired competitively through the market place.
3. Value would have been added if the offeror clearly demonstrated why there is no conflict of interest in its dual roles as managing member and insurance provider.
4. Proposal is inconsistent in discussion of insurance coverage – [xxx] with [xxx] deductible vice [xxx] with [xxx] deductible (PF pg 20 of 26, Operations, Management & Maintenance Plan pg 12 of 12).
5. Offeror's Vertical Cost per Square Foot appears low. Value would have been added if the offeror more clearly demonstrated through specific example their ability to achieve this price in a manner that would maintain the architectural integrity of West Point.
6. The offeror did not demonstrate a substantive advantage associated with their proposed loan of up to [xxx] [million] which would have a senior position to any money accruing to the reinvestment account.
7. Value would have been added if the offeror had established some typical parameters surrounding the guaranteed maximum price contract, e.g. scope, time.

[13](...continued)

also identifies the annual repair and maintenance budget per unit will be [xxx] per year (p. 23 of 26 FP).

3. Offeror's on-line schedule and vacancy rate is aligned with its renovation schedule.

AR 1039.

AR 1039 (emphasis added). The SSAC did not address Forest City's scope guarantee in its discussion of Forest City's Preliminary Project Concept Statement. See id. at 1041-46.

The RFQ provides that "[t]he assessment of the SSAC shall be briefed to the [SSA] who will make the final analysis resulting in a recommendation to award. Id. at 320. The RFQ places responsibility on the SSA to make an "independent judgment": "While the SSA may use reports and assessments prepared by others, the source selection decision [for selection of a contractor] will represent the SSA's independent judgment." Id. In exercising that "independent judgment," the RFQ directs that the SSA will select the offer that "provides the best value to the Government." Id. at 323.

It is apparent that the SSA reviewed the memorandum from the SSAC because the SSA noted that he based his decision upon and adopted the analysis and conclusions of the report from the SSAC, finding "the analysis and conclusions within [the SSAC] report to be persuasive, to be supported by the facts and to be in harmony with the selection factors in the solicitation." Id. at 1491. The SSA stated that he "therefore adopt[ed] them in support of [his] decision." Id. The SSA also noted that "[f]ollowing examination of the materials, the representatives of the SSAC, the SSEB, and counsel convened with [him] on March 5, 2007 to answer any further questions and provide any additional clarifications prior to [his] decision." Id. Aside from the SSAC memorandum, id. at 1491, and the proposals, id. at 1493-98, the SSA does not specify which materials he examined. Id. at 1489-98. The SSA determined that "the proposal offered by GMH/CENTEX Military Communities, LLC provides the best overall value to satisfy the Government's needs." Id. at 1489 (emphasis omitted).

The SSA stated the following in his overall summary of the basis of his decision:

> Each offeror presented an achievable financing plan based upon his concept plan. Significantly, GMH asked for the lowest capped cash-on-cash return on its equity contribution showing initiative to support the goals of Army RCI. In the early years of the project, FCMC's fee structure results in the lowest fees payable with GMH a close second. In contrast, [the other offerors] seek additional reimbursement and contingency fees above stated fee schedules. GMH also presented a cost structure that most closely represented the Army's benchmark and offered a Guaranteed Maximum Price which provided great confidence in the viability of the proposal. . . . FCMC's very low new construction costs (in relation to the Army benchmark) created significant concern about the ability to deliver the robust proposed scope. In addition, FCMC assumes funding sources by relying on aggressive assumptions of interest earnings and by delaying scope – which

> reduces the benefit to soldiers. Operating expense assumptions from FCMC and [another offeror] differed most widely from the Army benchmark while the remaining three offerors were more closely aligned.
>
> FCMC offered a robust scope with the greatest number of new units. However, FCMC's low construction cost assumptions created doubt about the ability to deliver. In addition, by delaying significant scope delivery until the end of the IDP, FCMC further diminishes the value of its new unit plan. In addition, FCMC's large community center far exceeds any yet approved for an RCI project similarly sized to the West Point project and drains resources from housing units. . . . Overall, GMH presented a balanced master plan and scope. The plan, which includes new construction, renovations, conversions and units that are maintained, is well supported by its cost assumptions. Conversions include changing two-bedroom units to four-bedroom homes in the Band neighborhoods and the North and South Apartments. By retaining the historic character of the units slated for conversion, GMH enhances the units' marketability while not increasing scope uncertainty. Each offeror has partnered with the Army on previous installations. GMH and [another offeror] both have significantly more experience with the Army as partners. Overall, each offeror presented a credible team who could successfully create and implement the CDMP.
>
> . . . .
>
> While not the most robust scope, GMH's creative plan and very reasonable cost assumptions gave the proposal the highest overall credibility. Therefore, I find that GMH's proposal represents the best overall value.

Id. at 1492-93.

It is beyond doubt that plaintiff's scope guarantee did not emerge as a strength in the SSA's decision. However, plaintiff's scope guarantee was in fact evaluated by the SSEB, and the scope guarantee was put before the SSA, albeit in a negative light, by the SSAC. The single gap in documentation of Forest City's scope guarantee in the evaluation process is the omission of a comment on it in the SSEB consensus evaluation.

Plaintiff contends that its scope guarantee was not comprehensively evaluated because the evaluators used the wrong Project Finance evaluation form. Pl.'s Mot. 17-23. Plaintiff has complicated its argument that the wrong Project Finance evaluation form was used because plaintiff itself included its most detailed discussion of its price and scope

guarantee in the Preliminary Project Concept Statement section of its proposal. Notwithstanding plaintiff's contention, there is an absence of evidence that plaintiff was prejudiced by defendant's use of the wrong form. The individual members of the SSEB did in fact consider plaintiff's guarantee in their evaluations of plaintiff's proposal. AR 1097, 1119-20, 1169, 1186, 1227, 1252, 1278, 1306-07. Although the SSEB consensus report does not mention plaintiff's guarantee, id. at 1057-85, all of the individual SSEB evaluators commented on the guarantee, id. at 1097, 1119-20, 1169, 1186, 1227, 1278, 1306-07. There is no explanation in the administrative record of the selection of the SSEB consensus evaluation considerations and the source selection plan required none. Id. at 323. The individual SSEB members made a wide variety of comments on Forest City's Project Finance proposal, id. at 1097, 1119-20, 1169, 1186, 1227, 1278, 1306-07, and the court cannot say that the items chosen for the consensus evaluation were selected in a manner that was "arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); see NVT Techs., 370 F.3d at 1159. Furthermore, even in the absence of specific comments on the scope guarantee in the SSEB consensus evaluation, the SSAC memorandum to the SSA specifically states that the SSAC considered the offerors' proposals, along with the SSEB consensus report. AR 1476. In addition, the SSAC comments indicate that the SSAC considered and evaluated Forest City's scope and price guarantee, and even though the SSAC's comments are not positive, the SSAC comments deal directly with two major features of plaintiff's scope guarantee – the GMP contracts and the Forest City Enterprise loans. Id. at 1039. The court finds, based on the administrative record, that the use of the wrong Project Finance evaluation form did not result in an evaluation that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see NVT Techs., 370 F.3d at 1159.

2. Vertical Cost of Construction

Plaintiff makes two arguments regarding the impact of defendant's analysis of plaintiff's vertical cost of construction on the evaluation of plaintiff's proposal. Plaintiff argues that: 1) the Army's use of a "plug number" to calculate GMH's vertical cost of construction created an unfair assessment of GMH's proposal that prejudiced plaintiff; and 2) plaintiff's vertical cost of construction was unfairly evaluated because the Army did not view plaintiff's vertical cost of construction in light of plaintiff's scope and price guarantee. Pl.'s Reply 20.

Plaintiff argues that the Army's calculation of GMH's vertical square foot costs using a "plug number" resulted in a favorable view by the SSAC of GMH's construction costs, in particular, that "GMH's construction costs appear high in relation to the other bidders, but are very close to the benchmark developed by the Army during due diligence

preparation." Id. (citing AR 1478) (emphasis omitted). Plaintiff argues that this favorable comment is unwarranted because "GMH/Centex's construction costs of [xxx] million were for the renovation and new construction of only [xxx] units," while "Forest City's construction costs were approximately [xxx] million for the renovation and new construction of 628 units." Id. (citing AR 1918) (emphasis omitted). Plaintiff argues that the only reason GMH received a favorable evaluation of its vertical costs is because "the Army 'plugged' in the Army's 1,850 SF to calculate GMH's vertical cost," which resulted in GMH's vertical costs being "very close" to the Army's benchmark. Id. (emphasis omitted). Plaintiff argues that "[t]he SSAC did not conduct its own analysis," and instead "adopted the SSEB's 'plug numbers.'" Id. at 21 (emphasis omitted). Plaintiff argues that "[b]y using a 'plug number' and passing it off as a calculation from Jones Lang LaSalle . . . , the SSAC misled the SSA, who, in turn, adopted in full the SSAC findings and conclusions." Id. At oral argument, plaintiff clarified that its argument regarding the "plug number" was not that the "plug number" itself was an error, but instead that it was used "to . . . make misleading statements about the GMH's proposal to the source selection authority, who, in turn, adopted or parroted those comments." Oral Arg. Tr. 44:25 - 45:5.

Defendant explains that when the Army was unable "to locate the weighted average per square foot in GMH's proposal," it "'plugged' its own estimate of the weighted average square footage for all 'new construction' units and calculated that GMH's vertical cost per square foot was [xxx], compared to the Army's own cost estimate of $162.16 per square foot and Forest City's [xxx] per square foot claim." Def.'s Mot. 16 (citing AR 1894) (emphasis omitted).

Forest City plainly set forth its estimated vertical cost of construction, [xxx] per square foot, in the Preliminary Project Concept section of its proposal. AR 525; see also AR 497 (providing highlights of the Project Finance section of Forest City's proposal including a reference to its low vertical construction cost). Forest City states:

> In the New Jersey/New York market, K. Hovnanian Homes constructs the house plans FCMC is proposing for [xxx] [per square foot] (pure cost). When this number is grossed up for Davis-Bacon Act wages and the fixed profit and overhead FCMC has negotiated with them, the price rises to [xxx] [per square foot]. The remaining [xxx] [per square foot] to the [xxx] [per square foot] cost assumption in our construction budget is spent on the upgraded finish packages that will make the interiors of the homes just as inviting and pleasing to live in as the exteriors.

Id. at 525. Also, under the heading "highlights" in the Project Finance section of its proposal, Forest City describes its vertical cost of construction, but does not provide an

actual cost figure. Id. at 497. Forest City states that one of its Project Finance highlights is that:

> FCMC is able to propose a vertical construction cost that is almost [xxx] per square foot lower than RS Means estimate for the Hudson River Valley housing market and [xxx] less than the national average. Our assumption is based on construction costing data provided by K. Hovnanian, the 7th largest publicly traded homebuilder in the US. K. Hovnanian's New Jersey/Hudson Valley division has current construction cost information for the homes it is currently building in the market and FCMC's proposal is based on these costs. These are not estimates. These are the actual costs they are incurring today with this product in this market.

Id.

GMH's proposal does not expressly provide its vertical cost estimate. Id. at 713-73. On a Project Review chart, that the court understands to have been created by Jones Lang LaSalle America, Inc., which features a comparison of the proposed costs of Forest City and GMH, the Army baseline vertical cost is noted as $162.16 per square foot for each new unit. Id. at 1894. This chart notes that defendant's consultant, Jones Lang LaSalle was "unable to locate [square feet] for units." Id. The chart also indicates that a plug number for the total square feet, which is 1,850 average square feet per unit, was used to calculate GMH's vertical construction costs for its proposed new units. Id. Using the plug number, Jones Lang LaSalle calculated GMH's vertical costs to be [xxx]. Id. Based on the calculations of GMH's vertical cost with the "plug number," the SSA commented that "GMH . . . presented a cost structure that most closely represented the Army's benchmark." Id. at 1492.

The parties' briefing points out – correctly, the court believes – that the vertical cost can be calculated by determining the total weighted average square footage using the figures provided in GMH's proposal. Pl.'s Mot. 27; Def.'s Mot. 16; Def.-Int.'s Mot. 26. In briefing, defendant calculated GMH's vertical cost per square foot by using data from GMH's proposal and determined that GMH's vertical cost per weighted average square foot is [xxx].[14] Def.'s Mot. 17. Although the SSA evaluated GMH's proposal based on a

[14]Defendant calculated GMH's vertical cost per square foot by determining the total average square footage, or total square feet divided by the number of proposed new units. Def.'s Mot. 17. GMH proposed to construct [xxx] new units, AR 946, ranging in bedroom size and square footage. Id. The total square footage is [xxx]. See id. at 718, 721, 724, 946. Therefore, (continued...)

vertical cost per square foot calculated with a "plug number," GMH's actual vertical cost per square foot, [xxx], is very much closer to the Army benchmark of $162.16 than Forest City's vertical cost per square foot of [xxx]. The court does not perceive how plaintiff could have been prejudiced by the Army's use of a plug number for GMH's vertical cost because plaintiff cannot demonstrate that its own vertical cost per square foot more closely matched the Army's benchmark than either GMH's vertical cost calculated with the plug number or its actual vertical cost. Therefore, the court does not find support for plaintiff's argument that it was prejudiced by the Army's use of a "plug number" which allegedly misled the SSA about GMH's vertical costs.

Plaintiff also argues that the Army did not fairly evaluate Forest City's vertical cost in relation to Forest City's guarantee. Pl.'s Mot. 20 (arguing that "the SSAC's evaluation focused on what the SSA perceived as Forest City's 'very low cost of vertical construction' and stated that Forest City 'did not sufficiently demonstrate that this cost could be achieved'"). Plaintiff contends that "any concern over vertical cost would have been dismissed as baseless," id. at 21, had defendant comprehensively evaluated plaintiff's entire scope guarantee, id. at 19. Plaintiff argues that "the very wording of Forest City's 'Scope Guarantee' makes clear that all project costs are covered." Pl.'s Reply 36 (citing AR 525-28). Plaintiff cites two of the SSEB individual evaluations and contends that "[t]hese individual SSEB evaluations are the only evidence in the AR where the Army evaluated and considered the full scope and coverage of Forest City's financial guarantee." Id. at 37. Plaintiff argues that "[s]ince the SSA only relied upon the SSAC's 'Memorandum to Source Selection Authority,' and he fully adopted it in support of his decision, there is no evidence in the AR that the SSA was even aware of Forest City's financial guarantee, much less its scope and coverage." Id. (citations omitted). Plaintiff contends that "the source selection decision documentation lacks a rational basis." Id. at 38.

During oral argument, Forest City emphasized that the primary component of its guarantee was that it guaranteed [xxx] million through GMP contracts that "would cover all of the construction costs [and] all of the hard costs." Oral Arg. Tr. 17:20-23, 18:7 - 23:15. In its proposal, Forest City states that "[s]cope pricing will be guaranteed by

---

[14](...continued)
the weighted average square footage for GMH's new construction is [xxx] ([xxx] total square feet divided by [xxx] units). Def.'s Mot. 17. Next, defendant divided the total cost per unit by the weighted average to determine the average per square foot vertical cost. Id. GMH's total proposed new housing cost is [xxx]. AR 1900. For [xxx] units, the cost per unit is [xxx] ([xxx] divided by [xxx] units). Def.'s Mot. 17. GMH's average per square foot vertical cost is [xxx] ([xxx] divided by [xxx] square feet per unit). Id.

contracting for phases of work using Guaranteed Maximum Price (GMP) contracts. Costs above the GMP will be borne solely by the Design-Builder subject to standard force majeure terms." AR 526. It is not disputed that the guarantee covered project hard costs. Id. at 528 (chart showing costs included in [xxx] million).

The evaluators, however, were also concerned with the architectural integrity of the West Point environment. Id. at 1039, 1492. The SSAC stated that one of Forest City's weaknesses under Project Finance subfactor five is that, "[o]fferor's Vertical Cost per Square Foot appears low. Value would have been added if the offeror more clearly demonstrated through specific example their ability to achieve this price in a manner that would maintain the architectural integrity of West Point." Id. at 1039. Forest City's proposal does not address the issue. Rather, Forest City states that its vertical cost estimate is

> based on construction costing data provided by K. Hovnanian, the 7th largest publicly traded homebuilder in the US. K. Hovnanian's New Jersey/Hudson Valley division has current construction cost information for the homes it is currently building in the market and FCMC's proposal is based on these costs. These are not estimates. These are the actual costs they are incurring today with this product in this market.

Id. at 497.

The SSAC's comment regarding Forest City's low vertical cost makes clear that the evaluators were concerned with Forest City's ability to maintain architectural integrity at its projected cost, not with whether Forest City would be able to support the low vertical cost generally. Forest City's scope guarantee does not address the evaluators' apparent concern about Forest City's sensitivity to architectural integrity. It is easy to understand how Forest City's focus on new homes unconnected to an historic environment could have been viewed as signaling difficulty ahead in project implementation. As the administrative record makes clear, plaintiff's argument that the evaluators' concerns regarding a low vertical cost should have been alleviated by Forest City's scope guarantee is misplaced because it does not address the issue of apparent concern to the evaluators.

3. Consideration of GMH's "No Work" Units

Plaintiff argues that "the Army failed to enforce the material requirements of the RFQ by accepting and selecting GMH on significantly different requirements than those required of the other offerors." Pl.'s Mot. 23. Plaintiff contends that GMH failed to comply with material requirements because the West Point RFQ required the new

construction and renovation of 628 housing units and GMH's proposal "provided for the new construction/renovation of only [xxx] units." Id. at 24. Plaintiff contends that GMH's proposal does not conform to the RFQ because GMH did not expect to renovate or reconstruct [xxx] units, which plaintiff characterizes as "no work" units. Id. Plaintiff argues that "the Army should have rejected GMH's nonconforming proposal," or, that the Army should have "amend[ed] the Solicitation and afford[ed] all offerors in the competitive range an opportunity to respond to the revised requirements." Id.

Defendant replies that the RFQ did not preclude the possibility that renovation and new construction could begin beyond [xxx] years from the start of project. Def.'s Mot. 14. Defendant notes that "[t]he RFQ provides that, in exchange for a 50-year conveyance of family housing units, 'the partner will provide for the new construction/renovation, operation, management and maintenance of the existing family housing inventory." Id. (citing AR 147). Defendant points out that there is no language in the RFQ that indicates that GMH's proposal of renovating [xxx] units in the [xxx] year of the project is prohibited. Id. Defendant also argues that the description of the [xxx] units as "no work" units is inaccurate because GMH, in fact, proposed that it would perform maintenance work on the [xxx] units during the first [xxx] years of the project. Id. at 15. Defendant notes that the SSA was aware "of this aspect of GMH's proposal: the SSA specifically referenced that aspect of GMH's proposal." Id. (citing AR 1496). In particular, the SSA noted that, "During the five[-]year initial development period[,] GMH plans to deliver [xxx] new units, to renovate [xxx] units, to convert [xxx] antiquated historic units into [xxx] more modern, yet still historic homes, and to perform no work on [xxx] units." AR 1496 (making clear that the concept of "no work" on certain units, even if imprecise, was not a subject of concern to the SSA).

On the basis of the administrative record, the court agrees with defendant that the RFQ does not preclude GMH's proposal to complete work on [xxx] units in the [xxx] year of the project. The RFQ originally required that "[a]ll dwelling units shall reach an adequate condition within 10 years of transfer of housing privatization operations to the partner." Id. at 361 (RFQ, Appendix B, Site Description and Economics of the Region); see also id. at 295 (details of the CDMP development plan in the RFQ also stating that the dwelling units must reach an adequate condition within 10 years of the start of the project). On September 22, 2006, however, Appendix B was amended to provide that "[a]ll dwelling units will be in adequate condition within [sic] for transfer to the partner." Id. at 145 (emphasis added). The "transfer" is contemplated to occur within 90 days of acceptance of the best value offeror's CDMP. Id. at 299. Notwithstanding the challenging grammar (it appears to the court that the word "within" remained in the sentence as a result of an obvious scrivener's error), the court understands this amendment to mean that there is no longer any time restriction within which any particular dwelling unit must reach

an adequate condition or any requirement that any particular dwelling unit be worked on during the initial development phase. See Oral Arg. Tr. 46:7 - 47:8. Moreover, the characterization of the [xxx] units as "no work" units means only that GMH did not propose to renovate or reconstruct the units until the [xxx] year. AR 735. GMH proposed to conduct maintenance work on these units. Id. at 745-52. The court does not find support in the administrative record for plaintiff's argument that GMH's [xxx] "no work" units are prohibited by the RFQ.

Plaintiff argues, in the alternative, that even if the RFQ does permit "no work" units, the SSEB, SSAC, and the SSA should have found that GMH's proposal of not working "on [xxx] of the units until the [xxx] year [is] a significant weakness in both the Project Finance or [sic] Preliminary Project Concept Statement factors." Pl.'s Mot. 25 (emphasis omitted). Plaintiff argues that "[h]ad the Army properly assessed GMH/Centex's proposal, it would have significantly downgraded both the Project Finance evaluation factor and its 'Overall Evaluation' rating, thereby rendering GMH/Centex's [proposal] improper." Id. at 26 (emphasis omitted); Pl.'s Reply 17-19. Plaintiff points, Pl.'s Reply 18, to RFQ Project Finance subfactor six, which requires the evaluators to determine whether the offeror identifies the "appropriate amounts of equity, detail sources, and outline[s] a plan for limiting its return on equity," AR 113. Plaintiff argues that the evaluators should have identified a weakness in GMH's proposal because "GMH/Centex [proposed to] generat[e] rental revenue for the [xxx] units for a period of [xxx] years without any corresponding outlay of capital." Pl.'s Reply 19.

In the Preliminary Project Concept Statement section of its proposal, GMH indicates that it will not begin work on [xxx] units until the [xxx] year of the project in a chart specifying what work GMH will complete during the secondary development period, years 6-50, of the project. AR 735. GMH also states that "[its] development plan ensures that [it] will bring the existing housing inventory to a condition that exceeds 'adequate' well within 5 years of transfer plus [it] will ensure that [their] operations and maintenance team will maintain the housing inventory in a superior fashion throughout the balance of the fifty (50) year project period." Id. In the Project Finance section of its proposal, GMH includes a chart with the work it proposes to complete during the initial development period. Id. at 755. In the Initial Development Period chart, GMH proposes that "No Immediate Work [is] Required" for [xxx] units during the initial development period. Id. Defendant indicated that "no work" means that no new construction, renovations, replacement, or demolition will be done to the [xxx] units, but they will be maintained. Id. at 735, 755. GMH states that it "will provide an integrated and comprehensive professional and responsive maintenance program - 24 hours a day, 7 days a week and maintain the communities to the highest levels." Id. at 745. Nowhere in its description of

its maintenance plan does GMH indicate that the [xxx] units are excluded from maintenance. Id. at 745-52.

There are no comments in the strengths or weaknesses sections of the SSEB consensus report regarding GMH's proposal with respect to the [xxx] units. Id. at 1342-57. The "summary data" section of the SSAC consensus report makes it clear that the SSAC had noted this aspect of GMH's proposal: "The offeror demolishes [xxx] units, constructs [xxx] new units, renovates [xxx] units, and converts [xxx] units and no work [xxx] units during the [xxx] year IDP. (Concept; Finance)." Id. at 1327. The SSAC does not include any comments in the strengths and weaknesses sections of its consensus report regarding GMH's proposal with respect to the [xxx] units. Id. at 1327-41. The SSAC also included a statement about GMH's proposed construction in its memorandum to the SSA. Id. at 1478. The SSAC was generous in its praise of GMH's development plan and evidenced absolutely no concern about the noted "no work" units:

> GMH proposed a five-year development plan in which they envision hard costs of [xxx] [million], supported by [xxx] [million] in private debt. During the initial development period they provide [xxx] new units, renovate [xxx] units, convert [xxx] antiquated historic units into [xxx] more modern, yet still historic homes, and perform no work on [xxx] units. GMH proposes [xxx] for the renovation of GFOQ Quarters 100 and an additional [xxx] each for GFOQ Quarters 101 and 102, indicating an understanding of the historical emphasis that the Army places on these structures. They further demonstrate their dedication to documentation and preservation of historic structures through their proposal to use the web-based Integrated Resource Management System as a resource tool to catalog the detailed treatment guidelines for the historic homes. GMH makes significant use of conversions as they plan to transform the Band housing area from [xxx] to [xxx] homes and to convert North and South Apartments into [xxx]. GMH's construction costs appear high in relation to the other bidders, but are very close to the benchmark developed by the Army during due diligence preparation. GMH demonstrates an excellent approach to master planning the entire community and addressing other constraints that may impact the project. The SSAC found that GMH satisfied all installation goals as outlined in the RFQ. One new community center and renovation of an existing community center will be provided to promote resident activities outside the home. As noted in the finance section . . ., GMH has never had to restructure or "down scope" an RCI project after assuming operations and this fact was deemed very significant by both the SSEB and the SSAC. No significant weaknesses were found in the Preliminary Concept proposed by

> GMH. SSAC confirmed the SSEB's finding that the Preliminary Concept is appropriately rated as [exceptional].

Id. (first emphasis added; second emphasis omitted). The SSA, who adopted the SSAC's memorandum as part of his findings, also included a highly favorable statement about GMH's construction proposal, noting the "no work" units. Id. at 1496-97.

> During the five year initial development period GMH plans to deliver [xxx] new units, to renovate [xxx] units, to convert [xxx] antiquated historic units into [xxx] more modern, yet still historic homes, and to perform no work on [xxx] units. GMH proposes [xxx] for the renovation of GFOQ Quarters 100 and an additional [xxx] each for GFOQ Quarters 101 and 102, indicating an understanding of the historical emphasis that the Army places on these structures. GMH demonstrates dedication to documentation and preservation of historic structures through the proposal to use the web-based Integrated Resource Management System as a resource tool to catalog the detailed treatment guidelines for the historic homes. GMH makes significant use of unit conversions to transform the Band housing area from [xxx] to [xxx] homes and to convert the North and South Apartments into [xxx]. GMH demonstrates an excellent approach to master planning the entire community and addressing other constraints that may impact the project. One new community center and renovation of an existing community center will be provided to promote resident activities outside the home.

Id. (emphasis added).

During oral argument, defendant pointed out that the administrative record, in particular the RFQ, contains information that further supports the reasonableness of an offer proposing no renovation work on certain units, because certain units had been recently renovated. Oral Arg. Tr. 50:18 - 51:18. The RFQ states that "56 multi-family units constructed in 1949 [were] extensively renovated in 2003" at the "Old Brick" housing area and that "156 duplex and triplex units constructed in 1962 [were] extensively renovated between 2003 and 2006" at the "New Brick" housing area. AR 377. GMH proposed that "no work [was] required" for [xxx] units in the New Brick housing area for junior enlisted families, id. at 718, and for [xxx] units in New Brick housing for "company grade officer homes," id. at 719. For the junior enlisted family homes in New Brick, GMH explained that:

> These units were recently renovated to meet the needs of Field Grade Officers; however, we will redesignate [xxx] units for junior enlisted personnel. Although funds are currently not specifically allocated to these units, during the CDMP we will complete a thorough assessment how these units may be further enhanced using Rapid Enhancement Funds. The units will be continuously maintained to ensure the highest quality for any resident.

Id. at 718.

With regard to the [xxx] company grade officer homes, GMH similarly stated:

> These units were recently renovated and will be transferred to GMH in an "as-is" condition. During CDMP we will complete a thorough assessment how these unit[s] may be further enhanced using Rapid Enhancement Funds. The units will be continuously maintained to ensure the highest quality for any resident.

Id. at 720.

It is clear that the Army was aware of GMH's plan to perform no renovation work on [xxx] units during the initial development period. See AR 1478, 1496. GMH also made it clear that it did not intend to work on some units because of recent renovation. Therefore, it is reasonable that the Army would not view GMH's proposal to perform no renovation on some of the units as a weakness. The administrative record does not support plaintiff's argument that defendant committed a prejudicial error when it failed to penalize GMH for proposing no renovations of [xxx] units until the [xxx] year of the project.

4. Past Performance

Plaintiff also argues that "the SSAC and SSA evaluated and extolled GMH/Centex's guarantee, thereby unjustly inflating GMH proposal evaluation which, in turn, improperly positioned GMH for award." Pl.'s Mot. 21-22. Plaintiff argues that GMH should not have received favorable ratings from the SSAC because "it failed to disclose to the SSA that: (i) the proposed guarantee was limited [xxx]; (ii) the Centex Guaranteed Maximum Price guarantee covered only [xxx] million of the [xxx] million projected costs or only [xxx]; (iii) none of GMH's [xxx] were guaranteed, and (iv) none of the [xxx] were covered by its guarantee." Pl.'s Reply 38-39 (emphases omitted). Plaintiff contends that, based on the SSAC's favorable comments on GMH's proposal, "it is evident SSAC relied not upon the guarantee proposed in the GMH/Centex proposal, but

rather . . . relied upon GMH's past performance on other projects." Id. at 39. Plaintiff also argues that "Past Performance" is an evaluation criterion only for the factor of "Organizational Capabilities," and not for "Project Finance." Oral Arg. Tr. 28:25 - 30:22. Plaintiff argues that it "suffered competitive prejudice as a result of the Army's flawed and careless evaluation of its proposal." Pl.'s Reply 39 (citing Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996)).[15]

Plaintiff is correct that "past performance" is not a specific evaluation subfactor under Project Finance. However, the RFQ provides that, in addition to the four Step 2 evaluation factors, past performance of the offerors will also be assessed. AR 320. In fact, past performance is viewed as an integral part of the best value determination. Id. In section 4.6(c) Evaluation Factors, the RFQ states the following:

> The assessment of Past Performance will be used in making the 'Best Value' selection. Past Performance enable [t]he Army to better predict the quality of, and customer satisfaction with, future work. The developer in this initiative must deliver the same high quality of service to [t]he Army as it delivers to its best private sector customers. The emphasis placed on past performance demonstrates [t]he Army's commitment to select the offeror that will accomplish, at a minimum, what was presented in the RFQ response and negotiated during the CDMP for the entire term of the project. Accordingly, offerors will be required to submit project past performance information as stated in Section 4.3.4. and Section 4.4.3.

Id. Section 4.3.4 describes past performance as an evaluation factor in the Step 1 evaluation process. Id. at 312. Past performance appears in the Step 2 evaluation process in Section 4.4.3 under the evaluation factor, Organization Capabilities. Id. at 317-18. Section 4.4.3 requires offerors to submit names and contact information for "all MHPI type projects for all military services that offeror is currently involved in even if offeror is not the lead on that project." Id.

---

[15]In Statistica, Inc. v. Christopher, 102 F.3d 1577 (Fed. Cir. 1996), the plaintiff appealed from the General Services Administration Board of Contract Appeals decision denying its protest under the (now-repealed) Brooks Automatic Data Processing Act, 40 U.S.C. § 759. Statistica, 102 F.3d at 1580. The plaintiff in Statistica failed to satisfy its duty to seek clarification from the government regarding the solicitation requirements and it failed persuade the court that it was prejudiced by any alleged errors of the evaluators in the selection process. Statistica, 102 F.3d at 1582-83. It is not clear to the court how the Statistica case supports this or any other aspect of plaintiff's argument.

The SSEB consensus report notes as a strength under the Project Finance factor, GMH's past performance: "Offeror states it has never had to adjust scope of a RCI project after assuming operations (ES p. 1)."[16] Id. at 1344.

Similarly, the SSAC lists GMH's track record as a major strength of GMH's proposal under the Project Finance factor: "Offeror states it has never had to adjust scope of a RCI project after assuming operations (ES p.1)." Id. at 1329 (emphasis added). The SSAC does not list any major weaknesses of GMH's proposal under the Project Finance factor. Id. In its memorandum to the SSA, the SSAC elevates GMH's track record to a place of the highest significance:

> GMH proposes very competitive fees that are significantly incentivized, and a modest cash on cash equity return of [xxx] with no portion preferred (they are the only developer to propose such a low return on equity). They have proposed a Rapid Enhancement Fund of [xxx] to facilitate quality of life enhancement during the first six months of the project and will also place [xxx] in a Backlog of Maintenance and Repair (BMAR) account to address immediate deficiencies in the housing units. Most significantly GMH provides a Guaranteed Maximum Price Contract for their projects and have never had to adjust scope on an RCI project after assuming operations. They SSAC felt that GMH's past performance is a testament to their ability to accurately estimate project costs and deliver a quality product at competitive prices.

Id. at 1478 (emphasis added).

While the SSEB and SSAC evaluation comments demonstrate that defendant placed high importance on GMH's past performance in relation to the Project Finance element of its proposal, that importance was anticipated by section 4.6 of the RFQ. Id. at 320. It is clear from a review of the SSA's summary determination titled "Rationale for Business Judgments and Tradeoffs" that past performance was only one of many factors in the best value determination. Id. at 1491-93. The highlights of the trade-off analysis included the following excerpts which touch on financing, cost structure, master planning, historic preservation, and small business utilization:

> Significantly, GMH asked for the lowest capped cash-on-cash return on its equity contribution showing initiative to support the goals of Army RCI. . . .

---

[16]The court understands that the citation "ES" refers to the Executive Summary portion of GMH's proposal. AR 710-11.

> GMH also presented a cost structure that most closely represented the Army's benchmark and offered a Guaranteed Maximum Price which provided great confidence in the viability of the proposal.
>
> . . . .
>
> Overall, GMH presented a balanced master plan and scope. The plan, which includes new construction, renovations, conversions, and units that are maintained, is well supported by its cost assumptions. . . . By retaining the historic character of the units slated for conversion, GMH enhances the units' marketability while not increasing scope uncertainty.
>
> . . . .
>
> GMH and [another offeror] made the most persuasive small business presentation. GMH described a very proactive small business plan that included specific contractual obligations in subcontracts over $500,000 and active review of subcontracts over $100,000 for small business goals.
>
> . . . .
>
> While not the most robust scope, GMH's creative plan and very reasonable cost assumptions gave the proposal the highest overall credibility. Therefore, I find that GMH's proposal represents the best overall value.

Id. at 1492-93. Past performance makes only a brief appearance in two sentences: "Each offeror has partnered with the Army on previous installations. GMH and [another offeror] both have significantly more experience with the Army as partners." Id. at 1493.

Plaintiff argued that past performance, as an evaluation factor, is "allowed only to the extent in consideration of organizational capabilities." Oral Arg. Tr. 29:3 - 30:22. The court disagrees. The first sentence of section 4.6(c) of the RFQ, clearly indicates that past performance shall be assessed in making the best value determination, without limiting this assessment to any one of the four Step 2 evaluation factors. Nothing in the balance of section 4.6(c) indicates that past performance shall be limited to the Organization Capabilities factor. The last sentence of section 4.6(c) instructs offerors to submit project past performance information pursuant to the section in the RFQ that describes the Organizational Capabilities factor. AR 320. A reasonable interpretation of section 4.6(c) is that past performance is an overall evaluation consideration that the SSA will use in making its best value determination. The use by the Army of GMH's past performance

evaluation as shown in the administrative record does not appear to the court to be in any way "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see NVT Techs., 370 F.3d at 1159.

5. Plaintiff's Late-Appearing Arguments

In its reply, plaintiff raises two arguments, not included in the initial counts in its Complaint and Motion for Preliminary Injunction, that the SSAC misled the SSA with regard to Forest City's proposal regarding Forest City's proposed home delivery schedule and the proposed size of its community center. Pl.'s Reply 21-23. Plaintiff argues that "the SSAC's report misled the SSA into concluding [that] Forest City's new home construction schedule was unacceptable." Id. at 21 (capitals in original). Plaintiff bases its argument on the following excerpt from the SSAC's memorandum to the SSA:

> The five year initial development period will consist of new construction of [xxx] single family homes and renovation [xxx] homes, the most new construction of any of the bidders. Unfortunately the majority of the new homes are not scheduled for delivery until the [xxx] year of [the] project, with an average of only [xxx] units per year delivered the first four years of the project and [xxx] units delivered the last [xxx] months of the project. . . . The evaluators believed that the soldier would be better served if [Forest City] focused more on improving the homes in a timely manner and less on the ancillary facilities and retail opportunities.

AR 1481 (emphasis added); see Pl.'s Reply 21. Plaintiff contends that the SSAC and the SSA failed to evaluate and consider the following:

- The Army Baseline only envisioned 59 new homes - Forest City is providing [xxx] new homes to the military families at West Point.
- GMH proposed to provide [xxx] new homes, compared to Forest City's [xxx] homes.
- Under the Army Baseline, its 59 units are delivered by the end of the 36th month - Forest City will be delivering [xxx] units in the same timeframe.
- GMH proposes to deliver its [xxx] new units by the end of the [xxx] month - Forest City will deliver [xxx] new units by the end of the [xxx] month - only [xxx] fewer homes, with the balance delivered in months [xxx].
- Forest City would deliver the last of its [xxx] homes at the end of its project IDP of [xxx] months - GMH/Centex will not begin to make

capital improvements on its [xxx] "no work" units for another [xxx] years.

- Forest City's demolition, construction and delivery of new homes at the end of its [xxx] month IDP consist of [xxx] units in the "New Brick" housing area. Yet GMH/Centex identifies these 156 units as part of its [xxx] "no work" units that do not receive capital improvements for the first [xxx] years of the project. Forest City was criticized; GMH/Centex was not.

Pl.'s Reply 22 (emphasis and citations omitted).

First, the court notes that the SSA indicated that he examined the materials before him and chose to adopt the SSAC's findings in the SSAC memorandum because he found them to be supported by the facts. AR 1491. Plaintiff's argument that the SSA failed to evaluate Forest City's proposal regarding home delivery in relation to GMH's delivery plan, without more explanation of what exactly the SSA failed to evaluate regarding Forest City's proposal, is unavailing. Plaintiff's argument indicates its high degree of dissatisfaction with how the SSAC and the SSA viewed its proposal rather than any specific charge of wrongdoing in the evaluation process or even that the SSAC's comment regarding Forest City's proposed home delivery schedule is incorrect. Plaintiff admits that "[i]t is accurate to state that Forest City does not contemplate delivery of the last of its [xxx] homes until the [xxx] month." Pl.'s Facts ¶ 77. As noted above in Part II.C.3, the Army amended the RFQ to eliminate a time frame in which the housing units must reach an adequate condition. AR 145. However, it is not unreasonable that the Army would prefer that the housing units be delivered sooner rather than later. Moreover, Forest City's schedule for delivery of new homes differs from GMH's proposal to delay renovation work on [xxx] units that underwent recent renovation and are therefore already in an improved condition. Nowhere does the SSAC indicate that Forest City's proposal is rendered "unacceptable" because of the delivery schedule. It was the SSAC's view that Forest City's delivery schedule was unfortunate. Id. at 1481. The SSAC's role is to provide its "assessment" to the SSA. Id. at 320, 323. To "assess" is "[t]o determine the value, significance, or extent of; appraise." American Heritage Dictionary 108 (4th ed. 2000). The fact that plaintiff disagrees with the assessment does not render the SSAC's assessment misleading.

Plaintiff also argues that "the SSAC's report misled the SSA into concluding that the proposed community center [in Forest City's proposal] would be too large." Pl.'s Reply 22 (capitals in original). Plaintiff bases its argument on the following excerpt from the SSAC consensus report on Forest City's proposal and the Preliminary Project Concept Statement factor: "The size of the proposed Stony Lonesome Community center ([xxx] sf)

and the accompanying amenities is excessive especially for a 628-unit project. Value would have been added if ancillary facilities were more appropriately sized." AR 1041. Plaintiff contends that "[t]he RFQ did not identify a 'maximum' size for a community center, and there is no evidence in the AR which establishes an 'industry standard,' or even a 'Government standard' for the relative size of a community center." Pl.'s Reply 23. Plaintiff, however, does not dispute that the size of the Stony Lonesome community center was incorrectly understood. Plaintiff also does not allege any wrongdoing or violation of the RFQ by the evaluators regarding the evaluation of its community center. Rather, the court views plaintiff's argument about the SSA being misled by the SSAC as a disagreement by plaintiff with the lack of favor with which the SSAC and SSA viewed Forest City's proposed community center. Plaintiff has not demonstrated that the SSA's decision to select GMH's proposal over plaintiff's proposal is rendered arbitrary or capricious because of defendant's preference for a smaller community center rather than plaintiff's proposed larger center.

The court does not find support in the administrative record for plaintiff's arguments that plaintiff's proposal was treated in a manner that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); see NVT Techs., 370 F.3d at 1159, as a result of the SSAC's evaluation of its home delivery schedule as unfortunate, or the size of its community center as "excessive."

III. Injunctive Relief

The court finds that plaintiff's claims of prejudicial errors in the procurement process are not supported by the administrative record. Because plaintiff does not prevail on the merits, the court does not further address plaintiff's requests for injunctive relief. Info. Tech. & Applications Corp. v. United States, 51 Fed. Cl. 340, 357 n.32 (2001), aff'd, 316 F.3d 1312 (Fed. Cir. 2003) ("Absent success on the merits, the other factors are irrelevant.").

IV. Conclusion

For the foregoing reasons, plaintiff's Motion is DENIED and defendant's and defendant-intervenor's motions are GRANTED. The Clerk of the Court shall enter judgment for defendant. No costs.

IT IS SO ORDERED.

s/Emily C. Hewitt
EMILY C. HEWITT

Judge